Peter Anderson, Esq., Cal. Bar No. 88891
    peteranderson@dwt.com
Sean M. Sullivan, Esq., Cal. Bar No. 229104
    seansullivan@dwt.com
Eric H. Lamm, Esq., Cal. Bar No. 324153
    ericlamm@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Tel: (213) 633-6800
Fax: (213) 633-6899

Attorney for Plaintiff
CHER, Individually and as
Trustee of The Veritas Trust

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>                     Plaintiff,<br><br>    v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>                Defendants. | Case No. 2:21-CV-08157 JAK (RAOx)<br><br>PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS<br><br>Date:      April 11, 2022<br>Time:     8:30 a.m.<br><br>Courtroom of the Honorable<br>John A. Kronstadt<br>United States District Judge |

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

1.   INTRODUCTION ............................................................................................. 1

    (a)   Summary of Argument.................................................................... 1

    (b)   Summary of Facts........................................................................... 2

        (1)   In 1978, Cher and Sonny Bono Execute the MSA ...................... 2

        (2)   Ms. Bono and the Other Heirs Assume Sonny's Ongoing Rights and Obligations Under the MSA ........................................ 3

        (3)   The Heirs Issue Their 2016 Notice of Termination to Various Music Publishing Companies—and Not to Cher........................ 3

        (4)   Five Years Later, Ms. Bono Takes the Position that the Termination Notice Terminates Cher's Rights Under the MSA .. 4

2.   MS. BONO'S MOTION TO DISMISS SHOULD BE DENIED IN ITS ENTIRETY ........................................................................................................ 4

    (a)   The Rule 12(b)(6) Standards ......................................................... 4

    (b)   Cher Has Stated a Claim for Declaratory Relief .......................... 5

    (c)   Ms. Bono's Section 304(c) Termination Notice Does Not Purport to, and Cannot, Terminate Cher's Rights ........................ 6

        (1)   Section 304(c) Provides for Termination of Only Certain Grants, and Only Certain Rights Under Those Grants ................. 6

        (2)   Ms. Bono's Notice Purports to Terminate Only Certain Grants to Music Publishers and Does Not Even Mention the MSA ........ 7

        (3)   Cher's Right to 50% of the Royalties and Right of Approval Are Not Terminable Under Section 304(c)................................... 9

            i.   Section 304(c) Provides for Termination Only of Rights that Arise Under the Copyright Act Only, Not State Law . 9

            ii.   The MSA is an Assignment of State-Law Rights ............. 9

        (4)   The MSA is Not an "Agreement To The Contrary".................. 12

        (5)   The MSA is Binding on Ms. Bono and Sonny's Other Heirs .... 13

        (6)   Ms. Bono's Arguments Regarding Preemption and Federal Supremacy Fail in Light of Section 304(c)'s Express Terms..... 14

i

     i.  Express Preemption Under Section 301 Does Not Bar Cher's Claim for Declaratory Relief ................................ 14

        a.  Cher's First Claim for Declaratory Relief Is Not a State Claim Preempted by Section 301 ................. 14

        b.  Neither Are the State-Law Rights Raised by Cher Preempted by Section 301 ...................................... 15

     ii.  There is No Conflict Between State and Federal Laws in this Case ............................................................................ 17

     iii.  *Marriage of Worth* and *Rodrigue* Are Not Relevant ........ 19

   (d)  Cher Has Stated a Claim for Breach of Contract ................................ 20

3.  CONCLUSION ........................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altera Corp. v. Clear Logic, Inc.*,
  424 F.3d 1079 (9th Cir. 2005) ..............................................................21

*Amelco Electric v. City of Thousand Oaks*,
  27 Cal. 4th 228 (2002) .........................................................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................5

*Broadcast Music, Inc. v. Hirsch*,
  104 F.3d 1163 (9th Cir. 1997) .........................................................10, 11

*Brown-Thomas v. Hynie*,
  441 F. Supp. 3d 180 (D.S.C. 2019)........................................................15

*Central Valley Gen. Hosp. v. Smith*,
  162 Cal. App. 4th 501 (2008) ................................................................20

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ...........................................................12, 13

*Close v. Sotheby's, Inc.*,
  894 F.3d 1061 (9th Cir. 2018) ...............................................................14

*Craigslist Inc. v. 3Taps Inc.*,
  942 F. Supp. 2d 962 (N.D. Cal. 2013) ...................................................21

*Dead Kennedys v. Biafra*,
  37 F. Supp. 2d 1151 (N.D. Cal. 1999) .............................................16, 21

*Doc's Dream, LLC v. Dolores Press, Inc.*,
  959 F.3d 357 (9th Cir. 2020) .................................................................15

*Downing v. Abercrombie & Fitch*,
  265 F.3d 994 (9th Cir. 2001) .................................................................16

iii

*Durgom v. Janowiak*,
  74 Cal. App. 4th 178 (1999) ........................................................ 10

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982)................................................................... 17

*Grosso v. Miramax Film Corp.*,
  383 F.3d 965 (9th Cir. 2004) ...................................................... 16

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*,
  896 F.2d 1542 (9th Cir. 1989) ...................................................... 5

*In re Jackson*,
  972 F.3d 25 (2d Cir. 2020)......................................................... 14

*Laws v. Sony Music Ent., Inc.*,
  448 F.3d 1134 (9th Cir. 2006) .................................................... 16

*Malinowski v. Playboy Enterprises, Inc.*,
  706 F. Supp. 611 (N.D. Ill. 1989) ............................................... 10

*In re Marriage of Worth*,
  195 Cal. App. 3d 768 (1987) ...................................................... 19

*Marvel Characters, Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002)................................................... 12, 13

*Mills Music, Inc. v. Snyder*,
  469 U.S. 153 (1985)................................................................ 6, 18

*Milne ex rel. Coyne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) ...................................................... 8

*Montz v. Pilgrim Films & Television, Inc.*,
  649 F.3d 975 (9th Cir. 2011) ....................................... 14, 15, 16, 17, 21

*Oddo v. Ries*,
  743 F.2d 630 (9th Cir. 1984) ...................................................... 11

*Peer Intern. Corp. v. Pausa Records, Inc.*,
  909 F.2d 1332 (9th Cir. 1990) .................................................... 10

*Penguin Group (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008)......................................................... 6

iv

*Reilly v. Wozniak,*
   No. CV-18-03775, 2020 WL 1033156 (D. Ariz. Mar. 3, 2020) ........................... 15

*Rey v. Lafferty,*
   990 F.2d 1379 (1st Cir. 1993) ........................................................................ 11, 16

*Rodrigue v. Rodrigue,*
   218 F.3d 432 (5th Cir. 2000) ............................................................... 9, 10, 17, 19

*Ryan v. Editions Ltd. West, Inc.,*
   786 F.3d 754 (9th Cir. 2015) ........................................................................ 14, 21

*Shloss v. Sweeney,*
   515 F. Supp. 2d 1068 (N.D. Cal. 2007) ................................................................. 6

*Silvers v. Sony Pictures Ent., Inc.,*
   402 F.3d 881 (9th Cir. 2005) ................................................................................. 9

*Societe de Conditionnement en Aluminium v. Hunter Engineering Co.,*
   655 F.2d 938 (9th Cir. 1981) ................................................................................. 5

*Standard Ins. Co. v. Saklad,*
   127 F.3d 1179 (9th Cir. 1997) ............................................................................. 15

*Stewart v. Abend,*
   495 U.S. 207 (1990) ............................................................................................. 12

*Sybersound Records, Inc. v. UAV Corp.,*
   517 F.3d 1137 (9th Cir. 2008) ............................................................................. 15

*U.S. v. Atlantic Research Corp.,*
   551 U.S. 128 (2007) ............................................................................................. 13

*Waite v. UMG Recordings, Inc.,*
   450 F. Supp. 3d 430 (S.D.N.Y. 2020) ................................................................ 6, 8

*Wolfe v. United Artists Corp.,*
   583 F. Supp. 52 (E.D. Pa. 1983) ......................................................................... 10

*Worth v. Universal Pictures, Inc.,*
   5 F. Supp. 2d 816 (C.D. Cal. 1997) ............................................................... 17, 19

*Yount v. Acuff Rose-Opryland,*
   103 F.3d 830 (9th Cir. 1996) ............................................................................... 10

**Statutes**

17 U.S.C.
    § 101 ............................................................................................................... 11
    § 102 ......................................................................................................... 15, 16
    § 103 ......................................................................................................... 15, 16
    § 106 ............................................................................................. 9, 11, 19, 21
    § 115 ............................................................................................................... 10
    § 115(a) ........................................................................................................... 10
    § 203 ................................................................................................................. 8
    § 203(a) ......................................................................................................... 6, 8
    § 203(b) ........................................................................................................... 18
    § 301 ....................................................................................... 14, 15, 16, 17
    § 301(a) ........................................................................................................... 14
    § 301(b)(3) ........................................................................................................ 9
    § 304 ................................................................................................................. 8
    § 304(c) ................................................................... 1, 3, 6, 7, 8, 9, 11, 14, 17, 20
    § 304(c)(1)-(4) ................................................................................................. 6
    § 304(c)(3) ........................................................................................................ 4
    § 304(c)(4) ........................................................................................................ 8
    § 304(c)(4)(A) ........................................................................................... 4, 7, 8
    § 304(c)(5) ................................................................................................... 1, 12
    § 304(c)(6)(E) ............................................... 1, 7, 8, 9, 10, 11, 13, 17, 18, 19
    § 304(c)(6)(F) .................................................................................................. 7
    § 304(c)(6)(F) .................................................................................................. 8
    § 304(c)(6)(F) .................................................................................................. 8

28 U.S.C. § 2201 (Declaratory Judgment Act) ........................................... 5, 15

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..................................................... 4, 5

**Other Authorities**

H.R. Rep. 94-1476, 94th Cong., 2nd Sess. (1976) ................................... 12, 18

1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 1.15[F][2]
    (2021) ............................................................................................................ 16

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.      INTRODUCTION

### (a)      Summary of Argument

This case is not about conflicting state and federal rights.  Defendant Mary Bono's rights under Section 304(c) of the Copyright Act to terminate certain grants of copyrights do not conflict with, and do not preempt, plaintiff Cher's rights under her 1978 marriage settlement agreement ("MSA").  In fact, Section 304(c) expressly provides:

> Termination of a grant . . . affects only those rights covered by the grant that arise under [the Copyright Act], and in no way affects rights arising under any . . . State . . . laws.

17 U.S.C. § 304(c)(6)(E).  As Cher's contractual rights to receive royalties and to approve related agreements arise under state law, they cannot be terminated under Section 304(c).  Indeed, because the MSA is not a "grant of a transfer or license of a renewal copyright or any right under it," and was not "executed before January 1, 1978," the MSA is not subject to termination under Section 304(c) at all.

Ms. Bono also misconstrues the statute in arguing that the MSA is an "agreement to the contrary," as referenced in Section 304(c)(5).  That Section provides merely that the termination right *itself* cannot be contracted away and has no bearing on the scope of rights that termination affects.

The Court need not decide these issues, however, because Ms. Bono's motion to dismiss ("Motion") fails for a simpler reason: The notice of termination served by Ms. Bono and other heirs does not, in fact, purport to terminate the MSA or Cher's rights thereunder.  Termination under Section 304(c) is grant-specific, and rights under non-terminated grants remain in effect.  Thus, even if Cher's rights under the MSA could have been terminated (and they could not have been), Ms. Bono's failure to even purport to give notice of termination of the MSA means they never were.

Accordingly, Ms. Bono's Motion should be denied in its entirety.

1    **(b)     Summary of Facts**

2        **(1)     In 1978, Cher and Sonny Bono Execute the MSA**

3        On August 10, 1978, Cher and her former husband Sonny Bono ("Sonny")

4    entered into the MSA.  Compl. (Doc. 1) at 3, ¶¶ 13-14; *see also* Def's RJN (Doc. 18-

5    2), Ex. A.   Paragraphs (9) and (10) of the MSA set forth the division of their

6    community property.

7        As relevant here, the community property that Sonny assigned to Cher included

8    "an undivided 50% interest" in and to all contingent receipts payable and paid after

9    July 14, 1978 from (a) various record companies, with respect to recordings released

10   pursuant to record contracts prior to their separation (the "Record Royalties"); and

11   (b) all sources, with respect to musical compositions authored by Sonny or acquired

12   by Sonny or his businesses before February 1, 1974 (the "Composition Royalties"),

13   subject to a deduction for administration fees.  Compl. at 3-4, ¶¶ 15-17; Def's RJN,

14   Ex. A at 5-7, ¶ (10)(a)-(d).   To confirm the equal division, Cher simultaneously

15   granted an undivided 50% interest in the Record and Composition Royalties to Sonny.

16   Def's RJN, Ex. A at 5, ¶ (10).

17       As Sonny or entities controlled by Sonny would remain in control of the

18   musical compositions generating the Composition Royalties, Sonny also agreed that

19   "all agreements with third parties respecting the subject matter of this Paragraph

20   (10)(d)," *i.e.*, the Composition Royalties, would be subject to Cher's approval, not to

21   be unreasonably withheld.  Compl. at 4, ¶ 17; Def's RJN, Ex. A at 7, ¶ (10)(d).  Finally,

22   the parties agreed that the MSA would be binding on their respective heirs and assigns,

23   and Sonny also specifically agreed that his successors in interest, assigns, and all third

24   parties with whom he or his businesses contract, are subject to Cher's right to her

25   ownership of 50% of the Composition Royalties and her approval rights.  Compl. at

26   4, ¶ 18, Def's RJN, Ex. A at 7, 17, ¶¶ (10)(d), (21).

27   ///

28   ///

**(2)** **Ms. Bono and the Other Heirs Assume Sonny's Ongoing Rights and Obligations Under the MSA**

Sonny later married Ms. Bono, his fourth wife.  After Sonny's death in January 1998, Ms. Bono served as the administrator of his estate.  As administrator, she formally acknowledged Cher's rights under the MSA and approved Cher's creditor's claim regarding those rights, including that Cher would continue to receive her share of the royalties after the closing of the estate.  Compl. at 5-6, ¶¶ 20-23.  In 1999, Sonny's rights were distributed to Ms. Bono and Sonny's other heirs (the "Heirs"), who took subject to Sonny's obligations to Cher under the MSA and, from that time until recently, paid or caused to be paid to Cher her 50% of the Composition Royalties and honored Cher's approval rights under the MSA.  *Id.* at 6, ¶¶ 24-25.

Sometime thereafter, the Heirs transferred their rights to receive royalties, subject to their obligations to Cher, to the Bono Collection Trust, of which Ms. Bono is the sole Trustee.  *Id.* at 7, ¶ 27.  Then, in 2011, Cher and Ms. Bono, as trustees of their respective trusts, entered into various agreements with non-party Wixen Music Publishing, Inc. ("Wixen"), whereby Wixen agreed to serve as administrator of the royalties owed to Cher and the Heirs (among other things).  *Id.* at 7-8, ¶¶ 28-31.  At all times up to this point, Cher had received sums that Ms. Bono and/or Wixen represented was Cher's share of the royalties owed to her under the MSA and her approval rights were honored.  *Id.* at 6, 8, ¶¶ 25, 31.

**(3)** **The Heirs Issue Their 2016 Notice of Termination to Various Music Publishing Companies—and Not to Cher**

In 2016, the Heirs issued a notice of termination pursuant to Section 304(c) of the Copyright Act, by which they gave notice that certain of Sonny's pre-1978 grants of the renewal copyrights in various compositions, or rights therein, would be terminated, with termination dates ranging from 2018 to 2026.[1]  Compl. at 8-9, ¶ 33;

---

[1]    A grant may be terminated at any time during a five-year period beginning at the later of January 1, 1978 or fifty-six years from the date the copyright was secured.

*see* Def's RJN, Ex. B.  The Heirs' issuance of this notice was done without Cher's knowledge or participation.  *Id.* at 9, ¶ 34.

The notice identifies 25 music publishing companies or other entities to whom Sonny had granted rights, which the notice expressly defines as the "Grantee[s] Whose Rights Are Being Terminated."  Def's RJN Ex. B.  Tellingly, the notice does not mention the MSA, and Cher and her trust, The Veritas Trust, were not among the notice's list of grantees whose grants were being terminated.  *See id.*

> **(4)** **Five Years Later, Ms. Bono Takes the Position that the Termination Notice Terminates Cher's Rights Under the MSA**

For roughly five years after issuance of the termination notice, and roughly three years after the effective date of the earliest grant terminations, Cher continued to receive what was represented to be the royalties owed to her under the MSA and Ms. Bono continued to honor Cher's approval rights.  Compl. at 9, ¶ 35.

However, in or around September 2021, Ms. Bono took the position that the Heirs' termination of the grants to the music publishers also somehow ended Cher's ownership of 50% of the royalties under the MSA and Cher's approval rights.  *Id.* at 9, ¶ 36.  Ms. Bono also advised Cher that, on the effective termination date of each grant, the Bono Collection Trust will no longer pay or account to Cher for her respective interests under the MSA.  *Id.*  As her Motion demonstrates, Ms. Bono continues to maintain this position, and the Heirs have either stopped or will shortly stop paying the royalties owed to Cher.  *Id.* at 10, ¶ 38.

## 2.  **MS. BONO'S MOTION TO DISMISS SHOULD BE DENIED IN ITS ENTIRETY**

### (a)  **The Rule 12(b)(6) Standards**

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court accepts the factual allegations in the complaint as true, and

---

17 U.S.C. § 304(c)(3).  The notice of termination must be served between two and ten years before the termination date.  *Id.* § 304(c)(4)(A).

1  determines whether they "state a claim to relief that is plausible on its face." *Ashcroft*
2  *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
3  570 (2007)).  "Asking for plausible grounds . . . does not impose a probability
4  requirement at the pleading stage[.]" *Twombly*, 550 U.S. at 556.  Rather, a "claim has
5  facial plausibility when the pleaded factual content allows the court to draw the
6  reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*,
7  556 U.S. at 678.[2]

8       **(b)**     <u>**Cher Has Stated a Claim for Declaratory Relief**</u>

9       "The Declaratory Judgment Act . . . permits a federal court to 'declare the rights
10  and other legal relations' of parties to 'a case of actual controversy.'" *Societe de*
11  *Conditionnement en Aluminium v. Hunter Engineering Co.*, 655 F.2d 938, 942 (9th
12  Cir. 1981) (citation omitted).  This "'actual controversy' requirement . . . is the same
13  as the 'case or controversy' requirement of Article III," and the Declaratory Judgment
14  Act permits suit "once the adverse positions have crystallized and the conflict of
15  interests is real and immediate." *Id.* at 942, 943 (citations omitted).  The plaintiff must
16  have "a real and reasonable apprehension" of being sued, although "the showing of
17  apprehension need not be substantial." *Hal Roach Studios, Inc. v. Richard Feiner &*
18  *Co., Inc.*, 896 F.2d 1542, 1556 (9th Cir. 1989) (citations omitted).

19       Ms. Bono does not contest that Cher has sufficiently alleged an "actual
20  controversy" under the Declaratory Judgment Act, 28 U.S.C. § 2201.  Cher's
21  allegations, and indeed Ms. Bono's own Motion, demonstrate that Cher has met these
22  requirements.  Before Cher filed suit, Ms. Bono took the position that the Heirs' notice
23  terminates Cher's royalty and approval rights under the MSA, and Ms. Bono in fact
24  maintains this position in her Motion.  Compl. at 3, ¶ 11, 9, ¶ 36; Def's Memo. (Doc.
25

---

26  [2]    While a Rule 12(b)(6) motion is generally directed to the face of the challenged
27  pleading, Ms. Bono asks that the Court take judicial notice of the MSA and the Heirs'
    notice of termination.  Def's RJN.  Cher does not oppose that request—indeed, both
28  documents undercut Ms. Bono's Motion and support Cher's claims.

18-1) at 1.  Ms. Bono has also indicated that the Bono Collection Trust will no longer pay or account to Cher for her interests post-termination.  *Id.* at 7, 9, ¶¶ 27, 36.  Cher has thus demonstrated real and reasonable apprehension sufficient to warrant declaratory relief.  *See, e.g.*, *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1075-77 (N.D. Cal. 2007) (holding author demonstrated sufficient apprehension of liability due to defendants' communications denying permission to publish materials and making "clear, if implicit, threats of litigation").

> **(c)**   **Ms. Bono's Section 304(c) Termination Notice Does Not Purport to, and Cannot, Terminate Cher's Rights**
>
> > **(1)**   **Section 304(c) Provides for Termination of Only Certain Grants, and Only Certain Rights Under Those Grants**

Section 304(c) of the Copyright Act provides a mechanism by which authors or their heirs can terminate a pre-1978 grant of a transfer or license of renewal copyrights, or rights under the renewal copyright, within a specified five-year period. 17 U.S.C. § 304(c)(1)-(4).  The purpose of this termination provision is to provide authors an opportunity to benefit from the 1976 Copyright Act's extension of the term of copyright protection; Congress's concern was that authors would frequently not be the beneficiaries of the extended term due to "ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985); *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008) (the termination right "is based on Congressional recognition that young authors frequently enter into long-term contracts with publishers when their bargaining power is weak and their prospects for success uncertain[.]").

Termination under Section 304(c) "is not automatic," however.  *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 434 (S.D.N.Y. 2020) (discussing similar provision for termination under Section 203(a)).  Termination of a specific grant is effected by "serving an advance notice in writing upon the grantee" of the grant, or

the "grantee's successor in title," between two and ten years before the termination date.  17 U.S.C. § 304(c)(4)(A).  The notice must specify the effective date of termination of that grant and must also be recorded in the Copyright Office before the effective date of termination.  *Id.*  If termination is *not* "effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term."  *Id.* § 304(c)(6)(F).

Termination under Section 304(c) also is limited to certain types of grants. Specifically, in keeping with the statutory purpose of affording authors an opportunity to benefit from an increase in value of their *copyrights*, the statute applies only to "grant[s] of a transfer or license *of the renewal copyright or any right under it*, executed before January 1, 1978 . . . otherwise than by will[.]"[3] *Id.* § 304(c) (emphasis added).  The statute also limits the rights under a grant that revert after termination in a similar way:

> In all cases the reversion of rights is subject to the following limitations: . . . Termination of a grant under this subsection [1] affects only those rights covered by the grant that arise under this title [*i.e.*, the Copyright Act], and [2] in no way affects rights arising under any other Federal, State, or foreign laws.

*Id.* § 304(c)(6)(E).

### (2)    Ms. Bono's Notice Purports to Terminate Only Certain Grants to Music Publishers and Does Not Even Mention the MSA

Ms. Bono's Motion should be denied for a simple reason: Ms. Bono never even purported to terminate the MSA or any of its provisions.  As the Heirs' termination notice concerns only grants to twenty-five music publishers or other entities, and

---

[3]    In light of this language, Ms. Bono's assertion that the "only grant that cannot be terminated is a grant by will" is clearly wrong.  Def's Memo. at 7:3-4.  By limiting Section 304(c) to grants of a renewal copyright or a right under a renewal grant, Congress confirmed that all other grants could not be terminated under Section 304(c).

neither Cher nor her trust are identified as grantees whose grants are being terminated, the termination notice could not affect the MSA. *See, e.g.*, 17 U.S.C. § 304(c)(4)(A) (termination "shall be effected by serving an advance notice in writing upon the grantee" of the grant); *Id.* § 304(c)(6)(F); *Waite*, 450 F. Supp. 3d at 434 ("The earlier grant will remain in effect absent a termination notice").

Moreover, the Heirs' notice cannot reasonably be construed as terminating the MSA or any of its provisions because Section 304(c) applies only to grants "executed before January 1, 1978," whereas the MSA was executed on August 10, 1978. *See* Def's RJN, Ex. A at 1; 17 U.S.C. § 304(c); *see also* *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1043 (9th Cir. 2005) (termination notice under Section 304 could not terminate renegotiated licensing agreement executed in 1983).

Ms. Bono nevertheless argues that "the Heirs possess all rights . . . to the copyrights that are subject to their termination notice," whether or not the rights were granted under an expressly terminated grant. Def's Memo. at 15:17-20. But that is not how termination works: The statute provides a procedure for terminating rights under *a specific grant*, not undoing all agreements that have anything to do with a copyrighted work. Numerous provisions of Section 304(c) make this clear. *See, e.g.*, 17 U.S.C. § 304(c)(6)(E) (termination of a grant "affects only those rights *covered by the grant*"); *Id.* § 304(c)(4) (effective termination is conditioned upon delivering notice "to the grantee" of the grant); *Id.* § 304(c)(6)(F) ("[i]n all cases the reversion of rights is subject to the . . . limitation[]" that a grant remains in effect "[u]nless and until termination is effected under this subsection"); *see also* *Waite*, 450 F. Supp. 3d at 434. Ms. Bono's reading would also eviscerate the distinction between Section 304, which applies to grants executed *before* January 1, 1978, and Section 203, which applies to grants executed *on or after* January 1, 1978. *Compare* 17 U.S.C. § 304(c) *with id.* § 203(a).

Even if the Heirs could have terminated Cher's rights under the MSA (which they could not), they never did, and the Motion should be denied on this basis alone.

**(3)     Cher's Right to 50% of the Royalties and Right of Approval Are Not Terminable Under Section 304(c)**

**i.     Section 304(c) Provides for Termination Only of Rights that Arise Under the Copyright Act Only, Not State Law**

Ms. Bono's Motion also should be denied because neither the MSA nor Cher's rights thereunder are subject to termination under Section 304(c).  As explained above, Section 304(c) provides for termination only of grants of copyrights, or rights under a copyright, and does not affect rights under a terminated grant that arise under state law.  17 U.S.C. § 304(c), (c)(6)(E).

As copyright is a "creature of statute," the "only rights that exist under copyright law are those granted by statute." *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 883-84 (9th Cir. 2005).  The rights that arise under the Copyright Act are set forth in Section 106, and consist of the "exclusive rights of reproduction, adaptation, publication, performance, and display." *Rodrigue v. Rodrigue*, 218 F.3d 432, 435 (5th Cir. 2000) (citing 17 U.S.C. § 106); *Silvers*, 402 F.3d at 884.

On the other hand, "[n]othing" in the Copyright Act "limits any rights or remedies under the common law or statutes of any state with respect to . . . activities violating . . . rights that are not equivalent to any of the exclusive rights within . . . section 106." 17 U.S.C. § 301(b)(3).  Thus, a contractual right that relates to a copyrighted work, but is not "equivalent to any of the[se] exclusive rights," is a right arising under state law. *Rodrigue*, 218 F.3d at 439 ("Among the entire "bundle" of rights comprising full ownership of property generally, the preemptive effect of federal copyright law extends only to this explicitly-enumerated, lesser-included quintet."); *see also cases cited below* at 10-11.

**ii.     The MSA is an Assignment of State-Law Rights**

Neither Cher's undivided 50% royalty interest nor her right to approve contracts relating to the Composition Royalties is a right that arises under the Copyright Act.
///

9

They are state-law contract rights, and are excluded from the rights that revert under a terminated grant.  17 U.S.C. § 304(c)(6)(E).

Numerous courts have held that a right to receive royalties from copyrighted musical works, like Cher's right here, arises under state contract law.  *See, e.g.*, *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir. 1996) ("[A] royalty interest does not bespeak an interest in the underlying copyright itself-a royalty is simply an interest in receiving money when the owner of the copyright exploits it."); *Broadcast Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997) ("Assignments of interests in royalties have no relationship to the existence, scope, duration or identification of a copyright, nor to 'rights under a copyright.'") (citation omitted); *Rodrigue*, 218 F.3d at 440 ("Notably absent from the Copyright Act's exclusive sub-bundle of five rights is the right to enjoy the earnings and profits of the copyright."); *Malinowski v. Playboy Enterprises, Inc.,* 706 F. Supp. 611, 615 (N.D. Ill. 1989) (Claims for "nonpayment of royalties do not constitute claims arising out of the Copyright Act."); *Wolfe v. United Artists Corp.*, 583 F. Supp. 52, 56 (E.D. Pa. 1983) (alleged failures to pay plaintiff royalties and credit him as author of copyrighted works "were the subject of the various contractual agreements between" the parties and not copyright infringement claims); *Durgom v. Janowiak*, 74 Cal. App. 4th 178, 186 (1999) (dispute over assignment of royalties "asserted purely state law claims").

Moreover, while Section 115 of the Copyright Act provides copyright owners of musical works a right to receive royalties under a compulsory license, the compulsory licensing scheme applies only to licenses to make and distribute phonorecords of, or arrange, the underlying musical work.  17 U.S.C. § 115(a). Because the MSA is not a compulsory license, Cher's royalty rights arise under state law.  *See Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1338, 1339 n.9 (9th Cir. 1990) (holding defendant's nonpayment of royalties under purported compulsory license was not copyright infringement as parties' license "var[ied] from ///

the statutory scheme," but noting that "a common law action may exist to recover unpaid royalties").

Cher's right to approve contracts relating to the Composition Royalties is also a right arising under state contract law. This right is not equivalent to any of the exclusive rights of reproduction, adaptation, publication, performance, or display under Section 106. Put differently, if Ms. Bono were to contend that Cher unreasonably withheld her consent to a contract with a music publishing administrator, for example, the action would be one for breach of the MSA, because Cher's exercise of her approval right does not implicate any exclusive right under the Copyright Act. *See, e.g.*, *Rey v. Lafferty*, 990 F.2d 1379, 1392-95 (1st Cir. 1993) (analyzing author's allegedly unreasonable withholding of approval of various products utilizing author's "Curious George" character under licensing agreement as state breach of contract claim); *cf. Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984) (licensee committed infringement by *publishing* licensor's works in manner that exceeded scope of license).

Because the MSA transfers only state-law rights, it is not a "grant of a transfer or license of the renewal copyright or any right under it," and Section 304(c) expressly excludes it from potential termination. *See* 17 U.S.C. § 101 (defining a "transfer of copyright ownership" as an "assignment . . . exclusive license . . . or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright"); *see also Hirsch*, 104 F.3d at 1166 (assignment of royalties was not transfer of copyright ownership). Moreover, even if the MSA were terminable— which it is not— the rights subject to reversion would not include the state-law royalty and approval rights at issue here because only rights "that arise under" the Copyright Act revert. 17 U.S.C. § 304(c)(6)(E). Ms. Bono's Motion should accordingly be denied.

///

///

### (4)   The MSA is Not an "Agreement To The Contrary"

Even though the Heirs' notice does not purport to terminate the MSA, Ms. Bono argues that all rights to the copyrights "revert only to the statutory beneficiaries notwithstanding any agreement to the contrary, including the MSA." Def's Memo. at 9:13-14; *see also id.* at 9:3-8 ("[F]uture grants of a transfer or license of musical compositions . . . are controlled by the Heirs . . . [and] all benefits thereof, including economic benefits, flow entirely to the Heirs rather than those music publishers, regardless of the MSA."). Ms. Bono clearly misreads the statute.

Section 304(c)(5) provides:

> Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

17 U.S.C. § 304(c)(5). The plain language of this provision demonstrates that the phrase "agreement to the contrary" has nothing to do with the scope of rights subject to reversion. Rather, an "agreement to the contrary" means an agreement *not to effect a termination*. In other words, this subsection's provision that "[t]ermination . . . may be effected notwithstanding any agreement to the contrary" serves to "provide[] an *inalienable* termination right." *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 985 (9th Cir. 2008) (citing *Stewart v. Abend*, 495 U.S. 207, 230 (1990)); *see also* H.R. Rep. 94-1476, 94th Cong., 2nd Sess., at 124-25 (1976) ("[a]lthough affirmative action is needed to effect a termination … the right to take this action cannot be taken away").

For example, under Section 304(c)(5), the Heirs were able to terminate copyright grants to music publishers even if Sonny or the Heirs had previously agreed with the music publishers not to terminate those grants when the time to do so arrived. That would be true even if their agreements with the music publishers specifically provided that they would not terminate their grant or otherwise precluded them from terminating their grant. *See, e.g.*, *Classic Media, Inc.*, 532 F.3d at 986 (holding that, to the extent assignment agreement operated to transfer heirs' termination rights prior

to their exercise, assignment was "void as an 'agreement to the contrary'"); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 289 (2d Cir. 2002) (holding settlement agreement, which retroactively deemed copyrighted work "work for hire" and thereby precluded author from exercising termination right, was void as "agreement to the contrary").

However, nothing in the MSA prevented the Heirs from terminating Sonny's grant of copyright rights to the music publishers. Unlike *Classic Media* and *Marvel Characters*, where the agreements would have prevented heirs or an author from recovering back *copyrights* that had been granted, the MSA does not prevent the Heirs from receiving the copyrights or copyright rights they are otherwise entitled to receive upon termination. *Classic Media*, 532 F.3d at 980-81 (assignment of motion picture, television, and radio rights in copyrighted novel); *Marvel Characters*, 310 F.3d at 284 (assignment of "any and all right, title and interest" to copyrighted works). Instead, as a matter of state law, the MSA requires the Heirs to account for and pay to Cher 50% of the royalties they receive. Further, if the MSA were considered an agreement to the contrary, which it plainly is not, that would render meaningless the statute's limitation that termination does not affect state-law rights. *See* 17 U.S.C. § 304(c)(6)(E); *U.S. v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007) (rejecting interpretation of statute that renders one provision "a dead letter").

**(5)    The MSA is Binding on Ms. Bono and Sonny's Other Heirs**

In a similar vein, Ms. Bono argues that the MSA cannot be binding on the Heirs because "the reverted copyrights belong to the Heirs individually," and "no Heir was a party to the MSA." Def's Memo. at 10:3-6. But the MSA provides that it is binding on Sonny's heirs and assigns, and that also was expressly recognized by Ms. Bono, as administrator of Sonny's estate, when she approved Cher's creditor's claim before the probate court's distribution to the Heirs. *See* Compl. at 4-5, ¶¶ 18, 23-24; Def's RJN Ex. A at 17, ¶ (21).

///

13

1   Indeed, Ms. Bono even acknowledges that the MSA binds the Heirs as to
2   "property and claims that are the subject of the MSA." Def's Memo. at 10:9-11. And
3   Cher has a vested ownership interest in 50% of the royalties, past and future. Ms.
4   Bono argues that the Heirs are not bound as to matters "outside the MSA, such as the
5   copyrights that are subject to the termination notice." *Id.* at 10:12-13. However,
6   Cher's state-law royalty and approval rights *are not* outside the MSA, and to the extent
7   the Heirs believe the MSA granted Cher any rights under the Copyright Act, the Heirs'
8   termination notice does not purport to terminate them. *See above* at 7-8. Ms. Bono's
9   arguments therefore fail.

10          **(6)    Ms. Bono's Arguments Regarding Preemption and Federal**
11                   **Supremacy Fail in Light of Section 304(c)'s Express Terms**

12   Federal preemption of state law takes three forms: "express preemption,
13   conflict preemption, and field preemption." *Close v. Sotheby's, Inc.*, 894 F.3d 1061,
14   1068 (9th Cir. 2018) (citations omitted). But field preemption does not apply because
15   "Congress did not . . . preempt the field when it enacted the Copyright Act." *Ryan v.*
16   *Editions Ltd. West, Inc.*, 786 F.3d 754, 760 (9th Cir. 2015). Thus, "claims are not
17   preempted if they fall outside the scope of § 301(a)'s express preemption and are not
18   otherwise in conflict with the Act." *Id.*; *accord Close*, 894 F.3d at 1068; *In re Jackson*,
19   972 F.3d 25, 34 n.6 (2d Cir. 2020). As discussed below, neither Section 301 express
20   preemption nor conflict preemption is applicable here.

21          **i.     Express Preemption Under Section 301 Does Not Bar**
22                   **Cher's Claim for Declaratory Relief**
23          **a.     Cher's First Claim for Declaratory Relief Is Not a**
24                   **State Claim Preempted by Section 301**

25   A claim is expressly preempted under Section 301 of the Copyright Act where
26   "[1] the plaintiff's work 'come[s] within the subject matter of copyright' and [2] the
27   state law grants 'legal or equitable rights that are equivalent to any of the exclusive
28   ///

14

rights within the general scope of copyright.'" *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (quoting 17 U.S.C. § 301(a)).

In arguing that Section 301 preempts Cher's claim for declaratory relief, Ms. Bono tries to fit a square peg into a round hole, ignoring that Cher's claim is a *federal* claim for relief as to the Copyright Act. That claim arises under the Copyright Act and the federal Declaratory Judgment Act because it "require[s] construction of the [Copyright] Act." *Doc's Dream, LLC v. Dolores Press, Inc.*, 959 F.3d 357, 363 (9th Cir. 2020); *see also id.* ("The [Declaratory Judgment Act] and the Copyright Act work in tandem."); *Reilly v. Wozniak*, No. CV-18-03775, 2020 WL 1033156 at *6 (D. Ariz. Mar. 3, 2020) (Copyright Act did not preempt federal declaratory relief claim); *Brown-Thomas v. Hynie*, 441 F. Supp. 3d 180, 205 (D.S.C. 2019) (declaratory relief claim requiring interpretation of termination provisions). This is true even though Cher's rights under the MSA arise under state law and Cher seeks a declaration as to the effect of termination under the Copyright Act. *See Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997) ("A person may seek declaratory relief in federal court if the one against whom he brings his action could have asserted his own rights there."); *see also Doc's Dream, LLC*, 959 F.3d at 361 (claim seeking declaration that defendant had abandoned copyright arose under Copyright Act). Cher's claim for a declaration of rights under the federal Declaratory Relief Act and the Copyright Act is therefore not expressly preempted by Section 301.

### b.   Neither Are the State-Law Rights Raised by Cher Preempted by Section 301

Ms. Bono apparently relies on Section 301 to challenge not Cher's right to seek declaratory relief under the federal Declaratory Judgment Act, but rather, the merits of Cher's assertion of her state rights. In this regard, too, Ms. Bono's reliance on Section 301 is misplaced.

Cher's claim—whether within the rights she seeks declared or her second claim for breach of contract—is for her 50% share of the royalties and her approval rights.

As a result, the first step of the Section 301 preemption test is not met because she does not seek to protect a "work [that] 'come[s] within the subject matter of copyright[.]'" *Montz*, 649 F.3d at 979; *see also Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1150 (9th Cir. 2008) (under first element, the "content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103."). Cher's royalty and approval rights arise solely under state law and neither Section 102 nor Section 103 identifies royalty or approval rights as within the subject matter of copyright. *See, e.g.*, *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1004 (9th Cir. 2001) (right of publicity claim not preempted because plaintiff's name and likeness do not fall within subject matter of copyright).[4]

As for the second step of the Section 301 preemption test, Cher's royalty and approval rights are not "equivalent to any of the exclusive rights within the general scope of copyright." *Montz*, 649 F.3d at 979. A right is "equivalent to copyright" if it is infringed by the mere act of reproduction, distribution, performance or display. *See Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1144 (9th Cir. 2006); 1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 1.15[F][2] (2021). A state cause of action is not preempted where it includes an "'extra element' that changes the nature of the action" from an action for copyright infringement. *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004) (citation omitted).

Cher's rights to receive her 50% of the royalties and approve related contracts are not "equivalent" to rights under the Copyright Act. First, they are not infringed by a mere act of reproduction, performance, distribution, or display, but instead by Ms. Bono, as trustee of the Bono Collection Trust, failing to pay Cher her royalties

---

[4]    Ms. Bono does not contend that Cher received an ownership interest in the underlying musical compositions' copyrights. *See* Def's Memo. at 2 n.4. Even if Ms. Bono were to argue to the contrary, she still would fail to establish Section 301 preemption because of the preemption test's second step, discussed below, and the "extra element" provided by the MSA and the contractual obligation to pay Cher her 50% of the royalties and accord her approval rights. *See below* at 16-17.

and honoring her approval rights.  *See*, *e.g.*, *Dead Kennedys v. Biafra*, 37 F. Supp. 2d 1151, 1154 (N.D. Cal. 1999) (state-law claims concerning alleged conversion of, and nonpayment of, royalties not preempted by Copyright Act); *Rey*, 990 F.2d at 1391-95 (holder of copyright to uses of Curious George products subject to contractual approval rights).  Moreover, Cher's claim arises out of the "bilateral understanding" memorialized in the MSA and her contractual rights constitute an "extra element" that removes her claim from the preemptive scope of Section 301.  *See, e.g.*, *Montz*, 649 F.3d at 976-77 ("[A] bilateral understanding of payment constitutes an additional element that transforms a claim from one asserting a right exclusively protected by federal copyright law, to a contractual claim that is not preempted[.]").

Neither the first nor the second step of the test for express preemption under Section 301 is satisfied and, accordingly, Section 301 does not preempt Cher's claim.

### ii.     There is No Conflict Between State and Federal Laws in this Case

A state law is not preempted under the doctrine of conflict preemption unless "it actually conflicts with federal law." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982); *see also* *Worth v. Universal Pictures, Inc.*, 5 F. Supp. 2d 816, 820 (C.D. Cal. 1997) ("When a party is unable to comply with both federal and state law, conflict preemption requires that the federal law supersede the state law.").  There is no conflict between Cher's rights under the MSA and Ms. Bono's rights under Section 304(c) because, again, Section 304(c) expressly provides that reversion of rights after termination does not include state-law rights.  *See above* at 9-11; 17 U.S.C. § 304(c)(6)(E).

Ms. Bono argues that Cher's rights under the MSA conflict with the Copyright Act because Cher's rights arise out of state community property laws.  *See* Def's Memo. at 12-15.  As a preliminary matter, Ms. Bono cannot reasonably argue that the Copyright Act preempts all community property laws that have any effect on copyright ownership: The Copyright Act "expressly acknowledges that state law

continues to operate unless there is a direct and irreconcilable clash between a state law right and an exclusive right under the Act." *Rodrigue*, 218 F.3d at 439 ("[C]opyright law does not occupy the entire 'field' and thereby totally eclipse all state marital property law.").

Moreover, the Copyright Act's preemptive effect on community property law is irrelevant because Sonny agreed in the MSA—as a matter of *contract*—to assign the royalty and approval rights to Cher. *See* Compl. at 3-4, ¶ 15; *see also* Def's RJN, Ex. A at 6-7, ¶ (10) ("Husband and Wife agree that there shall be an equal division of the following property and interests in property[.]").  A division of community property was contemplated and effected by the MSA, but that does not change the fact that Cher asserts rights under that contract, not under community property law.

But even if Cher received these rights solely by way of California community property law (and she did not), the Copyright Act would not preempt her claim.  In distinguishing between rights that revert under a terminated grant and those that do not, the Copyright Act focuses on the character of the right—whether it arises under the Copyright Act or state law—not the particular state-law mechanism by which the rights were acquired.  *See* 17 U.S.C. § 304(c)(6)(E); *Mills Music*, 469 U.S. at 174 (explaining that, under separate derivative works exception to termination, the "distinction between the rights that revert to the author and those that do not revert is based on the character of the right—not on the form . . . of written instruments[.]").

Cher's position also does not "subvert Congress' intent" of ensuring that "authors and authors' heirs, not grantees or ex-spouses, would benefit from the extended term of copyright."  Def's Memo. at 15:20-22.  The MSA leaves the Heirs free to enter into new music publishing agreements with respect to the copyrights on better terms, or exercise any rights available to them under the Copyright Act.  And the Heirs will continue to reap the financial benefit of doing so, as they retain Sonny's share of royalty interests under the MSA.  In any event, if Congress wanted to distinguish between state-law rights provided to an ex-spouse and those provided to

others, it could have, but it did not, and the plain text of the statute is dispositive.  *See Mills Music*, 469 U.S. at 164 ("In construing a federal statute it is appropriate to assume that the ordinary meaning of the language that Congress employed 'accurately expresses the legislative purpose'") (citation omitted); *see also* H.R. Rep. 94-1476 (Similar language in termination provision of Section 203(b) "makes clear that, unless effectively terminated . . . all rights covered by an existing grant will continue . . . and that rights under . . . State . . . laws are unaffected.").

### iii.   *Marriage of Worth* and *Rodrigue* Are Not Relevant

For similar reasons, Ms. Bono's claim that Cher's position depends on the holdings of *In re Marriage of Worth*, 195 Cal. App. 3d 768 (1987), and *Rodrigue*, 218 F.3d at 432, is incorrect.  Those cases concern whether the Copyright Act preempts a transfer of *copyright ownership* by operation of state community property laws.  The court in *Worth* held that such a community property interest is *not* preempted.  *Worth*, 195 Cal. App. 3d at 773, 777.[5]  And the Fifth Circuit in *Rodrigue* agreed, insofar as the community property law transferred the "economic benefit produced by or derived from the copyright," because the right to receive economic benefits does not arise under the Copyright Act.  *Rodrigue*, 218 F.3d at 435, 437.[6]  While neither case addresses whether a community property interest in a copyright is subject to

---

[5]   *Worth* did not hold, as Ms. Bono may argue, that an assignment of royalties constitutes an assignment of rights under the Copyright Act.  Rather, it held that the non-author spouse's copyright ownership arose by operation of law notwithstanding a divorce decree that awarded only an equal division of royalties.  *See* 195 Cal. App. 3d at 774.

[6]   On the other hand, *Rodrigue* concluded that the Copyright Act would preempt Louisiana community property law to the extent it failed to recognize the author's "continued entitlement to the exclusive control and management of the five rights . . . specified in § 106."  *Rodrigue*, 218 F.3d at 443.  That conclusion is irrelevant here because Cher's approval right was not imposed on Sonny by California community property law.  Instead, Sonny entered into a bilateral contract that included providing Cher with a right of approval.  Authors grant third parties approval rights all the time and no court has ever found a contractual approval right to be preempted.

termination, that question is not at issue here.  As Cher's royalty and approval rights are state-law rights, they cannot be terminated even assuming, *arguendo*, Cher received other community property interests that could.  *See* 17 U.S.C. § 304(c)(6)(E) ("Termination of a grant . . . affects *only those rights covered by the grant* that arise under [the Copyright Act]") (emphasis added).

There is absolutely no merit to Ms. Bono's contention that the Heirs' notice of termination terminated Cher's state-law rights under the MSA.  The Heirs' notice does not even mention the MSA or Cher, and Section 304(c) expressly states that termination is limited to grants of rights arising under the Copyright Act, that termination does not affect rights under state law, and that a grant continues in effect unless otherwise terminated.  Ms. Bono's Motion to dismiss Cher's claim for declaratory relief is properly denied.

**(d)  Cher Has Stated a Claim for Breach of Contract**

Ms. Bono also moves to dismiss Cher's second claim for breach of contract.  In this claim, Cher alleges that Ms. Bono has breached the MSA by, among other things, refusing to pay Cher the royalties owed to her and repudiating her approval rights over third-party agreements respecting the Composition Royalties.  Compl. at 14-15, ¶¶ 46-48.

Ms. Bono does not dispute that Cher's claim is well-pleaded.  Nor could Ms. Bono.  Cher has alleged the contract at issue, her performance, both actual and anticipatory breaches by Ms. Bono, and damages resulting therefrom.  *See id.*; *Amelco Electric v. City of Thousand Oaks*, 27 Cal. 4th 228, 243 (2002) ("Under a breach of contract theory, the plaintiff must demonstrate a contract, the plaintiff's performance . . . breach, and damage to the plaintiff.") (citation omitted); *Central Valley Gen. Hosp. v. Smith*, 162 Cal. App. 4th 501, 514 (2008) ("When a promisor repudiates a contract, the injured party . . . can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract[.]") (citation omitted).

///

20

1    While Ms. Bono also asserts that there are "other aspects" of the claim that are

2    "improper," including that it is not based on "actual facts," she admits that these issues

3    "cannot be reached on a motion to dismiss" and are "not properly before the Court."

4    Def's Memo. at 16:10-24.  In any event, none of the facts that Ms. Bono accuses Cher

5    of misstating—for example, that Ms. Bono "has always granted Cher a right to

6    approve licenses of the musical compositions," *id.*—contradicts the dispositive facts

7    at issue here: Ms. Bono is using a wholly inapplicable statutory termination provision

8    of the Copyright Act as a pretense to deprive Cher of her rights under the MSA.

9    Instead, Ms. Bono's sole basis for challenging the breach of contract claim is

10   that the claim is preempted by the Heirs' "right to terminate." *Id.* at 16:7-9.  But as

11   discussed above, Cher's royalty and approval rights are state-law contract rights that

12   are not equivalent to any of the exclusive rights in Section 106 of the Copyright Act.

13   *See above* at 9-11.  Also, it is well established that a "bilateral understanding" supplies

14   the "extra element" that removes a breach of contract claim from the preemptive scope

15   of the Copyright Act. *Montz*, 649 F.3d at 976, 980 ("Contract claims generally survive

16   preemption because they require proof of such an extra element."); *Ryan*, 786 F.3d at

17   761 (similar); *see also Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th

18   Cir. 2005) ("Most courts have held that the Copyright Act does *not* preempt the

19   enforcement of contractual rights."); *Dead Kennedys*, 37 F. Supp. 2d at 1154;

20   *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 977 (N.D. Cal. 2013) (claims for

21   breach of contractual provisions were not preempted because they did not "merely

22   prohibit copying or reusing content").  Cher's breach of contract claim is thus not

23   preempted by the Copyright Act, and Ms. Bono's Motion should be denied.

24   ///

25   ///

26   ///

27   ///

28   ///

21

## 3. <u>CONCLUSION</u>

For the foregoing reasons, Cher respectfully requests that the Court deny Ms. Bono's Motion in its entirety.

Dated: December 22, 2021

/s/ Peter Anderson

Peter Anderson, Esq.
Sean M. Sullivan, Esq.
Eric H. Lamm, Esq.
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiff
CHER
Individually and as Trustee of
The Veritas Trust

22