DANIEL J. SCHACHT, #259717
dschacht@donahue.com
MARIO M. CHOI, #243409
mchoi@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
Telephone:  (510) 451-3300
Facsimile:   (510) 451-1527

Attorneys for Defendant
MARY BONO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>Plaintiff,<br><br>v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:21-CV-08157 JAK (RAOx)<br><br>**DEFENDANT MARY BONO'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS**<br><br>Judge:   Hon. John A. Kronstadt |

Defendant Mary Bono respectfully submits this supplemental brief in further support of her motion to dismiss to address how her undisputed termination rights under the Copyright Act affect Plaintiff Cher's rights under the Marriage Settlement Agreement (the "MSA") and the issues related thereto.

## I. INTRODUCTION

The Court's question is ultimately resolved through the straightforward application of Section 304. Cher retains her rights under the MSA to certain of Sonny's property, but not the extension terms of the terminated copyrights. Those copyrights are the exclusive and unencumbered property of the statutory heirs – Sonny's widow, Mary, and his four children (the "Heirs"). This brief also seeks to address the questions of fairness raised by the Court at the hearing, including how a straightforward application of Section 304 might affect an ex-spouse. In short, Cher was and is a sophisticated party who shrewdly negotiated the MSA in 1978 to obtain rights well beyond which she would have been entitled to under either the laws of community property or spousal support. What she received is what she bargained for: In addition to an ongoing interest in many properties, Cher received a fifty percent interest in the economic benefit of Sonny's agreements with his publishers *for the initial term of their copyright*. The statutory heirs, however, are the proper owners of the entire copyright, including the right to the royalties from exploiting those copyrights, for the extension (or "renewal") term – the term that exists after the termination of the initial term.

## II. FAIRNESS: RELEVANT FACTS AND HYPOTHETICALS

Sonny's first marriage was to Donna Rankin, and their daughter, Christine, was born in 1958. Compl. ¶ 24. Sonny wrote the majority of the songs at issue after his divorce from Ms. Rankin and before he and Cher married on November 24, 1967. Compl. ¶ 9; MSA(1); *see also* Dkt. No. 18-2 (Req. for Jud. Not., Ex. B, Sched. A ("Term. Not.")). These include Sonny's most iconic, and economically valuable, songs such as "I Got You Babe" (copyrighted 1965), "Bang Bang" (copyrighted

1966), and "The Beat Goes On" (copyrighted December 30, 1966 and March 16, 1967). Term. Not., Sched. A. Sonny and Cher's son, Chaz, was born in 1969. MSA ¶ 3. Sonny and Cher divorced in 1975 less than seven years after they married. *Id.* ¶¶ 1, 5. Cher remarried in 1975 and was married at the time she executed the MSA (as "Cher Bono Allman"). *Id*. at 1, 18. Sonny was married to Susie Coelho from 1981 to 1984. Sonny and Mary married in 1986 and remained married for twelve years, until Sonny's tragic death in 1998. Compl. ¶¶ 20-21. Sonny and Mary had two children, Chesare and Chianna. *Id.* ¶ 24.

### A. Spousal Support

At the April 25th hearing, the Court asked how spousal support might apply. The parties agree that Sonny and Cher waived their rights to spousal support in the MSA. MSA ¶ 8. Had they not done so, any spousal support to Cher would have been short lived. Her remarriage the same year of her divorce from Sonny would have terminated any spousal support. Cal. Fam. Code § 4337. Even if she had not remarried, her right to spousal support would have typically ended in 1978. *Id*. § 4320(l). Finally, even if Sonny and Cher had been married for a long time and Cher never remarried, spousal support would have ended in 1998 upon Sonny's death. *Id*. § 4337. These hypotheticals also do not account for the possibility that Sonny would have been entitled to spousal support from Cher.

### B. Community Property

The purpose of the MSA "is to settle the obligations of the parties to each other with respect to their … property interest and rights," including community property. MSA ¶ 6. The MSA addresses music written by Sonny both *before and during* the marriage. *Id.* ¶ 10(d). Importantly, Cher never had a community property interest in the most valuable copyrights at issue because Sonny wrote those compositions prior to his marriage to Cher. *See* Term. Not., Sched. A. The parties agree that Cher only has a right to the compositions through the MSA. Dkt. No. 19, Opp'n at 18:5-7.

At the hearing, the Court posed a hypothetical wherein an author writes

valuable works at the beginning of a long marriage and, one year after the divorce, the author recaptures her or his copyrights. Notably, the copyrights would have initially vested in the author and then automatically transferred to both spouses as community property. *In re Marriage of Worth*, 195 Cal. App. 3d 768, 774 (1987). The Court is understandably concerned that a strict textual application of the Copyright Act might prove unfair to this theoretical ex-spouse. There are, however, numerous reasons this hypothetical should not dissuade the Court from applying the Copyright Act as written.

The rights to the extension term were alienable at the time of this hypothetical divorce, so the ex-spouse could be granted rights under contract or other state law to the extension term of the copyrights. *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 987 (9th Cir. 2008). The hypothetical author must have issued the termination notice during the marriage and, therefore, could have transferred rights to the extension to the ex-spouse. *See* 17 U.S.C. § 304(c)(4)(A) (minimum of two-year notice). Even if one modifies the hypothetical so that the divorce predates the vesting of the termination right, a divorcee benefits from at least ten years of the original term of copyright after a divorce. *Id*. (maximum ten-year window for notices).

Undoubtedly represented by sophisticated lawyers who understood the 1976 Copyright Act, Cher received what she bargained for: a significant interest in the initial term of the copyrights at issue. In 1998, Congress further extended the term of copyright, beyond what Cher had bargained for in 1978, but with the specific intent that the extension term would benefit the author and, if deceased, her or his heirs. *See* Melville B. Nimmer & David Nimmer, 3 NIMMER ON COPYRIGHT ("NIMMER") § 11.05[B][2]. Cher has many rights to works created by or with Sonny during her marriage, including record and performance royalties (MSA ¶ 10), but they do not include the extension term of compositions that she did not author. While Cher refers to Mary somewhat dismissively as the "fourth wife" in her complaint (Compl. ¶ 11) even though it was Mary whom Sonny decided to spend the rest of his life with and

to whom he stayed married until his tragic death, Congress specifically intended for Mary and Sonny's four children to benefit from termination rights, not the second of three ex-spouses who already received nearly fifty years of royalties since she and Sonny separated in 1974. Compl. ¶ 12. The extension term of the copyrights, and all resulting benefits of their ownership, belong to Sonny's widow and four children.

Even if the actual facts of this matter were more sympathetic to Cher – *e.g.*, if the valuable songs had been written during her marriage to Sonny, if she had been married to Sonny for longer, if she were not trying to sell the copyrights to an unrelated third party, if she had not promptly remarried, if one disregarded Sonny's widow and children, or if Sonny had not been married to Mary for nearly twelve years[1] – this Court should not impose its own sense of fairness where Congress has already considered these factors and determined an outcome. Here, Congress explicitly determined that the extension term of these copyright vests with Mary and Sonny's four children, not with any ex-spouse of Sonny.

The case of *Boggs v. Boggs* is instructive. 520 U.S. 833 (1997). Therein, the Supreme Court noted that its sympathies lay with a deceased man's sons from his lengthy first marriage, who sought their father's retirement benefits through their mother's will, rather than his surviving spouse, whom the Court noted the man married "[w]ithin a year of [his first wife's] death." *Id.* at 836. Nonetheless, the Court ruled in favor of the surviving spouse because to allow the first wife's will to control the man's retirement benefits would gut the protections that Congress intended to provide to surviving spouses by making the retirement benefits inalienable. *Id.* at 851-52. *See also id.* at 851 (the "testamentary transfer, which is the source of respondents' claimed ownership interest, is a prohibited 'assignment or alienation.'"). Regardless of its sympathies, if the Court ruled otherwise,

---

[1] These are illustrations of hypotheticals that this Court might consider and are not meant to disrespect Cher or her relationship with Sonny. Mary and Cher continue to work together amicably and respectfully to preserve Sonny's legacy.

testamentary transfers could drastically reduce the surviving spouse's annuity, and the funds could even be "diverted to support an unrelated stranger." *Id.* at 844. Here, too, Congress clearly set forth its intent to protect authors and their statutory successors from giving away their rights to the extension term, whether to publishers, ex-spouses, or other third parties.

As community property and spousal support are inapplicable here, and since Congress decided that ex-spouses are not statutory heirs under the Copyright Act, Cher is legally equivalent to any third-party who obtained a royalty and approval right by contract prior to the vesting of the termination rights. The most important hypothetical here is, therefore, what would happen if Cher were any other third party, such as a publisher? Allowing third parties to prematurely divest authors and their statutory heirs of their termination rights and the economic benefit of the extension term by contract is the exact outcome that Congress intended to avoid by enacting Section 304. Dkt. No. 18-1 (Mot. at 5:24-6:18); *see also Mills Music, Inc. v. Snyder*, 469 U.S. 153, 186 (1985) (discussing legislative history, specifically H.R. Rep. No. 94–1476, at 124, and finding that "[t]he termination provisions, therefore, clearly favor authors' interests over those of grantees such as music publishers").

## II. THE MSA

### A. The MSA's Effect

The parties agree that the MSA remains in effect. The parties also agree that the MSA governed, and governs, various rights and property owned by Sonny and/or Cher that are wholly distinct from copyright – including real estate, cars, and cash held in joint accounts – and certain rights and property related to copyrights, including unterminated copyrights, such as foreign and master recording copyrights, and the copyright of any of Sonny's compositions during its initial term of copyright (*i.e.*, until the effective date of termination). The parties also agree that the MSA is binding on Sonny and Cher's heirs (MSA ¶ 21) as to the foregoing property. The parties' dispute is whether the MSA governs the extension term of the terminated

copyrights. As discussed below, the extension term of the copyrights at issue is the separate property of the Heirs and, therefore, not subject to the MSA. Even if the MSA could govern the Heirs' separate property, the Copyright Act did not allow Sonny to alienate the right to the renewal terms via the MSA. Relatedly, the parties dispute whether the rights that reverted to the Heirs include the specific rights granted to Cher under the MSA – the right to royalties and approval rights.

### B. The MSA Is Not Applicable to the Extension Terms of the Copyrights Because They Are the Heirs' Separate Property

Cher asks the Court to read as broadly as possible the MSA provision that binds Sonny's "successors in interest." MSA ¶ 10(d); Compl. ¶ 18; Dkt. No. 19 (Opp'n at 2:21-26). That provision served, and serves, its purpose for the property not in dispute, as well as for the initial term of the copyrights at issue. Sonny's existing copyright interests passed to his widow and adult children under California's intestacy laws when he died in 1998 (Compl. ¶¶ 20-21; Cal. Prob. Code §§ 6400, *et seq.*), and Cher continued, and continues, to receive her half of the royalties under the MSA from 1998 through the initial terms of the copyrights, which end between 2018 and 2026. *See* Term. Not. It is self-evident, however, that the MSA does not – indeed, cannot – govern the Heirs' own separate property, such as a song written by Mary, and Cher's counsel did not seriously dispute this point at the hearing. *See* Mot. at 10:9-13. The MSA does not govern the renewal term of the at-issue copyrights because those copyrights reverted to the Heirs and are their sole property. *See Peretti v. Authentic Brands Grp. LLC*, --- F.4th ----, No. 21-2174-CV, 2022 WL 1397767, at *7 (2d Cir. May 4, 2022) (author could not have transferred renewal rights to third party because author died before termination right vested in author and thus author "did not own the contingent rights held by" his statutory heirs).

The extension term of the copyrights at issue is a distinct property right that belongs solely to the Heirs. The Copyright Act provides that after the initial term, a "***new property right of an extended copyright term***" passes to the author's statutory

heirs upon termination. NIMMER § 11.07[B][3] (emphasis added). "The renewal term of a copyright is not merely an extension of the original copyright term but *a new estate … clear of all rights, interests or licenses granted under the original copyright*." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (emphasis added) (quoting *P.C. Films Corp. v. MGM/UA Home Video Inc.*, 138 F.3d 453, 457 (2d Cir. 1998)); *see also Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 117 (2d Cir. 2018) ("the renewal term is a 'new estate ... clear of all rights, interests or licenses granted under the original copyright.'") (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir. 1951)).

### C. The MSA Is Not Applicable to the Extension Terms of the Copyrights Because It Is an Agreement to the Contrary

Even if the MSA could reach the Heirs' separate property, the MSA could not have granted Cher rights to the renewal term of the copyrights because the Copyright Act forbids it. As discussed in Mary's previous briefs, the language of the statute is clear that the right to this extension term was inalienable in 1978. *See* Mot. at 8:10-13, 9:1-15; Dkt. No. 20 (Reply 4:3-8); 17 U.S.C. § 304(c)(5) ("Termination of the grant may be effected *notwithstanding any agreement to the contrary*") (emphasis added). An inalienable right is "[a] right that cannot be transferred or surrendered." Black's Law Dictionary (11th ed. 2019). In short, it defies logic to claim that a party can alienate an inalienable right. Any rights to royalties after these copyrights were terminated were simply never on the table when Sonny and Cher negotiated the MSA. The rights did not become alienable until they vested in the statutory heirs when they served, or could have served, the termination notice. *See Classic Media*, 532 F.3d at 987. Congress's intent is clear as well: to protect authors and allow them, or their statutory heirs, to benefit from the extension term of their copyrights. *See* Mot. at 5:24-6:18, 9:21-10:2; Reply at 4:21-23.

### D. The Rights that Derive from the Copyrights Revert to the Heirs

Cher argues that her right to royalties from, and approval of uses of, the copyrights applies to the renewal term because the Copyright Act does not "identify royalty or approval rights as within the subject matter of copyright act." Opp'n at 9:10-24, 16:1-10. *See also* 17 U.S.C. § 304(c)(6) ("rights under this title [the Copyright Act]" revert upon termination). This is wrong.

Approval rights are explicitly set forth in the Copyright Act: "the owner of copyright under this title has the exclusive rights to do ***and to authorize*** any of the [enumerated rights of copyright]." 17 U.S.C. § 106 (emphasis added). By granting owners the right to control the uses of a copyright work, the Copyright Act grants them the broad right to set the terms of such uses. Owners can, for example, allow the use of a copyrighted work only in certain media, for certain lengths of time, in certain markets, for a certain royalty, only in wholesome depictions, only if proceeds go to charity, etc. – the list is infinite. None of the foregoing terms is set forth in the Copyright Act, and it would be foolhardy for Congress to enumerate them. *See* H.R. REP. 94-1476, 61, 1976 U.S.C.C.A.N. 5659, 5674 ("The five fundamental rights … ***are stated generally*** in section 106. Each of the five enumerated rights ***may be subdivided indefinitely***… The approach of the bill is to set forth the copyright owner's exclusive rights ***in broad terms*** in section 106") (emphasis added). Instead, there are a myriad of unenumerated rights enjoyed by copyright owners that derive from the basic right of ownership of a copyrighted work, including the right to royalties. *See, e.g.*, *Everly v. Everly*, 958 F.3d 442, 457 (6th Cir. 2020) (authors have "the right to receive the benefits of authorship, such as royalties and license payments").

Cher's myopic reading of the rights under the Copyright Act is unsupported by case law and is contrary to the language and intent of Section 304. Courts, including the Supreme Court, have long understood that royalties inherently derive from copyrights. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S.

539, 546-47 (1985) ("Under the Copyright Act, these rights – to publish, copy, and distribute the author's work – vest in the author of an original work from the time of its creation… [T]he author commonly sells his rights to publishers who offer royalties in exchange for their services in producing and marketing the author's work."); *Ray Charles Foundation v. Robinson*, 795 F.3d 1109, 1123 (9th Cir. 2015) (right to royalties is an interest "Congress contemplated, regulated, and protected in enacting the termination provisions."). The rights in Section 106, and Section 304, are valueless without the right to collect royalties.

Cher's position relies on cases that stand for the proposition that the interpretation and enforcement of contracts assigning royalties are often controlled by state contract law, not federal copyright law. *See, e.g.*, *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir. 1996); *Broadcast Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997). Mary's earlier briefing discusses in detail why state law cannot trump the termination provisions of the Copyright Act. *See* Reply at 5:22-6:9. More importantly, the entire purpose of Section 304 is to allow authors and their heirs to recapture the ***economic value*** of the renewal term of authors' copyrights. *Classic Media*, 532 F.3d at 984; NIMMER § 11.01[A]. This necessarily includes the right to collect royalties from those copyrights: ***"[T]he right to receive royalties during the renewal term is the most valuable part of the termination rights."*** *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 863 (S.D.N.Y. 1987), *modified*, 678 F. Supp. 70 (S.D.N.Y. 1988) (interpreting Section 304) (emphasis added). *See also Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005) (doubling of royalties to heirs is "the very result envisioned by Congress when it enacted the termination provisions"). When a copyright is recaptured, any third party's right to royalties must end for the author's – or the deceased author's heirs' – economic right to be complete. The renewal terms of the copyrights at issue – and all of the economic benefits thereto – belong to the Heirs.

### III. CONCLUSION

There can be no "Cher Exception" to Section 304 without gutting the entire framework and purpose of the termination provisions of the Copyright Act. The termination rights exist to allow authors and their statutory heirs to get a second chance at obtaining the proper economic benefit of copyrights during their renewal term. Under Cher's interpretation of the law, a publisher could obtain a royalty interest for both the initial and renewal terms, regardless of termination rights. Thankfully, the law is clear and no such "Cher Exception" exists. The renewal term of the copyrights at issue, and all of the rights that derive therefrom including the rights of approval and to royalties, vest with the Heirs.

For the foregoing reasons, Representative Mary Bono respectfully requests that the Court dismiss with prejudice Plaintiff Cher's First Claim of Relief for Declaratory Relief as to Effect of 17 U.S.C. § 304(c) Termination on Plaintiff's Rights and dismiss without prejudice Plaintiff's Second Claim for Relief for Breach of Contract.

Dated: May 9, 2022

Respectfully submitted,

DONAHUE FITZGERALD LLP

By: /s/*Daniel J. Schacht*
Daniel J. Schacht
Mario M. Choi
Attorneys for Defendant
MARY BONO