DANIEL J. SCHACHT, #259717
dschacht@donahue.com
MARIO M. CHOI, #243409
mchoi@donahue.com
HAYLEY M. LENAHAN, #343528
hlenahan@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520

Telephone: (510) 451-3300
Facsimile: (510) 451-1527

Attorneys for Defendant
MARY BONO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust, <br><br> Plaintiff, <br><br> v. <br><br> MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 2:21-cv-08157-JAK (RAOx) <br><br> **DEFENDANT MARY BONO'S ANSWER TO COMPLAINT FOR DECLARATORY RELIEF; AND BREACH OF CONTRACT; COUNTERCLAIMS FOR:** <br><br> **1. Declaratory Judgment (Administration)** <br> **2. Declaratory Judgment (Record Royalties)** |
| MARY BONO, <br><br> Counter-Plaintiff, <br><br> v. <br><br> CHER, individually and as Trustee of The Veritas Trust, <br><br> Counter-Defendant. | Complaint Filed: October 13, 2021 |

Defendant Mary Bono ("Mary"), by and through her undersigned attorneys, hereby files her Answer to Plaintiff Cher's ("Cher") Complaint for Declaratory Judgment; and Breach of Contract ("Complaint"), as modified by the Court's March 14, 2023 Order re Defendant's Motion to Dismiss (ECF No. 43).

## PRELIMINARY STATEMENT

Cher's claims against Mary concerns Cher's access to certain royalties provided to her by the late Salvatore ("Sonny") Bono via a Marriage Settlement Agreement ("MSA") entered into between them in 1978, and the extent to which her continued access to such royalties trumps the statutory limitations set out in the Copyright Act.

The works at issue, and the copyright interests associated with those works, are subject to the Copyright Act. 17 U.S.C. § 102(a). And, contrary to Cher's allegations, the Copyright Act preempts Cher's claims. It is the Copyright Act that allows Sonny's Heirs, which include Sonny's widow, Mary, as well as Sonny's four children – Chesare, Chianna, Christy, and Chaz – to terminate grants made pursuant to the Copyright Act. And, through those terminations, any such royalties allegedly due to Cher no longer exists.

In addition to the fact that the Copyright Act terminates the distribution of certain royalties to Cher, Cher has also failed to include all the necessary parties to this litigation. Although Cher names "Does 1 through 10," Cher has only named Mary as a defendant in this litigation. Cher has failed to name Chesare, Chianna, Christy, and Chaz as defendants, although they, like Mary, are Sonny's statutory heirs and clearly have an interest in the litigation.

For all of these reasons, and the others addressed below, Cher is barred from pursuing her claims asserted in the Complaint.

## GENERAL DENIAL

Except as otherwise expressly stated herein, Mary: (1) generally denies each and every allegation of the Complaint, including, without limitation, any allegations

- 1 -

contained in the preamble, introduction, headings, subheadings, unnumbered Paragraphs and footnotes in the Complaint; (2) specifically denies that she has caused Cher to suffer any harm, losses, or damages; (3) denies any liability to Cher; and (4) declines to adopt or acknowledge as accurate any defined terms in the Complaint to the extent they constitute allegations directed at Mary. Mary reserves the right to challenge the authenticity of all sources and documents referred to or purportedly quoted from in the Complaint, and to assert that any of the sources or documents referred to or purportedly quoted from by Cher in the Complaint are covered by the attorney-client privilege, the work product doctrine, and/or otherwise applicable privileges. Mary reserves the right to seek to amend or supplement her Answer as may be necessary or appropriate.

## RESPONSES TO SPECIFIC ALLEGATIONS

### JURISDICTION AND VENUE

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     Admitted that Mary's agent, Wixen Music Publishing, Inc. ("Wixen"), is a resident in this District. Denied that all defendants are residents of the State of California. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4, and therefore denies the remaining allegations.

### THE PARTIES

5.     Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 5, and therefore denies the allegations.

6.     Admitted that Mary is an individual domiciled in Colorado. Admitted that Mary was the Trustee of the Bono Collection Trust. Denied that the Bono Collection Trust is still in existence. Denied as to the remainder of the allegations in Paragraph 6.

///

7. Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and therefore denies the allegations.

## BACKGROUND FACTS

### Plaintiff and the Music that She and Sonny Bono Made Famous

8. Admitted.

9. Admitted.

10. Mary lacks information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and therefore denies the allegations.

11. To the extent the allegations in Paragraph 11 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

### Plaintiff and Sonny's 1978 Marriage Settlement Agreement

12. Admitted.

13. Admitted.

14. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraph (9) of the Marriage Settlement Agreement states as follows:

> (9)   Husband and Wife agree to make an equal division of their community estate; to share their liabilities and obligations in such a manner as to implement said equal division of their community estate; to acknowledge the separate ownership of certain property; and to otherwise adjust and settle each and all of their property rights and interests in the manner provided in this Paragraph (9), and in Paragraphs (10), (11), (12), (13) and attached exhibits.
>    (a)   Prior to the distribution of the community property in equal amounts to each of the parties hereto as provided in Paragraph (9)(d) hereof, Husband agrees to restore to the community bank accounts of the parties from his separate funds (or to permit adjustments to be made in the distribution of the community bank accounts of the parties pursuant to paragraph (9)(b) and (9)(c) the following amounts:
>          (1) $150,000 – which represents the amounts of cash withdrawals by Husband from the community bank accounts of the parties prior to September 30, 1977.
>          (2) $150,000 – which represents the amount of a prior cash withdrawal by Husband from the

community bank accounts of the parties on or about November 16, 1977.

(3) $190,930.08 – which represents the amount of a prior cash withdrawal by Husband from the community bank accounts of the parties on or about April 17, 1978.

(4) $234,409.00 – which represents the amount of a prior cash withdrawal by Husband from the community bank accounts of the parties on or about April 17, 1978.

(5) $11,465.12 – which represents the amount of an excess prior cash withdrawal by Husband from the community bank accounts of the parties on or about August, 1975.

(6) $10,000.00 – which represents the agreed amount of interest accrued on prior withdrawals by Husband listed in this paragraph (9)(a).

(b)     The parties agree that prior to distribution of the community property in equal amounts to each of the parties hereto as provided in Paragraph (9)(d) hereof the parties agree that Wife my satisfy a separate obligation to Husband, referred to in Exhibit E hereof, in the amount of $234,409.00 by permitting an adjustment to the community in the amount of $468,818.00 in favor of Husband.

(c)     The parties agree that the intent of Paragraphs (9)(a) and (9)(b) hereof may be effectuated by permitting Wife to withdraw $277,986.20 from the community accounts of the parties prior to distribution of the community property in equal amounts pursuant to Paragraph (9)(d) hereof. The parties agree that in making an adjustment to the community property, Husband may sell any municipal bonds in the community account for cash.

(d)     Both Husband and Wife agree that there shall be an equal distribution to the parties of all of the community property of the parties, not otherwise specifically disposed of herein, including, but not limited to, the community assets in the custody of Husband's representatives listed in Exhibit A, attached hereto, to be distributed in cash or in kind where required. Said division and distribution shall be accomplished as soon after the execution of this document as is reasonably practical. If the parties are unable to agree upon a distribution in kind of any of said assets, then the parties agree that such assets shall be sold and the proceeds shall be divided equally between them.

(e)     The parties acknowledge that the community bank accounts of the parties are in the custody and control of Husband and Husband's representatives. Both parties acknowledge that all of the monies in the community bank accounts have been properly included therein as community property. Both parties warrant that all monies received by either of them which constitute community monies have been deposited in the community account or that adjustments of the community have been made

- 4 -

therefor. Both parties warrant that any monies received by either of them subsequent to the date of this agreement which constitute joint monies will be divided equally between the parties. The parties acknowledge that Husband and Chris-Marc Music entered into an agreement with Broadcast Music, Inc. (hereinafter referred to as "BMI") dated September 9, 1977, that advances were given to Husband from BMI and that BMI encumbered community assets of the parties in order to insure its recoupment of said advances. The parties agree that Husband may retain said advances as his separate property. Husband agrees that he will account directly to Wife all monies to which Wife would have been entitled but for the encumbrance by BMI including any administration fee, if applicable. Husband agrees to use his best efforts to have the BMI agreement modified in such a way as to segregate any collateralization of community property with his separate property.

(f)     The parties heretofore entered into a Memorandum of Agreement dated May 29, 1974 respecting distribution of certain of their community property and this Marriage Settlement Agreement will not pertain with respect to that distribution that was previously made in accordance with mutual agreement of the parties.

(g)     The property described in Paragraphs (9), (10), (11), and (12) hereof constitutes all of the community property of the parties. By this Agreement, the parties intend to divide said property equally between them.

Admitted that paragraph (10) of the Marriage Settlement Agreement states as follows:

(10)   As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:

(a)     Any and all distribution to either or both of the parties, payable and paid after July 14, 1978, from any and all contingent receipts from Atlantic Recording Corporation under the agreement dated August 30, 1966, with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

(b)     Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964, between Cher and York Records (and its assignee Atlantic Recording Corporation), Imperial Records and Liberty Records, with respect to master recordings recorded by

Wife. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

(c)     Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc., Husband and Wife with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

(d)     Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interests, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband.

- 6 -

(e)     Any and all receipts of Cher Enterprises, Inc. payable from and after July 14, 1978, as a result of the following: (1) income derived from joint performances and professional activities of Husband and Wife both before and after February 1, 1974, and (2) income derived as a result of the individual performances and professional activities of the parties prior to February 1, 1974, including, but not limited to, the "Sonny and Cher" television programming, together with any editing thereof to one-half hour shows for syndication [sic] or any other exploitation thereof, any feature motion pictures produced thereunder, etc. All said receipts of Cher Enterprises, Inc. shall be subject to the following adjustments: (1) reasonable overhead allowance for the administrative costs of collecting and accounting to Wife, (2) reasonable attorneys' fees with respect to new contracts for the use of old programs, (3) any commissions paid to the William Morris Agency, and (4) any direct expenses incurred in the exploitation of the properties. Husband agrees that he will cause Cher Enterprises, Inc. to account to the extent of 50% of said receipts directly to Wife or any company she designates. However, to the extent that Wife receives any such receipts directly or through any other company, she shall be deemed to be satisfied to the extent of such receipts on any accounts payable to Wife by Husband under this Paragraph (10)(e).

(f)     Any and all receipts of Apis Productions, Inc. payable from and after July 14, 1978 as a result of income derived from any future exploitation of "Sonny and Cher" television programming. Wife agrees that she will cause Apis Productions, Inc. to account directly to Husband or any company he designates to the extent of 50% of net profits Husband may be entitled to pursuant to Paragraph I.1 of that certain Settlement Agreement dated November 21, 1975. For purposes of this Paragraph (10)(f), Paragraph I.1 of the said November 21, 1975 Settlement Agreement shall be deemed to remain in effect and as used herein, the term "net profits" shall be defined thereby.

(g)     Any and all other receipts and distributions to the parties individually or jointly or to any corporation, business or other entity owned or controlled by either party from their professional endeavors performed or made jointly or with joint investments on their part both prior to February 1, 1974 and thereafter after the effective date of this Agreement except as otherwise provided herein or otherwise agreed to in writing. Both parties warrant that each has not conveyed, transferred or encumbered any of the rights referred to in this paragraph (10).

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14, and therefore denies the remaining allegations.

///

- 7 -

15.     Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraphs (10)(a), (b), and (c) of the Marriage Settlement Agreement states as follows:

> (10)   As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:
>
> (a)     Any and all distribution to either or both of the parties, payable and paid after July 14, 1978, from any and all contingent receipts from Atlantic Recording Corporation under the agreement dated August 30, 1966, with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.
>
> (b)     Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964, between Cher and York Records (and its assignee Atlantic Recording Corporation), Imperial Records and Liberty Records, with respect to master recordings recorded by Wife. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.
>
> (c)     Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc., Husband and Wife with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15, and therefore denies the remaining allegations.

16.     Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraph 10(d) of the Marriage Settlement Agreement states as follows:

///

(10)   As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:

*  *  *

(d)   Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interests, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband.

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16, and therefore denies the remaining allegations.

///

17. Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraph 10(d) of the Marriage Settlement Agreement states as follows:

> (10) As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:
>
> ***
>
> (d) Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interests, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband.

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17, and therefore denies the remaining allegations.

18.    Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that paragraph 10(d) of the Marriage Settlement Agreement states as follows:

> (10)   As part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:
>
> ***
>
> (d)   Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interest, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris Marc Music or other business, under this Paragraph (10)(d). All said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with

- 11 -

the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband.

Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18, and therefore denies the remaining allegations.

19.     Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that Cher received sums of money from Sonny or his designees under the Marriage Settlement Agreement. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19, and therefore denies the remaining allegations.

**Sonny's 1998 Death and His Estate's Confirmation of Plaintiff's Ownership of Fifty Percent of the Royalties**

20.     Admitted.

21.     Admitted.

22.     Admitted that Cher and Sonny entered into the Marriage Settlement Agreement. Admitted that, in July 1998, Cher caused to be filed in the probate action her creditor's claim, raising Sonny's obligations to her under the Marriage Settlement Agreement. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22, and therefore denies the remaining allegations.

23.     Admitted that, in July 1999, Mary, as administrator of the Estate, caused to be filed in the probate action a document entitled "Agreement Regarding Disposition of Creditor's Claim Filed by Cher" ("Cher's Creditor's Claim Agreement"). Admitted that Cher's Creditor's Claim Agreement states as follows:

On or about July 20, 1998, CHER filed a Creditor's Claim with this Court for an unascertainable amount (hereinafter referred to as "Claim") based upon obligations arising under that certain Marital Settlement Agreement dated August 10, 1987 by and between Cher and the decedent (hereinafter referred to as the "Marital Settlement Agreement"). MARY BONO is the duly appointed and acting Administrator of the Estate of SALVATORE

PHILLIP BONO (hereinafter referred to as "Administrator").

In regard to the Claim, the parties now agree as follows:

1.     The Administrator acknowledges Cher's interest in certain ongoing royalties relating to the assets inventoried in this estate as Items 1 through 4 on Attachment 2 of the Final Inventory and Appraisement filed herein on March 17, 1999. Cher hereby acknowledges and agrees that the Claim relates solely to her ongoing rights under the terms and conditions of the Marital Settlement Agreement, and the judgment entered in the subject marital dissolution proceeding. Cher acknowledges that she has no knowledge of any breach of the decedent's obligations thereunder as of the date hereof;

2.     During the course of the administration of this estate, Cher acknowledges that to her knowledge the Administrator has been collecting said royalties, and has disbursed to Cher her share of such royalties, as provided for in the Marital Settlement Agreement;

3.     In recognition of Cher's continuing right to receive such royalty interests, and in the interests of the heirs of the estate, Cher and the Administrator hereby agree to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the heirs after the closing of this estate;

4.     In reliance on the foregoing provisions of this Agreement, the Administrator hereby approves the Claim filed herein by Cher, subject to the terms and provisions hereof.

Admitted that Mary approved Cher's creditor's claim. Denied as to the remaining allegations.

**The Estate's 1999 Distribution of its Assets, Subject to Plaintiff's Ownership of Fifty Percent of the Royalties, to Sonny's Heirs**

24.     Admitted that, in August 1999, the probate court entered an "Order Approving First and Final Account and Report of Special Administrator and Administrator; Petition for Statutory Fees and for Extraordinary Attorneys' Fees and for Final Distribution" (the "Order"). Admitted that the Order provided that all creditor's claims have either been approved, compromised, or settled. Admitted that Order provided for a balance which included Sonny's music portfolio assets including royalties and publishing rights. Admitted that the Order provided that the residue of the estate and any other property of Sonny or Sonny's estate would be ///

distributed to Mary, Chesare, Chianna, Christy, and Chaz (collectively, the "Heirs").
Denied as to the remaining allegations.

25.   Admitted.

### The Veritas Trust and The Bono Collection Trust

26.   Mary lacks information sufficient to form a belief as to the truth of the
allegations in Paragraph 26, and therefore denies the allegations.

27.   Admitted that there was The Bono Collection Trust, of which Mary was
the sole Trustee. Admitted that the Heirs transferred their rights to receive Royalties,
subject to certain obligations to Cher, to The Bono Collection Trust. Denied that The
Bono Collection Trust still is in existence. Denied as to the remaining allegations.

### The 2011 Agreements with Wixen Music Publishing, Inc.

28.   Admitted.

29.   Admitted.

30.   Mary lacks information sufficient to form a belief as to the truth of the
allegations in Paragraph 30, and therefore denies the allegations.

31.   Admitted.

### The Heirs' 2016 Notice of their Claimed 17 U.S.C. § 304(c) Termination of Sonny's Pre-1978 Music Publishing Grants

32.   To the extent the allegations in Paragraph 32 contain legal conclusions
and Cher's characterization of its legal claims, no response is required. To the extent
a response is required, admitted.

33.   Admitted.

34.   Mary lacks information sufficient to form a belief as to the truth of the
allegations in Paragraph 34, and therefore denies the allegations.

35.   Admitted.

///

///

///

- 14 -

**Defendants' Claim that the Heirs' § 304(c) Termination of Music Publishing Grants Also Terminates Plaintiff's Rights, Including Her Ownership of Fifty Percent of the Royalties**

36.     To the extent the allegations in Paragraph 36 contain legal conclusions and Cher's characterization of its legal claims, no response is required. To the extent a response is required, denied.

37.     To the extent the allegations in Paragraph 37 contain legal conclusions and Cher's characterization of its legal claims, no response is required. To the extent the allegations in Paragraph 37 involves Record Royalties, the Court has dismissed those claims and no response is required. To the extent a response is required as to the remaining allegations in Paragraph 37, denied.

38.     To the extent the allegations in Paragraph 38 contain legal conclusions and Cher's characterization of its legal claims, no response is required. To the extent a response is required, denied.

**FIRST CLAIM FOR RELIEF**
**(For Declaratory Relief as to Effect of 17 U.S.C. § 304(c) Termination on Plaintiff's Rights)**
**(Against Defendants)**

39.     Mary incorporates by reference and restates the responses to Paragraphs 1-38 as set forth above.

40.     To the extent the allegations in Paragraph 40 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

41.     To the extent the allegations in Paragraph 41 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent the allegations in Paragraph 41 involves Record Royalties, the Court has dismissed those claims and no response is required. Admitted that Cher is making the contentions set forth in Paragraph 41. To the extent a response is required as to the remaining allegations in Paragraph 41, denied.

///

42.     To the extent the allegations in Paragraph 42 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent the allegations in Paragraph 42 involves Record Royalties, the Court has dismissed those claims and no response is required. Admitted that Cher is making the contentions set forth in Paragraph 42. To the extent a response is required as to the remaining allegations in Paragraph 42, denied.

43.     To the extent the allegations in Paragraph 43 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent the allegations in Paragraph 43 involves Record Royalties, the Court has dismissed those claims and no response is required. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 43, and therefore denies the remaining allegations.

44.     To the extent the allegations in Paragraph 44 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

**SECOND CLAIM FOR RELIEF**
**(For Breach of Contract)**
**(Against Defendants)**

45.     Mary incorporates by reference and restates the responses to Paragraphs 1-44 as set forth above.

46.     To the extent the allegations in Paragraph 46 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, admitted that Sonny and Cher entered into an MSA. Mary lacks information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46, and therefore denies the remaining allegations.

47.     To the extent the allegations in Paragraph 47 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent a response is required, denied.

///

48. To the extent the allegations in Paragraph 48 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent the allegations in Paragraph 48 involves Record Royalties, the Court has dismissed those claims and no response is required. To the extent a response is required as to the remaining allegations in Paragraph 48, denied.

49. To the extent the allegations in Paragraph 49 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent the allegations in Paragraph 49 involves Record Royalties, the Court has dismissed those claims and no response is required. To the extent a response is required as to the remaining allegations in Paragraph 49, denied.

50. To the extent the allegations in Paragraph 50 contain legal conclusions and Cher's characterization of her legal claims, no response is required. To the extent the allegations in Paragraph 50 involves Record Royalties, the Court has dismissed those claims and no response is required. To the extent a response is required as to the remaining allegations in Paragraph 50, denied.

## ANSWER TO PRAYER

Mary denies that Cher is entitled to the relief sought in the Prayer for Relief or any other relief under any theory.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof, persuasion, or production not otherwise legally assigned to them as to any element of Cher's claims, and without waiving and hereby expressly reserving the right to assert any and all such defenses at such time and to such extent as discovery and factual developments establish a basis therefore, Mary asserts the following defenses:

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails, in whole or in part, to state claim upon which relief can be granted.

///

**SECOND AFFIRMATIVE DEFENSE**

Cher has failed to name or join a necessary party or parties to the present action, including each of Sonny's Heirs, who have rights and interests in the claims for relief at issue.

**THIRD AFFIRMATIVE DEFENSE**

Cher's claims for relief are preempted by the Copyright Act.

**FOURTH AFFIRMATIVE DEFENSE**

Mary has fully performed all conditions and covenants required to be performed under the alleged agreements with Cher.

**FIFTH AFFIRMATIVE DEFENSE**

Mary's obligation to perform under the applicable agreements, if any, was excused by Mary's substantial performance.

**SIXTH AFFIRMATIVE DEFENSE**

As to any and all causes of action based upon purported contracts or agreements, such contracts or agreements have been the subject of written and/or oral modifications, abandonment, mutual rescission, and/or termination and therefore, Cher's action is barred and/or Cher's right of recovery as against Mary, if any, is barred or must be reduced accordingly.

**SEVENTH AFFIRMATIVE DEFENSE**

Any action or inaction by Mary with respect to the allegations contained in the Complaint was lawful, justified, and/or privileged.

**EIGHTH AFFIRMATIVE DEFENSE**

Cher lacks standing to pursue her claims because she has assigned all rights thereto to a third party as part of a sale of her interests under the MSA.

**NINTH AFFIRMATIVE DEFENSE**

Cher is seeking amounts that would result in her receiving more than she is otherwise entitled to, such that she would be unjustly enriched.

///

## ADDITIONAL DEFENSES

Mary asserts, and expressly reserves all rights with respect to, all counterclaims, crossclaims, third-party claims, or contribution claims that may be revealed during the course of discovery. Mary also asserts and expressly reserves all rights with respect to all other defenses that may be revealed during the course of discovery. Mary expressly reserves the right to amend and/or supplement this Answer.

## PRAYER

WHEREFORE, Mary prays as follows:

1.     That Cher take nothing by this action;

2.     That Mary be awarded attorneys' fees and costs of this suit; and

3.     That Mary be awarded such other relief as the Court deems just and proper.

## COUNTERCLAIM

Defendant/Counter-Plaintiff Mary Bono ("Mary") hereby files her Counterclaims ("Counterclaim") against Plaintiff/Counter-Defendant Cher ("Cher") and alleges as follows:

## PARTIES

1.     Mary is an individual residing and domiciled in Colorado. Mary served as administrator to the Estate of Salvatore ("Sonny") Bono, and is an heir, along with his children to Sonny's Estate.

2.     Cher is an individual who, upon information and belief, resides and is domiciled in Los Angeles, California, and is Trustee of The Veritas Trust, a California trust formerly known as The Inshallah Trust.

## JURISDICTION AND VENUE

3.     This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) because the counterclaims are so related to the claims in the action ///

- 19 -

within such original jurisdiction that they form the same case or controversy under Article III of the U.S. Constitution.

4.     This Court has personal jurisdiction over Cher because she is a resident of the State of California and, upon information and belief, resides in this District.

5.     Venue is proper in the Central District of California under 28 U.S.C. §§ 1391(b) and (c) because Cher resides in this District. Additionally, Cher has consented to venue in this District by filing her Complaint against Mary in this District.

### FACTUAL ALLEGATIONS

### Sonny and Cher's Marriage

6.     Cher and Sonny were married in or about November 24, 1967.

7.     Cher and Sonny separated on or about February 1, 1974.

8.     Cher and Sonny dissolved their marriage on or about June 27, 1975.

9.     Cher and Sonny entered into the Marriage Settlement Agreement ("MSA") on or about August 10, 1978, in which the parties settled their obligations to each other as well as to relinquish any and all claims that they may have had against each other.

### The MSA and Master Recordings

10.     As part of the MSA, Cher and Sonny agreed to the equal division and allocation of an undivided 50% interest in "[a]ny and all distribution to either or both of the parties, payable and paid after July 14, 1978, from any and all contingent receipts from Atlantic Recording Corporation under the agreement dated August 30, 1966, with respect to master recordings of Husband [Sonny] and Wife [Cher] jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects."

11.     As part of the MSA, Cher and Sonny further agreed to the equal division and allocation of an undivided 50% interest in "[a]ny and all distributions to either

or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964, between Cher and York Records (and its assignee Atlantic Recording Corporation), Imperial Records and Liberty Records, with respect to master recordings recorded by Wife. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects."

12.     As part of the MSA, Cher and Sonny further agreed to the equal division and allocation of an undivided 50% interest in "[a]ny and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc., Husband and Wife with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects."

13.     The MSA does not provide for the division and allocation of interests with respect to master recordings between Sonny and Cher other than from the Atlantic Recording Corporation agreement dated August 30, 1966, the Liberty/U.A. Inc. agreements dated from and after November 1, 1964, and the MCA Records, Inc. agreements dated January 1, 1972, and February 11, 1971, between MCA Records, Inc. and its assignor Kapp Records, Cher Enterprises, Inc. (the "Record Royalties").

### Administration

14.     As part of the MSA, Cher and Sonny also agreed to the equal division and allocation of an undivided 50% interest in "[a]ny and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from

musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris-Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers."

15.    As part of the division of this interest (the "Composition Royalties"), Cher and Sonny approved, and the MSA provided, that "Husband agrees that his successors in interest, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agrees to account or to cause Chris-Marc Music or other business to account directly to Wife or any company she designates 50% of said future income of Husband, Chris-Marc Music or other business, under this Paragraph (10)(d)."

16.    Furthermore, Sonny and Cher agreed through the MSA that "[a]ll said contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by Husband."

17.     On information and belief, Sonny acted as the worldwide administrator in his lifetime in exchange for a ten percent fee.

### The Probate of Sonny's Estate

18.     In January 1998, Sonny died from injuries suffered in a skiing accident.

19.     Thereafter, a probate action for Sonny's Estate was initiated in the California Superior Court. Mary was appointed administrator of Sonny's Estate. As administrator, Mary had the authority to handle any and all claims made against Sonny's Estate.

20.     In July 1998, Cher caused to be filed in the probate action her creditor's claim, raising Sonny's obligations to her under the MSA.

21.     In July 1999, Mary, as administrator of the Estate, caused to be filed in the probate action a document entitled "Agreement Regarding Disposition of Creditor's Claim Filed by Cher" ("Cher's Creditor's Claim Agreement"). As part of Cher's Creditor's Claim Agreement, Mary approved Cher's creditor's claim. Mary further acknowledged the terms and conditions of the MSA. And "[i]n recognition of Cher's continuing right to receive such royalty payments, and in the interest of the heirs of the estate, Cher and the Administrator hereby agree to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the heirs after the closing of [Sonny's] Estate."

22.     In addition to Mary, the heirs of Sonny's Estate include Sonny's four children: Chesare, Chianna, Christy, and Chaz (with Mary, the "Heirs").

23.     In August 1999, the probate court entered its Order Approving First and Final Account and Report of Special Administrator and Administrator; Petition for Statutory Fees and for Extraordinary Attorneys' Fees and for Final Distribution," which approved, among other things, Cher's Creditor's Claim Agreement.

///

///

- 23 -

**Administration of the Royalties**

24.     In or about 1999, after the closing of Sonny's Estate, Cher and Mary, in her role as Administrator, agreed to appoint Montgomery, Glick & Company ("Glick") to oversee the collection and proper disbursement of royalties due Cher.

25.     In or about 2011, Cher and Mary agreed to replace Glick as administrator of the royalties.

26.     In or about 2011, Cher, through The Veritas Trust, and Mary, through a trust then known as The Bono Collection Trust, entered into agreements with Wixen Music Publishing, Inc. ("Wixen") concerning the administration, collection, and distribution of, among others, Composition Royalties and the Record Royalties (collectively, the "Royalties").

27.     The agreements entered into with Wixen provided that Wixen would receive commissions in connection with its administration, collection, and distribution of the Royalties consistent with the MSA.

28.     Upon information and belief, Wixen duly administered, collected, and distributed the Royalties to Cher pursuant to the terms set forth in the MSA.

29.     Upon information and belief, Wixen also administered and collected, among other things, Royalties outside of the agreements at issue in the MSA. Wixen has nonetheless distributed the collected funds to Cher pursuant to the terms set forth in the MSA.

30.     Upon information and belief, Wixen has, throughout its tenure as royalty administrator, provided Cher and Mary with detailed, accurate quarterly accounting statements; negotiated significant increases in sync royalties to the benefit of Cher and Mary and the Heirs; and otherwise fulfilled all of its duties as royalty administrator as provided for in the MSA.

**Unilateral Attempted Cancellation of Administration**

31.     Wixen continues to collect and disburse to Cher (or her Trust) sums that constitute Cher's percentage of the Royalties pursuant to the terms of the MSA.

32.   Upon information and belief, in or about 2021 or 2022, Cher sold all royalties to which she was entitled, including her Royalties, in part or in full, for a lump sum to a third-party company that acquires such artist royalties. Such companies endeavor to handle all collection and accounting matters in-house and minimize third-party costs. Upon information and belief, by eliminating any third-party collection costs, including those specifically provided for in the MSA for a worldwide royalty administrator, Cher would receive a higher payment for her Royalties.

33.   As part of the sale of her Royalties, Cher has unilaterally sought to cancel Wixen's administration, collection, and distribution of the Royalties. Cher seeks to receive all the benefits of Wixen's labors, including worldwide royalty collection, effective negotiations of Royalty licenses, and detailed accounting statements, while having Mary pay the entire cost of such representation and Cher paying nothing.

34.   Cher and Mary cooperated in 1999 and again in 2011 in developing a mutually acceptable mechanism for the collection and proper disbursement of the Royalties, and they cooperated for over twenty years in implementing that mechanism. Unfortunately, that cooperation has now broken down.

**Termination of Grants**

35.   In or about 2016, Mary and the Heirs, or a majority of them, issued a notice of termination pursuant to 17 U.S.C. § 304(c) to various music publishers or other companies to whom Sonny had granted a transfer or license of the renewal copyrights, or rights under them. The notice of termination specified various effective dates of termination ranging from 2018 to 2026.

36.   The termination of a grant or license of the renewal copyrights includes the termination of any agreement that Sonny entered into with a third party that allowed the third party to exploit rights provided to it pursuant to the grant or license of the copyright.

37.     As Sonny's heirs and owners of his copyrights, Mary and the Heirs may exercise any of the rights available to them under the Copyright Act, including entering into new agreements with third parties to exploit the copyrights.

38.     Cher disputes the exercise of such rights by Mary and the Heirs.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

39.     Mary incorporates by reference each of the allegations in Paragraphs 1 to 38 of this Counterclaim as though set forth fully herein.

40.     There is a dispute over the rights and obligations of the Parties as it concerns the selection of a worldwide royalty administrator to collect, account for, and properly disburse the Royalties collected, as required pursuant to the MSA and Cher's Creditor's Claim Agreement.

41.     Cher wrongly disputes that Mary has failed to fulfill all of her obligations under the Cher's Creditor's Claim Agreement, including by developing a mutually acceptable mechanism for the collection and proper disbursement of royalties after the closing of Sonny's Estate.

42.     Mary is now solely bound by the terms of the MSA as to the selection of a worldwide royalty administrator, including its provision that such a royalty administrator may be appointed at the sole discretion of a majority of the Heirs.

43.     In the alternative, Cher has been unreasonably withholding her agreement to the selection of an administrator to administer, collect, and distribute, among other things, the Royalties, in contravention of the Cher's Creditor's Claim Agreement entered into between Cher and Mary.

44.     In the alternative, Cher must abide by her approval of Wixen as the worldwide royalty administrator.

45.     Because the obligations under Cher's Creditor's Claim Agreement regarding the administrator expired, or, in the alternative, have been fulfilled as to Wixen, or, in the alternative, Cher has withheld her approval of an administrator

- 26 -

without reason, the MSA allows for the engagement of an administrator be subject to Sonny's "sole discretion."

46.     Mary is subject only to the requirements of the MSA, which allows for the "sole discretion" to engage an administrator.

47.     Mary prays for a declaratory judgment concerning Cher's rights and obligations concerning the selection of an administrator.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment)

48.     Mary incorporates by reference each of the allegations in Paragraphs 1 to 47 of this Counterclaim as though set forth fully herein.

49.     Pursuant to the MSA, Cher is entitled only to master royalties that are paid "from Atlantic Recording Corporation under the agreement dated August 30, 1966 . . . from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964 . . . [and] from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971."

50.     There is a dispute as to Mary's ability to enter into new agreements to exploit the sound recording copyrights Mary owns and whether Cher or her assignee would be entitled to fifty percent of the receipts arising from such new agreements.

51.     Mary prays for a declaratory judgment concerning her rights and obligations under the MSA, including the negotiation and entry into new agreements to exploit the sound recording copyrights Mary owns.

## PRAYER FOR RELIEF

WHEREFORE, Mary respectfully prays for the following relief:

1.     For entry of judgment in favor of Mary and against Cher on each of Mary's claims for relief alleged in this Counterclaim;

2.     A declaration finding that any obligation under Cher's Creditor's Claim Agreement to develop a mutually acceptable mechanism for the collection and proper

///

disbursement of such royalties to Cher and the Heirs was satisfied and is no longer binding on Mary;

3.      A declaration finding that (i) Cher does not have a right to approve or disapprove a worldwide administrator for the royalties due her and the Heirs under the MSA and (ii) the right to select such a worldwide royalty administrator is at the sole discretion of the Heirs that hold a majority interest in such royalties;

4.      In the alternative, a declaration finding that (i) Cher is not entitled to unreasonably withhold approval of a selection of an administrator and (ii) Wixen was approved by Cher as the worldwide administrator for the royalties due her and the Heirs and may continue to act as a worldwide administrator for the royalties due her and the Heirs under the MSA and receive up to ten percent of all such royalties, including those due Cher;

5.      A declaration finding that (i) Mary has the right to renegotiate and enter into new agreements to exploit the sound recording copyrights that she holds and (ii) any revenue arising from such new agreements would be subject neither to the MSA nor to any claim by Cher or her assignee;

6.      For costs of suit; and

7.      For such other relief as this Court finds just and proper.

                                        Respectfully submitted,

Dated:      March 28, 2023              DONAHUE FITZGERALD LLP


                                        By:/s/ Daniel J. Schacht
                                            Daniel J. Schacht
                                            Mario M. Choi
                                            Hayley M. Lenahan
                                            Attorneys for Defendant
                                            MARY BONO