DANIEL J. SCHACHT, #259717
dschacht@donahue.com
MARIO M. CHOI, #243409
mchoi@donahue.com
HAYLEY M. LENAHAN, #343528
hlenahan@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520

Telephone:   (510) 451-3300
Facsimile:   (510) 451-1527

*Attorneys for Defendant and Counterclaimant*
*MARY BONO*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>Plaintiff,<br><br>v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:21-CV-08157-JAK (RAOx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:           February 26, 2024<br>Time:          8:30 a.m.<br>Judge:         Hon. John A. Kronstadt<br>Ctrm:          10B<br><br>Complaint Filed: October 13, 2021<br>Trial Date: n/a |
| AND RELATED COUNTERCLAIMS | |

Donahue Fitzgerald LLP
Attorneys at Law
Oakland

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................... 1
STATEMENT OF FACTS ......................................................................................... 2
    I.    Background On The Parties ................................................................... 2
        A.    Sonny, Cher, Mary, And Sonny's Children .............................. 2
        B.    Sonny's Copyrights ................................................................... 2
        C.    The MSA And Its Material Terms ............................................. 2
        D.    Sonny's Death ........................................................................... 4
        E.    Royalty Administration After Sonny's Death ........................... 4
        F.    The Copyright Terminations ..................................................... 5
        G.    Cher Sells Her Music Interests ................................................. 5
        H.    Cher's Continued Approval Rights ........................................... 6
    II.    Procedural History ............................................................................. 6
ARGUMENT ............................................................................................................. 7
    I.    Standard Of Review ............................................................................ 7
    II.    Cher Lacks Standing ........................................................................... 8
    III.    Cher Failed To Add Indispensable Parties: The Bono Heirs ............... 9
    IV.    The Bono Heirs Properly Terminated the Grants And Now Own The Copyrights Unencumbered By The MSA ................................... 13
        A.    History of Copyright Termination ........................................... 13
            1.    The Copyright Act Of 1909 .......................................... 13
            2.    The Copyright Act Of 1976 .......................................... 15
            a)    The New Copyright Recapture System ......................... 15
            b)    Overturning *Fisher* In Favor Of Inalienable Rights ....... 16
        B.    Cher Agrees That Sonny Could Not Have Bargained Away Rights He Did Not Possess. .......................................... 18
        C.    The Bono Heirs Are The Beneficiaries, Not An Ex-Wife Grantee ................................................................................... 19
        D.    "I Believe I Should Have What I Had Before": Cher Is Not Entitled To More Than She Received In 1978 ................... 20
    V.    Cher's Remaining Claims For Relief Should Be Dismissed ............... 21
        A.    Royalty Payments ................................................................... 22
        B.    Approval Rights ...................................................................... 22
        C.    Royalty Administration ........................................................... 22

**TABLE OF CONTENTS**
(continued)

Page

VI.    MARY IS ENTITLED TO SUMMARY JUDGMENT ON HER
COUNTERCLAIMS..................................................................................23

CONCLUSION...........................................................................................24

Donahue Fitzgerald LLP
Attorneys at Law
Oakland

TABLE OF CONTENTS.                                    CASE NO. 2:21-CV-08157-JAK (RAOX)

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arizonans for Off. English v. Arizona*,
  520 U.S. 43 (1997) ........................................................................................ 8

*Brown-Thomas v. Hynie*,
  Case No. 2:18-cv-00307-SVW-JPR, 2018 WL 3811353
  (C.D. Cal. Aug. 7, 2018) .............................................................................. 19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...................................................................................... 8

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ................................................... 15, 16, 17, 20

*Clinton v. Babbitt*,
  180 F.3d 1081 (9th Cir. 1999) ..................................................................... 12

*Corcovado Music Corp. v. Hollis Music, Inc.*,
  981 F.2d 679 (2d Cir. 1993) ........................................................................ 17

*Crestview Cemetery Ass'n v. Dieden*,
  54 Cal. 2d 744 (1960) ............................................................................ 18, 23

*Dawavendewa v. Salt River Project Agric. Improvement and Power
  Dist.*,
  276 F.3d 1150 (9th Cir. 2002) ..................................................................... 12

*De Sylva v. Ballentine*,
  351 U.S. 570 (1956) ...................................................................................... 14

*E.E.O.C. v. Peabody Western Coal Co.*,
  400 F.3d 774 (9th Cir. 2005) .................................................................... 9, 11

*E.E.O.C. v. Peabody Western Coal Co.*,
  610 F.3d 1070 (9th Cir. 2010) .................................................................. 9, 11

*Emps. Reinsurance Co. v. Superior Ct.*,
  161 Cal. App. 4th 906 (2008) ................................................................ 18, 23

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

*Fred Fisher Music Co. v. M. Witmark & Sons*,
 318 U.S. 643 (1943) ...................................................................... 14

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
 716 F.3d 302 (2d Cir. 2013) ......................................................... 15

*Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*,
 545 U.S. 308 (2005) ...................................................................... 11

*Hays v. Temple*,
 23 Cal. App. 2d 690 (1937) ......................................................... 18

*Int'l Shoe Co. v. Washington*,
 326 U.S. 310 (1945) ...................................................................... 11

*Jacobsen v. Luckenbach S. S. Co.*,
 201 F. Supp. 883 (D. Or. 1961) ................................................... 10

*Lewis v. Cont'l Bank Corp.*,
 494 U.S. 472 (1990) ........................................................................ 8

*McCowen v. Jamieson*,
 724 F.2d 1421 (9th Cir. 1984) ....................................................... 9

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
 362 U.S. 373 (1960) ...................................................................... 14

*Mills Music, Inc. v. Snyder*,
 469 U.S. 153 (1985) ...................................................................... 15

*Milne v. Stephen Slesinger, Inc.*,
 430 F.3d 1036 (9th Cir. 2005) ..................................................... 17

*N.B. Scrivner & Wilson, Inc. v. Mobil Oil Corp.*,
 914 F.2d 263 (9th Cir. 1990) ....................................................... 23

*Oasis W. Realty, LLC v. Goldman*,
 51 Cal. 4th 811 (2011) ................................................................. 23

*Penguin Grp. (USA) Inc. v. Steinbeck*,
 537 F.3d 193 (2d Cir. 2008) ......................................................... 17

*Peretti v. Authentic Brands Grp. LLC*,
 33 F.4th 131 (2d Cir. 2022) ......................................................... 17

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

TABLE OF AUTHORITIES  CASE NO. 2:21-CV-08157-JAK (RAOX)

*Rodriguez v. Wal-Mart Stores, Inc.*,
   No. LA CV17-05129 JAK (RAOx), 2019 WL 13042079
   (C.D. Cal. Aug. 1, 2019) .................................................................. 7, 8

*Salt River Project Agr. Imp. And Power Dist. v. Lee*,
   672 F.3d 1176 (9th Cir. 2012) ......................................................... 9, 10

*Stewart v. Abend*,
   495 U.S. 207 (1990) ....................................................................... 14, 16

*Summers v. Teichert & Son, Inc.*,
   127 F.3d 1150 (9th Cir. 1997) ............................................................... 8

*Trump v. Intuitive Surgical, Inc.*,
   No. 18-CV-06413-LHK, 2020 WL 3163185
   (N.D. Cal. June 12, 2020) ..................................................................... 7

*Weddington Prods., Inc. v. Flick*,
   60 Cal. App. 4th 793 (1998) ................................................................ 22

*White-Smith Music Publishing Co. v. Goff*,
   187 F. 247 (1st Cir. 1911) .................................................................... 14

*Wilson v. Dynatone Publ'g Co.*,
   892 F.3d 112 (2d Cir. 2018) ................................................................ 16

*Woods v. Bourne Co.*,
   60 F.3d 978 (2d Cir. 1995) .................................................................. 14

*World-Wide Volkswagen v. Woodson*,
   444 U.S. 286 (1980) ............................................................................ 11

**Statutes**

17 U.S.C. § 203 ......................................................................... 1, 16, 17

17 U.S.C. § 304 ............................................................................. *passim*

Cal. Civ. Code § 1636 ...................................................................... 18, 20

Cal. Civ. Code § 1641 ........................................................................... 19

Cal. Civ. Code Proc. § 1473 ................................................................. 21

Cal. Civ. Code Proc. § 1856(c) .......................................................... 18, 23

Cal. Prob. Code §§ 6400, *et seq.* ...................................................................... 10

Copyright Act of 1909 ................................................................... 13, 14, 19

Copyright Act of 1976 (the "1976 Act") .................................................*passim*

**Other Authorities**

BLACK LAW'S DICTIONARY (11th ed. 2019) .................................................... 16

Fed. R. Civ. P. 12(b)(7) ............................................................................ 9

Fed. R. Civ. P. 15 .................................................................................. 13

Fed. R. Civ. P. 16(b)(4) .......................................................................... 13

Fed. R. Civ. P. 19 .........................................................................9, 10, 12

Fed. R. Civ. P. 56(a) ............................................................................... 7

House Report for the 1909 Act ............................................................ 13, 14

Melville B. Nimmer & David Nimmer,
    2 NIMMER ON COPYRIGHT § 8[C][03] ................................................. 2
    3 NIMMER ON COPYRIGHT § 9.02 ............................................... 13, 14
    3 NIMMER ON COPYRIGHT § 9.06[B][1] ..................................... 14, 17
    3 NIMMER ON COPYRIGHT § 9.06[C] ............................................ 17
    3 NIMMER ON COPYRIGHT § 11.01[A] ......................................... 15
    3 NIMMER ON COPYRIGHT § 11.02[A][4][b] .............................. 18
    3 NIMMER ON COPYRIGHT § 11.07[A] ......................................... 16
    3 NIMMER ON COPYRIGHT § 11.07[B] ......................................... 16
    3 NIMMER ON COPYRIGHT § 11.07[B][3] ................................ 15, 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

## INTRODUCTION

Now that the parties have completed discovery and found no material questions of fact, this case is ripe for resolution. As a procedural matter, Cher's claims in Count I fail because she lost standing when she sold her interests in Sonny Bono's music compositions earlier this year. Further, both Counts I and II fail because Cher has not added necessary parties to this action—Sonny's four children— who face losing their rights and their property without participating in this case.

As a substantive matter, Cher's claims fail, not because the Marriage Settlement Agreement ("MSA") or her rights were terminated, but because Cher never had a right to the copyrights that have belonged to Sonny's statutory heirs— his widow, Mary, and his four children (the "Bono Heirs")—since termination. Upon termination, a new and distinct property interest sprang into existence, belonging solely to the Bono Heirs. Under federal copyright law, Sonny was not permitted to sign away his heirs' interests in post-termination copyrights to Cher, or anyone else, because those rights were inalienable. In addition, the Bono Heirs never agreed to share royalties with Cher. The uncontroverted evidence shows that Cher shares this understanding of the MSA.

Even though she has sold all of her interests at issue in this lawsuit, Cher remains a sympathetic party as Sonny's ex-wife and one half of "Sonny & Cher." Her mistaken interpretation of the law, however, would render the text of Section 304 meaningless and would gut the expressly intended protections for all authors in Sections 203 and 304 of the Copyright Act of 1976 (the "1976 Act"). The purpose of termination rights is to give artists or their heirs a chance to negotiate better terms for their work than under their original contracts. Under Cher's interpretation of the law, a publisher could simply have authors assign their pre- and post-termination royalties to the publisher. A publisher, or their assignee, could then continue to collect an artist's royalties long after termination.

Cher's remaining claims fail for lack of evidentiary support. Mary's claims, in contrast, are borne out by the uncontroverted evidence.

## STATEMENT OF FACTS

### I. BACKGROUND ON THE PARTIES

#### A. Sonny, Cher, Mary, and Sonny's Children

Sonny's first marriage was to Donna Rankin, with whom he had a child, Christine, in 1958. (UF 8.) Sonny married his second wife, Cher, in 1967, and they had a child, Chaz, in 1969. (UF 9.) Sonny and Cher separated in 1974 and divorced in 1975. (UF 10.) Mary and Sonny married in 1986 and remained married until Sonny's death in 1998. (UF 11.) Mary and Sonny had two children, Chesare, in 1988, and Chianna, in 1991. (UF 12.)

#### B. Sonny's Copyrights

Around 1964, Sonny began to perform with Cher. (UF 13.) The duo, as Sonny & Cher, performed and recorded multiple musical compositions, including works Sonny composed before and during their marriage. (UF 14.) Sonny's greatest works as a composer predate his marriage to Cher, including "I Got You Babe," "Bang Bang," and "The Beat Goes On." (UF 9, 15.) As the composer and author, Sonny owned the copyrights, as Cher herself recognizes. (UF 16.) The case solely concerns Sonny's composition copyrights.[1]

#### C. The MSA and Its Material Terms

On or about August 10, 1978, three years after their divorce, Cher and Sonny entered into the written MSA. (UF 1; *see also* UF 2.) In Section 10(d) of the MSA, Sonny agreed to pay Cher fifty percent of his "right, title and interest . . . in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part by Husband [Sonny]

---

[1] Sonny's sound recording copyrights were not terminated and Cher's share of the related record royalties is not at issue here because, among other reasons, federal copyright and the accompanying termination rights do not extend to pre-1972 sound recordings. *See, e.g.*, Melville B. Nimmer & David Nimmer, 2 NIMMER ON COPYRIGHT ("NIMMER") § 8[C][03]; *see also* ECF No. 43 at 7-8.

and others prior to February 1, 1974." (UF 3.) This included songs Sonny wrote before he married Cher and songs that Cher never performed. (UF 4.)

There are several applicable deductions before Cher receives her half of publishing income. First, under the original publishing agreements for Sonny's compositions, the original music publishers received a certain share of the royalties (the "Publisher Share"). (UF 35.) Second, after deduction of the applicable Publisher Share, the "receipts shall be subject to an administration fee" (the "Administration Fee") of up to ten percent of the gross income actually received. (UF 36, 37.) Sonny could use his "sole discretion" to engage an administrator. (UF 36.) During his lifetime, Sonny appointed himself, either personally or through his publishing entity Chris-Marc Music, as the administrator and collected the ten percent Administration Fee before splitting the remainder of the publishing income with Cher. (UF 37, 38.) Aside from the appointment of the administrator, which was at Sonny's sole discretion, Sonny and Cher agreed that "all agreements with third parties" regarding these musical compositions "are subject to the approval of Wife [Cher] or Wife's representatives which approval will not be unreasonably withheld." (UF 36.)

The following chart illustrates this division of one dollar in publishing income where the original publisher received twenty percent:



(UF 39); *see id.* (Cher testifying that there is nothing in this chart inconsistent with her understanding). In the above example, out of every dollar of publishing income, Sonny, during his lifetime, retained forty-four cents ($0.44) ($0.08 plus $0.36); Cher thirty-six cents ($0.36); and the original publishers twenty cents ($0.20). *See id.*

### D.  Sonny's Death

When Sonny died intestate in 1998, Mary was appointed administrator of his Estate. (UF 17.) In July 1998, Cher filed her creditor's claim against the Estate, raising Sonny's obligations to her under the MSA. (UF 18.) In or around July 1999, Mary, as administrator, and Cher settled the claims in an "Agreement re Creditor's Claim." (UF 19.) Mary and Cher confirmed Cher's "ongoing rights under the terms and conditions of the [MSA]" and agreed to "cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and to the heirs after the closing of this estate." (UF 20.) After all claims and other administrative matters were resolved, including Cher's creditor's claim, the residue of Sonny's Estate, including his royalty interests, was distributed to Mary, Christine, Chaz, Chesare, and Chianna (the "Bono Heirs"). (UF 21.)

### E.  Royalty Administration After Sonny's Death

As noted above, Sonny served as the royalty administrator during his lifetime, and received the ten percent Administration Fee. (UF 38.) After Sonny's death, Mary and Cher initially agreed to engaged Jay Glick as the royalty administrator (UF 22.) At Glick's suggestion, the Bono Heirs formed The Bono Collection Trust, with Mary as trustee, to serve as payee of royalties due the Bono Heirs. (UF 23.)

In or around 2011, the Bono Heirs and Cher agreed to terminate Glick and appoint Wixen Music Publishing, Inc. ("Wixen") as the royalty administrator for the ten percent Administration Fee. (UF 24.) Under this arrangement, the Bono Collection Trust was no longer necessary, and it was terminated by 2012. (UF 25.) Each of the Bono Heirs received, and continues to receive, their own shares of Sonny's publishing income directly from Wixen. (UF 26.) In April 2022, Cher

unilaterally terminated her agreements with Wixen. (UF 47, 48.) Since that time, Cher and the Bono Heirs have not agreed upon a royalty administrator. (UF 49.) The Bono Heirs have retained Wixen as the royalty administrator and pay Wixen an Administration Fee only out of their share of publishing royalties. (UF 50.)

## F. The Copyright Terminations

Sonny's copyright grants began to be eligible for termination in 2018, which meant that the Bono Heirs could serve notices of termination starting in 2008. (UF 27.) Mary raised the issue of termination several times with Cher's manager in charge of Cher's interests in Sonny's publishing. (UF 28.) In 2016, a majority of the Bono Heirs issued a notice of termination pursuant to 17 U.S.C. § 304(c) to various music publishers to whom Sonny had granted a transfer or license of copyright, or rights under them, in musical compositions authored or co-authored by Sonny, with effective dates of termination ranging from 2018 to 2026. (UF 29.)

After the terminations became effective, Wixen, at the Bono Heirs' direction, stopped paying Cher half of all of Sonny's U.S. composition royalties. (UF 30, 31.) The termination notice did not affect foreign income from Sonny's composition copyrights, and these are not the subject of this litigation. (UF 32.) Similarly, Sonny and Cher's master recordings, performance royalties, and other sources of income from Sonny's music were unaffected, as are royalties from grants subject to the derivative work exception. *Id*.; *see* 17 U.S.C. § 304(c)(6)(A).

## G. Cher Sells Her Music Interests

Cher sold assets to Iconic Cher LLC ("Iconic") under an asset purchase agreement dated December 9, 2022. (UF 5.) The general assignment, dated January 5, 2023 (the "Iconic Assignment"), gives Iconic "all of [Cher's] right, title, and interest in and to" assets, including the compositions at issue in this lawsuit. *Id.* The Iconic Assignment excluded this lawsuit "solely with respect to" royalties due under the MSA before July 1, 2022. (UF 6.) Cher also irrevocably assigned to Iconic the "Rights of Administration" for "the musical compositions written, composed, owned,

or controlled" by Sonny or his Bono Heirs. (UF 7.) Since this sale took place, Mary has worked with Iconic, Cher's successor-in-interest, to collect record royalties (from sound recordings) directly from record labels. (UF 53.)

### H.   Cher's Continued Approval Rights

Regardless of the copyright terminations and sale to Iconic, Mary has continued to allow Cher to approve the use of the music at issue because she "think[s] it is very important that she [Cher] approves." (UF 52, 54, 55, 56.) Mary and Wixen regularly communicated with Cher's representative Lindsay Scott whenever a person or entity asked for permission to use any of the songs. (UF 54.) Cher, via Scott, was given a say in how much the songs were worth and who should be allowed to use them. *Id.* Cher, via Scott, even vetoed projects if they were not in her best interest. (UF 55.) Nonetheless, Mary has continued to seek Cher's approval for uses of Sonny's compositions and there has not been a single use of Sonny's music that Cher did not approve. (UF 52, 56.)

## II.   PROCEDURAL HISTORY

Cher filed the Complaint for Declaratory Relief; and Breach of Contract on October 13, 2021. (ECF No. 1.) Mary filed a motion to dismiss on December 8, 2021. (ECF No. 18.) After briefing and oral argument, the Court granted the motion in part, with leave to amend, and denied in part. (ECF No. 43.) On March 14, 2023, Mary filed an answer to the complaint and counterclaim. (ECF No. 44.) On March 28, 2023, Cher filed the First Amended Complaint (the "FAC".) (ECF No. 45.) Mary filed the Answer to the First Amended Complaint for Declaratory Relief and Breach of Contract; Restatement of Counterclaims on April 11, 2023. (ECF No. 47.) Cher filed an Answer to Defendant's Counterclaims on May 2, 2023. (ECF No. 49.)

In the first claim in the FAC, Cher asserts a claim for declaratory relief regarding the effect of the Bono Heirs' Section 304(c) termination on her rights under the MSA. In the second claim, Cher asserts that Mary breached the MSA by (i) not paying Cher "fifty percent of the United States Composition Royalties";

(ii) "[r]epudiating Plaintiff's approval rights" for third-party agreements; (iii) "[r]epudiating Plaintiff's right to terminate the Wixen Agreements; (iv) allowing administrative fees above the limit in the MSA; and (v) "[r]efusing to honor Plaintiff's election to have her fifty percent of Record Royalties paid directly to her."

In her counterclaims, Mary asserts claims for declaratory relief (i) regarding Cher's rights and obligations concerning the selection of an administrator and (ii) Mary's rights and obligations under the MSA, including the negotiation and entry into new agreements to exploit Sonny's sound recording copyrights.

## ARGUMENT

## I.   STANDARD OF REVIEW

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those which may affect the outcome of the case." *Trump v. Intuitive Surgical, Inc.*, No. 18-CV-06413-LHK, 2020 WL 3163185, at *2 (N.D. Cal. June 12, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

"The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Rodriguez v. Wal-Mart Stores, Inc.*, No. LA CV17-05129 JAK (RAOx), 2019 WL 13042079, at *8 (C.D. Cal. Aug. 1, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

> Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Where the nonmoving party will have the burden of proof on an issue, however, the movant need only demonstrate that there is an absence of evidence to support the claims of the nonmoving party.

*Id.* (citing *Celotex Corp.*, 477 U.S. at 324). Where "the moving party meets its initial burden, the nonmoving party must set forth 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "[A] mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 252, 249). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322-23.

## II.   CHER LACKS STANDING

Cher lost standing to bring Count I when she sold her assets to Iconic. Accordingly, the Court should dismiss Count I, the claim for declaratory relief.

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "Standing to sue or defend is an aspect of the case-or-controversy requirement." *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 64 (1997). "Article III denies federal courts the power 'to decide questions that cannot affect the rights of litigants in the case before them'…." *Lewis*, 494 U.S. at 477 (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). A plaintiff "must continue to have a personal stake in the outcome of the lawsuit." *Id.* at 478 (internal quotations and citation omitted).

Cher does not have standing for Count I. Cher is seeking a declaration regarding the effect of termination on her current and future rights associated with Sonny's compositions. For example, Cher requests a declaration that she "[c]ontinues to own and owns an undivided fifty percent of the Composition Royalties" and "[c]ontinues to have approval rights as to any and all third party contracts." FAC ¶¶ 43(a), (d). The evidence produced by Cher shows that, effective December 9, 2022, she sold her "right, title, and interest in and to" the compositions to Iconic and

irrevocably assigned it her administrative rights. (UF 5.) Assuming *arguendo* that Cher had a right to royalties or administration rights before the sale, she does not have them now. Accordingly, Count I should be dismissed for lack of standing.

The only interest in this lawsuit that Cher maintains is her interest in pre-July 1, 2022 royalties, i.e., Count II. Count II, however, fails for other reasons.

## III.   CHER FAILED TO ADD INDISPENSABLE PARTIES: THE BONO HEIRS[2]

Cher has failed to join Sonny's four children—Christine, Chaz, Chesare, and Chianna—to this matter. All of them are indispensable parties and, without them, complete relief cannot be accorded.

To determine whether a party is necessary, the Court must make "three successive inquiries" under Rule 19—the "Required Joinder of Parties" rule. *E.E.O.C. v. Peabody Western Coal Co.*, 610 F.3d 1070, 1078 (9th Cir. 2010). "First, the court must determine whether a nonparty should be joined under Rule 19(a)." *Id.* (citation omitted). "[T]he second stage is for the court to determine whether it is feasible to order that an absentee be joined." *Id.* (citation and internal punctuations omitted). Finally, if joinder is determined not to be feasible, a court must then "determine whether the case can proceed without the absentee, or whether the action must be dismissed." *Id.*

### A.   Sonny's Children are Necessary Parties

A party may be found necessary under Rule 19(a) in three different ways. "First, they may be necessary if, in their absence, the Court cannot accord complete relief among the existing parties." *Salt River Project Agr. Imp. And Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012) (citing Fed. R. Civ. P. 19(a)(1)(A)).

---

[2] Where a Rule 19 issue is presented at summary judgment, a court must "construe [this aspect of] the motion as one to dismiss for failure to join an indispensable party under Rule 12(b)(7)." *E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005) (citing *Dredge Corp. v. Penny*, 338 F.2d 456, 463-64 (9th Cir. 1964)); *see also McCowen v. Jamieson*, 724 F.2d 1421, 1424 (9th Cir. 1984) (noting that Rule 19 "is sufficiently important that it can be raised at any stage of the proceedings—even sua sponte").

"Second, they may be necessary if they have an interest in the action and resolving the action in their absence may, as a practical matter, impair or impede their ability to protect that interest." *Id.* (citing Fed. R. Civ. P. 19(a)(1)(B)(i)). "Third, they may be necessary if they have an interest in the action and resolving the action in their absence may leave an existing party subject to inconsistent obligations because of that interest." *Id.* (citing Fed. R. Civ. P. 19(a)(1)(B)(ii)). All apply here.

Cher alleges that she continues to be entitled to half of *all* the publishing royalties under the MSA, including from the terminated copyrights. *See* FAC ¶¶ 12-19, 37-39. But because her claims affect Sonny's children's interests, Rule 19 would require her to name them as defendants. Here, to get around Rule 19 and her naming Sonny's children as defendants, Cher originally alleged that Sonny's five statutory heirs transferred their royalty rights to The Bono Collection Trust. *See* FAC ¶ 27. But the evidence demonstrates that The Bono Collection Trust was terminated no later than 2012. (UF 25.) Thus, any decision rendered by the Court would affect Sonny's four children.

Indeed, Cher essentially asks the Court to determine whether, and to what extent, the copyrights—and accompanying economic benefit—in Sonny's works reverted to all the Bono Heirs pursuant to the notice of termination. 17 U.S.C. § 304(a)(1)(C). But this is a determination that concerns Sonny's children's rights as statutory heirs under the 1976 Act. Moreover, as the Bono children are successors to Sonny's interests under the MSA pursuant to California's probate laws, Cal. Prob. Code §§ 6400, *et seq.*, they are necessary parties to Cher's claim of breach of the MSA. *See Jacobsen v. Luckenbach S. S. Co.*, 201 F. Supp. 883, 889 (D. Or. 1961) ("Where rights sued upon arise out of contract, all parties thereto are deemed indispensable and should be joined.") (citing *Ward v. Deavers*, 203 F.2d 72, 75 (D.C. Cir. 1953)).

///

///

### B.     Joinder of Sonny's Children to this Litigation is Feasible

There are only three circumstances in which joinder is not feasible: "when venue is improper, when the absentee is not subject to personal jurisdiction, and when joinder would destroy subject matter jurisdiction." *Peabody Western Coal*, 400 F.3d at 779 (citing Fed. R. Civ. P. 19(a); *Tick v. Cohen*, 787 F.2d 1490, 1493 (11th Cir. 1986)). Here, none of these circumstances make joinder of Sonny's children infeasible.

First, there is no dispute that venue is proper in this Court. *See* FAC ¶ 4 (citing 28 U.S.C. § 1391(b)). Nor is there any dispute that the Court has subject matter jurisdiction. *See* FAC ¶ 1; *see Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312-15 (2005) (discussing federal question jurisdiction). And, assuming that each of Sonny's children is duly served with the summons and complaint, the Court will have personal jurisdiction based on their "sufficient 'contacts, ties, or relations' … [with] the forum state." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945); *see World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291-292 (1980).

Because Sonny's children are necessary parties, and because it is feasible to join them to this litigation, Cher's failure to do so warrants dismissal of this litigation.

### C.     The Case Cannot Proceed Without Christine, Chaz, Chesare, and Chianna's Involvement

Even if the Court were to determine that any of Sonny's children cannot be feasibly joined to the action, the Court should still dismiss the case because the litigation simply cannot proceed without the inclusion of all the statutory heirs.

"A nonparty in whose absence an action must be dismissed is one who 'not only [has] an interest in the controversy, but [has] an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience." *Peabody Western Coal Co.*, 610 F.3d

at 1078 (quotation omitted). To determine whether the action should proceed where joinder is not feasible, courts balance four factors: (1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum." *Dawavendewa v. Salt River Project Agr. Imp. and Power Dist.*, 276 F.3d 1150, 1161-62 (9th Cir. 2002) (citation omitted).

Here, Cher is seeking damages and a declaratory judgment concerning her rights to Sonny's publishing royalties, based upon her incorrect interpretation of the 1976 Act and its interplay with the MSA, which none of the Bono Heirs signed but to which Cher seeks their compliance. Whatever decision the Court makes will affect not only Mary's interests, but also those of Sonny's children. Cher is indisputably seeking a remedy that includes Sonny's children's interests. Indeed, at Cher's insistence and with the agreement of the Bono Heirs, all of the publishing royalties at issue in this dispute, including those belonging to Christine, Chaz, Chianna and Chesare, that have been received as of no later than April 6, 2022, have been placed in a separate account (UF 33.) And, as Cher's counsel acknowledged, any ruling by the Court "should be issue preclusive" as to Christine, Chaz, Chianna, and Chesare. (UF 34.) For Sonny's children to be subject to a court order that they have not had the opportunity to defend against would be prejudicial. *See Clinton v. Babbitt*, 180 F.3d 1081, 1090 (9th Cir. 1999) (determining prejudice test under Rule 19(b) is essentially the same as the inquiry under Rule 19(a)). Moreover, no relief can be shaped to lessen the prejudice to one Bono Heir without the relief affecting all other Bono Heirs. Finally, other than in this Court, there are no alternative forums to which the statutory heirs may be heard while this matter is pending before it.

///
///
///
///

Because this case cannot proceed without the involvement of Sonny's children, they are indispensable parties.[3] The Court should dismiss this litigation.

## IV. THE BONO HEIRS PROPERLY TERMINATED THE GRANTS AND NOW OWN THE COPYRIGHTS UNENCUMBERED BY THE MSA

In the ruling on the motion to dismiss, the Court wrote: "[o]n this record, it has not presently been established that Plaintiff's rights to the Composition Royalties have been terminated." *See* ECF No. 43 at 8. The parties have now developed a record that establishes that the MSA was not terminated and that there is no evidence that the notice of termination was ineffective. (UF 31.) The questions for the Court now are whether Sonny had an ownership interest in the recaptured term of copyright in 1978 and, if so, whether he was able to alienate that ownership right at that time. Federal law is clear on both points.

### A. History of Copyright Termination

#### 1. The Copyright Act of 1909

Since the Copyright Act of 1909, Congress has sought to allow authors and their heirs a chance to recapture the economic value of copyrighted works that the author bargained away. The mechanism set forth in the 1909 Act was an inalienable right of the author or the author's heirs to a second, or renewal, term of copyright. This renewal term "was intended to benefit authors by enabling them or their families to have a second opportunity to market their works after an original sale of the copyright." 3 NIMMER § 9.02 (footnote omitted) ("the renewal provision was clearly intended to benefit authors"). As the House Report for the 1909 Act explained: "It not infrequently happens that the author sells his copyright outright to a publisher for

---

[3] Any request to join Sonny's children at this time should be rejected as unduly prejudicial both to Mary, who has litigated this claim since 2021, and to Sonny's children, who have had no participation in this litigation. The parties have already engaged in motion practice and discovery, and they are now seeking resolution of their respective claims. To the extent there is any suggestion of modifying the scheduling order or moving to amend the pleadings, the Court should reject those requests because good cause has not been demonstrated and the timing to amend has passed, respectively. *See* Fed. R. Civ. P. 15, 16(b)(4).

a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right." *Id*. (quoting H.R. Rep. No. 2222, 60th Cong., 2d Sess. p. 14); *see also Stewart v. Abend*, 495 U.S. 207, 218 (1990); *White-Smith Music Publishing Co. v. Goff*, 187 F. 247, 251 (1st Cir. 1911); *Woods v. Bourne Co.*, 60 F.3d 978, 982 (2d Cir. 1995). When the first term of copyright expired, the author or the author's heirs, if the author had died, could apply to renew the copyright for a second term and obtain better terms for the sale or license of a valuable copyright, including, as Nimmer specifically notes, negotiating an increase in royalties. 3 NIMMER § 9.02 (noting that both the calculation and numerical amount of the royalty percentage would benefit from the author's improved bargaining position due to the renewal provision).

Though Congress's intent was clear, much of the law's purpose was undone by the Supreme Court in *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943). In a heavily criticized ruling, the Court held that "the Copyright Act of 1909 does not nullify agreements by authors to assign their renewal interests." *Id.* at 657-58. *See, e.g.*, 3 NIMMER § 9.06[B][1] (describing Justice Frankfurter's analysis of Congressional intent as "highly questionable"). After *Fisher*, predatory publishers could have authors sign over their renewal rights at the same time they assigned their copyrights to the publishers, negating the Congressional intent to allow authors to renegotiate their deals later from a more powerful position. Nonetheless, heirs retained their rights to the renewal term: An author could only assign the renewal right if it vested in her- or himself. **Even post-*Fisher*, an author could not alienate her or his heirs' right to the renewal term**. *See Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375 (1960) (the 1909 Act granted an author's surviving spouse and children "the renewal right, irrespective of whether the author in his lifetime has or has not made any assignment of it"); *De Sylva v. Ballentine*, 351 U.S.

570, 582 (1956) ("Since the author cannot assign his family's renewal rights, [Section 24 of the 1909 Act] takes the form of a compulsory bequest of the copyright to the designated persons.").

### 2.  The Copyright Act of 1976

In overhauling U.S. copyright law under the 1976 Act, Congress intended to improve and strengthen authors and their heirs' "second chance" at a copyright by (a) simplifying the procedural mechanism of copyright recapture and (b) overturning *Fisher*.

#### a)  The New Copyright Recapture System

Instead of a second term of copyright that reverts the copyright to an author or the author's heirs, the 1976 Act provides for a termination of transfers and licenses to effect the same reversion of rights. 17 U.S.C. §§ 203, 304; 3 NIMMER § 11.01[A] (explaining how Congress created a new system for copyright recapture because the renewal structure of the 1909 Act was "procedurally clumsy and difficult"). *See, e.g.*, *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985) ("[T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product."); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 984 (9th Cir. 2008) ("Without such a right of termination, the Extended Renewal Term [the 1976 Act's extension of copyrights by 19 years] would constitute a windfall to grantees.").

Terminated rights under the 1976 Act are, like a second term of copyright, a "***new property right***" that passes unencumbered to the author's statutory heirs. 3 NIMMER § 11.07[B][3] (emphasis added). "The renewal term of a copyright is not merely an extension of the original copyright term but ***a new estate … clear of all rights, interests or licenses granted under the original copyright***." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (emphasis added) (quoting *P.C. Films Corp. v. MGM/UA Home Video Inc.*, 138 F.3d 453, 457

(2d Cir. 1998)); *see also* 3 NIMMER § 11.07[B][3] ("[T]he benefits of copyright recapture … include[e] the new property right of an extended term of protection."); *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 117 (2d Cir. 2018) ("the renewal term is a 'new estate ... clear of all rights, interests or licenses granted under the original copyright.'") (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir. 1951)). The terminated rights at issue here are the unencumbered property of the Bono Heirs, and Cher has no right to them.

### b) Overturning *Fisher* in Favor of Inalienable Rights

To overturn *Fisher,* the 1976 Act provides that authors cannot bargain away their termination rights before they vest. 17 U.S.C. §§ 203(a)(5), 304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant."); 3 NIMMER § 11.07[B] ("Because Congress concluded that alienable reversionary interests did not adequately protect authors in their relationships with publishers and other assignees of their works, it expressly rendered those rights inalienable and unwaivable when it granted the termination of transfer right under the current Act in 1976 and, again, via an amendment in 1998."); *id.* § 11.07[A] ("After judicial interpretation of the 1909 Act frustrated this intent by upholding advance assignments of renewal terms, Congress spoke unambiguously in 1976: 'Termination of the grant may be effected notwithstanding *any* agreement to the contrary.…'") (quoting §§ 203(a)(5), 304(c)(5)) (emphasis added by Nimmer); *Stewart*, 495 U.S. at 230 ("The 1976 Copyright Act provides a single, fixed term, but provides an ***inalienable*** termination right.") (emphasis added); *Classic Media*, 532 F.3d at 985 (applying this quote from *Stewart*, as it applies to § 203, to the identical language of its "close counterpart," § 304(c)); BLACK'S LAW DICTIONARY (11th ed. 2019) (An inalienable right is "[a] right that cannot be transferred or surrendered.").

Termination rights become alienable only after the author (or the author's heirs) serves the notice of termination or, in certain situations, has the right to serve

such notice. 17 U.S.C. §§ 203(b)(4) and 304(c)(6)(D); *Classic Media*, 532 F.3d at 987 (discussing the "distinct factual scenario" of *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005) (further grant to original grantee's successor is effective where heir had the right to serve a termination notice)); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 198 (2d Cir. 2008) ("[The 1976 Act] created for authors or their statutory heirs … an inalienable right to terminate the grant of a transfer or license."). The MSA, therefore, could not have granted rights to the renewal term of the copyrights at issue. In addition, Sonny was not alive when his copyright grants were eligible for termination, so he never could have granted that interest to anyone, including Cher. *See Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 139 (2d Cir. 2022) (author could not have transferred renewal rights to third party because author died before termination right vested in author and thus author "did not own the contingent rights held by" his statutory heirs); *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 684 (2d Cir. 1993) ("there is a strong presumption against the conveyance of renewal rights"); 3 NIMMER § 9.06[B][1] ("if the author does not survive until such time as the renewal vests, then the next succeeding class under Section 304(a) may obtain the renewal rights free and clear of any prior assignment (or other transfer) executed by the author"); *id.* § 9.06[C] ("in the usual case where an assigning author does not survive to renewal vesting, his widow and children acquire renewal right ***unencumbered by any prior assignments***") (emphasis added).

Nimmer provides an illustrative example of how a third-party's rights that stem from a grant of a copyright are limited by the terms of the grant, whether the limits are contractual or statutory:

> Suppose that author *A* grants copyright in his work to *B*, and *B* in turn grants such copyright to *C*. *A* clearly has a right of termination against *B*. Because the grant to *C* was executed neither by the author, nor by a renewal claimant, it might be argued that no statutory right of termination exists against *C*. Even if this were true, it would not mean that *C* might continue to enjoy the benefit of his grant from

*B* although *B*'s rights had been terminated by *A*. **C's rights would be cut off simply because he can succeed to no greater rights than *B* had the power to convey.** Without *A*'s grant to *B*, *C* would be an infringer of *A*'s copyright. If the original grant from *A* to *B* had by its terms provided for a reversion to *A* thirty-five years after execution, *B* would lack the power to convey rights to *C* beyond such thirty-five-year period. **The fact that reversion from *B* to *A* occurs by operation of law rather than by the express terms of the grant to *B* does not enlarge the rights that *B* can convey to *C*.**

3 NIMMER § 11.02[A][4][b] (emphasis added). Nimmer's comment that "it might be argued that no statutory right to termination exists against *C*" because "the grant to *C* was [not] executed by the author" indicates that there is no question that a later grant to *C* by the author is subject to termination rights. *See id.*

## B.   Cher Agrees that Sonny Could Not Have Bargained Away Rights He Did Not Possess.

Cher agrees with the commonsense conclusion that the MSA reaches only property that belonged to Sonny in 1978. In 1978, Sonny owned fifty percent of the television program "The Sonny and Cher Comedy Hour," while writer and co-creator Chris Bearde owned twenty-five percent. (UF 42.) In 2001, Mary purchased Bearde's twenty-five percent for herself and her then-minor children, Chesare and Chianna. (UF 44.) Despite the MSA granting Cher half of the receipts of "Sonny and Cher" television programming and the MSA being binding on the Bono Heirs (UF 43), Cher agreed that she is not entitled to royalties arising from the twenty-five percent that Mary purchased from Bearde. (UF 45); *see Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (1960) ("actions speak louder than words" when interpreting a contract); Cal. Civ. Code § 1636; Cal. Civ. Proc. Code § 1856(c) ("The terms set forth in a writing … may be explained or supplemented by … course of performance"); *Emps. Reinsurance Co. v. Superior Ct.*, 161 Cal. App. 4th 906, 920 (2008) ("a course of performance [is] relevant in ascertaining the meaning of the parties' agreement") (internal quotation omitted); *see also Hays v. Temple*, 23 Cal. App. 2d 690, 694 (1937) (an individual who is not a party to a contract cannot be

bound by that contract). Similarly, Cher does not have a claim to the new copyright estates created by terminations that Congress granted solely to the Bono Heirs. *See* Cal. Civ. Code § 1641 ("whole of a contract is to be taken together … each clause helping to interpret the other").

### C.   The Bono Heirs are the Beneficiaries, Not an Ex-Wife Grantee

The 1976 Act was designed to protect and benefit Sonny's widow and children, not his publishers or one of his ex-wives. *See Brown-Thomas v. Hynie*, Case No. 2:18-cv-00307-SVW-JPR, 2018 WL 3811353, at *1 (C.D. Cal. Aug. 7, 2018) ("A previous spouse is not entitled to termination interests."). Congress identified exactly who it was protecting and benefiting by naming the heirs who can terminate the grants if the author is deceased: the author's surviving spouse and descendants. 17 U.S.C. § 304(c)(2). The author is not permitted to disrupt this statutory scheme by naming other heirs. § 304(c)(2)(B); § 304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary, ***including an agreement to make a will or to make any future grant***.") (emphasis added); 3 NIMMER § 11.07[B][3] ("This provision shows Congress's intent to give the author's statutory successors, ***rather than the author's assignees or devisees***, the benefits of copyright recapture—including the new property right of an extended term of protection.") (emphasis added).

Though Cher played an integral role in Sonny's success and is Sonny's ex-wife, for all relevant purposes, she is a grantee and must be treated as such. Under Cher's legal theory, a publisher could evade the termination provisions of the 1976 Act by simply including a separate clause assigning royalties to the publisher. An author's heirs would be left with worthless post-termination copyrights which bear no additional royalties and whose every use must be approved by the publisher. This cannot be the result. Such a ruling would not only run contrary to the text of the 1976 Act, but it would eviscerate the purpose of the termination provisions of the 1976 Act, just as *Fisher* frustrated the purposes of the 1909 Act.

**D.**   **"I Believe I Should Have What I Had Before": Cher Is Not Entitled To More Than She Received In 1978**

Assuming *arguendo* that Cher has some continuing right to Sonny's royalties, Cher should be entitled at most to the percentage she received when the MSA went into effect. In the MSA, Sonny agreed to grant Cher half of what he was entitled to after the Publisher Share and the Administrator's Share had been paid. (UF 36, 37.) Now that the Publisher Share has been terminated, those royalties should go to the Bono Heirs alone.

Notably, this is what Cher wants. In reviewing the chart depicted in Section I(C) above, she testified, "My concept is that I should get what I've always gotten," and testified further,

> Q But just to, I think, restate what you've testified to, if, from a dollar, you receive $0.36 before the terminations, you should receive $0.36 after the terminations; is that correct?
>
> ***A Yes, I -- I believe I should have what I had before.***

(UF 40); *see also* Cal. Civ. Code § 1636. In other words, the Publisher Share should revert solely to the Bono Heirs. While Mary believes that the entire copyright reverts to the Bono Heirs, as discussed above, if the Court views the "grant" that is terminated under Section 304(c) as the Publisher's Share, then when "all rights under this title that were covered by the terminated grant revert" to the statutory heirs (§ 304(c)(6)), it is the Publisher's Share that reverts to the Bono Heirs.

This finding would prevent a windfall to Cher (or her assignee). *See, e.g.*, *Classic Media*, 532 F.3d at 984 ("The 1976 Act, and in particular its twin termination of transfer provisions, were in large measure designed to assure that its new benefits would be for the authors and their heirs… Without such a right of termination, the Extended Renewal Term would constitute a windfall to grantees."). Cher should not be entitled to more than what she bargained for in the MSA. *See* UF 40. Cher is not an intended beneficiary of Section 304, as discussed in Section IV(C), above. The

Publisher's Share going to the Bono Heirs alone is consistent with Congress's expressed intent to benefit the statutory heirs, also as discussed above. It is also more consistent with the language of the 1976 Act that "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary," than the position advocated by Cher, namely that this statutory provision is ineffectual, and the Heir's terminations have no effect on the MSA. § 304(c)(5).

As a matter of public policy, finding that the Publisher Share reverts to statutory heirs and not to a party that was granted a royalty interest is more rational than forcing heirs to split a reverted interest with a grantee. First, it would preserve the general right to freedom of contract and alienability of property. Second, it allows for predictability when an artist or writer sells or grants her royalties to another. At the time of contracting, a grantee would know what will happen to its interest if its own grant or if other grants are terminated. Third, this ruling would allow an artist or his or her heirs to terminate unfavorable contracts while preserving other grants. Fourth, and most importantly, it is consistent with Congress's intent that, where an author has died, the economic benefits of copyright terminations should be granted solely to an author's heirs.

## V.   CHER'S REMAINING CLAIMS FOR RELIEF SHOULD BE DISMISSED

Cher's other claims regarding Mary's alleged breaches of contract should also be dismissed. As a foundational matter, the Court should look solely to the MSA for any contractual claims because the Creditor Claim Agreement's condition that the parties "agree to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the Bono Heirs after the closing of this estate" is no longer binding. (UF 20, 48.) First, by its own words, this was a one-time obligation that was fulfilled by appointing Jay Glick as the royalty administrator upon the closing of Sonny's estate. (UF 20); Cal. Civ. Code § 1473. Second, the term is aspirational and too uncertain to be legally binding. *See., e.g.*,

*Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811-12 (1998). Third, if the term were an ongoing obligation, Cher has breached the Creditor Claim Agreement by unilaterally terminating Wixen. (UF 47, 48.) In that case, Mary may, and does, elect to consider the agreement terminated.

### A.    Royalty Payments

Cher asserts that Mary breached the MSA by not paying Cher "fifty percent of the United States Composition Royalties." Compl. ¶ 49(a). For all of the reasons set forth in Section IV, since the termination, Cher is no longer entitled to half of the royalties for Sonny's U.S. composition copyrights.

### B.    Approval Rights

Cher alleges that Mary breached the MSA by not respecting her approval rights regarding agreements with third parties. Compl. ¶ 49(b). There is no evidence to support this claim. (UF 54 (neither Cher nor her manager responsible for approvals are aware of a single use of Sonny's music that Cher did not approve).) Indeed, there is no controversy on this point. (UF 52 ("I've continued to this day to make sure that she [Cher] approves, and I actually think it is very important that she approves."); UF 7 (Cher assigned her rights of administration to Iconic).) Accordingly, this claim should be dismissed.

### C.    Royalty Administration

Cher asserts that Mary breached the MSA by "[r]epudiating Plaintiff's right to terminate the Wixen Agreements" and "[r]efusing to honor Plaintiff's election to have her fifty percent of Record Royalties paid directly to her[.]" Compl. ¶¶ 49(c), (e). First, while Mary preferred to collaborate with Cher on designating an administrator, Mary acknowledges that Cher is permitted to terminate her own agreements with Wixen. (UF 46.) Indeed, Cher *did* terminate her contracts with Wixen, which termination Mary does not dispute. (UF 47, 48.) Second, Mary has not stopped Cher from having her record royalties paid directly to her. To the contrary, Mary has cooperated with Iconic—the current owner of said royalties—to have the

record royalties paid directly. (UF 53.) Finally, and fatally, there are no damages, since the only administrative fee that was collected was by Wixen, *pursuant to Cher's own agreement with Wixen*. (UF 57, 58); *see, e.g.*, *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (damages to plaintiff is a necessary element of a breach of contract claim); *N.B. Scrivner & Wilson, Inc. v. Mobil Oil Corp.*, 914 F.2d 263 (9th Cir. 1990) (upholding dismissal of breach of contract claim on summary judgment where plaintiff "failed to meet its burden to prove the amount and elements of damages it suffered as a result of the alleged breach.").

Cher has a similarly baseless claim that there were administrative fees above the ten percent limit set forth in the MSA. Compl. ¶ 49(d). The only administrative fees at issue were collected by Wixen, who had a base administration fee of ten percent, pursuant to agreements *entered into by Cher*. (UF 57, 58.)

## VI. MARY IS ENTITLED TO SUMMARY JUDGMENT ON HER COUNTERCLAIMS

In her counterclaims, Mary asserts claims for declaratory relief regarding (i) Cher's rights and obligations concerning the selection of an administrator and (ii) Mary's rights and obligations under the MSA, including the negotiation and entry into new agreements to exploit the sound recording copyrights the Bono Heirs own. *See* Answer and Rest. Counterclaims, ¶¶ 39-51.

First, the Bono Heirs have the right, at their sole discretion, to appoint a worldwide administrator for the publishing royalties subject to the MSA, including themselves or an entity owned by themselves, and to pay the administrator ten percent. (UF 36, 49, 50.) This is the same right that Sonny exercised in his lifetime. (UF 37, 38); *see, e.g.*, *Crestview Cemetery*, 54 Cal. 2d at 754; Cal. Civ. Code § 1636; Cal. Civ. Proc. Code § 1856(c); *Emps. Reinsurance Co.*, 161 Cal. App. 4th at 920. The Bono Heirs have this right, and obligation, because, regardless of the outcome of this litigation, Cher continues to have a right to receive fifty percent of certain publishing royalties pursuant to the MSA, including all non-U.S. publishing income

and U.S. income from works subject to the derivative work exception of Section 304. 17 U.S.C. §§ 304(c)(6)(E) (termination does not affect foreign rights), 304(c)(6)(A) (derivative work exception). Accordingly, the Bono Heirs need to continue to administer royalties under the MSA. Mary intends to either have Wixen continue to administer royalties, with Cher paying her full and fair share of the ten percent Administration Fee or, alternatively, designate an entity that she owns as the royalty administrator, as Sonny did, and use the Administration Fee to pay third parties to ensure a continued proper administration of Cher and the Bono Heirs' royalties. (UF 51.)

Second, Mary has the right to negotiate new agreements for sound recording royalties without giving Cher fifty percent of the royalties. The MSA grants Cher an interest in sound (master) recording royalties *only* that are paid "from Atlantic Recording Corporation under the agreement dated August 30, 1966 … from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964 … [and] from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971." (UF 60.) Accordingly, Mary has the right to renegotiate these agreements and neither Cher nor Iconic would be entitled to any of the royalties.

## **CONCLUSION**

For the reasons stated above, the Court should grant summary judgment in favor of Defendant and Counterclaimant Representative Mary Bono.

Respectfully submitted,

Dated: November 20, 2023          DONAHUE FITZGERALD LLP


By: */s/ Daniel J. Schacht*
          Daniel J. Schacht
          Mario M. Choi
          Hayley M. Lenahan
          *Attorneys for Defendant and Counterclaimant*
          *MARY BONO*