1  DANIEL J. SCHACHT, #259717
   dschacht@donahue.com
2  MARIO M. CHOI, #243409
   mchoi@donahue.com
3  HAYLEY M. LENAHAN, #343528
   hlenahan@donahue.com
4  DONAHUE FITZGERALD LLP
   Attorneys at Law
5  1999 Harrison Street, 26th Floor
   Oakland, California  94612-3520
6  Telephone:  (510) 451-3300
   Facsimile:   (510) 451-1527
7
   *Attorneys for Defendant and Counterclaimant*
8  *MARY BONO*

9            UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11                 WESTERN DIVISION

12

13  CHER, individually and as Trustee of     Case No. 2:21-CV-08157 JAK (RAOx)
    The Veritas Trust,
14                                           **DEFENDANT'S STATEMENT OF**
              Plaintiff,                     **UNCONTROVERTED FACTS**
15                                           **AND CONCLUSIONS OF LAW IN**
         v.                                  **SUPPORT OF MOTION FOR**
16                                           **SUMMARY JUDGMENT**
    MARY BONO, individually and as
17  Trustee of the Bono Collection Trust,    Date:      February 26, 2024
    and DOES 1 through 10, inclusive,        Time:      8:30 a.m.
18                                           Judge:     Hon. John A. Kronstadt
              Defendants.                    Ctrm:      10B
19
20                                           Complaint Filed:  October 13, 2021
                                             Trial Date: n/a
21

22
23  AND RELATED COUNTERCLAIMS

24

25

26

27

28

Defendant Mary Bono ("Mary" or "Defendant") submits the following Statement of Uncontroverted Facts and Conclusions of Law, together with references to supporting evidence, in support of her Motion for Summary Judgment.

## I.   SEPARATE STATEMENT OF UNCONTROVERTED FACTS

### A. Defendant is Entitled to Summary Judgment as to Plaintiff Cher's ("Cher" or "Plaintiff") First Claim for a Declaratory Judgment. ECF No. 45 at 12-16.

#### 1. Cher Lacks Standing to Bring Her Claim Because She Sold Her Rights and Interests to Third Party Iconic.

| Uncontroverted Fact | Supporting Evidence Citation |
|---|---|
| 1.      On or about August 10, 1978, Plaintiff Cher ("Cher") and Sonny Bono ("Sonny") entered into a written Marriage Settlement Agreement (the "MSA"). | Decl. of Daniel Schacht in Supp. of Def. Mary Bono's Mot. for Summ. J., dated Nov. 20, 2023 ("Schacht Decl."), Ex. 1 (Marriage Settlement Agreement, entered August 10, 1978 ("MSA")).<br><br>First Amended Complaint, filed Mar. 28, 2023 ("FAC"), ¶ 13 (ECF No. 45). |
| 2.      Cher does not recall the negotiations regarding the MSA. | *See* MSA.<br><br>Schacht Decl., Ex. 3 (Dep. of Cher, dated Sept. 5, 2023 ("Cher Dep.")), at 37:24-38:1.<br><br>Q: Do you have any recollection of the negotiations around this agreement [the MSA] with Sonny? A: No.<br><br>Schacht Decl., Ex. 4 (Dep. of Lindsay Scott, dated Aug. 17, 2023 ("Scott Dep.")), at 47:23-25.<br><br>Q: Have you ever seen a copy of the Marriage Settlement Agreement? A: I don't believe so.<br><br>Scott Dep. at 48:9-12.<br><br>Q: Do you have any knowledge of the negotiations of that Marriage Settlement Agreement from 1978? A: No. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

| Uncontroverted Fact | Supporting Evidence Citation |
|---|---|
| | Schacht Decl., Ex 5 (Cher's Resp. to Interrog., dated Mar. 13, 2023 ("Resp. to Interrog.")), No. 1. <br><br> List the name and last known contact information for each person with knowledge of the facts set forth in your complaint. <br> Without waiving the foregoing objections and the objections in the Preliminary Statement, Plaintiff responds as follows: The name and last known contact information for each person presently known to Plaintiff and whom Plaintiff believes is likely to have discoverable information which Plaintiff may use to support the claims in her Complaint are as follows: <br> • Plaintiff []; <br> • Defendant []; <br> • One or more designated witnesses on behalf of Wixen Music Publishing, LLC [*sic*] []; <br> • Randall Wixen []; <br> • Lisa Alter, Esq., Alter, Kendrick & Baron, LLP []; <br> • Jacqueline Charlesworth, Esq., Charlesworth Law []; and <br> • Lindsay Scott []. |
| 3.    In Section 10(d) of the MSA, Sonny agreed to pay Cher fifty percent of his "right, title and interest . . . in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part by Husband [Sonny] and others prior to February 1, 1974." | MSA § 10(d). <br><br> FAC ¶ 16. |
| 4.    The MSA granted Cher an interest in musical compositions Sonny wrote before he married Cher and songs that Cher never performed. | MSA § 10(d). <br><br> FAC ¶ 16. <br><br> Schacht Decl., Ex. 2 (General Assignment, dated Jan. 5, 2023 ("Iconic Agreement")), C-000660-63 (APA Schedule of Included Compositions). |

DONAHUE FITZGERALD LLP <br> ATTORNEYS AT LAW <br> OAKLAND

| Uncontroverted Fact | Supporting Evidence Citation |
|---|---|
| 5.    Cher sold assets, including the musical compositions at issue in this lawsuit, to Iconic Cher LLC ("Iconic") pursuant to an asset purchase agreement dated December 9, 2022 and a General Assignment dated January 5, 2023, in which the General Assignment gives Iconic "all of [Cher's] right, title, and interest in and to" assets, including the compositions at issue in this lawsuit. | Schacht Decl., Ex. 28 (Cher's Resp. to Interrog., dated June 22, 2023), No. 12.<br><br>Identify the third party to whom you assigned "various rights and properties, including the right to receive certain amounts due and payable to [you] under the MSA on or after July 1, 2022," as stated in Paragraph 32 to Plaintiff's Answer to Defendant's Counterclaim.<br>Iconic Cher LLC.<br><br>Cher Dep. at 85:10-11.<br><br>Q: What did you sell to Irving Azoff's company?<br>A What -- what was mine, up to Believe.<br><br>Scott Dep. at 65:16-66:3.<br><br>Q: Are you aware of whether Cher has sold her mu- -- any musical assets?<br>A I'm aware of...<br>Q: What is your understanding of what she sold?<br>A Well, I wasn't involved in it. So my understanding is what -- if -- if I wasn't her personal manager, I would -- my understanding would be exactly the same as what anybody who reads about it in the press is, and that she sold the rights to her royalties for all of her work up to the album called "Believe" in 1999.<br>Q: Do you know to whom she sold those to?<br>A A company called Iconic.<br><br>Schacht Decl., Ex. 21 (March 2, 2023 email re termination).<br><br>Schacht Decl., Ex. 2 (Iconic Agreement) at C-000652, 654.<br><br>The assets on Schedule B include "the Subject Compositions," which is defined in Schedule A as:<br><br>the interest of any Assignor |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

DEF.'S SEPARATE STMT ISO MOT. FOR
SUMMARY JUDGMENT

CASE NO. 2:21-CV-08157-JAK (RAOX)

| Uncontroverted Fact | Supporting Evidence Citation |
|---|---|
| | [i.e., Cher] in any and all musical compositions written, composed, owned, or controlled by Artist, Bono, or any successor-in-interest to Bono, directly or indirectly, in whole or in part, which were created prior to January 1, 2022, including those musical compositions set forth Schedule E (but excluding the Excluded Compositions), together with all the titles, music, and lyrics of such musical compositions, any and all arrangements, adaptations, editions, translations, foreign language versions, and derivative works thereof, and all Copyrights therein and thereto. |
| 6.     The Iconic Assignment excluded this lawsuit "solely with respect to" royalties due under the MSA before July 1, 2022. | Schacht Decl., Ex. 2 (Iconic Agreement) at C-000655. |
| 7.     Cher irrevocably assigned to Iconic the "Rights of Administration" for "the musical compositions written, composed, owned, or controlled" by Sonny or the Bono Heirs. | Schacht Decl., Ex. 2 (Iconic Agreement) at C-000639. |

## 2.  Cher Failed to Add Indispensable Parties: The Bono Heirs

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 8.     Christine Bono was born in 1958 to Sonny and his first wife, Donna Rankin. | Decl. of Mary Bono, dated Nov. 20, 2023 ("Bono Decl."), ¶ 4. |
| 9.     Sonny and Cher married on November 24, 1967, and had a child, Chaz Bono, in 1969. | MSA §§ 1, 3. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

- 5 -

DEF.'S SEPARATE STMT ISO MOT. FOR
SUMMARY JUDGMENT

CASE NO. 2:21-CV-08157-JAK (RAOX)

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 10.    Sonny and Cher separated on or about February 1, 1974 and divorced on or about June 27, 1975. | FAC ¶ 12.<br><br>MSA §§ 2, 5. |
| 11.    Mary and Sonny married in 1986 and remained married until Sonny died in 1998. | Bono Decl. ¶ 3. |
| 12.    Mary and Sonny had two children: Chesare Bono in 1988 and Chianna Bono in 1991. | Bono Decl. ¶ 3. |
| 13.    Around 1964, Sonny began to perform with Cher, and they performed as the duo "Sonny and Cher" in the 1960s and 1970s. | FAC ¶ 9. |
| 14.    The duo performed as "Sonny & Cher" and recorded multiple musical compositions, including works Sonny composed before and during their marriage. | FAC ¶ 9.<br><br>Schacht Decl., Ex. 2 (Iconic Agreement), C-000660-63 (APA Schedule of Included Compositions). |
| 15.    Sonny's works as a composer include "I Got You Babe" (copyrighted 1965), "Bang Bang" (copyrighted 1966), and "The Beat Goes On" (copyrighted December 30, 1966 and March 16, 1967). | FAC ¶ 9<br><br>Schacht Decl., Ex. 2 (Iconic Agreement), C-000660-63 (APA Schedule of Included Compositions). |
| 16.    As the composer of these songs, Sonny owned the copyrights, as Cher herself recognizes. | FAC ¶ 10.<br><br>MSA § 10(d).<br><br>Cher Dep. at 54:21-55:4.<br><br>Q: It -- you have certain royalty rights to Sonny's music publishing interest; is that correct?<br>A I have -- I know that I get money, and it has something to do -- I mean, it has something to do with music. I know I get money from Sonny. I have been for all these years, and it has something to do with music. Now, can I tell you it's -- I don't know what specific place it comes from. |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 1.      On or about August 10, 1978, Cher and Sonny entered into the MSA. | *See* MSA.<br><br>FAC ¶ 13. |
| 2.      Cher does not recall the negotiations regarding the MSA. | *See* MSA.<br><br>Cher Dep. at 37:24-38:1.<br><br>Scott Dep. at 47:23-25, 48:9-12.<br><br>Schacht Decl., Ex 5 (Resp. to Interrog.), No. 1. |
| 3.      In Section 10(d) of the MSA, Sonny agreed to pay Cher fifty percent of his "right, title and interest . . . in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part by Husband [Sonny] and others prior to February 1, 1974." | MSA § 10(d).<br><br>FAC ¶ 16. |
| 4.      The MSA granted Cher an interest in musical compositions Sonny wrote before he married Cher and songs that Cher never performed. | MSA § 10(d).<br><br>FAC ¶ 16.<br><br>Schacht Decl., Ex. 2 (Iconic Agreement), C-000660-63 (APA Schedule of Included Compositions). |
| 17.     When Sonny died intestate in 1998, Mary was appointed administrator of his Estate. | FAC ¶ 21.<br><br>Schacht Decl., Ex. 6 (Dep. of Mary Bono, dated Aug. 16, 2023 ("Bono Dep.")), at 23:16-24:2.<br><br>Q: Sorry. It's one of those things we're supposed to ask. When did Mr. Bono pass?<br>A. 1988.<br>Q: Did he leave a will?<br>A. Excuse me. 1998.<br>Q: Did he leave a will?<br>A. No, he did not.<br>Q: Is it correct that you served as administrator of his estate?<br>A. Yes.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's |

Donahue Fitzgerald LLP<br>Attorneys at Law<br>Oakland

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | Claim Filed by Cher, entered July 6, 1999). |
| 18.    In July 1998, Cher filed her creditor's claim against Sonny's Estate, raising Sonny's obligations to her under the MSA. | FAC ¶ 22.<br><br>Schacht Decl., Ex. 9 (Creditor's Claim, dated July 16, 1998). |
| 19.    In or around July 1999, Mary, as administrator, and Cher settled Cher's creditor claim against Sonny's estate in an "Agreement re Creditor's Claim." | FAC ¶ 23.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 20.    The "Agreement re Creditor's Claim" confirmed Cher's "ongoing rights under the terms and conditions of the [MSA]" and Mary, as administrator of Sonny's estate, and Cher agreed to "cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and to the heirs after the closing of this estate." | FAC ¶ 23.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 21.    After the claims and other administrative matters were resolved, including Cher's creditor claim, the residue of Sonny's Estate, including his royalty interests, was distributed to Mary, Christine, Chaz, Chesare, and Chianna Bono (together, the "Bono Heirs"). | FAC ¶ 24.<br><br>Schacht Decl., Ex. 11 (Order Approving First and Final Account and Report of Special Administrator and Administrator; Petition for Statutory Fees and for Extraordinary Attorneys' Fees and for Final Distribution, dated Aug. 16, 1999). |
| 22.    After Sonny's death, Mary and Cher agreed to engage Jay Glick as administrator. | Bono Dep. at 41:19-42:1.<br><br>Q: Was any mechanism agreed upon to collect and disburse the royalties to Cher and the heirs?<br>A. Yes. Multiple times. Twice.<br>Q: What was the first mechanism?<br>A. Warren and I agreed to hire my CPA. His name was Jay Glick. And that he would be the independent maybe -- he would be the credible third party to collect and distribute royalties. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

- 8 -

DEF.'S SEPARATE STMT ISO MOT. FOR
SUMMARY JUDGMENT

CASE NO. 2:21-CV-08157-JAK (RAOX)

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 23.    At Glick's suggestion, the Bono Heirs formed The Bono Collection Trust, with Mary as trustee, to serve as payee of royalties due the Bono Heirs. | Bono Dep. at 60:19-61:14.<br><br>Q: Okay. Have you heard the phrase the Bono Collection Trust?<br>A. Yes.<br>Q: When was the trust formed?<br>MR. SCHACHT: Calls for a legal conclusion. Go ahead.<br>THE WITNESS: The trust was formed when we hired Jay Glick.<br>BY MR. ANDERSON:<br>Q: And what was the purpose of the Bono Collection Trust?<br>MR. SCHACHT: Same objection. Go ahead.<br>THE WITNESS: The only purpose of the Bono Collection Trust was to be able to open a bank account in -- so to create a depository of all the royalties that would be distributed. Rather than putting it in Jay Glick's trust account or any other trust account, that it was our specific account solely for receiving royalties and then disbursing them quarterly. |
| 24.    In or around 2011, the Bono Heirs and Cher agreed to terminate Glick's services as the royalty administrator and appoint Wixen Music Publishing, Inc. ("Wixen") as the royalty administrator. Wixen received a fee of ten percent of the publishing income. | FAC ¶ 29.<br><br>Bono Decl. ¶ 8.<br><br>Bono Dep. at 100:8-15.<br><br>Q: You also said that -- and I believe this is what you said -- that the termination of the Bono Collection Trust was agreed to. By -- agreed to among whom?<br>A. I was -- okay. Perhaps I speculated. The decision to move from Jay Glick to Wixen Music Publishing was unanimous between our side and Cher's side. Everybody felt it was a good idea.<br><br>Schacht Decl., Exs. 12 (2011 Collection Agreement); 13 (2011 Administration Agreement); 14 (2011 Promotion Agreement). |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

DEF.'S SEPARATE STMT ISO MOT. FOR
SUMMARY JUDGMENT

CASE NO. 2:21-CV-08157-JAK (RAOX)

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 25.    After the appointment of Wixen as royalty administrator, The Bono Collection Trust was terminated no later than 2012 because it was no longer necessary. | Bono Dep. at 97:22-99:11. <br><br> Q: If we can go to the last page. There is a reference or statement as follows: "Bono Collection Trust has been incorporated into Wixen Music Publishing, Inc." Do you see that? <br> A. Yes. <br> Q: Who provided that language? <br> A. Jay, Jay Glick. <br> Q: Did you have any conversations with Jay Glick about that language? <br> A. No. <br> Q: Do you have an understanding as to what he meant by this language? <br> A. I have an understanding and I think it is pretty straightforward that -- and by the way, Jay wasn't happy when I moved everything. But that his responsibility in collecting and distributing the royalties had been shifted over to Wixen Music Publishing. So he -- yeah. <br> Q: Do I understand correctly that your understanding of this was that Bono Collection Trust was – had been shifted over so that Wixen Music Publishing was collecting the moneys from Bono Collection Trust and disbursing them? <br> A. Yes. And Bono Collection Trust was terminated. <br> Q: What makes you think that Bono Collection Trust was terminated? <br> A. Well, I'm not a lazy person, but I didn't feel like I needed to do tax returns for an entity that had no money. So we terminated it. We have the termination filing with the IRS, that we stated we're terminating it, and then just shifted it all over to Wixen. Again, this was an agreed-upon decision with both sides. <br> Q: What – well, first of all, what documents indicate that the Bono Collection Trust was terminated? <br> A. The final tax return. <br> Q: Anything else? <br> A. Not that I recall. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | Schacht Decl. Ex. 15 (United States House of Representatives Calendar Year 2012 Financial Disclosure Statement for Defendant, dated March 26, 2013).<br><br>Schacht Decl., Ex. 16 (2012 Final Tax Return for Bono Collection Trust). |
| 26.    Since the termination of The Bono Collection Trust, each of the Bono Heirs has been directly receiving, and continues to directly receive, from Wixen their own shares of Sonny's publishing income. | Bono Dep. at 101:14-103:15.<br><br>Q: When Wixen -- excuse me -- replaced Jay Glick and was making -- was paying out the net 50 percent that went to Sonny and then to Sonny's heirs, you and the four children, did Wixen send or make a direct -- I'm sorry. Let me take this apart. Did Wixen pay by check or did it do direct deposits?<br>A. Originally?<br>Q: Yes.<br>A. I don't recall.<br>Q: Did Wixen send the payment to you for you to split it up between the -- with you and the four children?<br>A. No.<br>Q: Did Wixen pay you a portion of the net 50 percent that was Sonny's share?<br>A. Yes.<br>Q: And did Wixen pay each of the -- to your knowledge, did Wixen pay each of the children separately?<br>A. Yes. |
| 27.    Sonny's copyright grants began to be eligible for termination in 2018, which meant that the Bono Heirs could serve notices of termination starting in 2008. | Schacht Decl., Ex. 2 (Iconic Agreement) at C-000660-63 (APA Schedule of Included Compositions); *id.*, Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). |
| 28.    Mary raised the issue of termination several times with Cher's manager in charge of Cher's interests in Sonny's publishing. | Schacht Decl., Ex. 22 (Aug. 17, 2016 string of emails from R. Wixen to Mary Bono and L. Scott).<br><br>Schacht Decl., Ex. 23 (July 14, 2011 email from R. Wixen to Mary Bono and Warren Grant re termination). |

DONAHUE FITZGERALD LLP<br>ATTORNEYS AT LAW<br>OAKLAND

| | |
|---|---|
| 1 | Bono Dep. at 35:12-36:4. |
| 2 | Q: Is it correct that the conversation |
| 3 | you had with Roger Davies in that time period had -- did not involve the notice of termination? |
| 4 | A. I don't recall. |
| 5 | Q: Did you ever mention the notice of termination? And you know what I'm referring to by the notice of |
| 6 | termination? |
| 7 | A. Yes. Q: Did you ever mention the notice of |
| 8 | termination to Roger Davies? A. I did not. I assumed he knew. |
| 9 | Q: What was that assumption based on? |
| 10 | A. That Lindsay had known. Q: How did Lindsay know about the |
| 11 | notice of termination? A. Lindsay was notified by Randall. |
| 12 | Q: Who told you that? A. I don't recall. |
| 13 | Schacht Decl., Ex. 7 (Dep. of Randall |
| 14 | Wixen, dated June 15, 2023 ("Wixen Dep.")), at 92:13-95:20. |
| 15 | A. Yeah, this does reflect my |
| 16 | recollection that both Mary and the Cher parties knew what was going |
| 17 | on and were fully aware and were being copied on everything. |
| 18 | Q: What conversations did you have with Warren Grant about the notices |
| 19 | of termination that Copyright Recapture had done? |
| 20 | A. I don't recall. Q: And do you recall any |
| 21 | conversations with Mary Bono in this time period regarding notices of |
| 22 | termination? MR. SCHACHT: Same objection and |
| 23 | request. A. Yes. |
| 24 | MR. ANDERSON: Again, I'm just asking if he recalls, I haven't even |
| 25 | gotten to what -- MR. SCHACHT: If it is just about |
| 26 | whether you recall, then I retract the objection. |
| 27 | A. I don't recall, but they were both clearly in the loop and I was keeping |
| 28 | them in the loop. BY MR. ANDERSON: |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | Q: Were you keeping them in the loop because you understood that Wixen was to treat them equally? A. Yes. |
| 29.    In 2016, through their attorney Jacqueline Charlesworth, former General Counsel and Associate Register of Copyrights of the U.S. Copyright Office, a majority of the Bono Heirs issued a notice of termination pursuant to 17 U.S.C. § 304(c) to various music publishers and companies to whom Sonny had granted a transfer or license of copyright, or rights under them, in musical compositions authored or co-authored by Sonny, with effective dates of termination ranging from 2018 to 2026. | Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions). |
| 30.    After the terminations became effective, Wixen stopped paying the U.S. copyright royalties of those terminated musical compositions to Cher. | Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions). Schacht Decl., Ex. 26 (Feb. 20, 2020 Email re Copyright Terminations). |
| 31.    The MSA was not terminated and there is no evidence that the notice of termination was ineffective. | Schacht Decl., Ex. 1 (MSA). Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). |
| 32.    The termination notice did not affect foreign agreements related to Sonny's musical compositions, so Cher continued to receive her portion of those royalties. Similarly, Sonny and Cher's master recordings, performance royalties, and other sources of income from Sonny's music were unaffected. | Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions). |
| 33.    On January 25, 2022, Cher made her approval of a commercial synch license for the song "I Got You Babe" contingent on half of the U.S. publishing fee being deposited in an escrow account to be disbursed to the | Schacht Decl., Ex. 29 (Jan. 26, 2022 email from Wixen to Schacht re "'I Got You Babe' (Bono) – Freshpet – Pet Food Commercial"). |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| appropriate party upon resolution of this litigation, which the Bono Heirs agreed to. Starting no later than April 6, 2022, Wixen has placed the publishing royalties in dispute in this litigation in a separate account. | Bono Decl. ¶ 13.<br><br>Schacht Decl., Ex. 30 (Mar 23, 2023 emails regarding money held in separate account). |
| 34.   In the meet-and-confer conference regarding this motion, Cher's counsel said that a ruling in this lawsuit "should be issue preclusive" as to Sonny's children. | Schacht Decl. ¶ 34. |

### 3.  The Bono Heirs Properly Terminated the Grants and Now Own the Copyrights Unencumbered by the MSA

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 8.    Christine Bono was born in 1958 to Sonny and his first wife, Donna Rankin. | Bono Decl. ¶ 4. |
| 9.    Sonny and Cher married on November 24, 1967, and had a child, Chaz Bono, in 1969. | MSA §§ 1, 3. |
| 10.   Sonny and Cher separated on or about February 1, 1974 and divorced on or about June 27, 1975. | FAC ¶ 12<br><br>MSA §§ 2, 5. |
| 11.   Mary and Sonny married in 1986 and remained married until Sonny died in 1998. | Bono Decl. ¶ 3. |
| 12.   Mary and Sonny had two children: Chesare Bono in 1988 and Chianna Bono in 1991. | Bono Decl. ¶ 3. |
| 13.   Around 1964, Sonny began to perform with Cher, and they performed as the duo "Sonny and Cher" in the 1960s and 1970s. | FAC ¶ 9. |
| 14.   The duo performed as "Sonny & Cher" and recorded multiple musical compositions, including works Sonny composed before and during their marriage. | FAC ¶ 9.<br><br>Schacht Decl., Ex. 2 (Iconic Agreement), C-000660-63 (APA Schedule of Included Compositions). |

- 14 -

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 15.    Sonny's works as a composer include "I Got You Babe" (copyrighted 1965), "Bang Bang" (copyrighted 1966), and "The Beat Goes On" (copyrighted December 30, 1966 and March 16, 1967). | FAC ¶ 9<br><br>Schacht Decl., Ex. 2 (Iconic Agreement), C-000660-63 (APA Schedule of Included Compositions). |
| 16.    As the composer of these songs, Sonny owned the copyrights, as Cher herself recognizes. | FAC ¶ 10.<br><br>MSA § 10(d).<br><br>Cher Dep. at 54:21-55:4. |
| 1.    On or about August 10, 1978, Cher and Sonny entered into the MSA. | MSA<br>FAC ¶ 13. |
| 2.    Cher does not recall the negotiations regarding the MSA. | *See* MSA.<br><br>Cher Dep. at 37:24-38:1.<br><br>Scott Dep. at 47:23-25, 48:9-12.<br><br>Schacht Decl., Ex 5 (Resp. to Interrog.), No. 1. |
| 4.    The MSA granted Cher an interest in musical compositions Sonny wrote before he married Cher and songs that Cher never performed. | MSA § 10(d).<br><br>FAC ¶ 16.<br><br>Schacht Decl., Ex. 2 (Iconic Agreement), C-000660-63 (APA Schedule of Included Compositions). |
| 35.    Under the publishing agreements for Sonny's musical compositions, the original publishers received a certain share of the royalties. | Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)).<br><br>MSA § 10(d) (Cher's fifty percent interest is calculated based on the amount Sonny received "less costs of conversion and collection (including sub-publisher' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers").<br><br>Wixen Dep. at 41:23-43:16.<br><br>Q: Do you know what Warner/Chappell's portion of the |

- 15 -

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | collection, the amount it was able to keep was? <br> … <br> Q: Please tell me what you think you remember. <br> A. My recollection was that it was a 60/40 copublishing deal, meaning that 40 percent of the income on the publisher half of the income was retained by Warner/Chappell or its predecessors, and that 60 percent of the publisher's half was due to whoever was the Bono parties. <br> … <br> Q: And do I understand correctly that -- let's talk about Warner/Chappell, for example, that it collects monies with respect to the compositions that it publishes and it pays over 60 percent --under this collection agreement, it pays to Wixen 60 percent of what it has collected, Wixen then takes a 10 percent fee and then distributes the balance? <br> A. No, that's wrong. <br> Q: Did Wixen commission the money -- the collections that Warner/Chappell disbursed? <br> A. Yes. <br> Q: So how is it wrong? <br> A. You said that they paid over 60 percent. I believe it is 60 percent of the publisher's half and all of the writer's half. So I believe that -- if I'm recalling correctly, that they would have paid 80 percent of their receipts over to Wixen and then we would have taken our commission. <br><br> Schacht Decl., Ex. 2 (Iconic Agreement) at C-000660-63 (APA Schedule of Included Compositions). |

DONAHUE FITZGERALD LLP <br> ATTORNEYS AT LAW <br> OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 3.      In Section 10(d) of the MSA, Sonny agreed to pay Cher fifty percent of his "right, title and interest . . . in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part by Husband [Sonny] and others prior to February 1, 1974." | MSA § 10(d).<br><br>FAC ¶ 16. |
| 36.     The MSA states that "All said contingent receipts [payable to Cher] shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's [Sonny's] sole discretion. Said administration fee shall be sum equivalent to 10% of the gross income actually received by Husband [and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10) (d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld." | MSA § 10(d).<br><br>FAC ¶ 17. |
| 37.     Cher's fifty percent interest in the contingent receipts from Sonny's musical compositions was paid net of (*i.e.*, after deduction of) the administration fee. | MSA § 10(d).<br><br>Bono Dep. at 20:19-21.<br><br>Q: So net of the administration fee, Sonny and Cher each got 50 percent of the net amount?<br>A. Correct.<br><br>Bono Decl. ¶ 6. |
| 38.     During his lifetime, Sonny appointed himself, either personally or through his publishing entity, Chris-Marc Music, as the royalty administrator and paid himself the ten percent Administration Fee set forth in the MSA. | Bono Dep. at 19:19-20:18.<br><br>Q: Okay. Is it your understanding that under the MSA -- excuse me -- the marriage settlement agreement, under this provision Cher receives -- received, at least until the events that gave rise to this litigation, that Cher was receiving 50 percent of the musical composition royalties that Sonny Bono -- actually let me break that down. Prior to Sonny Bono's |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | passing, did you have any understanding as to what royalties Cher received with respect to musical compositions that Sonny had written, co-written, or acquired during the marriage?<br>A. Yes.<br>Q: What was your understanding?<br>A. That all royalties went to Sonny and to -- he kept them quarterly and withheld a 10 percent administration fee for doing the work. And then quarterly he would distribute her share, which would have been 45 percent.<br>Q: 45 percent after the deduction of a 10 percent admin fee?<br>A. Correct. 55 to him, 45 to her.<br>Q: And he got 55 because he also collected the 10 percent administration fee?<br>A. Correct.<br><br>Bono Decl. ¶¶ 6-7. |
| 39.    The chart below illustrates the division in Sonny's publishing income pursuant to the MSA during Sonny's lifetime and prior to the copyright terminations, where the original publisher received twenty percent. Cher testified that she is not aware of anything inconsistent with the chart.<br><br> | MSA § 10(d).<br><br>Wixen Dep. at 41:23-43:16 (original publisher Warner/Chappell received twenty percent)<br><br>Bono Dep. at 19:19-20:18 (Sonny received 10% administration fee and paid half of the remaining 90% to Cher).<br><br>Bono Decl. ¶¶ 6-7 (Sonny received 10% administration fee and paid half of the remaining 90% to Cher).<br><br>Schacht Decl., Ex. 8 (Ex. 73) (chart).<br><br>Cher Dep. at 79:1-81:18.<br><br>Q: And, Cher, do you see that graph [Ex. 73]?<br>A Absolutely.<br>Q: Okay. So what I want to get at -- as soon as I pull it up -- hold on. Ah, there it is. I'm going to represent to you that there's certain publishers that took a percentage of Sonny's publishing income, which is |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
|  | represented by the publisher there, and at times, that percentage was 20 percent. I'll also represent to you that Sonny took an administration fee of 10 percent of the remaining share during his lifetime, either he or through Chris-Marc Music, and that he then paid you, either directly or through one of your entities, half of the remainder. Is there anything that you're aware of that is inconsistent with my representation that I just made to you?<br>A No, there's nothing that I'm aware of.<br>Q: Okay. And so does that graph kind of make sense to you, that there's a dollar of publishing income at source, as it's often called, $0.20 --<br>A I --<br>Q: -- would go to the --<br>A I have to tell you, I -- I didn't know that he took that percentage for distributing the – he took the -- what did he take the percentage for?<br>Q: It was called an administration fee.<br>A Okay. No, I didn't know that.<br>Q: But there's nothing -- again, there's nothing that you're aware of that's inconsistent with that?<br>A No.<br>…<br>Q: And so is it your under- -- I will also represent to you that the copyright notices seek to get that $0.20 in this chart back to Sonny's heirs, at least as to U.S. income. Do you have any awareness of anything inconsistent with that representation?<br>[]<br>THE WITNESS: No, I don't -- I don't know it -- I don't know it at all.<br>BY MR. SCHACHT:<br>Q: Okay. Now, is it your understanding that Mary's claim is that the terminations would, as to the U.S. revenue, leave you with zero from this dollar; is that correct?<br>A Yes.<br>Q: Is your claim -- let me ask you this: Do you have an understanding of |

- 19 -

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
|  | your claim as to what you should get under this chart?<br>A My concept is that I should get what I've always gotten.<br>Q: And would that be the $0.36 here?<br>A Babe, I don't know.<br>Q: But just to clar- --<br>A It's your chart. So I don't know. I mean, they're just numbers for me.<br>Q: But just to, I think, restate what you've testified to, if, from a dollar, you receive $0.36 before the terminations, you should receive $0.36 after the terminations; is that correct?<br>A Yes, I -- I believe I should have what I had before. |
| 40.   In reviewing the chart depicted immediately above, Cher testified as follows:<br><br>Q: Is your claim -- let me ask you this: Do you have an understanding of your claim as to what you should get under this chart?<br>A My concept is that I should get what I've always gotten.<br>…<br>Q: But just to, I think, restate what you've testified to, if, from a dollar, you receive $0.36 15 before the terminations, you should receive $0.36 after the terminations; is that correct?<br>A Yes, I -- I believe I should have what I had before. | Schacht Decl., Ex. 8 (Ex. 73) (chart).<br><br>Cher Dep. at 81:3-18.<br><br>Q: Is your claim -- let me ask you this: Do you have an understanding of your claim as to what you should get under this chart [Ex. 73]?<br>A My concept is that I should get what I've always gotten.<br>Q: And would that be the $0.36 here?<br>A Babe, I don't know.<br>Q: But just to clar- --<br>A It's your chart. So I don't know. I mean, they're just numbers for me.<br>Q: But just to, I think, restate what you've testified to, if, from a dollar, you receive $0.36 15 before the terminations, you should receive $0.36 after the terminations; is that correct?<br>A Yes, I -- I believe I should have what I had before. |
| 41.   Cher testified that she "thought [she] would only be getting the money that [she] usually get[s]." | Cher Dep. at 113:6-11.<br><br>THE WITNESS: I don't know. I -- I – I thought I would only be getting the money that I usually get." |

Donahue Fitzgerald LLP<br>Attorneys at Law<br>Oakland

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 17.    When Sonny died intestate in 1998, Mary was appointed administrator of his Estate. | FAC ¶ 21.<br><br>Bono Dep. at 23:16-24:2.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 18.    In July 1998, Cher filed her creditor's claim against Sonny's Estate, raising Sonny's obligations to her under the MSA. | FAC ¶ 22.<br><br>Schacht Decl., Ex. 9 (Creditor's Claim, dated July 16, 1998). |
| 19.    In or around July 1999, Mary, as administrator, and Cher settled Cher's creditor claim against Sonny's estate in an "Agreement re Creditor's Claim." | FAC ¶ 23.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 20.    The "Agreement re Creditor's Claim" confirmed Cher's "ongoing rights under the terms and conditions of the [MSA]" and Mary, as administrator of Sonny's estate, and Cher agreed to "cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and to the heirs after the closing of this estate." | FAC ¶ 23.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 21.    After the claims and other administrative matters were resolved, including Cher's creditor claim, the residue of Sonny's Estate, including his royalty interests, was distributed to the Bono Heirs. | FAC ¶ 24.<br><br>Schacht Decl., Ex. 11 (Order Approving First and Final Account and Report of Special Administrator and Administrator; Petition for Statutory Fees and for Extraordinary Attorneys' Fees and for Final Distribution, dated Aug. 16, 1999). |
| 26.    Since the termination of The Bono Collection Trust, each of the Bono Heirs has been directly receiving, and continues to directly receive, from Wixen their own shares to the Royalties. | Bono Dep. at 101:14-103:15. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 27.    Sonny's copyright grants began to be eligible for termination in 2018, which meant that the Bono Heirs could serve notices of termination starting in 2008. | Schacht Decl., Ex. 2 (Iconic Agreement) at C-000660-63 (APA Schedule of Included Compositions); id., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). |
| 28.    Mary raised the issue of termination several times with Cher's manager in charge of Cher's interests in Sonny's publishing. | Schacht Decl., Ex. 22 (Aug. 17, 2016 string of emails from R. Wixen to Mary Bono and L. Scott).<br><br>Schacht Decl., Ex. 23 (July 14, 2011 email from R. Wixen to Mary Bono and Warren Grant re termination).<br><br>Bono Dep. at 35:12-36:4.<br><br>Wixen Dep. at 92:13-95:20. |
| 29.    In 2016, through their attorney Jacqueline Charlesworth, former General Counsel and Associate Register of Copyrights of the U.S. Copyright Office, a majority of the Bono Heirs issued a notice of termination pursuant to 17 U.S.C. § 304(c) to various music publishers and companies to whom Sonny had granted a transfer or license of copyright, or rights under them, in musical compositions authored or co-authored by Sonny, with effective dates of termination ranging from 2018 to 2026. | Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)).<br><br>Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions). |
| 30.    After the terminations became effective, Wixen stopped paying the U.S. copyright royalties of those terminated musical compositions to Cher. | Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions).<br><br>Schacht Decl., Ex. 26 (Feb. 20, 2020 Email re Copyright Terminations). |
| 31.    The MSA was not terminated and there is no evidence that the notice of termination was ineffective. | *See* MSA.<br><br>Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 32.     The termination notice did not affect foreign agreements related to Sonny's musical compositions, so Cher continued to receive her portion of those royalties. Similarly, Sonny and Cher's master recordings, performance royalties, and other sources of income from Sonny's music were unaffected. | Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)).<br><br>Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions). |
| 42.     Sonny owned fifty percent of the television program "The Sonny and Cher Comedy Hour," while another twenty-five percent was owned by the writer and co-creator Chris Bearde. | Bono Decl. ¶ 12.<br><br>Cher Dep. at 69:22-70:15.<br><br>Q: Okay. So did you know that Chris Bearde -- let me ask you this, who is Chris Bearde?<br>A Chris Bearde was one of the producers.<br>Q: Do you know –<br>A This was --<br>Q: Oh, go ahead.<br>A This is my thought on this. I knew that Chris and Allen had some sort of percentage, and I knew at some point that Mary was wanting to buy it up. I don't know exactly what happened.<br>Q: Okay. So I'm going to represent to you that Sonny had a 50 percent interest and that Allen and Chris each had a 25 percent interest?<br>A Okay. So I --<br>Q: Is that -- sorry, let me finish the question, please. Is that consistent with your recollection?<br>A No. I -- no, it's not, but I believe what you're saying.<br>Q: Okay. So you don't have a reason to believe that I'm misstating those percentages?<br>A Absolutely not. |
| 43.     The MSA grants Cher fifty percent of the receipts of "Sonny and Cher" television programming and states that it "shall be binding upon, and shall inure to the benefit of, each of the parties hereto, and their respective heirs and assigns." | MSA §§ 10(e), (f), 21. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
Oakland

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 44.     Mary purchased Chris Bearde's twenty-five percent share of "The Sonny and Cher Comedy Hour" in or around 2001, for herself and as guardian of her then-minor children, Chesare and Chianna Bono. | Bono Decl. ¶ 12.<br><br>Cher Dep. at 72:16-20.<br><br>Q: Okay. And you mentioned that Mary Bono purchased Chris Bearde's share later --<br>A Yes.<br>Q: -- is that correct?<br>A Yes. |
| 45.     Cher testified that she is not entitled to royalties arising from the twenty-five percent share of "the Sonny and Cher Comedy Hour" that Mary purchased from Chris Bearde. | Cher Dep. at 72:16-24<br><br>Q: Okay. And you mentioned that Mary Bono purchased Chris Bearde's share later --<br>A Yes.<br>Q: -- is that correct?<br>A Yes.<br>Q: Is it your position that you would be entitled to a percentage of the royalties that come from Chris Bearde's share that Mary Bono purchased?<br>A No. |
| 5.     Cher sold assets, including the musical compositions at issue in this lawsuit, to Iconic pursuant to an asset purchase agreement dated December 9, 2022 and a General Assignment dated January 5, 2023, in which the General Assignment gives Iconic "all of [Cher's] right, title, and interest in and to" assets, including the compositions at issue in this lawsuit. | Schacht Decl., Ex. 28 (Cher's Resp. to Interrog. No. 12).<br><br>Cher Dep. at 85:10-11.<br><br>Scott Dep. at 65:16-66:3.<br><br>Schacht Decl., Ex. 21 (March 2, 2023 email re termination).<br><br>Schacht Decl., Ex. 2 (Iconic Agreement) at C-000652, 654. |

### B. Defendant Mary Bono is Entitled to Summary Judgment as to Plaintiff Cher's Second Claim for Breach of Contract. ECF No. 45 at 16-17.

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 1.     On or about August 10, 1978, Cher and Sonny entered into the MSA. | *See* MSA.<br><br>FAC ¶ 13. |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 2.    Cher does not recall the negotiations regarding the MSA. | *See* MSA.<br><br>Cher Dep. at 37:24-38:1.<br><br>Scott Dep. at 47:23-25, 48:9-12.<br><br>Schacht Decl., Ex 5 (Resp. to Interrog.), No. 1. |
| 4.    The MSA granted Cher an interest in musical compositions Sonny wrote before he married Cher and songs that Cher never performed. | MSA § 10(d).<br><br>FAC ¶ 16.<br><br>Schacht Decl., Ex. 2 (Iconic Agreement), C-000660-63 (APA Schedule of Included Compositions). |
| 35.    Under the publishing agreements for Sonny's musical compositions, the original publishers received a certain share of the royalties. | Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)).<br><br>MSA § 10(d).<br><br>Wixen Dep. at 41:23-43:16.<br><br>Schacht Decl., Ex. 2 (Iconic Agreement) at C-000660-63 (APA Schedule of Included Compositions). |
| 3.    In Section 10(d) of the MSA, Sonny agreed to pay Cher fifty percent of his "right, title and interest . . . in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part by Husband [Sonny] and others prior to February 1, 1974." | MSA § 10(d).<br><br>FAC ¶ 16. |
| 36.    The MSA states that "All said contingent receipts [payable to Cher] shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's [Sonny's] sole discretion. Said administration fee shall be sum equivalent to 10% of the gross income actually received by Husband [and Chris-Marc Music from all sources worldwide. Husband | MSA § 10(d).<br><br>FAC ¶ 17. |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| agrees that all agreements with third parties respecting the subject matter of this Paragraph (10) (d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld." | |
| 37.   Cher's fifty percent interest in the contingent receipts from Sonny's musical compositions was paid net of (*i.e.*, after deduction of) the administration fee. | MSA § 10(d).<br><br>Bono Dep. at 20:19-21.<br><br>Bono Decl. ¶ 6. |
| 38.   During his lifetime, Sonny appointed himself, either personally or through his publishing entity, Chris-Marc Music, as the royalty administrator and paid himself the ten percent Administration Fee set forth in the MSA. | Bono Dep. at 19:19-20:18.<br><br>Bono Decl. ¶¶ 6-7. |
| 39.   The chart below illustrates the division in Sonny's publishing income pursuant to the MSA during Sonny's lifetime and prior to the copyright terminations, where the original publisher received twenty percent. Cher testified that she is not aware of anything inconsistent with the chart.<br><br> | MSA § 10(d).<br><br>Wixen Dep. at 41:23-43:16.<br><br>Bono Dep. at 19:19-20:18.<br><br>Bono Decl. ¶¶ 6-7.<br><br>Schacht Decl., Ex. 8 (Ex. 73) (chart).<br><br>Cher Dep. at 79:1-81:18. |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 40.    In reviewing the chart depicted immediately above, Cher testified as follows:<br><br>Q: Is your claim -- let me ask you this: Do you have an understanding of your claim as to what you should get under this chart?<br>A My concept is that I should get what I've always gotten.<br>...<br>Q: But just to, I think, restate what you've testified to, if, from a dollar, you receive $0.36 15 before the terminations, you should receive $0.36 after the terminations; is that correct?<br>A Yes, I -- I believe I should have what I had before. | Schacht Decl., Ex. 8 (Ex. 73) (chart).<br><br>Cher Dep. at 81:3-18. |
| 41.    Cher testified that she "thought [she] would only be getting the money that [she] usually get[s]." | Cher Dep. at 113:6-11. |
| 17.    When Sonny died intestate in 1998, Mary was appointed administrator of his Estate. | FAC ¶ 21.<br><br>Bono Dep. at 23:16-24:2.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 18.    In July 1998, Cher filed her creditor's claim against Sonny's Estate, raising Sonny's obligations to her under the MSA. | FAC ¶ 22.<br><br>Schacht Decl., Ex. 9 (Creditor's Claim, dated July 16, 1998). |
| 19.    In or around July 1999, Mary, as administrator, and Cher settled Cher's creditor claim against Sonny's estate in an "Agreement re Creditor's Claim." | FAC ¶ 23.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 20.   The "Agreement re Creditor's Claim" confirmed Cher's "ongoing rights under the terms and conditions of the [MSA]" and Mary, as administrator of Sonny's estate, and Cher agreed to "cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and to the heirs after the closing of this estate." | FAC ¶ 23.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 21.   After the claims and other administrative matters were resolved, including Cher's creditor claim, the residue of Sonny's Estate, including his royalty interests, was distributed to the Bono Heirs. | FAC ¶ 24.<br><br>Schacht Decl., Ex. 11 (Order Approving First and Final Account and Report of Special Administrator and Administrator; Petition for Statutory Fees and for Extraordinary Attorneys' Fees and for Final Distribution, dated Aug. 16, 1999). |
| 26.   Since the termination of The Bono Collection Trust, each of the Bono Heirs has been directly receiving, and continues to directly receive, from Wixen their own shares to the Royalties. | Bono Dep. at 101:14-103:15. |
| 27.   Sonny's copyright grants began to be eligible for termination in 2018, which meant that the Bono Heirs could serve notices of termination starting in 2008. | Schacht Decl., Ex. 2 (Iconic Agreement) at C-000660-63 (APA Schedule of Included Compositions); *id.*, Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). |
| 28.   Mary raised the issue of termination several times with Cher's manager in charge of Cher's interests in Sonny's publishing. | Schacht Decl., Ex. 22 (Aug. 17, 2016 string of emails from R. Wixen to Mary Bono and L. Scott).<br><br>Schacht Decl., Ex. 23 (July 14, 2011 email from R. Wixen to Mary Bono and Warren Grant re termination).<br><br>Bono Dep. at 35:12-36:4.<br><br>Wixen Dep. at 92:13-95:20. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 29.   In 2016, through their attorney, Jacqueline Charlesworth, former General Counsel and Associate Register of Copyrights of the U.S. Copyright Office, a majority of the Bono Heirs issued a notice of termination pursuant to 17 U.S.C. § 304(c) to various music publishers and companies to whom Sonny had granted a transfer or license of copyright, or rights under them, in musical compositions authored or co-authored by Sonny, with effective dates of termination ranging from 2018 to 2026. | Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). <br><br> Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions). |
| 30.   After the terminations became effective, Wixen stopped paying the U.S. copyright royalties of those terminated musical compositions to Cher. | Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions). <br><br> Schacht Decl., Ex. 26 (Feb. 20, 2020 Email re Copyright Terminations). |
| 31.   The MSA was not terminated and there is no evidence that the notice of termination was ineffective. | *See* MSA. <br><br> Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). |
| 32.   The termination notice did not affect foreign agreements related to Sonny's musical compositions, so Cher continued to receive her portion of those royalties. Similarly, Sonny and Cher's master recordings, performance royalties, and other sources of income from Sonny's music were unaffected. | Schacht Decl., Ex. 24 (Oct. 14, 2016 Certificate of Recordation of Notice of Termination Under 17 U.S.C. Section 304(c)). <br><br> Schacht Decl., Ex. 25 (Sept. 19, 2019 Letter from Alter, Kendrick & Baron to Wixen Music Publishing, Inc. re Copyright reversions). |
| 42.   Sonny owned fifty percent in the television program "The Sonny and Cher Comedy Hour," while another twenty-five percent was owned by the writer and co-creator Chris Bearde. | Bono Decl. ¶ 12. <br><br> Cher Dep. at 69:22-70:15. |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 43.     The MSA grants Cher fifty percent of the receipts of "Sonny and Cher" television programming and states that it "shall be binding upon, and shall inure to the benefit of, each of the parties hereto, and their respective heirs and assigns." | MSA §§ 10(e), (f), 21. |
| 44.     Mary purchased Chris Bearde's twenty-five percent share of "The Sonny and Cher Comedy Hour" in or around 2001, for herself and as guardian of her then-minor children, Chesare and Chianna Bono. | Bono Decl. ¶ 12.<br><br>Cher Dep. at 72:16-20. |
| 45.     Cher testified that she is not entitled to royalties arising from the twenty-five percent share of "the Sonny and Cher Comedy Hour" that Mary purchased from Chris Bearde. | Cher Dep. at 72:16-24. |
| 5.     Cher sold assets, including the musical compositions at issue in this lawsuit, to Iconic pursuant to an asset purchase agreement dated December 9, 2022 and a General Assignment dated January 5, 2023, in which the General Assignment gives Iconic "all of [Cher's] right, title, and interest in and to" assets, including the compositions at issue in this lawsuit. | Schacht Decl., Ex. 28 (Cher's Resp. to Interrog. No. 12).<br><br>Cher Dep. at 85:10-11.<br><br>Scott Dep. at 65:16-66:3.<br><br>Schacht Decl., Ex. 21 (March 2, 2023 email re termination).<br><br>Schacht Decl., Ex. 2 (Iconic Agreement) at C-000652, 654. |
| 46.     Cher is permitted to terminate her own agreements with Wixen. | Bono Decl. ¶ 10. |
| 22.     After Sonny's death, Mary and Cher agreed to engage Jay Glick as administrator. | Bono Dep. at 41:19-42:1. |
| 24.     In or around 2011, the Bono Heirs and Cher agreed to terminate Glick's services as the royalty administrator and appoint Wixen as the royalty administrator. Wixen received a fee of ten percent of the publishing income. | FAC ¶ 29.<br><br>Bono Decl. ¶ 8.<br><br>Bono Dep. at 100:8-15.<br><br>Schacht Decl., Exs. 12 (2011 Collection Agreement); 13 (2011 Administration Agreement); 14 (2011 Promotion Agreement). |

- 30 -

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 47.    Cher unilaterally sought to terminate her agreements with Wixen in or around September 2021. | Schacht Decl., Ex. 17 (Sept. 1, 2021 Email from D. Passman to D. Schacht).<br><br>Schacht Decl., Ex. 18-20 (Oct. 13, 2021 letters from D. Passman to Wixen Music Publishing, Inc. cancelling agreements). |
| 48.    Cher terminated her agreements with Wixen in April 2022. | Schacht Decl., Ex. 21 (Mar. 2, 2023 set of emails re Sonny Bono Master Royalties). |
| 49.    Since that time, Cher and the Bono Heirs have not agreed upon a royalty administrator. | Bono Decl. ¶ 10.<br><br>When I found out that Cher wanted to terminate Wixen as the administrator, I hoped that she and I and Sonny's children could come to an agreement on a replacement administrator, just as we had mutually agreed to appoint Jay Glick and then Wixen as the administrator. Unfortunately, we were not able to come to an agreement. |
| 50.    The Bono Heirs have continued to retain Wixen as the royalty administrator and pay Wixen the ten percent Administration Fee out of their share of publishing royalties. | Bono Decl. ¶¶ 9, 10. |
| 51.    Mary intends, with the support of the Bono Heirs, to either have Wixen act as the royalty administrator or designate an entity that she owns as the royalty administrator to make sure that Sonny's publishing royalties are properly accounted for to Cher and all of the Bono Heirs. That entity would engage the services of third parties to ensure the proper accounting, and those services would be paid out of the ten percent administration fee that is called for in the MSA. | Bono Decl. ¶ 10. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 52.     Even after the terminations were effective and Cher sold her interests to Iconic, Mary continues to allow Cher to approve the use of the music at issue. Mary testified that "I actually think it is very important that she [Cher] approves." | Schacht Decl., Ex. 27 (Jan. 21, 2022 string of emails between Wixen and L. Scott). <br><br> Bono Dep. at 133:4-135:13. <br><br> Q: Did you send any text, email, letter, or other document to Cher or her representatives on that subject? <br> A. Did I or Randall? <br> Q: You. <br> A. No. <br> Q: Did Randall? <br> A. I don't know, but I know that I've continued to this day to make sure that she approves, and I actually think it is very important that she approves. <br> Q: Why? <br> A. I think the history of my belief on how I've tried to run this stuff the best I've been able to is to honor both Cher and Sonny's legacies. I do believe that the songs over the years have been able to be misconstrued and I've wanted to make sure that they wouldn't be. And I wanted to make sure that she has never had an objection to how she, her music, her singing, would be portrayed. |
| 53.     Mary has cooperated with Iconic – the current owner of said royalties – to have the record royalties paid directly to Iconic, for Cher's half, and the Bono Heirs, for their half. | Bono Decl. ¶ 11. <br><br> Schacht Decl. ¶ 31; id. Ex. 21 (March 2, 2023 email re termination of Wixen). |
| 54.     Mary and Wixen regularly communicated with Cher's representative Lindsay Scott whenever a person or entity asked for permission to use any of Sonny's songs, and Cher, through Lindsay Scott, was given a say in how much the songs were worth and who should be allowed to use them. | Bono Dep. at 133:4-135:3. <br><br> Scott Dep. at 52:11-53:24. <br><br> Q: Why are you the one dealing with publishing matters with Randall Wixen and Mary Bono if – if you don't have financial interest in it? <br> … <br> THE WITNESS: I -- a long time ago when Warren Grant was still her business manager, he -- he advised me that Randall Wixen had been employed in some capacity to work on Sonny's publishing and to promote Sonny's publishing. And I thought about it and I thought, well, |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | somebody's going to need to oversee that just to make sure it runs smoothly and everybody feels okay about getting an answer quickly, etcetera, etcetera.<br>And I thought who should do that? And I thought it should be me. And so I volunteered to do it knowing full well that I would not be -- I had no problem with that. I just wanted to make sure that things ran smoothly.<br>Scott Dep. at 62:10-64:21.<br><br>Q: Was there ever something that you were not asked to approve or disapprove that you were aware of?<br>A Not that I was aware of, no.<br>Q: Was there ever in a situation where you, on behalf of Cher, disapproved of something, yet, it moved ahead?<br>A That's a good question. I don't think so. There may have been one or two. I'm not trying to be evasive. But I -- I think where we -- you know, it's certainly 99 percent of the time I think we were always -- we always came to an agreement as to how we should respond to a request.<br>Q: And what happened in those instances when you didn't come to an agreement on how to respond?<br>A Well -- all right. Let me say a hundred percent of the time because I don't think there was an instance. I don't -- I can't recall one. And if -- if an account had been controversial or I – I most certainly would -- would recall it. I think we always just came to an agreement somehow.<br>Q: And when you say "we," who came to an agreement?<br>A Usually my- -- myself and Mary Bono's side through Randall Wixen…<br>Q: But is it fair to characterize it you and Mary were the ones making the decisions?<br>A Yeah, I think that's fair.<br>Q: What was your -- what were your goals in your role there dealing with Ms. Bono and Randall Wixen? |

Donahue Fitzgerald LLP<br>Attorneys at Law<br>Oakland

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | A My goal was to ensure, on behalf of Cher, that any work that she was involved in and was being licensed publicly be a situation that Cher would be comfortable with and that it be compensated generously. Q: And were there ever any instances where you had a disagreement with Ms. Bono about whether to approve or disapprove something? A I don't believe so. And if you -- if you look back at those very earlier e-mails, I think you'll find that Mary Bono was inclined to agree with a lot of my comments and advice, so I think it was really quite friendly…. <br><br> Scott Dep. at 68:13-69:22. <br><br> Q: Sure. Of the matters that you've discussed, been involved with, with Mr. Wixen and Ms. Bono, which of those have you raised to Cher's attention specifically? A Well, I cannot give you the exact situations, not very -- not very many, quite frankly. There might have been one or two. I think there was a -- well, not I think, I know there was the use of -- of a Sonny and Cher song for a Super Bowl commercial… But -- but otherwise, I mean, she -- she didn't really get too involved. She's very busy. <br><br> Schacht Decl., Ex. 27 (Jan. 21, 2022 string of emails between Wixen and L. Scott). |
| 55.    Cher's representative vetoed projects if they were not in Cher's best interest. | Bono Dep. at 133:4-135:3. <br><br> Wixen Dep. at 75:21-76:6. <br><br> Q: Thank you. Was the best of Sonny and Cher compilation album ever released? A. Unfortunately, Lindsay said it was going to interfere with Cher's solo releases and he would not approve it. Q: Was that the only reason it wasn't released? A. Primarily the only reason. |

- 34 -

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | Q: What other reasons were there?<br>A. Let me think. No, I would just have to say Cher's representatives put a kibosh on it…. <br><br>Wixen Dep. at 77:16-78:20. <br><br>A. Yeah, I made efforts. I had various meetings with people to try and get some documentaries off the ground. I wanted to do a Sonny and Cher sort of like -- what's the PBS thing called, you know, American Masters. I was trying to do an American Masters type documentary on Sonny and Cher and trying and get it on the air and I got several Grammy winners on board with the project. I essentially had funding available…. And we all had a meeting and we had funding and we had a director and all the people and we took a meeting with Lindsay at some hotel in Beverly Hills and Lindsay put a kibosh on it because he said that it was going to interfere and get attention away from the opening of The Cher Show musical. And so that one was killed…. I was constantly working at stuff. |
| 56.     Neither Cher nor her manager, Scott, are aware of a single use of Sonny's music that Cher did not approve. | Scott Dep. at 52:11-53:24; 62:10-64:21; 68:13-69:22. <br><br>Cher Dep. at 93:11-94:8. <br><br>Q. Was there ever a use of Sonny's music that Mary approved that you did not approve, that you're aware of?<br>A I don't know.<br>Q Okay.<br>A Because I didn't do that. That wasn't part of my -- you know, that -- I didn't -- I didn't approve them. I think Lindsay did. I'm not sure.<br>…<br>Q What's your understanding of who, on your team, had responsibility for such approvals?<br>A I thought it was Lindsay. |

DONAHUE FITZGERALD LLP<br>ATTORNEYS AT LAW<br>OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
|  | Q Okay. And he never told you of an incident where Mary had approved something that he had not; is that right?<br>A No.<br>Q Are you aware of any situation where you authorized the use of music that Mary did not and the music was used anyways?<br>A No. |
| 57.    Wixen took a ten percent administration fee from all royalties pursuant to its agreements with Cher, which agreements set forth a basic ten percent administration fee and permit a higher royalty in specific instances. | Schacht Decl., Ex. 12-14 (Collection, Administration, Promotion Agreements dated Apr. 1, 2011).<br><br>*See also* Wixen Dep. at 43:20-44:2.<br><br>Q: So the record is clear, Warner/Chappell would collect income, it would pay a portion over to Wixen. Wixen would take its 10 percent commission under the collection agreement and disburse the rest to the Sonny Bono Collection Trust and to the Inshallah Trust. Is that correct?<br>A. That's correct[], but we would provide significant services to earn that 10 percent.<br><br>Wixen Dep. at 62:3-25.<br><br>Q: Well, isn't it the case -- and I can go to the provision, but isn't it the case that Wixen charged 10 percent for -- on the same money that was received, 10 percent for administration plus 10 percent for collection for a total of 20 percent?<br>A. No, that's not correct. It was an either/or, either it came under one agreement or the other.<br>Q: Well, let's go through this and can you tell me where that limitation appears? Because I don't see it.<br>A. Well, again you are asking for a legal interpretation. But I think it --<br>MR. SCHACHT: Sorry, calls for a legal conclusion. Please continue.<br>A. But I think that the definition of compositions under one agreement would have a different agreement -- |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | a different definition of compositions covered under the other agreement. And my belief is that we wouldn't have entered into an agreement that would have double commissioned under two agreements. We just don't do that. That's not how we operate. |
| 58.    Wixen continues to collect a ten percent administration fee from the Bono Heirs' portion of Sonny's publishing royalties. | Bono Decl. ¶ 9. |
| 59.    Since this sale took place, Mary has worked with Iconic, Cher's successor-in-interest to allow both Iconic and the Bono Heirs to collect sound recording royalties directly from the applicable record labels. | Bono Decl. ¶ 11. Schacht Decl., ¶ 31. Schacht Decl., Ex. 21 (March 2, 2023 email re termination of Wixen). |

### C. Mary is Entitled to Summary Judgment on Her Counterclaims.

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 1.    On or about August 10, 1978, Cher and Sonny entered into the MSA. | *See* MSA. FAC ¶ 13. |
| 2.    Cher does not recall the negotiations regarding the MSA. | *See* MSA. Cher Dep. at 37:24-38:1. Scott Dep. at 47:23-25, 48:9-12. Schacht Decl., Ex 5 (Resp. to Interrog.), No. 1. |

Donahue Fitzgerald LLP
Attorneys at Law
Oakland

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 36.    The MSA states that "All said contingent receipts [payable to Cher] shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's [Sonny's] sole discretion. Said administration fee shall be sum equivalent to 10% of the gross income actually received by Husband [and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10) (d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld." | MSA § 10(d). FAC ¶ 17. |
| 37.    Cher's fifty percent interest in the contingent receipts from Sonny's musical compositions was paid net of (*i.e.*, after deduction of) the administration fee. | MSA § 10(d). Bono Dep. at 20:19-21. Bono Decl. ¶ 6. |
| 38.    During his lifetime, Sonny appointed himself, either personally or through his publishing entity, Chris-Marc Music, as the royalty administrator and paid himself the ten percent Administration Fee set forth in the MSA. | Bono Dep. at 19:19-20:18. Bono Decl. ¶¶ 6-7. |
| 17.    When Sonny died intestate in 1998, Mary was appointed administrator of his Estate. | FAC ¶ 21. Bono Dep. at 23:16-24:2. Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 19.    In or around July 1999, Mary, as administrator, and Cher settled Cher's creditor claim against Sonny's estate in an "Agreement re Creditor's Claim." | FAC ¶ 23. Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |

Donahue Fitzgerald LLP
Attorneys at Law
Oakland

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 20.    The "Agreement re Creditor's Claim" confirmed Cher's "ongoing rights under the terms and conditions of the [MSA]" and Mary, as administrator of Sonny's estate, and Cher agreed to "cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and to the heirs after the closing of this estate." | FAC ¶ 23.<br><br>Schacht Decl., Ex. 10 (Agreement Regarding Disposition of Creditor's Claim Filed by Cher, entered July 6, 1999). |
| 60.    There is no extrinsic evidence relevant to the interpretation of Creditor's Claim Agreement. | Cher Dep. at 130:23-131:1.<br><br>Q: ... do you have an understanding of the creditor claim that you filed in Sonny Bono's probate matter?<br>A No.<br><br>Cher Dep. at 135-20-136:2.<br><br>Q....[Having] seen this document [the Creditor Claim Agreement], do you recall filing a creditor claim in Sonny's probate matter?<br>A No.<br>Q: Do you recall an agreement that you made with Mary, regarding that claim?<br>A No.<br><br>Scott Dep. at 58:21-59:2.<br><br>Q: Were you aware of any probate matters involving Sonny Bono and his estate?<br>A No, I -- no, no, absolutely not. Not at all.<br>Q: Are you -- were -- are you aware that the -- that Cher filed a creditor claim with Sonny's estate?<br>A No.<br><br>Bono Dep. at 25:3-12.<br><br>Q: And did you have any discussions with Cher about this creditor's claim?<br>A. Not that I recall. |

Donahue Fitzgerald LLP<br>Attorneys at Law<br>Oakland

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| | Q: Did you have any discussions with any of her lawyers or representatives regarding this creditor's claim?<br>A. Not that I recall.<br>Q: Did you discuss this creditor's claim with anyone other than your own lawyers?<br>A. Not that I recall.<br><br>Bono Dep. at 27:13-19.<br><br>Q: And did you have any discussions with Cher regarding the agreement marked as Exhibit 49 [the Creditor Claim Agreement]?<br>A. I don't recall.<br>Q: Did you have any discussions with any of Cher's lawyers or other representatives regarding the agreement reflected in Exhibit 49?<br>A. I don't recall.<br><br>Schacht Decl., Ex 5 (Resp. to Interrog. No. 1). |
| 22.    After Sonny's death, Mary and Cher agreed to engage Jay Glick as administrator. | Bono Dep. at 41:19-42:1. |
| 24.    In or around 2011, the Bono Heirs and Cher agreed to terminate Glick's services as the royalty administrator and appoint Wixen as the royalty administrator. Wixen received a fee of ten percent of the publishing income. | FAC ¶ 29.<br><br>Bono Decl. ¶ 8.<br><br>Bono Dep. at 100:8-15.<br><br>Schacht Decl., Exs. 12 (2011 Collection Agreement); 13 (2011 Administration Agreement); 14 (2011 Promotion Agreement). |
| 47.    Cher unilaterally sought to terminate her agreements with Wixen in or around September 2021. | Schacht Decl., Ex. 17 (Sept. 1, 2021 Email from D. Passman to D. Schacht).<br><br>Schacht Decl., Ex. 18-20 (Oct. 13, 2021 letters from D. Passman to Wixen Music Publishing, Inc. cancelling agreements). |
| 48.    Cher terminated her agreements with Wixen in April 2022. | Schacht Decl., Ex. 21 (Mar. 2, 2023 set of emails re Sonny Bono Master Royalties). |

| Uncontroverted Fact | Supporting Relevant Facts |
|---|---|
| 49.      Since that time, Cher and the Bono Heirs have not agreed upon a royalty administrator. | Bono Decl. ¶ 10. |
| 50.      The Bono Heirs have continued to retain Wixen as the royalty administrator and pay Wixen the ten percent Administration Fee out of their share of publishing royalties. | Bono Decl. ¶¶ 9, 10. |
| 51.      Mary intends, with the support of the Bono Heirs, to either have Wixen act as the royalty administrator or designate an entity that she owns as the royalty administrator to make sure that Sonny's publishing royalties are properly accounted for to Cher and all of the Bono Heirs. That entity would engage the services of third parties to ensure the proper accounting, and those services would be paid out of the ten percent administration fee that is called for in the MSA. | Bono Decl. ¶ 10. |
| 61.      The MSA grants Cher an interest in sound recording royalties from only the following agreements "from Atlantic Recording Corporation under the agreement dated August 30, 1966 . . . from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964 . . . [and] from MCA Records, Inc. under agreements dated January 1, 1972, and February 11, 1971." | *See* MSA §§ 10(a), (b), (c). *See generally* MSA. |

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

## II. CONCLUSIONS OF LAW

### A. Summary Judgment

1. Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those which may affect the outcome of the case." *Trump v. Intuitive Surgical, Inc.*, 2020 WL 3163185, at *2 (N.D. Cal. June 12, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

2. "The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Rodriguez v. Wal-Mart Stores, Inc.*, No. LA CV17-05129 JAK (RAOx), 2019 WL 13042079, at * (C.D. Cal. Aug. 1, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where "the moving party meets its initial burden, the nonmoving party must set forth 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322-23.

### B. Cher Lacks Standing.

3. Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "Standing to sue or defend is an aspect of the case-or-controversy requirement." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64 (1997). "Article III denies federal courts the power 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Lewis*, 494 U.S. at 477 (citation omitted). A

plaintiff "must continue to have a personal stake in the outcome of the lawsuit." *Lewis*, 494 U.S. at 478 (internal quotations and citations omitted).

### C.   Cher Failed to Add Indispensable Parties: The Bono Heirs

4.   Where a Rule 19 issue is presented at summary judgment, a court must "construe [this aspect of] the motion as one to dismiss for failure to join an indispensable party under Rule 12(b)(7)." *E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005) (citing *Dredge Corp. v. Penny*, 338 F.2d 456, 463-64 (9th Cir. 1964) (explaining that dismissal for failure to join a party must be decided on a motion to dismiss, not summary judgment)); *see also McCowen v. Jamieson*, 724 F.2d 1421, 1424 (9th Cir. 1984) (noting that Rule 19 "is sufficiently important that it can be raised at any stage of the proceedings—even sua sponte").

5.   To determine whether a party is necessary, the Court must make "three successive inquiries" under Rule 19—the "Required Joinder of Parties" rule. *E.E.O.C. v. Peabody Western Coal Co.*, 610 F.3d 1070, 1078 (9th Cir. 2010). "First, the court must determine whether a nonparty should be joined under Rule 19(a)." *Id.* (citation omitted). "[T]he second stage is for the court to determine whether it is feasible to order that an absentee be joined." *Id.* (citation and internal punctuations omitted). Finally, if joinder is determined not to be feasible, a court must then "determine whether the case can proceed without the absentee, or whether the action must be dismissed." *Id.*

6.   A party may be found necessary under Rule 19(a) in three different ways. "First, they may be necessary if, in their absence, the Court cannot accord complete relief among the existing parties." *Salt River Project Agr. Imp. And Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012) (citing Fed. R. Civ. P. 19(a)(1)(A)). "Second, they may be necessary if they have an interest in the action and resolving the action in their absence may, as a practical matter, impair or impede their ability to protect that interest." *Id.* (citing Fed. R. Civ. P. 19(a)(1)(B)(i)). "Third, they may be necessary if they have an interest in the action and resolving the action in their

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

- 43 -

DEF.'S SEPARATE STMT ISO MOT. FOR
SUMMARY JUDGMENT

CASE NO. 2:21-CV-08157-JAK (RAOX)

absence may leave an existing party subject to inconsistent obligations because of that interest." *Id.* (citing Fed. R. Civ. P. 19(a)(1)(B)(ii)).

7.    "Where rights sued upon arise out of contract, all parties thereto are deemed indispensable and should be joined." *Jacobsen v. Luckenbach S. S. Co.*, 201 F. Supp. 883, 889 (D. Or. 1961) (citing *Ward v. Deavers*, 203 F.2d 72, 75 (D.C. Cir. 1953)).

8.    There are only three circumstances in which joinder is not feasible: "when venue is improper, when the absentee is not subject to personal jurisdiction, and when joinder would destroy subject matter jurisdiction." *E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005) (citing Fed. R. Civ. P. 19(a); *Tick v. Cohen*, 787 F.2d 1490, 1493 (11th Cir. 1986)).

9.    The Court has subject matter jurisdiction. *See Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312-15 (2005) (finding that where the interpretation of a federal statute is in dispute, or where "state-law claims implicate significant federal issues," such a dispute falls within the federal court's subject matter jurisdiction). Where one is duly served with the summons and complaint, the Court will have personal jurisdiction based on their "sufficient 'contacts, ties, or relations' … [with] the forum state." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945); *see World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291-292 (1980) (noting that Due Process requires that "there exist 'minimum contacts' between the defendant and the forum" to protect the defendant "against the burdens of litigating in a distant or inconvenient" court).

10.    "A nonparty in whose absence an action must be dismissed is one who 'not only [has] an interest in the controversy, but [has] an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience." *Peabody Western Coal Co.*, 610 F.3d at 1078 (quotation omitted).

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

11.　　To determine whether the action should proceed where joinder is not feasible, courts balance four factors: (1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum." *Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*, 276 F.3d 1150, 1161-62 (9th Cir. 2002) (citation omitted).

12.　　To be subject to a court order where one has not had the opportunity to defend against would be prejudicial. *See Clinton v. Babbitt*, 180 F.3d 1081, 1090 (9th Cir. 1999) (determining prejudice test under Rule 19(b) is essentially the same as the inquiry under Rule 19(a)).

### D.　　The Bono Heirs Properly Terminated the Grants and Now Own the Copyrights Unencumbered by the MSA

13.　　As the House Report for the 1909 Act explained: "It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right." H.R. Rep. No. 2222, 60th Cong., 2d Sess. p. 14; *see also White-Smith Music Publishing Co. v. Goff*, 187 F. 247, 251 (1st Cir. 1911); *Woods v. Bourne Co.*, 60 F.3d 978, 982 (2d Cir. 1995); *Stewart v. Abend*, 495 U.S. 207, 218 (1990).

Though Congress's intent was clear, much of the law's purpose was undone by the Supreme Court in *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643 (1943). The Court held that "the Copyright Act of 1909 does not nullify agreements by authors to assign their renewal interests." *Id.* at 657-58. However, an author could not alienate her or his heirs' right to the renewal term. *See Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375 (1960) (the 1909 Act granted an author's

- 45 -

surviving spouse and children "the renewal right, irrespective of whether the author in his lifetime has or has not made any assignment of it"); *De Sylva v. Ballentine*, 351 U.S. 570, 582 (1956) ("Since the author cannot assign his family's renewal rights, [Section 24 of the 1909 Act] takes the form of a compulsory bequest of the copyright to the designated persons.").

14.     The Copyright Act of 1976 overhauled US copyright law. Instead of a second term of copyright that reverts the copyright to an author or the author's heirs, the 1976 Act provides for a termination of transfers and licenses to effect the same reversion of rights. 17 U.S.C. §§ 203, 304; *see, e.g., Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172–73 (1985) ("[T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product."); *Classic Media v. Mewborn*, 532 F.3d 978, 984 (9th Cir. 2008) ("Without such a right of termination, the Extended Renewal Term [the 1976 Act's extension of copyrights by 19 years] would constitute a windfall to grantees.").

15.     The renewal term of a copyright is not merely an extension of the original copyright term but a new estate … clear of all rights, interests or licenses granted under the original copyright." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (quoting *P.C. Films Corp. v. MGM/UA Home Video Inc.*, 138 F.3d 453, 457 (2d Cir. 1998)); *see also Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 117 (2d Cir. 2018) ("the renewal term is a 'new estate ... clear of all rights, interests or licenses granted under the original copyright.'") (quoting *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 471 (2d Cir. 1951)).

16.     The 1976 Act provides that authors cannot bargain away their termination rights before they vest. 17 U.S.C. §§ 203(a)(5), 304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant."); *Stewart*, 495 U.S. at 230

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

("The 1976 Copyright Act provides a single, fixed term, but provides an inalienable termination right."); *Classic Media*, 532 F.3d at 985 (applying this quote from *Stewart*, as it applies to § 203, to the identical language of "its close counterpart," § 304(c)).

17.     Termination rights become alienable only after the author (or the author's heirs) serves the notice of termination or, in certain situations, has the right to serve such notice. 17 U.S.C. §§ 203(b)(4) and 304(c)(6)(D); *Classic Media*, 532 F.3d at 987 (discussing the "distinct factual scenario" of *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005) (further grant to original grantee's successor is effective where heir had the right to serve a termination notice)); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 198 (2d Cir. 2008) ("[The 1976 Act] created for authors or their statutory heirs … an inalienable right to terminate the grant of a transfer or license.").

18.     Where owner was not alive when his copyrights grants were eligible for termination, so he never could have granted that interest to another. *See Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 139 (2d Cir. 2022) (author could not have transferred renewal rights to third party because author died before termination right vested in author and thus author "did not own the contingent rights held by" his statutory heirs); *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 684 (2d Cir. 1993) ("there is a strong presumption against the conveyance of renewal rights").

19.     "Actions speak louder than words" when interpreting a contract. *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (1960); Cal. Civ. Code § 1636. "The terms set forth in a writing … may be explained or supplemented by … course of performance." Cal. Civ. Proc. Code § 1856(c); *Emps. Reinsurance Co. v. Superior Ct.*, 161 Cal. App. 4th 906, 920 (2008) ("a course of performance [is] relevant in ascertaining the meaning of the parties' agreement") (internal quotation omitted). The "whole of a contract is to be taken together … each clause helping to interpret the other." Cal. Civ. Code § 1641.

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

20.   An individual who is not a party to a contract cannot be bound by that contract. *See Hays v. Temple*, 23 Cal. App. 2d 690, 694 (1937).

21.   The 1976 Act was designed to protect and benefit the heirs. *See Brown-Thomas v. Hynie*, Case No. 2:18-cv-00307-SVW-JPR, 2018 WL 3811353, at \*1 (C.D. Cal. Aug. 7, 2018) ("A previous spouse is not entitled to termination interests."). Congress identified exactly who it was protecting and benefiting by naming the heirs who can terminate the grants if the author is deceased: the author's surviving spouse and descendants. 17 U.S.C. § 304(c)(2). The author is not permitted to disrupt this statutory scheme by naming other heirs. § 304(c)(2)(B); § 304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary, ***including an agreement to make a will or to make any future grant***.") (emphasis added).

22.   "The 1976 Act, and in particular its twin termination of transfer provisions, were in large measure designed to assure that its new benefits would be for the authors and their heirs…. Without such a right of termination, the Extended Renewal Term would constitute a windfall to grantees." *Classic Media*, 532 F.3d at 984.

### E.   Cher's Remaining Causes of Action Should be Dismissed

23.   Where a term to a contract is aspirational and too uncertain, it is not legally binding. *See., e.g.*, *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811–12, (1998).

24.   There are no damages where there was an agreement. *See, e.g., Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (damages to plaintiff is a necessary element of a breach of contract claim); *N.B. Scrivner & Wilson, Inc. v. Mobil Oil Corp.*, 914 F.2d 263 (9th Cir. 1990) (upholding dismissal of breach of contract claim on summary judgment where plaintiff "failed to meet its burden to prove the amount and elements of damages it suffered as a result of the alleged breach.").

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND

**F.      Defendant is Entitled to Summary Judgment on Her Counterclaims**

25.    "Actions speak louder than words" when interpreting a contract. *Crestview Cemetery*, 54 Cal. 2d at 754; Cal. Civ. Code § 1636. "The terms set forth in a writing … may be explained or supplemented by … course of performance." Cal. Civ. Proc. Code § 1856(c); *Emps. Reinsurance Co.*, 161 Cal. App. 4th at 920 ("a course of performance [is] relevant in ascertaining the meaning of the parties' agreement") (internal quotation omitted).

Respectfully submitted,

Dated: November 20, 2023          DONAHUE FITZGERALD LLP

By:/s/ *Daniel J. Schacht*
    Daniel J. Schacht
    Mario M. Choi
    Hayley M. Lenahan
    *Attorneys for Defendant and Counterclaimant*
    *MARY BONO*

DONAHUE FITZGERALD LLP
ATTORNEYS AT LAW
OAKLAND