Peter Anderson, Esq., Cal. Bar No. 88891
    peteranderson@dwt.com
Sean M. Sullivan, Esq., Cal. Bar No. 229104
    seansullivan@dwt.com
Eric H. Lamm, Esq., Cal. Bar No. 324153
    ericlamm@dwt.com
Samuel Turner, Esq., Cal. Bar No. 338089
    samturner@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Tel: (213) 633-6800
Fax: (213) 633-6899

Attorney for Plaintiff and Counterdefendant
CHER, Individually and as
Trustee of The Veritas Trust

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>                Plaintiff,<br><br>   v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>                Defendants.<br><br>_____<br><br>AND RELATED COUNTERCLAIMS<br>_____ | Case No. 2:21-CV-08157 JAK (RAOx)<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF AND COUNTERDEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Date:     February 26, 2024<br>Time:    8:30 a.m.<br><br>Courtroom of the Honorable<br>John A. Kronstadt<br>United States District Judge |

1

## **TABLE OF CONTENTS**

2
**Page**

3  MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

4  1.  INTRODUCTION ........................................................................................ 1

5  (a)  Summary of Argument ................................................................. 1

6  (b)  Summary of Facts ......................................................................... 2

7  (1)  Cher Receives Rights to Composition Royalties and Record
8  Royalties and Approval Rights Under the MSA ....................... 2

9  (2)  Ms. Bono Assumes Sonny's Duties Under the MSA and
Enters the Creditor's Claim Agreement with Cher ..................... 3

10  (3)  In 2011, the Parties Appoint Wixen .......................................... 4

11  (4)  In 2016, Ms. Bono Issues the Notice of Termination; Ms.
12  Bono and Wixen Later Execute a Secret Separate Agreement .... 4

13  (5)  In 2021, Cher Learns of Ms. Bono's Claimed Termination of
Cher's Rights and the Diversion of Cher's Royalties; Cher
14  Files this Action and Terminates Wixen ...................................... 6

15  2.  THE RULE 56 STANDARD ...................................................................... 6

16  3.  CHER IS ENTITLED TO DECLARATORY RELIEF ............................... 6

17  (a)  Cher Satisfies the Requirements of the Declaratory Judgment Act ........ 6

18  (b)  Cher's Composition Royalty Rights Have Not Been Terminated .......... 7

19  (1)  Section 304(c) Strictly Limits Termination to Pre-1978 Grants
20  of Copyright Rights and Does Not Apply to the MSA ................ 7

21  (2)  Nothing in Discovery Alters the Grounds of the Court's
22  Correct Ruling that the Notice of Termination Has Not
Terminated Cher's Rights ............................................................ 9

23  (c)  Cher's Record Royalties Have Not Been Terminated .......................... 10

24  4.  CHER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON
25  HER CLAIM FOR BREACH OF CONTRACT ........................................ 10

26  (a)  Ms. Bono Has Breached the MSA and Creditor's Claim Agreement .. 10

27  (b)  Cher Is Entitled to Recover the Royalties that Ms. Bono Diverted,
Plus Prejudgment Interest ........................................................... 11

28

i

5.    MS. BONO'S AFFIRMATIVE DEFENSES FAIL ........................................ 12

(a)    Cher's Claims Are Not Preempted by the Copyright Act .................... 12

(b)    Sonny's Children Are Not Necessary Parties ........................................ 13

(c)    Cher Has Standing ................................................................................ 14

(d)    Ms. Bono's Remaining Affirmative Defenses Are Boilerplate ........... 15

6.    CHER IS ENTITLED TO SUMMARY JUDGMENT AS TO MS.
BONO'S COUNTERCLAIMS ................................................................... 16

(a)    Ms. Bono's First Counterclaim Fails as a Matter of Law .................... 16

(1)    Ms. Bono's Diversion of Cher's Royalties Is a Breach of the
MSA and Creditor's Claim Agreement, and Does Not Relieve
Ms. Bono of Her Obligations ...................................................... 16

(2)    The Wixen Agreements Provide Cher an Unqualified Right to
Terminate Them ........................................................................... 17

(3)    The Creditor's Claim Agreement Did Not "Expire" and Still
Binds the Parties .......................................................................... 18

(b)    Ms. Bono's Second Counterclaim Fails as a Matter of Law ................ 19

7.    CONCLUSION ........................................................................................... 20

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alto v. Black*,
    738 F.3d 1111 (9th Cir. 2013) ................................................................... 13, 14

*Amelco Electric v. City of Thousand Oaks*,
    27 Cal. 4th 228 (2002) ............................................................................... 10

*Bombardier Inc. v. Mitsubishi Aircraft Corp.*,
    331 F.R.D. 427 (W.D. Wash. 2019) .......................................................... 14

*Broadcast Music, Inc. v. Hirsch*,
    104 F.3d 1163 (9th Cir. 1997) ................................................................... 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................... 6

*Clark v. City of Seattle*,
    899 F.3d 802 (9th Cir. 2018) ..................................................................... 19

*Dead Kennedys v. Biafra*,
    37 F. Supp. 2d 1151 (N.D. Cal. 1999) ...................................................... 12, 13

*Doc's Dream, LLC v. Dolores Press, Inc.*,
    959 F.3d 357 (9th Cir. 2020) ..................................................................... 12

*Dow v. Honey Lake Res. Conserv. Dist.*,
    63 Cal. App. 5th 901 (2021) ...................................................................... 17

*Durgom v. Janowiak*,
    74 Cal. App. 4th 178 (1999) ...................................................................... 9

*F.B.T. Prods., LLC v. Aftermath Records*,
    827 F. Supp. 2d 1029 (C.D. Cal. 2011) ..................................................... 17

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ................................................................................... 12

*Fund Liquid. Hldgs. LCL v. Bank of Am. Corp.*,
    991 F.3d 370 (2d Cir. 2021) ...................................................................... 14

*Ghirado v. Antonioli*,
   14 Cal. 4th 39 (1996) ........................................................................ 15

*Gonzalez v. U.S. ICE*,
   975 F.3d 788 (9th Cir. 2020) ............................................................ 14

*Grebow v. Mercury Ins. Co.*,
   241 Cal. App. 4th 564 (2015) ........................................................... 16

*Grosso v. Miramax Film Corp.*,
   383 F.3d 965 (9th Cir. 2004) ............................................................ 13

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*,
   896 F.2d 1542 (9th Cir. 1989) ............................................................. 7

*Harvill v. Harvill*,
   No. 3:12-cv-00807, 2013 WL 1245729 (M.D. Tenn. Mar. 27, 2013) ................ 14

*Kalmanovitz v. Bitting*,
   43 Cal. App. 4th 311 (1996) ............................................................. 19

*Laws v. Sony Music Entm't, Inc.*,
   448 F.3d 1134 (9th Cir. 2006) .......................................................... 12

*Lee v. Verimatrix, Inc.*,
   No. 19-cv-2054-W(BLM), 2020 WL 4747751
   (S.D. Cal. Aug. 17, 2020) ................................................................. 15

*Liang v. Cal-Bay Intern., Inc.*,
   No. 06cv1082–WMc, 2012 WL 1282984 (S.D. Cal. Apr. 13, 2012) ................ 11

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................... 6

*Medimmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ......................................................................... 19

*Merrill v. Hyman*,
   No. 3:21-CV-551 (JAM), 2022 WL 11727631
   (D. Conn. Oct. 20, 2022) .................................................................... 9

*Mission Product Hldgs., Inc. v. Tempnology, LLC*,
    139 S. Ct. 1652 (2019) ............................................................... 15

*Montz v. Pilgrim Films & Television, Inc.*,
    649 F.3d 975 (9th Cir. 2011) ...................................................... 13

*Northwest Home Designing Inc. v. Sound Built Homes Inc.*,
    776 F. Supp. 2d 1210 (W.D. Wash. 2011) ................................. 13

*Rey v. Lafferty*,
    990 F.2d 1379 (1st Cir. 1993) ...................................................... 9

*Rodrigue v. Rodrigue*,
    218 F.3d 432 (5th Cir. 2000) ........................................................ 9

*Salt River Project Agr. Imp. & Power Dist. v. Lee*,
    672 F.3d 1176 (9th Cir. 2012) .................................................... 13

*Shloss v. Sweeney*,
    515 F. Supp. 2d 1068 (N.D. Cal. 2007) ....................................... 7

*Silvers v. Sony Pictures Entm't, Inc.*,
    402 F.3d 881 (9th Cir. 2005) ........................................................ 8

*Societe de Conditonnement en Aluminium v. Hunter Engineering Co.*,
    655 F.2d 938 (9th Cir. 1981) ........................................................ 7

*Spinedex Phys. Therapy USA Inc. v. United Healthcare of Az., Inc.*,
    770 F.3d 1282 (9th Cir. 2014) .................................................... 14

*Taylor v. Lockheed Martin Corp.*,
    78 Cal. App. 4th 472 (2000) ...................................................... 17

*Tenzera, Inc. v. Osterman*,
    205 Cal. App. 4th 16 (2012) ...................................................... 11

*West v. Sec. of DOT*,
    206 F.3d 920 (9th Cir. 2000) ...................................................... 15

*Wolf v. Walt Disney Pictures & Television*,
    162 Cal. App. 4th 1107 (2008) .................................................. 11

*Wolfe v. United Artists Corp.*,
    583 F. Supp. 52 (E.D. Pa. 1983) .................................................. 9

v

*Yount v. Acuff Rose-Opryland*,
103 F.3d 830 (9th Cir. 1996) ............................................................................... 9

**Statutes**

17 U.S.C.
§ 102 ............................................................................................................ 12
§ 103 ............................................................................................................ 12
§ 106 ................................................................................................... 8, 9, 12
§ 203 .............................................................................................................. 9
§ 301 ............................................................................................................ 12
§ 304(c) ............................................................................. 1, 5, 7, 8, 9, 12
§ 304(c)(1) ..................................................................................................... 8
§ 304(c)(2) ................................................................................................... 14
§ 304(c)(4) ..................................................................................................... 8
§ 304(c)(6)(E) .................................................................................. 5, 8, 12
§ 304(c)(6)(F) .................................................................................... 8, 12

28 U.S.C. § 2201 ............................................................................................ 6, 12

Cal. Civ. Code
§ 1638 .......................................................................................................... 17
§ 3289 .......................................................................................................... 11

**Rules**

Fed. R. Civ. P. 1 ................................................................................................... 6

Fed. R. Civ. P. 19(a) .......................................................................................... 13

Fed. R. Civ. P. 56(a) ............................................................................................ 6

**Regulations**

37 C.F.R. § 201.10(b)(iv) .................................................................................... 8

**Other Authorities**

5 B. Witkin, California Proc., Pleading §1141 (6th Ed. 2023) ............................ 15

3 W.F. Patry, Patry on Copyright § 7:42 (2023) .................................................. 9

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.    INTRODUCTION

### (a)    Summary of Argument

Discovery in this action has closed and there is no genuine dispute that Ms. Bono did not, and could not have, terminated Cher's royalty and approval rights under her and Sonny Bono's 1978 Marriage Settlement Agreement ("MSA") and the State Court Judgment entered on the MSA.  Cher's right to musical composition royalties and her approval rights were not terminated for reasons this Court has already decided: For example, Ms. Bono issued a purported notice of termination (the "Notice of Termination") under Section 304(c) of the Copyright Act, but that Section is inapplicable to the MSA.  *See* Order re MTD ("Order"), Doc. 43 at 8-10.  And while the Court, based on the pleadings, concluded that Cher's right to royalties from sound recordings is dependent on whether the underlying recording contracts were terminated (*see id.* at 7-8), Ms. Bono has admitted in discovery that her Notice of Termination did not affect those recording contracts.  Cher is accordingly entitled to the declaratory relief she seeks.

Cher is also entitled to judgment on her second claim for breach of contract because Ms. Bono's wrongful withholding of Cher's royalties breaches Ms. Bono's obligations both under the MSA, and under a 1999 agreement between Cher and Ms. Bono in her capacity as administrator of Sonny's estate (the "Creditor's Claim Agreement").

Ms. Bono raises a number of affirmative defenses, but none of them apply. Copyright preemption is irrelevant to this action because, among other reasons, the Copyright Act expressly provides that its statutory terminations do not affect rights under non-terminated grants and it is beyond dispute that the MSA has not been terminated.  Ms. Bono also suggests Cher was required to sue Sonny's children, but they are not necessary parties because the Court can grant the complete relief sought and Ms. Bono adequately represents their interests in this action.  Ms. Bono asserts

that Cher lacks standing because she sold her catalog to a third party.  But that sale occurred more than a year after this action commenced, Cher retains her claim to the disputed royalties, and she also benefits from a judicial declaration that her royalty and approval rights belonged to her, not Ms. Bono and the Heirs.  Ms. Bono's remaining affirmative defenses are mere boilerplate and fail as well.

Cher also seeks summary judgment as to Ms. Bono's two counterclaims for declaratory relief.  Ms. Bono's first counterclaim asserts that Cher has not cooperated regarding how to collect and distribute royalties, but discovery has disproven that assertion.  That leaves Ms. Bono's first counterclaim with its alternative argument that Cher cannot terminate the collection agent, Wixen Music Publishing, Inc. ("Wixen"), whom she and Ms. Bono jointly engaged in 2011.  But the agreements engaging Wixen expressly provide that any party may unilaterally terminate them.  And while Cher was not required to have cause to terminate them, she clearly did: Wixen conspired with Ms. Bono to secretly divert Cher's royalties.

Ms. Bono's second counterclaim likewise fails.  It seeks a declaration as to whether Ms. Bono can enter new agreements regarding sound recording copyrights she owns, but Ms. Bono has admitted in discovery that the record companies—not Ms. Bono—own the sound recording copyrights.  Accordingly, Ms. Bono's second counterclaim is not based upon an actual controversy, but on a set of hypothetical facts that cannot support declaratory relief.

Summary judgment should therefore be granted.

**(b)** **<u>Summary of Facts</u>**

**(1)** **Cher Receives Rights to Composition Royalties and Record Royalties and Approval Rights Under the MSA**

In 1974, Cher and Sonny Bono ("Sonny") separated, and on August 10, 1978, they entered into the MSA, which divided their community property.  Facts 1, 10-12. The community property being divided included their rights to royalties as recording artists under the recording contracts, as well as rights with respect to musical

2

compositions Sonny authored, co-authored, or acquired during their marriage. Specifically, Sonny assigned to Cher as her separate property **(1)** fifty percent of future contingent receipts with respect to master sound recordings pursuant to recording contracts with specified record companies ("Record Royalties") (MSA at 5-6 ¶¶ 10(a)-(c)); and **(2)** fifty percent of future contingent receipts from *any source*, with respect to musical compositions Sonny authored or acquired before February 1, 1974 ("Composition Royalties") (*id.* at 6-8 ¶ 10(d)). Facts 2-5.

Paragraph 10(d) of the MSA also provides that the Composition Royalties are subject to an administration fee of up to ten percent, paid to a worldwide administrator, and that Sonny had sole discretion to select "which administrator(s) to be engaged." However, the same paragraph goes on to state that "all agreements with third parties respecting the subject matter of [Paragraph 10(d)] are subject to the approval of [Cher] … which approval will not be unreasonably withheld." Facts 4, 6. The MSA also provides that it, including Sonny's assignment of fifty percent of the royalties to Cher, is binding on Sonny's successors and heirs. Facts 8-9.

On July 3, 1979, the California Superior Court entered its Further Judgment approving and confirming the MSA, including Sonny's assignment to Cher of fifty percent of the Record Royalties and the Composition Royalties and Cher's approval rights thereunder. Facts 10-11.

### (2)   Ms. Bono Assumes Sonny's Duties Under the MSA and Enters the Creditor's Claim Agreement with Cher

After Sonny's death in 1998, Sonny's fourth wife, Ms. Bono, served as administrator in the probate of his estate in the California Superior Court. Facts 14-15. Cher filed a creditor's claim raising her rights under the MSA, including her rights to fifty percent of the royalties. Fact 16. In their July 1999 Creditor's Claim Agreement, Ms. Bono approved Cher's claim. Facts 17, 21. Ms. Bono and Cher also agreed, in "recognition of Cher's continuing" royalty rights, "to cooperate in

developing a mutually acceptable mechanism for the collection and proper disbursement of" future royalties to Cher and Sonny's heirs.  Fact 20.

In August 1999, the Superior Court entered its Order confirming that all creditor's claims were settled, and approving final distribution to Sonny's heirs—namely Ms. Bono and Sonny's four children (the "Heirs").  Facts 22-23.

### (3)    In 2011, the Parties Appoint Wixen

Further to the Creditor's Claim Agreement, Ms. Bono and Cher have at least twice "cooperate[d] in developing a mutually acceptable [royalty] mechanism[.]" First, they cooperated in 1999, when they agreed that Ms. Bono's CPA, Jay Glick, would collect and disburse the royalties.  Facts 80-81.  Second, they cooperated in 2011, when they replaced Glick with Wixen.  Facts 82-83.  In doing so, Ms. Bono, as trustee of the Bono Collection Trust, and Cher, as trustee of the Inshallah Trust (n/k/a the Veritas Trust), jointly engaged Wixen as their agent pursuant to a Collection Agreement, an Administration Agreement, and a Promotion Agreement, each dated as of April 1, 2011 (the "Wixen Agreements").  Facts 84.

Each of the Wixen Agreements expressly provides that any of the parties may elect to terminate it by written notice.  Fact 89.  There is no requirement that termination be for cause.

### (4)    In 2016, Ms. Bono Issues the Notice of Termination; Ms. Bono and Wixen Later Execute a Secret Separate Agreement

As early as 2013 and again in 2016, Wixen raised with Ms. Bono and one of Cher's artist managers, Lindsay Scott, the possibility of retaining counsel to consider preparing and issuing a statutory notice of termination under the Copyright Act.  Fact 100.  Mr. Scott thought the idea worth exploring, since it might remove Sonny's early music publishers from the royalty stream and, as a result, increase royalties for the Heirs and Cher.  Fact 101.  Then, in September 2016, Ms. Bono and two of the Heirs, apparently with Wixen's participation, issued their Notice of Termination.  Facts 29,

100-102.  Ms. Bono and Wixen issued the Notice of Termination without the consent or approval of Cher or Mr. Scott.  Facts 100-103.

The Notice of Termination states that, "[p]ursuant to 17 U.S.C. Section 304(c)," it will terminate grants "of copyright [or] rights under copyright with respect to the musical compositions" listed in an attached Schedule A.  Fact 30.  That Schedule A also lists the future termination date for each musical composition, beginning in 2018.  The Notice of Termination was served on twenty-five identified companies as the "Grantee[s] Whose Rights Are Being Terminated."  Facts 31, 32.  The Notice of Termination does not mention Cher or the MSA, and was not served on Cher.  Facts 39-41.

By 2019 at the latest, Ms. Bono and Wixen had agreed to take the position that Ms. Bono's Notice of Termination also terminated Cher's royalty and approval rights.[1]  *See* Facts 56, 102-105.  To that end, Ms. Bono, her two children, and Wixen entered into a separate written agreement pursuant to which Wixen would pay Cher's fifty percent of Composition Royalties to Ms. Bono, her children, and Sonny's two other Heirs.  Facts 104-105.  After that agreement and the Notice of Termination dates began arriving for particular compositions, Wixen began diverting Cher's fifty percent of Composition Royalties to Ms. Bono and the others.  Facts 35, 58.

Neither Ms. Bono nor Wixen disclosed to Cher or Mr. Scott that this 2019 separate agreement existed, that Ms. Bono and Wixen had agreed to take the position that a statutory notice of termination would end, rather than raise, Cher's fifty percent of Composition Royalties, and that Wixen had begun diverting Cher's Composition Royalties.  *See* Facts 35, 58, 104-109.

---

[1]   Section 304(c)(6)(E) provides that termination "in no way affects rights arising under any other Federal, State or foreign laws."  Ms. Bono acknowledges that her Notice of Termination does not affect Cher's right to fifty percent of Composition Royalties under foreign law—and hence, all further references to Composition Royalties are to U.S. Composition Royalties.  *See* Fact 45.  Yet, Ms. Bono claims the Notice does terminate Cher's rights under State law to those same royalties.

**(5)**  **In 2021, Cher Learns of Ms. Bono's Claimed Termination of Cher's Rights and the Diversion of Cher's Royalties; Cher Files this Action and Terminates Wixen**

In the context of discussions in September 2021 about the possible sale of Cher's music catalog, Ms. Bono's counsel disclosed to Cher's counsel that Ms. Bono has issued a notice of termination that Ms. Bono claims also terminates Cher's right to receive her fifty percent of the royalties.  Fact 110.  Cher then terminated the Wixen Agreements and filed this action.  Facts 75, 94.

In or around February 2022, the parties, including Wixen, agreed to deposit the disputed royalties in an escrow account pending the outcome of this litigation.  By that time, however, Wixen had already diverted $187,534.91 of Cher's Composition Royalties.  Facts 57-58.

## 2. <u>THE RULE 56 STANDARD</u>

"Summary judgment procedure is properly regarded … as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  <u>*Celotex Corp. v. Catrett*</u>, 477 U.S. 317, 327 (1986) (quoting <u>Fed. R. Civ. P. 1</u>).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  <u>Fed. R. Civ. P. 56(a)</u>.  Once the movant shows that summary judgment is appropriate, the burden shifts to the nonmoving party to establish genuine issues exist as to material facts.  <u>*Celotex*</u>, 477 U.S. at 324.  Where the record "as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*</u>, 475 U.S. 574, 587 (1986).

## 3. <u>CHER IS ENTITLED TO DECLARATORY RELIEF</u>

**(a)**  <u>Cher Satisfies the Requirements of the Declaratory Judgment Act</u>

The Declaratory Judgment Act, <u>28 U.S.C. § 2201</u>, "permits a federal court to 'declare the rights and other legal relations' of parties to 'a case of actual

controversy.'"  *Societe de Conditionnement en Aluminium v. Hunter Engineering Co.*, 655 F.2d 938, 942 (9th Cir. 1981) (citation omitted).  The Act permits suit "once the adverse positions have crystallized and the conflict of interests is real and immediate."  *Id.* at 942, 943 (citations omitted); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1556 (9th Cir. 1989); *see, e.g.*, *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1075-77 (N.D. Cal. 2007).

An actual controversy exists here.  Prior to this action and to this day, Ms. Bono asserts that the Notice of Termination of grants to music publishers also terminates Cher's royalty and approval rights, and Ms. Bono has directed Wixen to pay Cher's royalties to the Heirs instead.  Facts 33-34.  Cher's royalties have in fact been diverted, and Cher's royalties not already paid out to Ms. Bono and the Heirs have been deposited in a separate account controlled by Wixen pending resolution of this action.  Facts 36, 57-64.  Cher has thus demonstrated an actual controversy more than sufficient to warrant declaratory relief.

**(b)     Cher's Composition Royalty Rights Have Not Been Terminated**

**(1)     Section 304(c) Strictly Limits Termination to Pre-1978 Grants of Copyright Rights and Does Not Apply to the MSA**

Section 304(c) of the Copyright Act provides a strictly limited mechanism for authors and their heirs to terminate certain grants.  For multiple reasons, the MSA's assignment of fifty percent of the Composition Royalties and approval rights to Cher, which assignment was confirmed by the State Court's Further Judgment, does not come within that Section.

First, termination under that Section applies only to a "grant of a transfer or license of the renewal copyright or any right under it, executed on or before January 1, 1978."  17 U.S.C. § 304(c).  The MSA, however, was executed on August 10, 1978.  Facts 1, 37.  For that reason alone, the Notice of Termination has no effect on Cher's rights.

Second, termination is not automatic.   Section 304(c) provides only a mechanism for terminating a *particular* grant of copyright or copyright rights.  *See, e.g.*, 17 U.S.C. § 304(c)(1) (requirements for terminating particular types of grants). And terminating a grant, requires, among other things, "serving an advance notice in writing upon the grantee or the grantee's successor in title."  *Id.* § 304(c)(4).  It is undisputed that Ms. Bono's 2016 Notice of Termination was not served on Cher and does not identify Cher as a grantee whose rights are being terminated.  Facts 38-40. For those reasons as well, the Notice of Termination did not terminate Cher's rights. *See* 17 U.S.C. § 304(c)(6)(F) ("Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect….").

Third, the regulations promulgated under Section 304(c)(4)(B) require that the notice reasonably identify the grant being terminated.  37 C.F.R. § 201.10(b)(iv).  The Notice of Termination does not mention the MSA or the Judgment on the MSA.  Facts 41-42.  Again, for that reason alone, the Notice of Termination did not terminate Cher's rights.

Fourth, termination also is strictly limited to transfers or licenses of copyright or copyright rights.  17 U.S.C. § 304(c); *see also id.* at § 304(c)(6)(E) ("Termination of a grant … affects only those rights covered by the grant that arise under this title"). Copyright rights are those granted by the Copyright Act, such as the exclusive rights of reproduction, adaptation, publication, performance, and display.  17 U.S.C. § 106; *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 883-84 (9th Cir. 2005) ("Copyright … is a creature of statute, and the only rights that exist under copyright law are those granted by statute.").  As discussed below, the royalty and approval rights under the MSA are not copyright rights, but instead arise under State contract law.  Therefore, the MSA is not subject to termination because it is not a transfer or license of copyright or copyright rights.

And fifth, termination "in no way affects rights arising under any other Federal, State, or foreign laws."  17 U.S.C. § 304(c)(6)(E).  The right to assigned royalties

arises under State law.[2]  As a result, an assignment of the right to royalties is not a grant terminable under Section 304(c).  *Merrill v. Hyman*, No. 3:21-CV-551 (JAM), 2022 WL 11727631, at *2-3 (D. Conn. Oct. 20, 2022); 3 W.F. PATRY, PATRY ON COPYRIGHT § 7:42 (2023) ("When a mere right to receive royalties is conveyed, that right is not a Section 106 right and therefore is not subject to termination under either Section 203 nor 304.").  Cher's right to approve agreements with third parties related to the collection and payment of royalties also is not a copyright right, but a right that arises under State contract law.  *See* Order at 6; *Rey v. Lafferty*, 990 F.2d 1379, 1392-95 (1st Cir. 1993) (analyzing author's allegedly unreasonable withholding of approval of various products utilizing author's Curious George character under licensing agreement as state breach of contract claim).  Cher's royalty and approval rights are accordingly not subject to termination.

For each of these separate, independent grounds, Ms. Bono's Notice of Termination has not terminated Cher's rights under the MSA and the State Court's Further Judgment confirming the MSA.

## (2)     Nothing in Discovery Alters the Grounds of the Court's Correct Ruling that the Notice of Termination Has Not Terminated Cher's Rights

On Ms. Bono's motion to dismiss, the Court correctly ruled that her Notice of Termination did not terminate Cher's rights to the Composition Royalties and

---

[2]     *See* Order at 6 ("The parties agree that … Plaintiff's royalty and approval rights arise under State law."); *see also Broadcast Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997) (assignments of royalty interests have "no relationship to the existence … of a copyright, nor to 'rights under a copyright.'"); *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir. 1996) ("a royalty interest does not bespeak an interest in the underlying copyright"); *Rodrigue v. Rodrigue*, 218 F.3d 432, 440 (5th Cir. 2000) ("Notably absent from the Copyright Act's exclusive … rights is the right to enjoy the earnings and profits of the copyright."); *Wolfe v. United Artists Corp.*, 583 F. Supp. 52, 56 (E.D. Pa. 1983) (claim for failure to pay royalties was State law contract claim); *Durgom v. Janowiak*, 74 Cal. App. 4th 178, 186 (1999) (similar).

9

approval rights.  *See* <u>Order at 8-10</u>.  The Court erred on the side of caution in noting that discovery might yield evidence as to the meaning of the MSA's provisions.  *See* <u>Order at 8</u>.  But discovery has now closed and there is no genuine dispute that Cher's right is to the proceeds of the musical compositions from all sources perpetually, and is not limited—as are the Record Royalties—to proceeds under any particular grant or agreement.  Facts 5, 43.

**(c)    Cher's Record Royalties Have Not Been Terminated**

In ruling on Ms. Bono's motion to dismiss, the Court correctly recognized that, unlike the Composition Royalties, the Record Royalties are tied to specific recording contracts with five record companies (the "Recording Contracts").  *See* <u>Order at 6-7</u>; Fact 46.  However, Ms. Bono's Notice of Termination did not terminate the Recording Contracts: The Notice of Termination was not served on the record companies, does not identify the Recording Contracts, and expressly refers to grants as to musical compositions, not sound recordings.  Facts 47-51.  Cher's Record Royalties have therefore not been terminated.

## 4.    <u>CHER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HER CLAIM FOR BREACH OF CONTRACT</u>

**(a)    Ms. Bono Has Breached the MSA and Creditor's Claim Agreement**

In withholding Cher's royalties, Ms. Bono has breached the MSA and the Creditor's Claim Agreement.  The elements of a breach of contract claim are "a contract, the plaintiff's performance or excuse for nonperformance, breach, and damage to the plaintiff."  *Amelco Electric v. City of Thousand Oaks*, 27 Cal. 4th 228, 243 (2002).

It is undisputed that the MSA obligated Sonny, and now obligates Ms. Bono as his successor and heir, to pay Cher her fifty percent of Composition and Record Royalties.  *See* Facts 52-53.  Indeed, Cher received those royalties for decades, including after Ms. Bono and Cher entered into the Creditor's Claim Agreement approving Cher's claim to ongoing royalty payments.  There can be no dispute that

Cher has fully performed all of her obligations under the MSA and the Creditor's Claim Agreement.    Facts 55, 80-83.   In addition, Cher has demonstrated that Ms. Bono's Notice of Termination did not terminate Cher's royalty rights.  *See* above at 7-10.   Accordingly, Ms. Bono has breached the MSA and the Creditor's Claim Agreement by claiming entitlement to, and by receiving and not returning, Cher's royalties.

>    **(b)**    **Cher Is Entitled to Recover the Royalties that Ms. Bono Diverted, Plus Prejudgment Interest**

Cher's damages on account of Ms. Bono's failure to pay the royalties can also be established with "reasonable certainty." *Liang v. Cal-Bay Intern., Inc.*, No. 06cv1082–WMc, 2012 WL 1282984 at *1 (S.D. Cal. Apr. 13, 2012) (collecting cases).   For the purpose of this Motion, Cher accepts that Wixen paid out only $187,534.91 of the disputed royalties, with Ms. Bono keeping fifty percent ($93,767.46).[3]  *See* Facts 57-59.   Combining the royalties paid to Ms. Bono (only), with the disputed royalties currently held by Wixen, totals $1,083,456.04, to which Cher is entitled as an award of damages.  *See* Facts 59, 61-62, 64.

Because the amount of damages is certain, Cher is also entitled to prejudgment interest. *See* *Tenzera, Inc. v. Osterman*, 205 Cal. App. 4th 16, 21 (2012).  Prejudgment interest should be awarded at ten percent per annum on account of Ms. Bono's breach of the Creditor's Claim Agreement, which was entered into after January 1, 1986. Cal. Civ. Code § 3289; *see* Fact 17.  Alternatively, interest in the amount of seven percent per annum should be awarded for the breaches of the MSA.  *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1113-32 (2008).

---

[3]    As the other Heirs are not defendants in this lawsuit, Cher seeks recovery only of the portion Ms. Bono received. *See* Facts 59, 61, 62, 64.

**5.**    **MS. BONO'S AFFIRMATIVE DEFENSES FAIL**

**(a)**    **Cher's Claims Are Not Preempted by the Copyright Act**

Ms. Bono's affirmative defenses include that the Copyright Act preempts Cher's royalty and approval rights.  But that defense is absurd because, first, *the Copyright Act* provides that rights under nonterminated grants remain in effect.  17 U.S.C. § 304(c)(6)(F).  Because the MSA (and the Recording Contracts) were not terminated (*see above* at 7-10), Cher's rights survive by the express language of Section 304(c) and, for that reason alone, do not "actually conflict[]" with the Heirs' termination rights.  *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Furthermore, *the Copyright Act* also provides that termination "in no way affects rights arising under any … State … laws," 17 U.S.C. § 304(c)(6)(E), and it is undisputed that Cher's royalty and approval rights arise under State law.  *See* above at 8-9; Order at 6.  Thus, Ms. Bono's argument that federal law preempts Cher's State law rights ignores that *the federal law expressly preserves those State law rights*.

Ms. Bono also finds no support in Section 301 of the Copyright Act, which preempts State law claims if (a) the "subject matter" of the claims fall within the subject matter of copyright as described in 17 U.S.C. Sections 102 and 103; and (b) the claim asserts rights "equivalent to the rights contained in 17 U.S.C. § 106[.]" *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006); *see* 17 U.S.C. § 301(a).  Of course, Cher's first cause of action is not preempted because it is a federal claim that arises under the Declaratory Judgement Act and the Copyright Act itself.  *See Doc's Dream, LLC v. Dolores Press, Inc.*, 959 F.3d 357, 363 (9th Cir. 2020).

In any event, neither of the express preemption elements are satisfied for Cher's first or her second claims.  First, royalty and contractual approval rights are not the "subject matter of copyright" under Sections 102 and 103.  *See, e.g.*, *Dead Kennedys v. Biafra*, 37 F. Supp. 2d 1151, 1154 (N.D. Cal. 1999) (action for unfair business practices not preempted because plaintiff did not claim "unfair use of the [copyrighted works] at issue").  Second, royalty and contractual approval rights are not equivalent

to copyright rights, such as the right to reproduce a copyrighted work. _Id._ (conversion claim not preempted because it "alleges conversion of royalties, not of the works themselves"). And finally, Cher's claims do not involve equivalent rights to copyright rights because they involve an "extra element" that is absent in a claim for infringement—namely, contractual rights. _Grosso v. Miramax Film Corp._, 383 F.3d 965, 968 (9th Cir. 2004); _Montz v. Pilgrim Films & Television, Inc._, 649 F.3d 975, 980 (9th Cir. 2011) ("Contract claims generally survive preemption because they require proof of such an extra element"); _Northwest Home Designing Inc. v. Sound Built Homes Inc._, 776 F. Supp. 2d 1210, 1216 (W.D. Wash. 2011) (similar).

In short, copyright preemption is entirely inapplicable to this dispute.

**(b)    Sonny's Children Are Not Necessary Parties**

Ms. Bono also contends that Sonny's four children are necessary parties. Of course, she has not named them nor have they intervened. Fact 74. Her concern is contrived.

"Under Rule 19(a), an absent party is 'necessary (i.e., required to be joined if feasible)' if the court cannot accord complete relief among existing parties." _Salt River Project Agr. Imp. & Power Dist. v. Lee_, 672 F.3d 1176, 1179 (9th Cir. 2012) (citing Fed. R. Civ. P. 19(a)(1)(A)). An absent party may also be necessary if "he has an interest in the action" and resolving the action may either (a) "as a practical matter impair or impede his ability to protect that interest," or (b) "leave an existing party subject to inconsistent obligations because of that interest." _Id._ (citing Fed. R. Civ. P. 19(a)(1)(B)(i)-(ii)).

First, the Court can accord complete relief among the existing parties. "Complete relief 'is concerned with consummate rather than partial or hollow relief … [and] with precluding multiple lawsuits[.]" _Alto v. Black_, 738 F.3d 1111, 1126 (9th Cir. 2013). A judgment in this matter completely and finally resolves the subject matter of this action: namely, whether Ms. Bono is correct that the Notice of Termination terminates Cher's rights. Moreover, to the extent the children have

13

received any portion of Cher's Composition Royalties that Ms. Bono and Wixen diverted, Cher does not seek its return. *See above* at 11, n.3; Facts 59, 61-62, 64.

Second, Ms. Bono owns fifty percent of Sonny's termination interests, and as a result, she claims fifty percent of Cher's Composition Royalties, while each child's interest is only a quarter of that. *See* 17 U.S.C. § 304(c)(2)(A)-(B). Ms. Bono has the greater interest and is vigorously pursuing her share, as well as the claimed effect of the Notice of Termination. So any interest the children may have is "adequately represented by existing parties to the suit." *Alto*, 738 F.3d at 1128; *see also Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 331 F.R.D. 427, 432-33 (W.D. Wash. 2019); *Harvill v. Harvill*, No. 3:12-cv-00807, 2013 WL 1245729 at *4 (M.D. Tenn. Mar. 27, 2013).

Finally, the Court's judgment would not leave any party subject to inconsistent obligations because there is no other litigation among them. The children are therefore not necessary parties.

**(c)   Cher Has Standing**

A plaintiff has Article III standing if "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to … the defendant; and (3) it is likely … that the injury will be redressed by a favorable decision." *Spinedex Phys. Therapy USA Inc. v. United Healthcare of Az., Inc.*, 770 F.3d 1282, 1289 (9th Cir. 2014).

Ms. Bono asserts that Cher lacks standing because Cher has sold her catalog, which includes some rights to the disputed royalties. But Cher retains the right to all of the royalties that Ms. Bono diverted as well as most of the disputed royalties being held by Wixen. Facts 76-77, 63. More importantly, however, standing is determined "as of the time [the plaintiff] commenced suit[.]" *Gonzalez v. U.S. ICE*, 975 F.3d 788, 803 (9th Cir. 2020); *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992); *Fund Liquid. Hldgs. LCL v. Bank of Am. Corp.*, 991 F.3d 370, 386-89 (2d Cir.

14

1  2021).  When Cher filed this action in October 2021, she owned all relevant MSA
2  rights.  *See* Facts 75-77.  She therefore has standing.

3      Cher's catalog sale also does not render this action moot.  Cher's claim for
4  money damages—recovery of the royalties—"ensure[s] a live controversy."  *Mission*
5  *Product Hldgs., Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019).  Cher also
6  maintains an interest in her claim for declaratory relief because it is based upon the
7  same live controversy, and because the Court's decision will establish what rights and
8  interests Cher transferred to the buyer, and accordingly, what Cher receives in return.
9  Facts 78-79; *West v. Sec. of DOT*, 206 F.3d 920, 924 (9th Cir. 2000); *Lee v.*
10 *Verimatrix, Inc.*, No. 19-cv-2054-W(BLM), 2020 WL 4747751 at *5 (S.D. Cal. Aug.
11 17, 2020) (action to declare ownership of stock shares not mooted by plaintiff's sale
12 of stock; declaration would establish, among other things, whether stock has been
13 validly assigned to third party).

14      **(d)     Ms. Bono's Remaining Affirmative Defenses Are Boilerplate**

15     Ms. Bono asserts that she has performed, or "substantially performed, all
16 conditions and covenants under her agreements with Cher."  Def's Answer &
17 Counterclaims ("Answer") (Doc. 47) at 17-18.  But that assumes, incorrectly, that the
18 Notice of Termination deprived Cher of the royalties that Ms. Bono then took.  *See*
19 *above* at 7-10.  Ms. Bono also asserts contract defenses of modification, abandonment,
20 rescission, and termination.  Answer at 19.  But Ms. Bono has provided no evidence
21 of those and the relevant agreements are still in effect.

22     Ms. Bono also claims that "any action and/or inaction" by her was lawful,
23 justified, and/or privileged.  However, her diversion of Cher's royalties was not
24 "lawful," and justification and privilege are tort defenses that are inapplicable here.  5
25 B. WITKIN, CALIFORNIA PROC., Pleading § 1141 (6th Ed. 2023).  Finally, Ms. Bono
26 raises unjust enrichment, but there is no claim, let alone evidence, that Cher received
27 any "benefit at [Ms. Bono's]" expense.  *Ghirado v. Antonioli*, 14 Cal. 4th 39, 51
28 (1996) (requirements for unjust enrichment).  Further, unjust enrichment does not lie

1   if an express written contract governs the parties' relationship, as the MSA does here.

2   *Grebow v. Mercury Ins. Co*., 241 Cal. App. 4th 564, 580 (2015).

3        Ms. Bono's affirmative defenses accordingly fail.

4   **6.**    **CHER IS ENTITLED TO SUMMARY JUDGMENT AS TO MS.**

5          **BONO'S COUNTERCLAIMS**

6        **(a)    Ms. Bono's First Counterclaim Fails as a Matter of Law**

7        Ms. Bono's first counterclaim reads like a stream-of-consciousness litany of

8   different thoughts and assertions, none of which have merit.

9               **(1)    Ms. Bono's Diversion of Cher's Royalties Is a Breach of the**

10                    **MSA and Creditor's Claim Agreement, and Does Not Relieve**

11                    **Ms. Bono of Her Obligations**

12       Ms. Bono first alleges that Cher "wrongly" accuses her of not fulfilling "all of

13  her obligations under the [] Creditor's Claim Agreement…." Answer at 26 ¶ 41.  But

14  in the Creditor's Claim Agreement, Ms. Bono agreed to honor Cher's ongoing royalty

15  rights under the MSA, which Ms. Bono has plainly failed to do.  *See above* at 10-11.

16  Ms. Bono also asserts that there is a dispute as to whether Ms. Bono fulfilled her

17  obligation to cooperate in developing a mutually agreeable royalty mechanism.  *See*

18  Answer at 26 ¶ 41.  But that is incorrect—it is undisputed that the parties satisfied this

19  obligation each time it arose.  *See* Facts 80-83.

20       Ms. Bono then asserts that, apparently because she has been "wrongly" accused

21  of breaching the Creditor's Claim Agreement, she is no longer bound by it "as to the

22  selection of a worldwide royalty administrator…." Answer at 26 ¶ 42.  But breaching

23  a contract does not free the breaching party of its terms.  Moreover, Ms. Bono's claim

24  that the Heirs alone may appoint an administrator ignores that the MSA grants Cher

25  the right to approve contracts with third parties.  *See* Fact 6.

26

27

28

1       **(2)    The Wixen Agreements Provide Cher an Unqualified Right to**

2       **Terminate Them**

3       Ms. Bono next alleges, in the alternative, that "Cher must abide by her [2011]

4  approval of Wixen…." <u>Answer at 26 ¶ 44</u>. But in terminating the Wixen Agreements,

5  Cher exercised an express, bargained-for right *in those agreements*.

6       As explained above, in the Creditor's Claim Agreement, Ms. Bono and Cher

7  agreed to "cooperate in developing a mutually acceptable mechanism" for the

8  collection and payment of royalties.  Fact 20.  They cooperated in 1999 when they

9  appointed Glick, and again in 2011, when they jointly engaged Wixen pursuant to the

10  three Wixen Agreements.  Facts 80-83.  In each of the three Wixen Agreements, they

11  agreed that Ms. Bono's Bono Collection Trust "**and/or**" Cher's Trust, on the one

12  hand, or Wixen, on the other, could terminate simply by providing notice.  Facts 86-

13  89 (emphasis added).  Further, while earlier drafts referred to Ms. Bono "and" Cher

14  being able to terminate the Wixen Agreements, the last version was specifically

15  changed to "and/or."  Facts 90-91.

16       Moreover, the plain meaning of the term "and/or" is that *either* Ms. Bono, *or*

17  Cher, *or* both of them, may terminate the Wixen Agreements.  *See, e.g.*, <u>Taylor v.

18  Lockheed Martin Corp.</u>, 78 Cal. App. 4th 472, 487 (2000) (in contract requiring party

19  to comply with "federal and/or state requirements," such "use of the word

20  'or'…indicates an intention to … designate alternative or separate categories"); <u>Dow

21  v. Honey Lake Res. Conserv. Dist.</u>, 63 Cal. App. 5th 901, 913 (2021) ("*and/or*'" is "an

22  inclusive disjunction" that "allows the possibility of either option, or both").  This

23  plain language establishes the parties' mutual intent and is controlling.  *See* <u>F.B.T.

24  Prods., LLC v. Aftermath Records</u>, 827 F. Supp. 2d 1029, 1102 (C.D. Cal. 2011) ("The

25  mutual intent of the parties is to be determined from the language of a contract if the

26  'language is clear and explicit and does not involve an absurdity.'") (quoting <u>Cal. Civ.

27  Code § 1638</u>).

28

Ms. Bono also alleges that Cher "withheld her approval of an administrator without reason." Answer at 26 ¶ 45. Since Ms. Bono has not identified any other person who was not approved, she apparently refers to Cher's termination of the Wixen Agreements. However, Cher's right to terminate those agreements is not conditioned upon providing a "reason." Fact 89. Instead, Ms. Bono apparently contends that since she and Cher agreed in the 1999 Creditor's Claim Agreement to "cooperate in developing a mutually agreeable mechanism" for royalty collection and payment (Fact 20), Cher could terminate the 2011 Wixen Agreements in 2021 only if she had a "reason." See Answer at 27 ¶ 43. But that stretches plain language too far: The parties were not *developing* a mutually agreeable mechanism when Cher terminated Wixen—Cher was exercising her right under the mechanism Ms. Bono and Cher selected when they entered into the 2011 Wixen Agreements. *See* Facts 82-89.

In any event, even if the Wixen Agreements required Cher to have a reason to terminate them (which they do not), Cher plainly had a reason: Wixen secretly conspired with Ms. Bono to divert Cher's royalties. *See* Facts 100-110.

Accordingly, Ms. Bono's first counterclaim fails as a matter of law.

**(3)    The Creditor's Claim Agreement Did Not "Expire" and Still Binds the Parties**

Finally, Ms. Bono alleges that the Creditor's Claim Agreement has "expired" or was "fulfilled" by the 2011 selection of Wixen, and Ms. Bono "is subject only to" the MSA. Answer at 26 ¶¶ 45-46. But the Creditor's Claim Agreement has no expiration date or term and, by its own plain language, it continues as long as Cher's royalties are payable. Neither did the selection of Wixen fulfill its purpose. If that were so, its purpose was already "fulfilled" when Glick was chosen to collect and pay royalties. Instead, its purpose applies so long as there is a need to collect and disburse royalties. Indeed, the parties' cooperating in selecting Glick in 1999, and then cooperating *again* in replacing Glick with Wixen in 2011, proves their Creditor's

18

1   Claim Agreement is a continuing obligation.  *See, e.g.*, *Kalmanovitz v. Bitting*, 43 Cal.

2   App. 4th 311, 316 (1996) ("The parties' practical construction of a contract, as shown

3   by their actions, is important evidence of their intent.").

4           Further, when Ms. Bono and Cher cooperated to choose Wixen, Ms. Bono

5   agreed that she, or Cher, could terminate the Wixen Agreements whenever she thought

6   it appropriate.  As a result, Cher's right to terminate Wixen, and therefore her decision

7   to do so, is not inconsistent with their obligation to cooperate.  It is *the result* of that

8   cooperation.

9           The Court should therefore dismiss Ms. Bono's first counterclaim in its entirety.

10          **(b)     Ms. Bono's Second Counterclaim Fails as a Matter of Law**

11          Ms. Bono's second and last counterclaim begins by stating that the MSA ties

12   Cher's Record Royalties to the Recording Contracts identified in the MSA.  Answer

13   at 27 ¶ 49.  Ms. Bono then cryptically seeks a declaration as to whether Ms. Bono "is

14   able to enter into new agreements to exploit *the sound recording copyrights [she]*

15   *owns* and whether Cher or her assignee would be entitled to fifty percent of the receipts

16   arising from such new agreements." *Id.* at 27 ¶ 50 (emphasis added).  But Ms. Bono

17   has admitted that she owns no sound recording copyrights, because the record

18   companies own them under the Recording Contracts.  Facts 111-112.  Further, it is

19   undisputed that her Notice of Termination does not pertain to sound recording

20   copyrights and does not terminate the Recording Contracts.  Facts 47-50, 113.

21          For that reason, Ms. Bono's second counterclaim is based not on an actual

22   controversy, but on a "hypothetical state of facts" that cannot support a claim for

23   declaratory relief. *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007);

24   *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018) (Article III standing requires

25   an injury that is "actual or imminent, not 'conjectural' or 'hypothetical'").  It must

26   therefore be dismissed.

27

28

1

### 7. __CONCLUSION__

2       Cher respectfully requests that the Court grant the Motion in its entirety and

3   enter summary judgment in her favor.

4

5   Dated: November 20, 2023

6                                                    */s/ Peter Anderson*
                                                   Peter Anderson, Esq.
7                                                  Sean M. Sullivan, Esq.
                                                   Eric H. Lamm, Esq.
8                                                  Samuel Turner, Esq.
                                                DAVIS WRIGHT TREMAINE LLP
9                                                  Attorneys for Plaintiff
                                                         CHER
10                                              Individually and as Trustee of
                                                     The Veritas Trust

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for the Defendants who have appeared in this action, certifies that this Memorandum contains 6,321 words, which complies with the word limit of L.R. 11-6.1.

Dated: November 20, 2023

/s/ Peter Anderson
Peter Anderson, Esq.