**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

CHER, individually and as Trustee of The Veritas Trust,

Plaintiff,

v.

MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,

Defendants.

AND RELATED COUNTERCLAIMS

Case No. 2:21-CV-08157 JAK (RAOx)

[*PROPOSED*] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF AND COUNTERDEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Courtroom of the Honorable
John A. Kronstadt
United States District Judge

# TABLE OF CONTENTS

**Page**


1. UNCONTROVERTED FACTS .......... 1
   (a) Cher Is Entitled to a Judicial Declaration Finding That Her Royalty and Approval Rights Have Not Been Terminated .......... 1
      (1) The MSA and Cher's Rights Thereunder .......... 1
      (2) Ms. Bono, As Administrator of Sonny's Estate, Approves Cher's Creditor's Claim to Her Rights Under the MSA, including Cher's Right to 50% of the Royalties .......... 11
      (3) Ms. Bono's 2016 Notice of Termination .......... 16
      (4) An Actual Controversy Exists Regarding Whether the Notice of Termination Terminates Cher's Rights Under the MSA .......... 17
      (5) Cher's Composition Royalties and Related Approval Rights Have Not Been Terminated .......... 19
      (6) Cher's Record Royalties Have Not Been Terminated .......... 22
   (b) Ms. Bono Has Breached the MSA and the Creditor's Claim Agreement as a Matter of Law .......... 25
      (1) Ms. Bono Has Breached the MSA and the Creditor's Claim Agreement by Diverting the Royalties Owed to Cher .......... 25
      (2) Cher Is Entitled to Damages on Account of the Withheld Royalties, Plus Prejudgment Interest .......... 27
   (c) Ms. Bono's Affirmative Defenses Fail .......... 30
      (1) The Other Heirs Are Not Necessary Parties .......... 30
      (2) Cher Does Not Lack Standing .......... 33
   (d) Ms. Bono's First Counterclaim Fails as a Matter of Law .......... 35
      (1) Cher Cooperated with Ms. Bono as Agreed in the 1999 Creditor's Claim Agreement .......... 35
      (2) Cher Terminated the Wixen Agreements Pursuant to an Express Right to Terminate them .......... 37
      (3) In Any Event, Cher's Termination of the Wixen Agreements Was Reasonable .......... 42
         i. Wixen's Duties Under the Wixen Agreements .......... 42
         ii. Cher's Reasons for Terminating the Wixen Agreements .......... 44

(e) Ms. Bono's Second Counterclaim Fails as a Matter of Law ..... 48

2. CONCLUSIONS OF LAW ..... 50

(a) The Court's Jurisdiction ..... 50

(b) The Summary Judgment Standards ..... 51

(c) Cher Is Entitled to Declaratory Relief ..... 51

(1) Cher Satisfies the Requirements of the Declaratory Judgment Act ..... 51

(2) Cher's Rights to Composition Royalties and Approval Rights Have Not Been Terminated ..... 52

i. Section 304(c) Strictly Limits Termination to Pre-1978 Grants of Copyright Rights and Does Not Apply to the MSA ..... 52

(3) Cher's Rights to Record Royalties Have Not Been Terminated 54

(d) Cher Is Entitled to Judgment as a Matter of Law on Her Claim for Breach of Contract ..... 55

(1) Ms. Bono Has Breached the MSA and the Creditor's Claim Agreement ..... 55

(2) Cher Is Entitled to Damages on Account of Ms. Bono's Breaches of Contract, Plus Prejudgment Interest ..... 56

(e) Ms. Bono's Affirmative Defenses Fail ..... 57

(1) Cher's Claims Are Not Preempted by the Copyright Act ..... 57

i. Conflict Preemption Does Not Apply ..... 57

ii. Express Preemption Does Not Apply ..... 58

(2) Sonny's Children Are Not Necessary Parties ..... 60

(3) Cher Does Not Lack Standing ..... 61

(4) Ms. Bono's Remaining Affirmative Defenses Fail ..... 63

(f) Ms. Bono's First Counterclaim Should Be Dismissed ..... 64

(1) Cher Has Terminated the Wixen Agreements ..... 64

(2) The Creditor's Claim Agreement Continues to Bind the Parties ..... 65

(g) Ms. Bono's Second Counterclaim Should Be Dismissed ..... 66

3. CONCLUSION ..... 67

## STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

The Court having considered the Motion of plaintiff and counterdefendant Cher for Summary Judgment or, in the alternative, Partial Summary Judgment, the opposition of defendant and counterclaimant Mary Bono ("Ms. Bono"), Cher's reply papers, and the oral argument at the hearing on the Motion,

### 1. UNCONTROVERTED FACTS

The Court determines that the following facts have been established as uncontroverted:

| Uncontroverted Fact | Evidence in Support |
|---|---|
| **(a) Cher Is Entitled to a Judicial Declaration Finding That Her Royalty and Approval Rights Have Not Been Terminated**<br>**(1) The MSA and Cher's Rights Thereunder** | |
| **1.** On or about August 10, 1978, Cher and Sonny Bono ("Sonny") executed the Marriage Settlement Agreement ("MSA"). | Anderson Decl. at 1 ¶ 3 & Ex. 1 (MSA) at 18; Ex. 33 (Def's Resp. to Pltf's RFAs Set One) at 11 (admitting that the MSA is genuine); Cher Decl. at 1 ¶ 4; First Amended Complaint ("FAC") (Doc. 45) at 3 ¶ 13 and Def's Answer & Counterclaim ("Def's Answer") (Doc. 47) at 3 ¶ 13 (admitting that "[o]n or about August 10, 1978, Plaintiff and Sonny entered into a written marriage Settlement Agreement…."). |

| **Uncontroverted Fact** | **Evidence in Support** |
|---|---|
| **2.** Paragraphs 10(a), 10(b), and 10(c) of the MSA provide:<br>(10) As a part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and Interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests:<br><br>(a) Any and all distribution to either or both of the parties, payable and paid after July 14, 1978, from any and all contingent receipts from Atlantic Recording Corporation under the Agreement dated August 30, 1966, with respect to master sound recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the | Anderson Decl. Ex. 1 (MSA) at 5-6 ¶¶ 10(a)-(c); FAC (Doc. 45) at 3-4 ¶ 15 & Def's Answer (Doc. 47) at 8 ¶ 15. |

| Uncontroverted Fact | | Evidence in Support |
|---|---|---|
| payments made payable directly to each of them, if either so elects.<br><br>(b) Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from Liberty/U.A. Inc. under the agreements dated from and after November 1, 1964, between Cher and York Records (and its assignee Atlantic Recording Corporation), Imperial Records and Liberty Records, with respect to master recordings recorded by Wife. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects.<br><br>(c) Any and all distributions to either or both of the parties payable and paid after July 14, 1978, from any and all contingent receipts from MCA Records, Inc. under | | |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| agreements dated January 1, 1972 and February 11, 1971, between MCA Records, Inc., and its assignor Kapp Records, Cher Enterprises, Inc., Husband and Wife with respect to master recordings of Husband and Wife jointly and severally. It is agreed that Husband and Wife shall execute such notice as may be required to have one-half of the payments made payable directly to each of them, if either so elects. | |
| **3.** In Paragraphs 10(a)-(c) of the MSA, Sonny assigned to Cher, as her separate property, fifty percent of the royalties they receive on account of the exploitation of sound recordings ("Record Royalties") pursuant to specified contracts with Atlantic Recording Corporation, York Records, Imperial Records, Liberty Records, and MCA Records, Inc. | *See* Fact 2 and evidence cited in support thereof; Def's Answer (Doc. 47) at 20-21 ¶¶ 10-13. |
| **4.** Paragraph 10(d) of the MSA provides: | Anderson Decl. Ex. 1 (MSA) at 6-8 ¶ 10(d); Def's Answer (Doc. 47) at 9 ¶ |

| Uncontroverted Fact | Evidence in Support |
| --- | --- |
| (10) As a part of the equal division and allocation of the community property of the parties, Husband and Wife agree that there shall be an equal division of the following property and Interests in property, and each hereby transfers, conveys, assigns and quitclaims to the other as his or her sole and separate property, an undivided 50% interest in and to said property and interests: […] (d) Any and all of Husband's right, title and interest, individually or through any other business, corporation, firm or entity in which he has an interest (hereinafter referred to as "other business") including Chris-Marc Music, in and to contingent receipts payable and paid after July 14, 1978 from musical compositions and interests therein, written and composed, in whole or in part, by Husband or others prior to February 1, 1974, and/or acquired by Husband, Chris- | 16. |

| **Uncontroverted Fact** | | **Evidence in Support** |
| --- | --- | --- |
| Marc Music, or other business, prior to said date in whole or in part, from all sources perpetually and throughout the world, based upon the amounts thereof received by Husband, Chris-Marc Music, or other business, less costs of conversion and collection (including sub-publishers' and collection fees and taxes, if any, withheld therefrom at the source) and obligations to pay royalties to the other writers. Husband agrees that his successors in interest, his assigns and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of Wife as set forth in this Paragraph (10)(d). Husband agreed to account or to cause Chris-Marc Music or other businesses to account directly to Wife or any company she designates 50% of said future income of Husband, Chris-Marc Music or other business, under this Paragraph (10)(d). All said | | |

| Uncontroverted Fact | | Evidence in Support |
|---|---|---|
| contingent receipts shall be subject to an administration fee to be kept and retained by the worldwide administrator(s), which administrator(s) to be engaged shall be subject to Husband's sole discretion. Said administration fee shall be a sum equivalent to 10% of the gross income actually received by Husband and Chris-Marc Music from all sources worldwide. Husband agrees that all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of Wife or Wife's representatives which approval will not be unreasonably withheld. Husband agrees that any such agreements will be on substantially the same terms and conditions as any other agreements made by Husband with the same third parties with respect to subject matter which is not part of this Paragraph (10)(d). Chris-Marc Music shall be controlled solely by | | |

| Uncontroverted Fact | | Evidence in Support |
|---|---|---|
| Husband. | | |
| **5.** In Paragraph 10(d) of the MSA, Sonny assigned to Cher, as her separate property, an undivided fifty percent interest in all of Sonny's right, title, and interest, individually or through any entity in which he has an interest, to royalties that he, his businesses, and their respective successors in interest receive after July 14, 1978, from the exploitation of musical compositions, and interests in musical compositions, that Sonny wrote or acquired, in whole or part, prior to February 1, 1974 (the "Musical Compositions"), from all sources perpetually and throughout the world (the "Composition Royalties"). | | *See* Fact 4 and evidence cited in support thereof; Def's Answer (Doc. 47) at 21-22 ¶ 14. |
| **6.** Under Paragraph 10(d) of the MSA, Sonny agreed that "all agreements with third parties respecting the subject matter of this Paragraph (10)(d) are subject to the approval of [Cher] or [Cher's] representatives which approval will not | | *See* Fact 4 and evidence cited in support thereof; Def's Answer (Doc. 47) at 22 ¶ 16. |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| be unreasonably withheld." | |
| **7.** The MSA provides that it is governed by the laws of the State of California. | Anderson Decl. Ex. 1 (MSA) at 17 ¶ (20). |
| **8.** Paragraph 10(d) of the MSA provides that Sonny's "successors in interest, his assigns, and all third parties with whom he or any of his other businesses contracts shall be subject to the rights of [Cher] as set forth in this Paragraph (10)(d)." | Anderson Decl. Ex. 1 (MSA) at 6-8 ¶ 10(d); Def's Answer (Doc. 47) at 9 ¶ 16. |
| **9.** The MSA provides that it is "binding upon, and shall inure to the benefit of, each of the parties hereto, and their respective heirs and assigns." | Anderson Decl. Ex. 1 (MSA) at 17 ¶ 21. |
| **10.** The court presiding over the marital dissolution action entered its final judgment of divorce on June 27, 1975, but reserved jurisdiction with respect to, among other things, matters of property. | Anderson Decl. at 1 ¶ 4 & Ex. 2 (Final Judgment); Def's Answer (Doc. 47) at 20 ¶¶ 8-9. |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| **11.** In its July 3, 1979, Further Judgment Upon Reserved Issues After Judgment of Dissolution of Marriage ("Further Judgment"), the court "approved, confirmed and ratified" the MSA and "ordered [Sonny and Cher] to perform and comply in all respects with each and all of the executory terms and provisions of said [MSA] and to perform all obligations thereunder as provided for therein." | Anderson Decl. at 1-2 ¶ 3 & Ex. 3 (Further Judgment) at 1 § 1; FAC (Doc. 45) at 3 ¶ 13 & Def's Answer (Doc. 47) at 3 ¶ 13 (admitting that, among other things, the MSA was "subsequently approved by the California Superior Court"). |
| **12.** In its Further Judgment, the court "ordered that as part of the equal division of the community property of the parties, each party is awarded an undivided 50% interest in" the Record Royalties and the Composition Royalties. | Anderson Decl. Ex. 3 (Further Judgment) at 5-7 §§ 7.A-7.D; *see also* Ex. 1 (MSA) at 5-8 ¶¶ 10(a)-(d). |
| **13.** In 1990, Cher transferred her rights to receive the Composition Royalties and Record Royalties to herself, in her capacity as trustee of the Inshallah Trust, now known as the | Cher Decl. at 1-2 ¶ 1. |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| Veritas Trust ("Cher's Trust"). | |
| **(2) Ms. Bono, As Administrator of Sonny's Estate, Approves Cher's Creditor's Claim to Her Rights Under the MSA, including Cher's Right to 50% of the Royalties** | |
| **14.** Ms. Bono is Sonny's widow. | FAC (Doc. 45) at 5 ¶ 21 & Def's Answer (Doc. 47) at 12 ¶ 21. |
| **15.** After Sonny passed away in 1998, Ms. Bono served as administrator in the California Superior Court probate action of Sonny's estate, *Estate of Salvatore Phillip Bono*, Case No. IP 15865 (Sup. Ct.) (the "Probate Action"). | FAC (Doc. 45) at 5 ¶ 21 & Def's Answer (Doc. 47) at 12 ¶ 21; Anderson Decl. Ex. 35 (Bono Depo.) at 23:22-24. |
| **16.** On July 20, 1998, Cher filed a Creditor's Claim in the Probate Action, raising the MSA and, without limitation, her right to fifty percent of Record Royalties and Composition Royalties. | Anderson Decl. at 2 ¶ 6 & Ex. 4 (Creditor's Claim); Ex. 33 (Def's Resp. to Pltf's RFAs Set One) at 11 (admitting Creditor's Claim is genuine); Ex. 35 (Bono Depo.) at 24:6-25:1; Def's Answer (Doc. 47) at 12 ¶ 22. |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| **17.** In June 1999, Cher and Ms. Bono entered into the Agreement Regarding Disposition of Creditor's Claim filed by Cher ("Creditor's Claim Agreement"), which was then filed in the Probate Action on July 7, 1999. | Anderson Decl. at 2 ¶ 7 & Ex. 5 (Creditor's Claim Agreement); Ex. 33 (Def's Resp. to Pltf's RFAs Set 1) at 11 (admitting Creditor's Claim Agreement is genuine); Def's Answer (Doc. 47) at 12 ¶ 23. |
| **18.** In Section 1 of the Creditor's Claim Agreement, Ms. Bono "acknowledge[d] Cher's interest in" the Composition Royalties and the Record Royalties. | Anderson Decl. Ex. 5 (Creditor's Claim Agreement) at 1-2 § 1; Def's Answer (Doc. 47) at 13 ¶ 23. |
| **19.** In Section 2 of the Creditor's Claim Agreement, Cher "acknowledge[d] that to her knowledge [Ms. Bono] has been collecting said royalties, and has disbursed to Cher her share of such royalties, as provided for in the [MSA]." | Anderson Decl. Ex. 5 (Creditor's Claim Agreement) at 2 § 2; Def's Answer (Doc. 47) at 13 ¶ 23. |
| **20.** Section 3 of the Creditor's Claim Agreement provides:<br><br>In recognition of Cher's continuing right to receive such | Anderson Decl. Ex. 5 (Creditor's Claim Agreement) at 2 § 3; Def's Answer (Doc. 47) at 13 ¶ 23. |

| Uncontroverted Fact | Evidence in Support |
| --- | --- |
| royalty interests, Cher and the Administrator [Ms. Bono] hereby agree to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the heirs [of Sonny] after the closing of this estate. | |
| **21.** Ms. Bono approved Cher's Creditor's Claim. | Anderson Decl. Ex. 5 (Creditor's Claim Agreement) at 2 § 4; Def's Answer (Doc. 47) at 13 ¶ 23 (admitting that "Ms. Bono approved Cher's creditor's claim"). |
| **22.** On August 16, 1999, the probate court in the Probate Action found, among other things, that all "creditor's claims have either been approved, compromised or settled," and directed that the residue of the estate be distributed to Sonny's heirs. | Anderson Decl. at 2-3 ¶ 8 & Ex. 6 (Order Approving First and Final Account, etc.) at 2 § 5; Ex. 33 (Def's Resp. to RFA Set One) at 11 (admitting the order approving first and final account is genuine); Def's Answer (Doc. 47) at 13 ¶ 24. |
| **23.** Sonny's heirs are Ms. Bono and Sonny's four children, Chesare Bono, Chianna Bono, Christy Bono, and Chaz | Anderson Decl. Ex. 6 (Order Approving First and Final Account) at |

| <u>**Uncontroverted Fact**</u> | <u>**Evidence in Support**</u> |
| --- | --- |
| Bono (together with Ms. Bono, the "Heirs"). | 4 § 7; Def's Answer (<u>Doc. 47</u>) at 13 ¶ 24. |
| **24.** Christy Bono is Sonny's daughter with his first wife. | Cher Decl. at 1 ¶ 3. |
| **25.** Chaz Bono is Sonny and Cher's son. | Cher Decl. at 1 ¶ 3. |
| **26.** Chianna Bono and Chesare Bono are Sonny and Ms. Bono's daughter and son, respectively. | Anderson Decl. Ex. 6 (Order Approving First and Final Account) at 4 § 7 (ordering that distributions to "Chesare Bono and Chianna Bono[] shall be made to their mother, Mary Bono…."); Ex. 35 (Bono Depo.) at 38:3-9. |
| **27.** The Heirs took their interests in Sonny's estate, including Sonny's rights and interests under the MSA, subject to Cher's rights under the MSA. | *See* Facts 8, 9, 11, 18-22; Anderson Decl. Ex. 1 (MSA) at 6-8 ¶ 10(d); *Id.* at 17 ¶ 21; Ex. 5 (Creditor's Claim Agreement) at 2 §§ 1, 3 (Ms. Bono acknowledging Cher's ongoing royalty interests); Ex. 6 (Order Approving First and Final Account) at 2 § 5; Ex. 8 (1999 Royalty Distribution Letter Agreement) at 1 (confirming Sonny's |

| **Uncontroverted Fact** | **Evidence in Support** |
|---|---|
| | rights to the ongoing music and performance royalties have been assigned to the estate beneficiaries); Anderson Decl. Ex. 35 (Bono Depo.) at 59:18-60:17 (describing allocation of Composition royalties among the heirs); *see also* Def's Answer (Doc. 47) at 26 ¶ 42 (alleging that Ms. Bono is bound by the terms of the MSA) |
| **28.** After Sonny's death and the Probate Action, the Heirs or their designees disbursed to Cher her share of the Record Royalties and Composition Royalties and honored Cher's approval and other rights under the MSA. | FAC (Doc. 45) at 6-7 ¶ 25 & Def's Answer (Doc. 47) at 14 ¶ 25 (admitting that, "[f]ollowing the Heirs' receipt of their distributions in 1999, Plaintiff received sums that they or their designees represented were [Cher's] fifty percent of all Royalties they received, directly or indirectly, as her share of community property assigned to her under the [MSA] as her separate property, and, to the best of [Cher's] knowledge and belief, the Heirs honored [Cher's] approval and other rights under the [MSA]."). |

| <u>**Uncontroverted Fact**</u> | <u>**Evidence in Support**</u> |
|---|---|
| **(3) Ms. Bono's 2016 Notice of Termination** | |
| **29.** On or about September 30, 2016, Ms. Bono and her children with Sonny, Chianna Bono and Chesare Bono, caused to be served a purported Notice of Termination under 17 U.S.C. § 304(c) ("Notice of Termination"). | Anderson Decl. at 3 ¶ 9 & Ex. 7 (Notice of Termination); FAC (<u>Doc. 45</u>) at 8-9 ¶ 33 & Def's Answer (<u>Doc. 47</u>) at 14 ¶ 33; Def's Answer (<u>Doc. 47</u>) at 25 ¶ 35; *see also* Anderson Decl. Ex. 35 (Bono Depo.) at 38:3-9, 125:7-126:9 (authenticating Notice of Termination). |
| **30.** The Notice of Termination states: "Pursuant to 17 U.S.C. § 304(c), the notice of termination of the grant of the transfer or license of copyrights and of any rights under copyright with respect to the musical compositions listed [in Schedule A] is hereby served by the successors of the deceased author [Sony Bono]." | Anderson Decl. Ex. 7 (Notice of Termination) at C-000151; *see also* FAC (<u>Doc. 45</u>) at 8-9 ¶ 33 & Def's Answer (<u>Doc. 47</u>) at 14 ¶ 33 (admitting, inter alia, that the Notice of Termination was issued to various music publishers to whom Sonny had granted a transfer or license of the renewal copyrights, or rights under them, in the Musical Compositions). |
| **31.** The Notice of Termination identifies twenty-five entities who, directly or through a successor, received a grant of transfer or license of | Anderson Decl. Ex. 7 (Notice of Termination) at C-000151-52; *see also* FAC (<u>Doc. 45</u>) at 8-9 ¶ 33 & Def's Answer (<u>Doc. 47</u>) at 14 ¶ 33 |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| copyright or rights under copyright in the musical compositions specified in Schedule A to the Notice of Termination. | (admitting, inter alia, that the Notice of Termination was issued to various music publishers to whom Sonny had granted a transfer or license of the renewal copyrights, or rights under them, in the Musical Compositions). |
| **32.** The Notice of Termination's Schedule A specifies "Effective Dates of Termination" of grants of copyright or copyright rights in each musical composition, ranging from 2018 to 2026. | Anderson Decl. Ex. 7 (Notice of Termination) at C-000153-155; FAC (Doc. 45) at 8-9 ¶ 33 & Def's Answer (Doc. 47) at 14 ¶ 33 (admitting, inter alia, that the Notice of Termination "specified various effective dates of termination ranging from dates in 2018 to 2026"). |
| **(4) An Actual Controversy Exists Regarding Whether the Notice of Termination Terminates Cher's Rights Under the MSA** | |
| **33.** In September 2021, Ms. Bono's representatives advised Cher's representatives that Ms. Bono contends that the Notice of Termination terminates Cher's royalty and approval | Passman Decl. at 1 ¶ 4; Cher Decl. at 2 ¶ 8. |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| rights under the MSA. | |
| **34.** Ms. Bono continues to assert in this action that the Notice of Termination operates to terminate Cher's royalty and approval rights under the MSA. | *See, e.g.*, Def's Answer (Doc. 47) at 1; *id.* at 25 ¶ 36; Def's Mot. to Dismiss (Doc. 18). |
| **35.** On or after the date of termination for grants of copyright or copyright rights in each musical composition identified in Schedule A of the Notice of Termination, Ms. Bono or her representatives have stopped paying Cher the portion of the Composition Royalties that were being paid to her previously. | *See, e.g.*, Anderson Decl. at 5-6 ¶¶ 18-20 & Ex. 17 (September 19, 2019 letter instructing Wixen to pay royalties to the Heirs and not to Cher); Ex. 18 (separate Wixen Agreement dated January 1, 2019 to administer the Heirs' interests); Anderson Decl. at 9 ¶ 30 (explaining that disputed royalties are held by Wixen); Ex. 37 (Wixen Depo.) at 167:22-168:2 ("Q. There was, however, a sum of money, approximately $187,000, that Wixen paid to Ms. Bono and others in reliance on the assumption, belief or instruction that they received that – not to pay Cher; is that correct? A. Yes."); Ex. 35 (Bono Depo.) at 143:13-145:5 ("Q. Do you have any reason to doubt that |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| | Wixen paid $187,535 of the Cher portion of the royalties to you and to the children? A. I have no reason”). |
| **36.** Pursuant to an agreement with Wixen Music Publishing, Inc. (“Wixen”), the royalties that Cher contends are owed to her, and that Ms. Bono contends are not, are being held in separate accounts pending the outcome of this litigation. | Anderson Decl. at 9 ¶ 30 (explaining that disputed royalties are held in separate account by Wixen); *see also, e.g.*, Ex. 30 (account statement for disputed royalty account). |
| **(5) Cher’s Composition Royalties and Related Approval Rights Have Not Been Terminated** | |
| **37.** The MSA was not executed on or before January 1, 1978. | *See* Fact 1 (MSA executed August 10, 1978); Anderson Decl. Ex. 1 (MSA) at 18; Cher Decl. at 1 ¶ 4; FAC (Doc. 45) at 3 ¶ 13 and Def’s Answer (Doc. 47) at 3 ¶ 13 (admitting that “[o]n or about August 10, 1978, Plaintiff and Sonny entered into a written marriage Settlement Agreement….”). |
| **38.** The Notice of Termination identifies each of 25 entities as a | Anderson Decl. Ex. 7 (Notice of Termination) at C-000151-52; *see also* |

| Uncontroverted Fact | | Evidence in Support |
|---|---|---|
| "Grantee Whose Rights Are Being Terminated, or the Grantee's Successor in Title, and Each Address At Which Service of the Notice Is Being Made." | | FAC (Doc. 45) at 8-9 ¶ 33 & Def's Answer (Doc. 47) at 14 ¶ 33 (admitting, inter alia, that the Notice of Termination was issued to various music publishers to whom Sonny had granted a transfer or license of the renewal copyrights, or rights under them, in the Musical Compositions). |
| **39.** The Notice of Termination does not identify Cher or Cher's Trust as a "Grantee Whose Rights Are Being Terminated, or the Grantee's Successor in Title." | | Anderson Decl. Ex. 7 (Notice of Termination) at C-000151-52; *see also* Cher Decl. at 2 ¶ 10 ("I have reviewed Ms. Bono's notice of termination and its list of companies to which it was addressed. None of those companies are my companies. The notice of termination was not mailed to me or to any of my companies."). |
| **40.** The Notice of Termination does not identify Cher or Cher's Trust as someone on whom the Notice of Termination was served. | | Anderson Decl. Ex. 7 (Notice of Termination) at C-000151-52, *id.* at C-000156-57 (mail manifest report); *see also* Cher Decl. at 2 ¶ 10 ("I have reviewed Ms. Bono's notice of termination and its list of companies to which it was addressed. None of those |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| | companies are my companies. The notice of termination was not mailed to me or to any of my companies.”). |
| **41.** The Notice of Termination does not identify the MSA as a grant being terminated. | Anderson Decl. Ex. 7 (Notice of Termination) at C-000160. |
| **42.** The Notice of Termination does not identify the Further Judgment as a grant being terminated. | *See* Anderson Decl. Ex. 7 (Notice of Termination) at C-000160; *see also* Ex. 3 (Further Judgment). |
| **43.** Cher’s right to 50% of the Composition Royalties is not limited to royalties from the exploitation of the Musical Compositions pursuant to a particular grant or agreement, but instead includes Composition Royalties from “all sources perpetually and throughout the world.” | Anderson Decl. Ex. 1 (MSA) at 6-8 ¶ 10(d); *compare* Ex. 1 (MSA) at 6-8 ¶ 10(d), *with id.* at 5-6 ¶¶ 10(a)-(c) (assigning to Cher, as separate property, fifty percent of the Record Royalties received pursuant to specified recording contracts with Atlantic Recording Corporation, York Records, Imperial Records, Liberty Records, and MCA Records, Inc.) |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| **44.** Cher's approval rights under Paragraph 10(d) of the MSA are not limited to approving or withholding approval of any particular agreement. | *See* Fact 6 and evidence cited in support thereof; Anderson Decl. Ex. 1 (MSA) at 6-8 ¶ 10(d). |
| **45.** The Notice of Termination has no effect on Cher's rights to receive payments with respect to the exploitation of the Musical Compositions outside of the United States. | Anderson Decl. Ex. 34 (Def's Supp. Resp. to Pltf's RFA, Set One) at 13-14 (Supp. Resp. to RFA 12). |
| **(6) Cher's Record Royalties Have Not Been Terminated** | |
| **46.** The Record Royalties granted to Cher under Paragraphs 10(a)-(c) of the MSA consist of royalties paid on account of the exploitation of sound recordings pursuant to contracts (the "Recording Contracts") with record companies Atlantic Recording Corporation, York Records, Imperial Records, Liberty Records, and MCA Records, Inc. (the "Record Companies"). | *See* Facts 2-3 and evidence cited in support thereof; Anderson Decl. Ex. 1 (MSA) at 5-6 ¶ 10(a)-(c); Def's Answer (Doc. 47) at 20-21 ¶¶ 10-13, 27 ¶ 49. |

| **Uncontroverted Fact** | | **Evidence in Support** |
|---|---|---|
| **47.** The Notice of Termination identifies musical compositions, not sound recordings. | | Anderson Decl. Ex. 7 (Notice of Termination) at C-000159 ("notice of termination of the grant of the transfer or license of copyright and of any rights under copyright with respect to the musical compositions listed below is hereby served…"); *see also* FAC (Doc. 45) at 8-9 ¶ 33 & Def's Answer (Doc. 47) at 14 ¶ 33 (admitting, inter alia, that the Notice of Termination was issued to those to whom Sonny had granted a transfer or license of the renewal copyrights, or rights under them, in musical compositions); Ex. 37 (Wixen Depo.) at 136:14-137:12 ("A musical composition exists independently of the sound recording. It is an underlying composition."). |
| **48.** The Notice of Termination's Schedule A identifies the copyrighted works' registration numbers as beginning with EU or EP, which signifies unpublished or published musical compositions, not sound | | Anderson Decl. Ex. 7 (Notice of Termination) at C-000161-63; Ex. 37 (Wixen Depo.) at 138:4-15 ("Q. And the E refers to – well it, includes compositions but not sound recordings? A. Yes, I believe the ones |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| recordings. | that pre-'78 that included sound recordings start with SR.”). |
| **49.** The Notice of Termination does not identify any of the Record Companies as a “Grantee Whose Rights Are Being Terminated, or the Grantee's Successor in Title.” | Def's Answer (Doc. 47) at 14-15 ¶ 34 (admitting that the Notice of Termination “does not identify any Record Companies as grantees whose rights are being terminated”); *compare* Anderson Decl. Ex. 1 (MSA) at 5-6 ¶ 10(a)-(c) *with* Ex. 7 (Notice of Termination) at C-000159-60. |
| **50.** The Notice of Termination was not served on any of the Record Companies. | Def's Answer (Doc. 47) at 14-15 ¶ 34 (admitting that the “Notice of Termination was not served on the Record Companies”); *compare* Anderson Decl. Ex. 1 (MSA) at 5-6 ¶ 10(a)-(c) *with* Anderson Decl. Ex. 7 (Notice of Termination) at C-000164-65. |
| **51.** The Notice of Termination did not purport to terminate the Recording Contracts. | Def's Answer (Doc. 47) at 14-15 ¶ 34 (admitting that the “Notice of Termination did not purport to terminate any of the Recording |

| **Uncontroverted Fact** | **Evidence in Support** |
|---|---|
| | Contracts"); *see* Facts 47-50 and evidence in support thereof. |
| **(b) Ms. Bono Has Breached the MSA and the Creditor's Claim Agreement as a Matter of Law** | |
| **(1) Ms. Bono Has Breached the MSA and the Creditor's Claim Agreement by Diverting the Royalties Owed to Cher** | |
| **52.** Paragraphs 10(a)-(d) of the MSA require Sonny to, among other things, transfer to Cher her fifty percent of the Composition Royalties and Record Royalties. | *See* Facts 2-5 and evidence in support thereof. |
| **53.** Ms. Bono is an heir of Sonny and assumed Sonny's rights and obligations under the MSA after his passing. | *See* Facts 8, 9, 11, 14, 18-22; Anderson Decl. Ex. 1 (MSA) at 6-8 ¶ 10(d); *Id.* at 17 ¶ 21; Ex. 5 (Creditor's Claim Agreement) at 2 §§ 1, 3 (Ms. Bono acknowledging Cher's ongoing royalty interests); Ex. 6 (Order Approving First and Final Account) at 2 § 5; Ex. 8 (1999 Royalty Distribution Letter Agreement) at 1 (confirming Sonny's rights to the royalties have been assigned to the estate beneficiaries); Anderson Decl. Ex. 35 (Bono Depo.) at |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| | 59:18-60:17 (describing allocation of Composition royalties among the heirs); *see also* Def's Answer (Doc. 47) at 26 ¶ 42 (alleging that Ms. Bono is bound by the terms of the MSA) |
| **54.** Ms. Bono and Cher are parties to the Creditor's Claim Agreement. | Anderson Decl. Ex. 5 (Creditor's Claim Agreement); FAC (Doc. 45) at 5-6 ¶ 23 & Def's Answer (Doc. 47) at 12-13 ¶ 23. |
| **55.** In the Creditor's Claim Agreement, Ms. Bono agreed, among other things, that she "acknowledges Cher's interest in" the Composition Royalties and the Record Royalties. | *See* Fact 18 and evidence cited in support thereof. |
| **56.** In or about 2019, if not before, Ms. Bono instructed Wixen to stop paying Cher 50% of the Composition Royalties on or after the Effective Date of Termination for each Musical Composition in the Notice of Termination. | *See, e.g.*, Anderson Decl. at 5-6, ¶¶ 18-20 & Ex. 17 (September 19, 2019 letter instructing Wixen to pay royalties to the Heirs and not to Cher); Ex. 18 (separate Wixen Agreement dated January 1, 2019 to administer the Heirs' termination interests); Ex. 37 (Wixen Depo.) at 167:22-168:2 ("Q. There was, however, a sum of money, |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| | approximately $187,000, that Wixen paid to Ms. Bono and others in reliance on the assumption, belief or instruction that they received that – not to pay Cher; is that correct? A. Yes."); Ex. 35 (Bono Depo.) at 143:13-145:5 ("Q. Do you have any reason to doubt that Wixen paid $187,535 of the Cher portion of the royalties to you and to the children? A. I have no reason"). |
| **(2) Cher Is Entitled to Damages on Account of the Withheld Royalties, Plus Prejudgment Interest** | |
| **57.** In or around February 2022, Wixen agreed to deposit the disputed Composition Royalties in a separate account pending resolution of this case. | Anderson Decl. at 8-9 ¶¶ 29-30; *see, e.g., id.* Ex. 30 (account statement for disputed royalty account). |
| **58.** Prior to depositing the disputed royalties in this action in a separate account, Wixen distributed at least $187,534.91 of Composition Royalties to the Heirs that, but for Ms. Bono's claimed termination of Cher's right to the Composition Royalties, would have | Anderson Decl. at 8-9 ¶¶ 29-30; Ex. 37 (Wixen Depo.) at 167:22-168:2 ("Q. There was, however, a sum of money, approximately $187,000, that Wixen paid to Ms. Bono and others in reliance on the assumption, belief or instruction that they received that – not to pay |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| been distributed to Cher. | Cher; is that correct? A. Yes."); Ex. 35 (Bono Depo.) at 143:13-145:5 ("Q. Do you have any reason to doubt that Wixen paid $187,535 of the Cher portion of the royalties to you and to the children? A. I have no reason"). |
| **59.** Of the $187,534.91 in royalties paid to the Heirs that, but for Ms. Bono's claimed termination of Cher's right to the Compensation Royalties, would have been distributed to Cher, at least $93,767.46 (50%) was paid to Ms. Bono. | *See* Fact 58 and evidence cited in support thereof; Anderson Decl. Ex. 7 (Notice of Termination) at C-000151 (identifying Ms. Bono as the owner of 50% of Sonny's termination interest); Ex. 17 (letter directing Wixen to adjust its "payment policies" to ensure that the U.S. exploitations of post-termination uses are allocated and paid 50% to Ms. Bono). |
| **60.** As of June 30, 2022, $418,156.82 in Composition Royalties that, but for Ms. Bono's claimed termination of Cher's right to Composition Royalties, would have been distributed to Cher, are being held in a account at Fifth Third Bank by | Anderson Decl. at 9 ¶¶ 30-31, Ex. 27 (June 30, 2022 disputed royalty account statement). |

| **Uncontroverted Fact** | **Evidence in Support** |
|---|---|
| Wixen. | |
| **61.** As of July 31, 2023, $739,688.58 in royalties that, but for Ms. Bono's claimed termination of Cher's right to the Composition Royalties, would have been distributed to Cher, are being held in an account at Fifth Third Bank by Wixen. | Anderson Decl. at 9 ¶¶ 30-34 & Ex. 30 (July 31, 2023 disputed royalty account statement). |
| **62.** Since March 2023, an additional $250,000 in royalties that, but for Ms. Bono's claimed termination of Cher's interests, would have been distributed to Cher, is being held by Wixen in a separate account at Manufacturers Bank. | Anderson Decl. at 9 ¶¶ 32-33, Ex. 28 (email confirming $250,000 would be moved to Manufacturers Bank), *see, e.g.*, Ex. 33 (Manufacturers Bank Statement). |
| **63.** As of June 30, 2022, the total of the disputed royalties held by Wixen, plus the disputed royalties already paid to Ms. Bono, is $511,924.28. | *See* Facts 59 and 60 and evidence cited in support thereof. |
| **64.** As of July 31, 2023, the date of the latest royalty report provided to Cher, the total of the disputed royalties | *See* Facts 59, 61, and 62 and evidence cited in support thereof. |

| Uncontroverted Fact | | Evidence in Support |
|---|---|---|
| held by Wixen, plus the disputed royalties already paid to Ms. Bono, is $1,083,456.04. | | |
| **(c) Ms. Bono's Affirmative Defenses Fail** **(1) The Other Heirs Are Not Necessary Parties** | | |
| **65.** Ms. Bono was the administrator of Sonny's estate and is a party to the Creditor's Claim Agreement. | | FAC (Doc. 45) at 5 ¶ 21 & Def's Answer (Doc. 47) at 12 ¶ 21 (admitting that Ms. Bono was appointed administrator of Sonny's Estate); *see also, e.g.*, Anderson Decl. Ex. 5 (Creditor's Claim Agreement) at 1. |
| **66.** Ms. Bono, in her individual capacity, receives an undivided 50% interest in the copyrights and copyright rights whose grants are terminated by the Notice of Termination. | | *See* FAC (Doc. 45) at 5 ¶ 21 & Def's Answer (Doc. 47) at 12 ¶ 21 (admitting that Mary is Sonny's widow); Anderson Decl. Ex. 7 (Notice of Termination) at C-000151 (identifying Ms. Bono as the owner of 50% of Sonny's termination interest); *see also* 17 U.S.C. § 304(c)(2)(A). |
| **67.** Chesare Bono, Chianna Bono, Christy Bono, and Chaz Bono each receives an undivided 12.5% interest in | | *See* Ex. 7 (Notice of Termination) at C-000151 (identifying Chesare Bono and Chianna Bono each as the owners of |

| Uncontroverted Fact | | Evidence in Support |
|---|---|---|
| the copyrights and copyright rights whose grants are terminated. | | 12.5% of Sonny's termination interest); Ex. 17 at BONO004125 (identifying each of Sonny's children as the owners of 12.5% of Sonny's termination interest); *see also* 17 U.S.C. § 304(c)(2)(B). |
| **68.** Christy Bono and Chaz Bono did not execute the Notice of Termination. | | *See* Anderson Decl. Ex. 7 (Notice of Termination) at C-000151 ("The persons executing this notice who constitute more than one-half of Sonny Bono's termination interest are Mary Bono (50%), Chianna Maria Bono (12.5%) and Chesare Elan Bono (12.5%)."). |
| **69.** The Bono Collection Trust was formed to collect and distribute the royalties received from the exploitation of musical compositions and sound recordings, including those described in Paragraphs 10(a)-(d) of the MSA. | | Anderson Decl. Ex. 35 (Bono Depo. at 60:23-61:23). |
| **70.** Before entering into the April 2011 Wixen Collection Agreement, Administration Agreement, and | | Anderson Decl. Ex. 35 (Bono Depo.) at 78:11-17; *see also id.* at 59:18-60:17 |

| **Uncontroverted Fact** | | **Evidence in Support** |
|---|---|---|
| Promotion Agreement (the "Wixen Agreements"), the Bono Collection Trust distributed 50% of the Composition Royalties, after the fees and deductions set forth in MSA ¶ 10(d) to Cher, and the other 50% to the Heirs. | | (describing allocation of Composition Royalties among the heirs). |
| **71.** After execution of the Wixen Agreements, Wixen began paying 50% of the Composition Royalties to Cher's Trust (after the fees and deductions set forth in MSA ¶ 10(d) and the Wixen Agreements). | | Anderson Decl. Ex. 9 (Wixen Collection Agreement) at 6 § 11(c); Anderson Decl. Ex. 37 (Wixen Depo.) at 42:22-44:2; *see also* FAC (Doc. 45) at 8 ¶ 31 & Def's Answer (Doc. 47) at 14 ¶ 31 (admitting *inter alia* that Wixen "disbursed to Plaintiff or her Trust sums that Wixen represented constitute Plaintiff's fifty percent of Royalties that Sonny assigned to Plaintiff in the [MSA]"); Anderson Decl. Ex. 36 (Bono Depo.) at 58:2-13; Cher Decl. at 1-2 ¶ 6 (explaining that the Inshallah Trust has been renamed the Veritas Trust). |
| **72.** The Bono Collection Trust distributed the royalties received from | | *See* Def's Answer (Doc. 47) at 14 ¶ 27 ("Admitted that the Heirs transferred |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| Wixen to Ms. Bono and the other Heirs. | their rights to receive Royalties, subject to certain obligations to Cher, to The Bono Collection Trust."); *see also* Ex. 10 (Wixen Administration Agreement) at 6 § 7(c) (noting that payments from Wixen to the Bono Collection Trust will thereafter be allocated among the beneficiaries). |
| **73.** Through at least February 2022, the Bono Collection Trust continues to receive royalty payments via Wixen. | *See* Anderson Decl. at 10 ¶ 36 & Ex. 32 (BMI royalty statement paid to Bono Collection Trust) |
| **74.** Neither Chesare, Chianna, Christy, nor Chaz have chosen to intervene in this action. | *See* Docket in this action. |
| **(2) Cher Does Not Lack Standing** | |
| **75.** Cher filed this action on October 13, 2021. | *See* Complaint, Doc. 1. |
| **76.** On or about January 5, 2023, Cher executed a General Assignment in which she assigned, among other things, certain of her royalty and | Cher Decl. at 2 ¶ 9; Anderson Decl. Ex. 31 (General Assignment) at C-000639, C-000656-57. |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| approval rights under the MSA, to a third party. | |
| **77.** Cher did not assign her right to the Composition Royalties disputed in this action due and payable prior to July 1, 2022. | Cher Decl. at 2 ¶ 9; Anderson Decl. Ex. 31 (General Assignment) at C-000646, 655. |
| **78.** If this Court were to find that the Notice of Termination did in fact terminate Cher's rights under the MSA, then Cher's rights to receive the Composition Royalties and Record Royalties could not have transferred to the buyer. | *See, e.g.*, Def's Answer (Doc. 47) at 1 ("any such royalties allegedly due to Cher no longer exists"); Ex. 17 (September 19, 2019 letter instructing Wixen to pay royalties to the Heirs and not to Cher). |
| **79.** This Court's determination of whether or not Ms. Bono terminated Cher's rights to the Composition Royalties and Record Royalties affects the value of Cher's assignment to the buyer and, accordingly, what Cher receives in exchange. | *See* Fact 78 and evidence cited in support thereof; Cher Decl. at 2 ¶ 9. |

| **Uncontroverted Fact** | | **Evidence in Support** |
| --- | --- | --- |
| **(d) Ms. Bono's First Counterclaim Fails as a Matter of Law** **(1) Cher Cooperated with Ms. Bono as Agreed in the 1999 Creditor's Claim Agreement** | | |
| **80.** In 1999, after the Probate Action, Cher and Ms. Bono agreed to retain Jay Glick, CPA, of Montgomery, Glick & Co., to collect and disburse royalties. | | Anderson Decl. at 3 ¶ 10, Ex. 8 (1999 Letter Agreement) at 1. |
| **81.** In retaining Mr. Glick in 1999, Ms. Bono and Cher cooperated to develop a mutually acceptable mechanism for the collection and proper disbursement of royalties as required under Section 3 of the Creditor's Claim Agreement. | | *See* Fact 20 and evidence cited in support thereof; Anderson Decl. Ex. 8 (1999 Letter Agreement) at 1 (noting the necessity to develop a mutually acceptable mechanism for the collection and distribution of royalties and that the mechanism described in the letter agreement is acceptable to the parties); Ex. 35 (Bono Depo) at 41:19-42:1 ("Q. Was any mechanism agreed upon to collect and disburse the royalties to Cher and the heirs? A. Yes…. Twice. Q. What was the first mechanism? A. [Cher's |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| | representative] and I agreed to hire my CPA. His name was Jay Glick.”). |
| **82.** In 2011, Ms. Bono, in her capacity as trustee of the Bono Collection Trust, and Cher, in her capacity as trustee of Cher’s Trust, retained Wixen to, among other things, collect and disburse the royalty income owed to Cher and the Heirs under the MSA. | Anderson Decl. Ex. 9 (Wixen Collection Agreement) at 1-2. |
| **83.** In retaining Wixen in 2011, Ms. Bono and Cher again cooperated to develop a mutually acceptable mechanism for the collection and proper disbursement of royalties as required under Section 3 of the Creditor’s Claim Agreement. | *See* Fact 20 and evidence cited in support thereof; Def’s Answer (Doc. 47) at 26 ¶ 34 (“Cher and Mary cooperated in 1999 and again in 2011 in developing a mutually acceptable mechanism for the collection and proper disbursement of the Royalties”); Anderson Decl. Ex. 35 (Bono Depo.) at 41:19-42:1 (“Q. Was any mechanism agreed upon to collect and disburse the royalties to Cher and the heirs? A. Yes…. Twice…. Q. What was the second mechanism? |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| | [objection] THE WITNESS: When we hired Wixen Music Publishing."). |
| **84.** In retaining Wixen's services, Ms. Bono, in her capacity as Trustee of the Bono Collection Trust, Cher, in her capacity as Trustee of Cher's Trust, and Wixen, executed the three Wixen Agreements, each dated as of April 1, 2011. | Anderson Decl. at 3-4 ¶¶ 11-13, Ex. 9 (Collection Agreement), Ex. 10 (Administration Agreement), Ex. 11 (Promotion Agreement), Ex. 37 (Wixen Depo.) at 33:9-34:15 (authenticating Collection Agreement), 61:6-17 (authenticating Administration Agreement), 64:13-65:2 (authenticating Promotion Agreement). |
| **85.** Each of the Wixen Agreements was entered into in California and provides that its validity, interpretation, and legal effect is governed by the laws of the State of California. | Anderson Decl. Ex. 9 (Collection Agreement) at 9 § 17(d); Ex. 10 (Administration Agreement) at 8 § 14 (d)); Ex. 11 (Promotion Agreement) at 7 § 9(d). |
| **(2) Cher Terminated the Wixen Agreements Pursuant to an Express Right to Terminate them** | |
| **86.** In each of the Wixen Agreements, the Bono Collection Trust, of which Mary Bono is the | Anderson Decl. Ex. 9 (Collection Agreement) at 1; Ex. 10 |

| **Uncontroverted Fact** | **Evidence in Support** |
|---|---|
| trustee, is defined as [redacted] | (Administration Agreement) at 1; Ex. 11 (Promotion Agreement) at 1. |
| **87.** In each of the Wixen Agreements, Cher's Trust, of which Cher is the trustee, is defined as [redacted] | Anderson Decl. Ex. 9 (Collection Agreement) at 1; Ex. 10 (Administration Agreement) at 1; Ex. 11 (Promotion Agreement) at 1. |
| **88.** Section 7 of the Collection Agreement, Section 1 of the Administration Agreement, and Section 2 of the Promotion Agreement each provides that Wixen will perform the services set forth therein [redacted] | Anderson Decl. Ex. 9 (Collection Agreement) at 4-5 § 7; Ex. 10 (Administration Agreement) at 2 § 1; Ex. 11 (Promotion Agreement) at 3 § 2. |
| **89.** Section 7 of the Collection Agreement, Section 1 of the Administration Agreement, and Section 2 of the Promotion Agreement each states, in part: | Anderson Decl. Ex. 9 (Collection Agreement) at 4-5 § 7; Ex. 10 (Administration Agreement) at 2 § 1; Ex. 11 (Promotion Agreement) at 3 § 2. |

| **Uncontroverted Fact** | | **Evidence in Support** |
|---|---|---|
| [redacted] | | |
| **90.** In previous drafts of each of the Wixen Agreements, the drafts provided (emphasis added): [redacted] | | *See* Anderson Decl. at 4-5 ¶¶ 13-15, Ex. 13 (Draft Collection Agreement) at 4-5 § 7; Ex. 14 (Draft Administration Agreement) at 2 § 1; Ex. 15 (Draft Promotion Agreement) at 2-3 § 2. |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| [redacted] | |
| **91.** The change from [redacted], was specifically agreed to by Wixen, and Mario F. Gonzalez, Esq., counsel for both the Bono Collection Trust and Cher's Trust. | *See* Anderson Decl. at 4 ¶ 14, Ex. 12 at BONO_012473-74. |
| **92.** Section 7 of the Collection Agreement, Section 1 of the Administration Agreement, and Section 2 of the Promotion Agreement each provides that: [redacted] | Anderson Decl. Ex. 9 (Collection Agreement) at 4-5 § 7; Ex. 10 (Administration Agreement) at 2 § 1; Ex. 11 (Promotion Agreement) at 3 § 2. |

| **Uncontroverted Fact** | | **Evidence in Support** |
|---|---|---|
| [redacted] | | |
| **93.** Each of the Wixen Agreements provides that notices to Wixen may be sent [redacted]. | | Anderson Decl. Ex. 9 (Collection Agreement) at 8 § 16; Ex. 10 (Promotion Agreement) at 5 § 8; Ex. 11 (Administration Agreement) at 7 § 13. |
| **94.** On or about October 13, 2021, Cher's Trust sent written notices via certified mail, return receipt requested, of its election to terminate each of the Wixen Agreements. | | Passman Decl. at 1 ¶ 5; Anderson Decl. at 7-8 ¶¶ 26-28 & Exs. 26, 27, 28 (Veritas Trust termination letters); Ex. 37 (Wixen Depo.) at 187:13-23, 187:19-188:9, 193:3-12 (authenticating termination letters). |

| **Uncontroverted Fact** | **Evidence in Support** |
| --- | --- |
| **(3) In Any Event, Cher's Termination of the Wixen Agreements Was Reasonable**<br>**i. Wixen's Duties Under the Wixen Agreements** | |
| **95.** Wixen was not the owner of copyright interests in musical compositions or sound recordings subject to the MSA. | *See* Anderson Decl. Ex. 10 (Administration Agreement) at 3 § 2(c) (confirming owners of copyright interests, which do not include Wixen). |
| **96.** Under the Collection Agreement, Wixen agreed to serve as [redacted]. | Anderson Decl. Ex. 9 (Collection Agreement) at 2 § 1(a)-(b). |
| **97.** Under the Administration Agreement, Wixen's services included acting "[redacted] | Anderson Decl. Ex. 10 (Administration Agreement) at 2-3 § 2(a). |

| **Uncontroverted Fact** | | **Evidence in Support** |
|---|---|---|
| [redacted] | | |
| **98.** Each of the Wixen Agreements provides: [redacted] | | Anderson Decl. Ex. 9 (Collection Agreement) at 7-8 § 15; Ex. 10 (Administration Agreement) at 7 § 12; Ex. 11 (Promotion Agreement) at 6 § 7. |
| **99.** Randall Wixen testified that he was "keeping [Mary Bono's representatives and Cher's representatives] in the loop" about previous notices of termination prepared in 2011 because he understood that Wixen was obligated "to treat Ms. Bono and Cher equally." | | Anderson Decl. Ex. 37 (Wixen Depo.) at 93:18-95:20. |

| **Uncontroverted Fact** | **Evidence in Support** |
|---|---|
| **ii. Cher's Reasons for Terminating the Wixen Agreements** | |
| **100.** As early as 2013, and again in 2016, Wixen raised with Ms. Bono and Lindsay Scott, one of Cher's artist managers, the possibility of exercising copyright termination rights. | L. Scott Decl. at 1-2 ¶¶ 5-6; Anderson Decl. at 7 ¶¶ 22, 23, Ex. 20 (2013 emails), Ex. 21 (2016 emails), Ex. 37 (Wixen Depo.) at 121:22-122:17 (authenticating). |
| **101.** Mr. Scott believed that exercising copyright terminations might be worth exploring because it could remove Sonny's early music publishers and thereby increase royalties for the Heirs and Cher. | L. Scott Decl. at 1 ¶ 5. |
| **102.** In a September 21, 2016 email exchange with the subject line "[redacted]," Ms. Bono and Randall Wixen stated the following: [redacted] | Anderson Decl. at 7 ¶ 24, Ex. 22 (September 2016 emails). |

| **Uncontroverted Fact** | | **Evidence in Support** |
|---|---|---|
| [redacted]<br><br>[redacted]<br><br>[redacted] | | |
| **103.** The Notice of Termination was issued without Cher's participation or consent. | | L. Scott Decl. at 2 ¶ 7; Cher Decl. at 2 ¶ 8; Anderson Decl. Anderson Decl. Ex. 7 (Notice of Termination) at C-000151 ("The persons executing this notice who constitute more than one-half of Sonny Bono's termination interest are Mary Bono (50%), Chianna Maria Bono (12.5%) and Chesare Elan Bono (12.5%)."); Ex. 22 (September 2016 emails). |
| **104.** In an agreement dated as of January 1, 2019 (the "Separate Wixen Agreement"), Wixen, on the one hand, and Ms. Bono, Chesare Bono, and | | Anderson Decl. at 6 ¶ 20, Ex. 18 (Separate Wixen Agreement) at 1; Ex. 37 (Wixen Depo.) at 157:6-162:16 (authenticating); *see also* Anderson |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| Chianna Bono on the other, agreed for [redacted] | Decl. at 6 ¶ 21 & Ex. 19 (email transmitting separate Wixen agreement for signature in January 2020). |
| **105.** In an email and attached letter dated September 19, 2019 and directed to Randall Wixen, Ms. Bono (through counsel) instructed Wixen to adjust its payment policies such that, after the applicable termination dates in the Notice of Termination, royalties from U.S. exploitation of the musical compositions identified in the Notice of Termination would be paid to Ms. Bono and the other Heirs, instead of to Cher. | Anderson Decl. at 5 ¶¶ 18-19 & Ex. 16 (September 2019 email); Ex. 17 (September 2019 letter); Ex. 38 (Charlesworth Depo.) at 76:6-20 (authenticating September 2019 email); Ex. 37 (Wixen Depo.) at 151:3-9 (authenticating September 2019 letter). |
| **106.** Prior to the commencement of this action, Wixen never informed Cher or Cher's representatives of Ms. Bono's contention that the Notice of Termination terminated Cher's rights | *See* Scott Decl. at 2 ¶¶ 7-8; Cher Decl. at 2 ¶ 8; Passman Decl. at 1 ¶ 4 (explaining that he learned of Ms. Bono's contention from Ms. Bono's Counsel in September 2021). |

| Uncontroverted Fact | Evidence in Support |
|---|---|
| under the MSA. | |
| **107.** Prior to the commencement of this action, Wixen never informed Cher or Cher's representatives of the Separate Wixen Agreement, or of Ms. Bono's instruction to Wixen to adjust its payment policies such that royalties from U.S. exploitation of the musical compositions identified in the Notice of Termination would be paid to Ms. Bono and the other Heirs, instead of to Cher. | *See* Scott Decl. at 2 ¶¶ 7-8; Cher Decl. at 2 ¶ 8; *see also* Passman Decl. at 1 ¶ 4 (explaining that he learned of Ms. Bono's contention from Ms. Bono's counsel in September 2021). |
| **108.** Prior to the commencement of this action, Wixen had begun paying to the Heirs royalties that, but for the claimed copyright terminations, Wixen would instead have paid to Cher. | Anderson Decl. Ex. 17 (September 19, 2019 letter instructing Wixen to pay royalties to the Heirs and not to Cher); Ex. 18 (separate Wixen Agreement dated January 1, 2019 to administer the Heirs' interests); Ex. 37 (Wixen Depo.) at 167:22-168:2 ("Q. There was, however, a sum of money, approximately $187,000, that Wixen paid to Ms. Bono and others in reliance on the assumption, belief or instruction that they received that – not to pay Cher; |

| Uncontroverted Fact | | Evidence in Support |
|---|---|---|
| | | is that correct? A. Yes."); Ex. 35 (Bono Depo.) at 143:13-145:5 ("Q. Do you have any reason to doubt that Wixen paid $187,535 of the Cher portion of the royalties to you and to the children? A. I have no reason"); *see also* Anderson Decl. at 7 ¶ 25, Ex. 23 (September 2021 email); Passman Decl. at 1 ¶ 4. |
| **109.** Wixen never sought Cher's approval or consent to distribute royalties to the Heirs that, but for the claimed copyright terminations, Wixen would instead have paid to Cher. | | Scott Decl. at 2 ¶ 8; Cher Decl. at 2 ¶ 8; Passman Decl. at 1 ¶ 4. |
| **110.** In September 2021, Ms. Bono's counsel informed Cher's counsel of Ms. Bono's position that the Notice of Termination terminates Cher's rights under the MSA. | | Passman Decl. at 1 ¶ 4. |
| **(e) Ms. Bono's Second Counterclaim Fails as a Matter of Law** | | |
| **111.** Ms. Bono is not the owner of the copyrights of the sound recordings that | | Anderson Decl. Ex. 35 (Bono Depo.) at 18:12-19:18 & Ex. 36 (notice of errata |

| **Uncontroverted Fact** | | **Evidence in Support** |
|---|---|---|
| are subject to the Recording Contracts. | | re Bono Depo.) at 19:12-13 ("a label owns the master recordings"). |
| **112.** The Record Companies are the owners of the copyrights of the sound recordings that are subject to the Recording Contracts. | | Anderson Decl. Ex. 35 (Bono Depo.) at 18:12-19:18 & Ex. 36 (Notice of Errata re Bono Depo.) at 19:12-13 ("a label owns the master recordings"). |
| **113.** The Notice of Termination did not purport to terminate the Recording Contracts. | | Def's Answer (Doc. 47) at 14-15 ¶ 34 (admitting that the "Notice of Termination did not purport to terminate any of the Recording Contracts"); *see* Facts 47-50 and evidence in support thereof. |

**2. <u>CONCLUSIONS OF LAW</u>**

The Court makes the following conclusions of law:

**(a) <u>The Court's Jurisdiction</u>**

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), because this action arises under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, including by requiring the interpretation of the Copyright Act and the scope, meaning, and effect of the statutory termination provisions of 17 U.S.C. § 304(c). *See Doc's Dream, LLC v. Dolores Press, Inc.*, 959 F.3d 357, 363 (9th Cir. 2020).

2. The Court also has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) insofar as it is between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3. The Court has supplemental jurisdiction over Cher's state law claim pursuant to 28 U.S.C. § 1367(a) insofar as it is so related to the federal claim in this action that it forms part of the case or controversy under Article III of the United States Constitution.

4. Venue is proper in this District under 28 U.S.C. § 1400(a), insofar as defendants' agent, including without limitation, Wixen, is a resident in this district (*see* Def's Answer (Doc. 47) at 2 ¶ 4); under 28 U.S.C. § 1391(b)(2), insofar as a substantial part of the events or omissions giving rise to the claims occurred in this District; and under 28 U.S.C. § 1391(b)(3), insofar as at least one defendant is subject to the Court's personal jurisdiction. Venue is also proper in this district because Ms. Bono has filed a motion for summary judgment and therefore admitted "that the court has personal jurisdiction, that venue is properly laid there, and that the court should dispose of the case on its merits." *Misch on behalf of Estate of Misch v. Zee Enterps., Inc.*, 879 F.2d 628, 632 (9th Cir. 1989).

**(b) The Summary Judgment Standards**

5. "Summary judgment procedure is properly regarded … as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

6. Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

7. Once the movant shows that summary judgment is appropriate, the burden shifts to the nonmoving party to establish genuine issues exist as to material facts. *Celotex*, 477 U.S. at 324. The "party opposing summary judgment must direct [the court's] attention to specific, triable facts.'" *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) (quoting *Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir.2003)). Where the record "as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**(c) Cher Is Entitled to Declaratory Relief**

**(1) Cher Satisfies the Requirements of the Declaratory Judgment Act**

8. Cher's first claim for relief seeks declaratory relief under the Declaratory Judgment Act and the Copyright Act. *See* FAC (Doc. 45) at 11-15 ¶¶ 40-45.

9. "The Declaratory Judgment Act ... permits a federal court to 'declare the rights and other legal relations' of parties to 'a case of actual controversy.'" *Societe de Conditionnement en Aluminium v. Hunter Engineering Co.*, 655 F.2d 938, 942 (9th Cir. 1981) (citation omitted). This "'actual controversy' requirement ... is the same as the 'case or controversy' requirement of Article III," and the Declaratory Judgment Act permits suit "once the adverse positions have crystallized and the conflict of interests is real and immediate." *Id.* at 942, 943 (citations omitted). The plaintiff must

have "a real and reasonable apprehension" of being sued, although "the showing of apprehension need not be substantial." Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1556 (9th Cir. 1989) (citations omitted).

10. Ms. Bono contends that the Heirs' Notice of Termination issued pursuant to Section 304(c) of the Copyright Act, 17 U.S.C. § 304(c), operates to terminate Cher's royalty and approval rights granted to her under the MSA. Cher contends that the Notice of Termination did not, and could not have, terminated Cher's rights under the MSA.

11. It is undisputed that Wixen, at the direction of Ms. Bono, has stopped paying royalties to Cher that, but for Ms. Bono's contention that the Notice of Termination terminates Cher's rights under the MSA, would otherwise have been paid to Cher.

12. Cher has therefore demonstrated that an actual controversy exists under the Declaratory Judgment Act. *See, e.g.*, *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1075-77 (N.D. Cal. 2007).

**(2) Cher's Rights to Composition Royalties and Approval Rights Have Not Been Terminated**

**i. Section 304(c) Strictly Limits Termination to Pre-1978 Grants of Copyright Rights and Does Not Apply to the MSA**

13. Section 304(c) of the Copyright Act provides a mechanism for authors and their heirs to terminate a "grant of a transfer or license of the renewal copyright or any right under it, executed on or before January 1, 1978[.]" 17 U.S.C. § 304(c). Termination may be effected during a five-year period beginning at the later of either 56 years after securing the copyright, or January 1, 1978. *Id.* § 304(c)(3). If termination is not "effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term." *Id.* § 304(c)(6)(F).

14. Under Section 304(c), a grant of a transfer or license of the renewal copyright or any right under it may be terminated only if the grant was executed on or before January 1, 1978. *Id.* § 304(c). However, the MSA was executed on August 10, 1978. The Notice of Termination therefore cannot apply to the MSA. *See Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1043 (9th Cir. 2005) (termination notice under Section 304 could not terminate renegotiated licensing agreement executed in 1983).

15. Additionally, under Section 304(c), a grant may be terminated only by "serving an advance notice in writing upon the grantee or the grantee's successor in title" between two and ten years before the termination date. 17 U.S.C. § 304(c)(4). The Notice of Termination was not served on Cher or Cher's Trust, and it does not identify Cher or Cher's Trust as a grantee of a terminated grant or a grantee's successor in title. Accordingly, the Notice of Termination did not terminate the MSA.

16. Furthermore, 37 C.F.R. § 201.10(b)(iv) provides that a notice of termination must provide a "brief statement reasonably identifying the grant to which the notice of termination applies[.]" The Notice of Termination does not identify the MSA. Accordingly, the Notice of Termination did not terminate the MSA.

17. Cher's rights to the Composition Royalties and related approval rights arise solely under Paragraph 10(d) of the MSA, and not under any other grant or agreement. Therefore, because the Notice of Termination did not terminate the MSA, Cher's rights to the Composition Royalties and related approval rights have not been terminated.

18. Alternatively, Cher's rights to the Composition Royalties and her related approval rights have not been terminated because they are rights that arise under State law. Termination is strictly limited to transfers or licenses of copyright or copyright rights, and "in no way affects rights arising under any other Federal, State, or foreign laws." 17 U.S.C. § 304(c), 304(c)(6)(E).

19. A right to receive royalties is a right that arises under state law, not under the Copyright Act. *See* 17 U.S.C. §§ 106, 301(a); *see also, e.g.*, *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir. 1996); *Broadcast Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997); *Rodrigue v. Rodrigue*, 218 F.3d 432, 440 (5th Cir. 2000) ("Notably absent from the Copyright Act's exclusive sub-bundle of five rights is the right to enjoy the earnings and profits of the copyright."); *Malinowski v. Playboy Enterprises, Inc.*, 706 F. Supp. 611, 615 (N.D. Ill. 1989); *Wolfe v. United Artists Corp.*, 583 F. Supp. 52, 56 (E.D. Pa. 1983); *Durgom v. Janowiak*, 74 Cal. App. 4th 178, 186 (1999). Therefore, Cher's right to the Composition Royalties was not subject to termination under Section 304(c). *See* 3 W.F. PATRY, PATRY ON COPYRIGHT § 7:42 (2023) ("When a mere right to receive royalties is conveyed, that right is not a Section 106 right and therefore is not subject to termination under either Section 203 nor 304.").

20. Cher's right under Paragraph 10(d) of the MSA to approve agreements with third parties is likewise a right that arises under state contract law, not under the Copyright Act. *See, e.g.*, *Rey v. Lafferty*, 990 F.2d 1379, 1392-95 (1st Cir. 1993) (analyzing author's allegedly unreasonable withholding of approval of various products utilizing author's "Curious George" character under licensing agreement as state breach of contract claim). Cher's contractual approval right are likewise not subject to termination under Section 304(c).

21. Because the MSA transfers only State law rights, it is not a "grant of a transfer of the renewal copyright or any right under it," and therefore not subject to being terminated.

**(3) Cher's Rights to Record Royalties Have Not Been Terminated**

22. Unlike Cher's rights to Composition Royalties under Paragraph 10(d) of the MSA, Cher's rights to Record Royalties concern royalties payable for the exploitation of sound recordings under specific Recording Contracts, which are identified in Paragraphs 10(a), (b), and (c) of the MSA.

23. The Notice of Termination does not identify any of the Record Companies as a grantee of a grant that is being terminated, or a grantee's successors in title, and it was not served on the Record Companies. *See* 17 U.S.C. § 304(c)(4). Additionally, the Notice of Termination purports to terminate grants of copyrights in musical compositions, not sound recordings. The Notice of Termination accordingly did not terminate the Recording Contracts.

24. Therefore, because the Notice of Termination did not terminate the MSA or the Recording Contracts, it did not terminate Cher's rights to the Record Royalties.

25. Alternatively, Cher's rights to receive Record Royalties arise under state law and are therefore not subject to termination. *See* 17 U.S.C. § 304(c)(6)(E).

**(d) Cher Is Entitled to Judgment as a Matter of Law on Her Claim for Breach of Contract**

**(1) Ms. Bono Has Breached the MSA and the Creditor's Claim Agreement**

26. The elements of a breach of contract claim are "a contract, the plaintiff's performance or excuse for nonperformance, breach, and damage to the plaintiff." *Amelco Electric v. City of Thousand Oaks*, 27 Cal. 4th 228, 243 (2002).

27. The MSA is a binding contract. Paragraphs 10(a) through (d) of the MSA obligated Sonny to transfer Cher's Composition and Record Royalties to Cher.

28. Sonny's rights and obligations under the MSA are binding upon Ms. Bono.

29. Cher has fully performed all of her obligations under the MSA.

30. By directing Wixen not to pay to Cher her undivided fifty percent of the Composition Royalties, Ms. Bono has breached Paragraphs 10(a)-(d) of the MSA.

31. The Creditors' Claim Agreement is a binding contract. Ms. Bono is a party to the Creditors' Claim Agreement.

32. In Section 1 of the Creditor's Claim Agreement, Ms. Bono agreed that she acknowledges Cher's interests in the Composition Royalties and Record Royalties under the MSA.

33. Cher has fully performed all of her obligations under the Creditor's Claim Agreement.

34. By refusing to pay and directing Wixen not to pay to Cher her undivided fifty percent of the Composition Royalties, Ms. Bono has breached Section 1 of the Creditor's Claim Agreement.

**(2) Cher Is Entitled to Damages on Account of Ms. Bono's Breaches of Contract, Plus Prejudgment Interest**

35. In breach of contract actions, damages must be proven with *reasonable certainty* and a party need not prove the exact amount. *Liang v. Cal-Bay Intern., Inc.*, No. 06cv1082–WMc, 2012 WL 1282984 at *1 (S.D. Cal. Apr. 13, 2012) (collecting cases); *California Lettuce Growers v. Union Sugar Co.*, 45 Cal. 2d 474, 486-87 (1955).

36. Cher has demonstrated that she has suffered damages on account of Ms. Bono's breaches of contract in the amount of $1,083,456.04, which includes the $739,688.58 and $250,000.00 in disputed royalties held by Wixen in separate accounts, plus $93,767.46 in disputed royalties already paid to Ms. Bono.

37. Under California law, which applies to the MSA and the Creditor's Claim Agreement, prejudgment interest must be awarded where damages are certain, or capable of being made certain by calculation, and the right to recover them is vested. Cal. Civ. Code § 3287; *see Tenzera, Inc. v. Osterman*, 205 Cal. App. 4th 16, 21 (2012) ("If the statutory conditions are satisfied, the court must award prejudgment interest").

38. Cher has demonstrated that the damages sought above are certain and her right to recover them is vested. Cher is therefore entitled to prejudgment interest at 10 percent per annum on account of Ms. Bono's breach of the Creditor's Claim

Agreement. Cal. Civ. Code § 3289 (prejudgment interest rate of 10 percent per annum is applicable to contracts entered into after January 1, 1986).

39. Alternatively, Cher is entitled to prejudgment interest at 7 percent per annum on account of Ms. Bono's breaches of the MSA. *See* *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1131-32 (2008).

**(e) Ms. Bono's Affirmative Defenses Fail**

**(1) Cher's Claims Are Not Preempted by the Copyright Act**

40. Federal preemption of state law takes three forms: "express preemption, conflict preemption, and field preemption." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1068 (9th Cir. 2018) (citations omitted). But field preemption does not apply to the Copyright Act because "Congress did not ... preempt the field when it enacted the Copyright Act." *Ryan v. Editions Ltd. West, Inc.*, 786 F.3d 754, 760 (9th Cir. 2015). Thus, "claims are not preempted if they fall outside the scope of § 301(a)'s express preemption and are not otherwise in conflict with the Act." *Id.*; *accord* Close, 894 F.3d at 1068; *In re Jackson*, 972 F.3d 25, 34 n.6 (2d Cir. 2020).

**i. Conflict Preemption Does Not Apply**

41. Conflict preemption exists where a state law "actually conflicts with federal law" such that "compliance with both federal and state regulations is a physical impossibility" or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (citations omitted); *see also* *Worth v. Universal Pictures, Inc.*, 5 F. Supp. 2d 816, 820 (C.D. Cal. 1997) ("When a party is unable to comply with both federal and state law, conflict preemption requires that the federal law supersede the state law.").

42. Section 304 of the Copyright Act expressly provides that unless and until a grant is terminated, "the grant, if it does not provide otherwise, continues in effect…." 17 U.S.C. § 304(c)(6)(F). Because the Heirs' Notice of Termination did

not terminate the MSA, Cher's continuing royalty and approval rights under the MSA therefore do not conflict with the Heirs' rights under Section 304(c).

43. Alternatively, Cher's royalty and approval rights under the MSA do not conflict with the Heirs' rights under the Copyright Act because the Copyright Act expressly provides that termination does not affect rights that arise under state law, *see* 17 U.S.C. § 304(c)(6)(E), and Cher's royalty and approval rights arise under state law.

**ii. Express Preemption Does Not Apply**

44. A claim is expressly preempted under Section 301 of the Copyright Act where (1) the plaintiff's work "'come[s] within the subject matter of copyright" and (2) "the state law grants 'legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright.'" *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (quoting 17 U.S.C. § 301(a)).

45. The subject matter of copyright is set forth in Sections 102 and 103 of the Copyright Act and includes "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device," 17 U.S.C. § 102, and compilations and derivative works, *id.* § 103.

46. The exclusive copyright rights are those specifically granted by the Copyright Act and are the exclusive rights of reproduction, adaptation, publication, performance, and display. 17 U.S.C. §§ 106, 301(a); *Rodrigue v. Rodrigue*, 218 F.3d 432, 435 (5th Cir. 2000); *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 883-84 (9th Cir. 2005).

47. A claim does not assert rights that are equivalent to any of the exclusive copyright rights when, among other things, it contains an "extra element," such as a contractual promise, that changes the nature of the action. *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004); *Montz*, 649 F.3d at 979.

48. Cher's first claim for declaratory relief is not preempted because it is a federal claim that "require[s] construction of the [Copyright Act]" and therefore arises under the Federal Declaratory Judgment Act and the Copyright Act itself. *Doc's Dream, LLC*, 959 F.3d at 363; *Reilly v. Wozniak*, No. CV-18-03775, 2020 WL 1033156 at *6 (D. Ariz. Mar. 3, 2020) (Copyright Act did not preempt federal declaratory relief claim).

49. Additionally, the preemption elements are not satisfied as to either of Cher's claims. The first preemption element is not satisfied because Cher seeks to protect her contractual royalty and approval rights, not an expressive work that comes within the subject matter of copyright as set forth in Sections 102 and 103 of the Copyright Act. *See* 17 U.S.C. §§ 102, 103, 301; *Montz*, 649 F.3d at 979; *Dead Kennedys v. Biafra*, 37 F. Supp. 2d 1151, 1154 (N.D. Cal. 1999) (action for unfair business practices not preempted because plaintiff did not claim "unfair use of the [copyrighted works] at issue").

50. Furthermore, the second element of the express preemption test is also not met with respect to Cher's claims because Cher's royalty and approval rights are state law rights that are not equivalent to any of the rights granted under the Section 106 of the Copyright Act. *See, e.g.*, 17 U.S.C. §§ 106, 301; *Dead Kennedys*, 37 F. Supp. 2d at 1154 (claim for conversion of royalties not preempted because it "alleges conversion of royalties, not of the works themselves"). The second element is also not met because Cher's claims involve an "extra element," namely, a contractual promise, that makes them qualitatively different from an infringement claim. *Grosso*, 382 F.3d at 968 ("[Plaintiff's] claim for breach of an implied-in-fact contract is not preempted by the Copyright Act, because it alleges an extra element that transforms the action from one arising under the ambit of the federal statute to one sounding in contract"); *Northwest Home Designing Inc. v. Sound Built Homes Inc.*, 776 F. Supp. 2d 1210, 1216 (W.D. Wash. 2011) ("A claim for breach of contract has the 'extra element' of an alleged exchange of promises/representations between the parties.").

**(2) Sonny's Children Are Not Necessary Parties**

51. Ms. Bono contends that the other Heirs are necessary parties that must be joined under Federal Rule of Civil Procedure 19. Rule 19 imposes a "three-step inquiry: 1. Is the absent party necessary (i.e., required to be joined if feasible) under Rule 19(a)? 2. If so, is it feasible to order that the absent party be joined? 3. If joinder is not feasible, can the case proceed without the absent party, or is the absent party indispensable such that the action must be dismissed?" *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012). The party seeking joinder of necessary parties "bears the burden of persuasion." *Natomas v. Gardens Inv.*, 710 F. Supp. 2d 1008, 1018 (E.D. Cal. 2010).

52. Under the first step of the analysis, an absent party is "necessary (i.e., required to be joined if feasible)" if the Court cannot accord complete relief among existing parties." *Salt River Project Agr. Imp.*, 672 F.3d at 1179 (citing Fed. R. Civ. P. 19(a)(1)(A)). An absent party may also be necessary if "he has an interest in the action" and resolving the action may either (a) "as a practical matter impair or impede his ability to protect that interest," or (b) "leave an existing party subject to inconsistent obligations because of that interest." *Id.* (citing Fed. R. Civ. P. 19(a)(1)(B)(i)-(ii)).

53. The other Heirs are not necessary parties because, first, the Court can grant complete relief among the existing parties. "Complete relief 'is concerned with consummate rather than partial or hollow relief … [and] with precluding multiple lawsuits[.]" *Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013).

54. As to Cher's first claim for relief, the Court can accord complete relief because judgment in this action completely and finally resolves the subject matter of the action: namely, whether the Notice of Termination terminates Cher's rights.

55. As to Cher's second claim for relief, the Court can accord complete relief because Cher is not seeking recovery of any royalties distributed to the other Heirs. Rather, Cher is seeking recovery only the royalties distributed to Ms. Bono and the

royalties held in a separate account which the parties agree will be released upon the final resolution of this action and any appeal.

56. Second, the other Heirs' ability to protect their interests will not be "impaired by [their] absence" because their interests are "adequately represented by existing parties to this dispute." *Alto*, 738 F.3d at 1128 ("[A]n absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit."). Ms. Bono's interests are the same as, but greater than, that of the other Heirs, and there is no showing that the other Heirs would make arguments that Ms. Bono has not made. Furthermore, Ms. Bono has vigorously represented the interests of all the Heirs in this action.

57. Finally, neither Cher nor Ms. Bono will be subject to inconsistent obligations from the absence of the other Heirs. "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir. 1998); *accord Cachil Dehe Band of Wintun Indians v. California*, 547 F.3d 962, 976 (9th Cir. 2008). Adjudicating this case in the absence of the other Heirs would not render any party incapable of complying with another court's order, because there is no other litigation among them.

58. Because the other Heirs are not necessary parties under Rule 19(a), they need not be joined, even if joinder were feasible.

**(3) Cher Does Not Lack Standing**

59. A plaintiff has standing under Article III of the United States Constitution if "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to … the defendant; and (3) it is likely … that the injury will be redressed by a favorable decision." *Spinedex Phys. Therapy USA Inc. v. United Healthcare of Az., Inc.*, 770 F.3d 1282, 1289 (9th Cir. 2014).

60. Standing is determined "as of the time [the plaintiff] commenced suit[.]" Gonzalez v. ICE, 975 F.3d 788, 803 (9th Cir. 2020); *accord* Lujan v. Defenders of Wildlife, 504 U.S. 555, 570 n.5 (1992); Fund Liquid. Hldgs. LCL v. Bank of Am. Corp., 991 F.3d 370, 386-89 (2d Cir. 2021).

61. Although Cher sold certain of her rights under the MSA after the commencement of this action, it is undisputed that Cher was the owner of all relevant rights under the MSA at the time of filing. Furthermore, Cher has demonstrated that the injury she suffered is traceable to Ms. Bono and that the declaratory and monetary relief sought will redress that injury. Cher has therefore established standing to sue.

62. Mootness exists when a case "'los[es] its character as a present, live controversy of the kind that must exist if [courts] are to avoid advisory opinions." West v. Sec. of DOT, 206 F.3d 920, 924 (9th Cir. 2000). No case or controversy exists, and a suit becomes moot, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.… But a case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party[.]" Chafin v. Chafin, 568 U.S. 165, 172 (2013) (citations omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (citation omitted). The defendant "carries a heavy burden of establishing that no effective relief remains for the court to provide." Chang v. U.S., 327 F.3d 911, 919 (9th Cir. 2003).

63. A "case is not moot so long as a claim for monetary relief survives." Mission Product Hldgs., Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1660 (2019); Wright & Miller, FED. PRAC. & PROC. Jurisdiction § 3533.3 (3d. ed. 2023) ("Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable.").

64. It is undisputed that Cher expressly retains the right to recover all disputed royalties in this action payable and paid prior to July 1, 2022. Cher's claim

for breach of contract is accordingly not moot. *Mission Product Hldgs., Inc.*, 139 S. Ct. at 1660.

65. Cher's claim for declaratory relief is also not moot. It is based on the same live controversy as Cher's damages claim. *See* *Maine Cent. R. Co. v. Brotherhood of Maintenance of Way Emps.*, 813 F.2d 484, 487 (1st Cir. 1987). Additionally, Cher maintains an interest in prospective declaratory relief because the Court's determination affects the value of the property Cher assigned to the buyer and accordingly, what Cher received in exchange. *See* *Lee v. Verimatrix, Inc.*, No. 19-cv-2054-W(BLM), 2020 WL 4747751 at *5 (S.D. Cal. Aug. 17, 2020) (action to declare ownership of stock shares not mooted by plaintiff's sale of stock; declaration would establish, among other things, whether stock has been validly assigned to third party).

**(4) Ms. Bono's Remaining Affirmative Defenses Fail**

66. Ms. Bono asserts that she has performed, or substantially performed, all conditions and covenants under her agreements with Cher. But Cher has established that Ms. Bono breached the MSA and Creditor's Claim Agreement by, among other things, refusing to honor Cher's royalty and approval rights, and those breaches are not insubstantial.

67. Ms. Bono also asserts contract defenses of modification, abandonment, rescission, and termination, but Ms. Bono has provided no evidence of those and Cher has established that the relevant contractual obligations are still in effect. Def's Answer (Doc. 47) at 19.

68. Ms. Bono also claims that any action and/or inaction by her was lawful, justified, and/or privileged, but those are tort defenses and accordingly inapplicable here. *See, e.g.*, *Savage v. Citibank N.A.*, No. 14-cv-03633-BLF, 2015 WL 4880858 at *3 (N.D. Cal. Aug. 14, 2015); 5 B. WITKIN, CALIFORNIA PROC., Pleading § 1141 (6th Ed. 2023).

69. Ms. Bono raises the defense of unjust enrichment, but Cher seeks only monetary recovery of the royalties rightfully owed to her, and there is no showing that

Cher received any “benefit at [Ms. Bono’s]” expense. *Ghirado v. Antonioli*, 14 Cal. 4th 39, 51 (1996). Additionally, Ms. Bono has identified no evidence in support of her unjust enrichment defense. Further, unjust enrichment does not lie if an express written contract governs the parties’ relationship, as the MSA does here. *Grebow v. Mercury Ins. Co.*, 241 Cal. App. 4th 564, 580 (2015).

**(f) Ms. Bono’s First Counterclaim Should Be Dismissed**

**(1) Cher Has Terminated the Wixen Agreements**

70. In Ms. Bono’s first counterclaim for declaratory relief, Ms. Bono seeks, among other things, a declaration that “Wixen was approved by Cher as the worldwide administrator for the royalties due her and the Heirs under the MSA and may continue to act as a worldwide administrator,” and that Cher must “abide by her approval of Wixen as the worldwide royalty administrator.” Def’s Answer (Doc. 47) at 26 ¶ 44, 28 ¶ 4.

71. The Wixen Agreements each provide: “[redacted]”

72. The plain language of the Wixen Agreements, and the parties’ negotiations in drafting the Wixen Agreements, demonstrate that each party has the right to terminate the Wixen Agreements. *See, e.g.*, *Taylor v. Lockheed Martin Corp.*, 78 Cal. App. 4th 472, 487 (2000) (in contract requiring party to comply with “federal and/or state requirements,” such “use of the word ‘or’…indicates an intention to … designate alternative or separate categories”); *F.B.T. Prods., LLC v. Aftermath Records*, 827 F. Supp. 2d 1029, 1102 (C.D. Cal. 2011) (“The mutual intent of the parties is to be determined from the language of a contract if the ‘language is clear and explicit and does not involve an absurdity.’”) (quoting Cal. Civ. Code § 1638).

73. The right to terminate the Wixen Agreements is not conditioned upon showing reasonable grounds to terminate the Wixen Agreements.

74. Cher has established that she gave written notice as required and has therefore terminated the Wixen Agreements.

75. Alternatively, Cher has demonstrated objectively reasonable grounds for terminating the Wixen Agreements.

**(2) The Creditor's Claim Agreement Continues to Bind the Parties**

76. Section 3 of the Creditor's Claim Agreement provides: "In recognition of Cher's continuing right to receive such royalty interests, Cher and [Ms. Bono] hereby agree to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of such royalties to Cher and the heirs [of Sonny] after the closing of this estate."

77. In her first counterclaim, Ms. Bono alleges that Cher "wrongly" disputes that Ms. Bono has failed to fulfill all of her obligations under the Creditor's Claim Agreement and that Mary is accordingly bound solely by the MSA, and not by the Creditor's Claim Agreement, "as to the selection of a worldwide royalty administrator…." Def's Answer (Doc. 47) at 26 ¶¶ 41-42. However, Cher has established that Ms. Bono breached Section 1 of the Creditor's Claim Agreement by failing to honor Cher's ongoing royalty rights under the MSA. Furthermore, it is undisputed that Cher and Ms. Bono satisfied their obligation under Section 3 of the Creditor's Claim Agreement to cooperate in developing a mutually acceptable mechanism for the collection and proper disbursement of royalties each time the obligation arose.

78. Ms. Bono alternatively argues that the obligation under the Creditor's Claim Agreement to develop a mutually acceptable mechanism for the collection and proper disbursement of royalties "expired" or "has been fulfilled as to Wixen." Def's Answer (Doc. 47) at 26 ¶¶ 45. However, the Creditor's Claim Agreement has no expiration date or term, and by its own terms, continues as long as Cher's royalties are payable.

79. Furthermore, it is undisputed that the parties satisfied this obligation *twice*, once in 1999 with Mr. Glick, and again in 2011 with Wixen. This fact further demonstrates that the Creditor's Claim Agreement is a continuing obligation. *See, e.g.*, *Kalmanovitz v. Bitting*, 43 Cal. App. 4th 311, 316 (1996) ("The parties' practical construction of a contract, as shown by their actions, is important evidence of their intent.").

80. Cher's exercise of her express termination rights under the Wixen Agreements is not inconsistent with, and is not governed by, the parties' obligations to cooperate in developing a mutually acceptable mechanism under the Creditor's Claim Agreement.

**(g) Ms. Bono's Second Counterclaim Should Be Dismissed**

81. Ms. Bono's second counterclaim seeks a declaration regarding whether Ms. Bono may "enter into new agreements to exploit the sound recording copyrights [Ms. Bono] owns and whether Cher or her assignee would be entitled to fifty percent of the receipts arising from such new agreements[.]" Def's Answer (Doc. 47) at 28 ¶ 50.

82. However, it is undisputed that the Record Companies—not Ms. Bono—own the copyrights to the sound recordings under the Recording Contracts, and Cher has established that the Notice of Termination did not terminate the Recording Contracts or Cher's rights to the Record Royalties under the MSA. Accordingly, Ms. Bono's requested declaration is based not on an actual controversy, but on a "hypothetical state of facts" that cannot support a claim for declaratory relief. *Medimmune, inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)); *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018) (Article III standing requires an injury that is "actual or imminent, not 'conjectural' or 'hypothetical'").

**3. CONCLUSION**

83. There is no triable issue of fact. Cher is entitled to the declaratory and monetary relief sought as a matter of law, and to summary judgment as to Ms. Bono's counterclaims.

Dated: ____________________ ________________________________

The Honorable John A. Kronstadt
United States District Judge

*Submitted by:*

Peter Anderson, Esq., Cal. Bar No. 88891
peteranderson@dwt.com
Sean M. Sullivan, Esq., Cal. Bar No. 229104
seansullivan@dwt.com
Eric H. Lamm, Esq., Cal. Bar No. 324153
ericlamm@dwt.com
Samuel Turner, Esq., Cal. Bar No. 338089
samturner@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Tel: (213) 633-6800
Fax: (213) 633-6899

Attorneys for Plaintiff and Counterdefendant
CHER, Individually and as
Trustee of The Veritas Trust