DANIEL J. SCHACHT, #259717
dschacht@donahue.com
MARIO M. CHOI, #243409
mchoi@donahue.com
HAYLEY M. LENAHAN, #343528
hlenahan@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520

Telephone:  (510) 451-3300
Facsimile:  (510) 451-1527

*Attorneys for Defendant and Counterclaimant
MARY BONO*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>Plaintiff,<br><br>v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. 2:21-CV-08157-JAK (RAOx)<br><br>**DEFENDANT AND COUNTERCLAIMANT MARY BONO'S REPLY IN FURTHER SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  February 26, 2024<br>Time:  8:30 a.m.<br>Judge:  Hon. John A. Kronstadt<br>Ctrm:  10B<br><br>Complaint Filed: October 13, 2021<br>Trial Date: n/a |

# INTRODUCTION

The parties' briefings lay bare that there are no material questions of fact. Setting aside Cher's diversionary tactics and inflammatory rhetoric, the fundamental questions before the Court are: (1) whether Cher may continue this case without Sonny's children; (2) whether Cher has standing for Count I; (3) whether the MSA could grant Cher any interest in the Bono Heirs' terminated copyright grants; and (4) whether the Bono Heirs have the sole discretion to appoint a royalty administrator. All of these questions should be resolved in Mary's favor.

# ARGUMENT

## I.  CHER'S PROCEDURAL ISSUES ARE FATAL TO HER CLAIMS

### A.  The Court No Longer Has Jurisdiction Over Count I

"Article III denies federal courts the power to decide questions that cannot affect the rights of litigants in the case before them" because the litigant "must continue to have a personal stake in the outcome of the lawsuit." *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990) ("To sustain our jurisdiction in the present case, it is not enough that a dispute was very much alive when suit was filed."). Cher claims that she "still has a personal stake in her first claim for declaratory relief, which will … establish the rights she assigned to Iconic and, accordingly, what she receives in return." Cher Opp. at 3:5-8.[1] But Cher seeks different relief: a declaration that she "[c]ontinues to own and owns an undivided fifty percent of the Composition Royalties." FAC ¶ 43(a). And there is no evidence that Cher needs to establish her rights to receive something from Iconic. During discovery, Mary requested information about Cher's interest in Sonny's copyrights and received a heavily redacted Iconic agreement. Nothing therein supports Cher's new assertion or shows

---

[1] Capitalized terms are defined in the Memorandum of Points and Authorities in Support of Mary's Motion for Summary Judgment ("Bono MSJ") (ECF No. 64-1). "Cher Opp." refers to Cher's Memorandum of Points and Authorities in Opposition to Mary's Motion for Summary Judgment (ECF No. 88). "Bono Opp." refers to Mary's Opposition to Cher's Motion for Summary Judgment (ECF No. 86).

that Cher stands to gain anything if Iconic receives royalties from Sonny's copyrights. Instead, the evidence shows that Cher no longer has any interest in Sonny's copyrights, regardless of the outcome of this action. The Court should not opine on Iconic's rights when Iconic is not a party to this action.

Cher also argues that Count I is not moot because her "claim for monetary relief survives" and because Cher requested "such further necessary or proper relief as Plaintiff may request based on that declaration" in her complaint. Cher Opp. at 3:13-17. But the case cited by Cher, *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019), is inapplicable because Cher does not have a continuing stake in Court I, regardless of whether Cher seeks monetary damages. At most, Cher has a Count II claim for pre-July 1, 2022, Composition Royalties.

### B. Cher Failed to Add Necessary Parties

None of Cher's many arguments concerning her failure to add Sonny's children as defendants hold water. Cher first argues that "complete relief can be accorded" because the Court may resolve the "central issue" of "whether Ms. Bono's Notice of Termination under Section 304(c) terminates Cher's rights under the MSA" and that the Court "can accord complete *monetary* relief." Cher Opp. at 4:21-26. But Cher's claim for monetary relief affects each and every one of the Bono Heirs.

A few corrections are necessary. The Notice of Termination was issued by Mary *and* two of Sonny's children. (UF 29.) Wixen paid, and pays, each of the Bono Heirs individually and directly. (UF 26.) And, *all* of the Bono Heirs agreed to place in a separate account the publishing royalties at issue in this dispute received as of April 6, 2022. (UF 33.) In other words, Wixen has been setting aside half of each Bono Heir's U.S. royalties. If Cher succeeds in her claims, she would receive money that, if Mary succeeds, goes to all of the Bono Heirs. Cher is indisputably seeking a remedy that includes Sonny's children's interests and, in turn, *all* of the Bono Heirs will be directly affected by a ruling in Cher's favor in this case.

Cher argues that Sonny's children do not need to be parties because they are

bound by the MSA. Cher Opp. at 6:11-12. The children being bound by the MSA is just one of many reasons they are necessary parties, the most important of which is that they will be directly affected by the ruling if Cher prevails. *See Jacobsen v. Luckenbach S.S. Co.*, 201 F. Supp. 883, 889 (D. Or. 1961). Similarly, the children are necessary parties for any claim related to the Creditor Claim Agreement because it affects their rights. (UF 19-20.)

Cher then contends that Mary represents the interests of all of Sonny's children because, among other things, Mary was the administrator of Sonny's estate and trustee of The Bono Collection Trust, and "regularly communicated with Wixen" regarding "all of the Heirs' interests." Cher Opp. at 5:9-13. But the evidence shows that Mary stopped acting as the administrator of Sonny's estate long ago and that The Bono Collection Trust was terminated in 2012.[2] (UF 25.) Moreover, there is no indication that Mary's interests always align with those of Sonny's children. *See* Bono Opp. at 4:8-5:27. For example, only Mary and two of the children signed the termination notice. (UF 29.) And Cher's son, Chaz, could inherit all or some of Cher's estate. (UF 9.) At best, Cher has shown that Mary often acts as the

---

[2] While Cher disputes the existence of The Bono Collection Trust, discovery has conclusively established that the trust was terminated no later than 2012. (UF 25.) Mary testified to its termination and the common-sense reason for the dissolution, provided a final tax return, and filed a House of Representatives 2012 Financial Statement under penalty of perjury. *Id.* It is also undisputed that Wixen pays the Bono Heirs directly. (UF 26.) *See, e.g.*, 9 MERTENS LAW OF FED. INCOME TAX'N § 36:67 (trust terminates when the property held in trust has been distributed); Cal. Prob. Code § 15407 (a trust terminates when the "trust purpose is fulfilled" or when the "trust is revoked"). Cher falsely claims that there must be a writing terminating the trust. *See* Cal. Prob. Code § 15207 (oral creation of trust). Cher also fails to acknowledge that the absence of a decade-old document from Mary's possession, custody or control does not mean such a writing never existed. In opposition, Cher's "substantial evidence" points to a single document that still lists Sonny as the affiliate and the trust as the payee and addressee, care of Wixen, to argue the existence of the trust. Cher Opp. at 5 n.2. But Cher never asked Randall Wixen or Mary about this document at their depositions, nor deposed any alleged beneficiaries of this non-existent trust. While no reasonable jury would find that one payor's failure to update its records establishes the existence of a trust in light of the evidence to the contrary, it also misses the point. Cher needs to establish that Mary is the *trustee* for Sonny's children, and there is no evidence that Mary was the trustee of the trust after 2012.

spokesperson when the Bono Heirs are in agreement. But this is a far cry from having any legal authority over, or duty to, the children.

Cher then claims that the Bono Heirs "share the same counsel with respect to their termination interests." Cher Opp. at 5:13-14. Cher also speculates that Mary and her counsel will make all of the arguments that Sonny's four children would have made, making their involvement unnecessary. *Id.* at 5:15-16. These are grossly misleading overgeneralizations. The Bono Heirs have shared counsel in certain instances and on certain issues when they are all in agreement. But there is no evidence that Mary's counsel represents Sonny's children *in this litigation*.

Cher's argument that the children have "chosen" not to intervene is pure speculation. *Id.* at 5:23-6:4. Cher has not provided any declarations from the children to support this contention. There is also no case stating that a party has an affirmative duty to police a docket and intervene in cases that affect one's interest. The cases Cher cites, *U.S. v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999), and *Harvill v. Harvill*, 2013 WL 1245729 at *5 (M.D. Tenn. Mar. 27, 2013), are distinguishable because the courts there did not find that the third parties had legally protected interests in those actions. In contrast, here, Sonny's children have a legally protected interest.

Cher's claim that joinder is infeasible because Mary does not state where Sonny's children live is specious. Cher Opp. at 7:7-8. Cher sued Mary under the Copyright Act and based on Mary's minimum contacts with California, and could make the same claim against Sonny's children. FAC ¶¶ 1, 6. Cher also characterizes Mary's argument as "belated" and noted the failure of the parties to seek discovery from the children. Cher Opp. at 5:19. But Mary had no need to obtain discovery from the children, and she raised this exact issue years earlier. *See, e.g.*, Joint Rule 16(b)/26(f) Report, filed Aug. 26, 2022 (ECF No. 28) (listing as legal issues "the status of The Bono Collection Trust, which Ms. Bono contends terminated several years ago" and Sonny's children as indispensable parties, and, as a subject of discovery, "the status of The Bono Collection Trust").

Finally, Cher argues that the case should proceed without all of the Bono Heirs even if they are necessary parties because neither Cher nor the Bono Heirs will be prejudiced and because Mary will represent the interests of the Bono Heirs. Cher Opp. at 7:22-26. Strangely, Cher claims that she "has limited any prejudice by not seeking recovery of any royalties paid to the other Heirs," when the opposite is true. For the reasons discussed above, the Bono Heirs would be prejudiced.

## II. THE POST TERMINATION RIGHTS REVERTED UNENCUMBERED TO THE BONO HEIRS

Cher states that Mary "flat out concedes" that the MSA was not terminated, but Mary has *never* taken the position that the MSA was terminated. Cher Opp. at 9:15. Mary's consistent position is that Sonny could not have granted to Cher the Bono Heirs' rights to the terminated grants of copyright.

### A. Termination Builds On, and Improves, Renewal Terms

Using inflammatory statements instead of meaningfully engaging with Mary's arguments, Cher fails to challenge Mary's detailed discussion about the purpose and application of Section 304. *See* Bono MSJ at 13:15-18:10. Arguing that Section 304(c) was, like virtually all meaningful legislation, a compromise, Cher disregards the obvious purpose of inalienable renewal and termination rights: to benefit authors and their statutory heirs, *not* third parties, including ex-wives. Cher Opp. at 12:8-19. In the sole case she cites, the Supreme Court lays out in great detail the chronology and purpose of renewal and termination rights, consistent with, and supporting, each of Mary's contentions. Cher Opp. at 12:8-11 (citing *Stewart v. Abend*, 495 U.S. 207, 217-220, 230 (1990)). Indeed, the "compromise" that *Stewart* refers to is not, as Cher implies, whether termination rights are for the benefit of an author and her or his statutory heirs (they are (495 U.S. at 217-18)) or inalienable (they are (*id*. at 230 ("The 1976 Copyright Act … provides an inalienable termination right."))). Rather, the "compromise" to which *Stewart* refers to is the much narrower issue of the

derivative work exception set forth in Section 304(c)(6)(A).³ *Id*. at 225.

Contrary to Cher's contention, the renewal process is not "irrelevant." Cher Opp. at 10:24. It is, as the Supreme Court says, the new mechanism by which authors and their heirs recapture copyrights: termination rights are the equivalent of a third renewal term for the 19 year extension of copyright added by the 1976 Act. *Stewart*, 495 U.S. at 224-25. And, aside from the actually irrelevant derivative work exception, there is no serious argument that the new termination regime was not meant to *strengthen* the right of recapture. "Congress devised a new system for protecting authors under the Copyright Act of 1976, namely an inalienable right to terminate transfers." 3 NIMMER ON COPYRIGHT § 9.06[B][1] n.15 (citation omitted); *see also id.* § 11.01[B] ("Both the House and Senate Reports … characterize Section 203 as 'a provision safeguarding authors against unremunerative transfers.' It would seem to follow that the termination procedures therefore, cannot apply to prejudice the interest of authors.").

Mary's discussion of *Fred Fisher Music Co., Inc. v. M. Witmark & Sons*, 318 U.S. 643 (1943), highlights a stated purpose of Section 304(c): to make clear that an author *could not* alienate her or his termination rights. *See* Bono MSJ at 16:8-18:10. Cher *agrees*. Cher Opp. at 10:17-18. Under *Fisher*, "if the author does not survive until such time as the renewal vests, then [an author's widow and children] may obtain the renewal rights free and clear of any prior assignment (or other transfer) executed by the author." 3 NIMMER § 9.06[B][1]. In other words, even under *Fisher*, Section 304's renewal mechanism *preempts state contract law* when it comes to the rights of an author's heirs to claim the renewal term as a new, unencumbered property right. It would be an absurd outcome to have Section 304(a), governing the renewal term, have stronger protections for heirs than Section 304(c), governing terminations, which was specifically enacted to strengthen those rights.

---

³ Even that issue undermines Cher's theory. There would be no need for an exception for licenses for derivative works if state contract rights trumped Section 304.

B. **Cher Cannot Evade the Copyright Act**

In an effort to evade Section 304, Cher argues that the Copyright Act does not apply to her rights because federal law does not preempt her contract, and royalties are not subject to the Copyright Act. Cher Opp. at 11:25-12:6; 12:23-13:4. But this argument elevates form over substance. It is a matter of semantics as to whether a publisher pays money to an author or receives a fee for its services. *See, e.g.*, UF 24 (ten percent fee for administering composition copyrights). It cannot be that had the original publishers received a perpetual fee of 20% for their services, instead of paying Sonny an 80% royalty, that such an agreement could not be terminated. Yet that is Cher's argument, and it applies equally to the MSA. Whether the agreement to the contrary is the initial agreement or a subsequent agreement is immaterial, particularly where the statutory heirs are not a party to the subsequent agreement. Section 304 preempts ***any*** agreement to the contrary, not merely the agreement containing the terminated grant. Regardless of the linguistic gymnastics of a clever drafting attorney, *any agreement contrary to the reversion of the terminated grants, in their entirety, to the Bono Heirs is preempted and must be ignored*. Fundamentally, Cher argues that the MSA conveys 50% percent of the terminated grant to her. Her argument applies equally to a publisher who takes a 100% fee. But no third party, whether a creditor, publisher or an ex-wife, should be able to evade the explicit language or the clear purpose of Section 304(c): terminated grants revert solely to the heirs, notwithstanding any agreement to the contrary.

1. **The MSA Is An Agreement to the Contrary**

Cher is wrong that state law contract rights trump the Copyright Act. The Ninth Circuit held that Section 203, which is interpreted in tandem with Section 304(c), ***preempts California contract law when they conflict***. *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993);[4] *see also Classic Media, Inc. v. Mewborn*, 532 F.3d

---

[4] Courts have criticized *Rano* regarding a here-irrelevant minimum license term, but agree with its holding that Section 203 preempts contract law when there is a conflict. *See, e.g., Walthal v. Rusk*, 172 F.3d 481, 485 (7th Cir. 1999) ("as the *Rano* court

978, 985 (9th Cir. 2008) (§§ 203 and 304(c) are "close counterparts" with identical language and should be interpreted in tandem where appropriate). One copyright treatise makes it absolutely clear:

> Congress's intent that the Court not again substitute its own ideological view for Congress's intent is made clear in identical language in both provisions, 17 USC 203(a)(5), and 304(c)(5): "Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." ***In short, the right is absolute in the statutory heirs. No individual or state law can interfere***.

2 PATRY ON COPYRIGHT § 5:116.50 (emphasis added).

### 2. Royalties for Copyrighted Works Arise from Copyrights

Cher argues that royalties from copyrighted works are not subject to the Copyright Act. Cher Opp. at 11:25-12:6. But royalties from—and approval rights over—copyrighted works are inherent in, and rise directly out of, the right of a copyright owner "to do and to authorize any" of the rights of copyright. 17 U.S.C. § 106. Royalties are the consideration for such authorization. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 166–67 (1985) (discussing at length royalties as part of the grant of copyright subject to termination and noting that "[t]he source of the [author's heirs'] entitlement to a 50 percent share in the royalty income is the 1940 grant"). A "grant" of copyright includes royalties, and the grant that reverts, unencumbered, to the Bono Heirs includes all of its accompanying royalties. *See id.*; *see also* 17 U.S.C. § 101 (a "transfer of copyright ownership" includes such financial instruments as mortgages and hypothecations).

Section 304(c)(6)(E) provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title,

---

correctly points out, state contract law cannot provide the basis of a decision if that law conflicts with federal law. Under the principle of preemption, for instance, in light of the existence of § 203, *we could not use common law rules for the interpretation of contracts to require that a contract for the life of the copyright be enforced for that length of time. That interpretation would be in direct conflict with § 203*.") (emphasis added) (citation omitted).

and in no way affects rights arising under any other Federal, State, or foreign laws." As such, termination is limited to copyrights, such as the composition copyrights at issue here, and does not affect rights not arising from copyright, such as trademark or right of publicity. *See* 3 NIMMER § 11.02[B][1] ("when one instrument simultaneously conveys rights under copyright and trademark law, the former is subject to termination, whereas the latter continues in perpetuity") (citing *Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1141-42 (C.D. Cal. 2008)). The correct application of Section 304(c)(6)(E) is, therefore, that Sonny's U.S. copyrights, and all of their accompanying rights, are the proper subject of terminations.

### C. The Publisher Share Reverts Solely to the Bono Heirs

Cher claims that "[n]owhere does the MSA set the Publisher Share at 1978 levels" and complains that "if the Heirs receive the Publisher Share, they would receive more than the fifty percent of the royalties that Sonny was entitled to receive under the MSA." Cher Opp. at 15:25-26; 16:18-21. However, the Publisher Share reverts because of the Bono Heirs' termination of Sonny's agreements with his publishers, not the MSA. (UF 29, 35.) The MSA provides that Cher receives half of *Sonny's* "right, title and interest" in "contingent receipts … from musical compositions and interests therein…." (UF 3.) But Sonny could not, and did not, give Cher his heirs' sole property. *See Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375 (1960); *De Sylva v. Ballentine*, 351 U.S. 570, 582 (1956); *Classic Media*, 532 F.3d at 987; *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 198 (2d Cir. 2008).

It is undisputed that Cher would continue to receive the same amount if only the Publisher Share reverted to the Bono Heirs. If anyone should receive a windfall from the terminations, it should be the artist's widow and children, not the music company to whom an ex-wife sold her rights. *See Classic Media*, 532 F.3d at 984 ("The 1976 Act, and in particular its twin termination of transfer provisions, were in large measure designed to assure that its new benefits would be for the authors and

their heirs… Without such a right of termination, the Extended Renewal Term would constitute a windfall to grantees.").

### III. BREACH OF CONTRACT CLAIM

For the reasons set forth above, Mary has not breached the MSA.[5] *See, e.g.*, Bono MSJ at 15:22-16:7; Bono Opp. at 14:21-28. And Cher wrongly focuses on the Creditor Claim Agreement and fails to engage with either its plain language or the caselaw cited by Mary. *See* Bono MSJ at 21:21-22:4. As discussed in detail in Mary's Opposition, the Creditor Claim Agreement is no longer binding because of (i) its plain language, (ii) its lack of certainty, (iii) Cher's breach, and (iv) Cher's claim to direct payment of Record Royalties, which estops her from arguing the Creditor Claim Agreement is still in force. *See* Bono Opp. at 15:18-17:27.

### IV. MARY'S COUNTERCLAIMS

The Court should grant judgment in favor of Mary as to her counterclaims for the same reasons addressed in Section III. Contrary to Cher's nonsensical contractual interpretation, *see* Cher MSJ at 19:8-21, the evidence is undisputed that Sonny had, and the Bono Heirs now have, the "*sole* discretion" to appoint a worldwide administrator, including an entity they own, for all publishing royalties, and retain the 10% administration fee. *See* Bono Opp. at 17:13-27. Further, the Bono Heirs are not required to give Cher any portion of the royalties earned under *new* agreements to exploit the sound recording copyrights.

### CONCLUSION

For all the reasons set forth herein and in her opening brief, Representative Mary Bono respectfully asks the Court to grant summary judgment in her favor.

---

[5] One red herring that can be disposed of is that Mary "secretly" terminated the copyrights at issue. It is undisputed that: (a) Randall Wixen and Mary raised the issue of terminations with Cher years before the Notice was filed (UF 28; Cher's UF 100); (b) the Notice is a public document, recorded with the Copyright Office and therefore available to the public online (UF 29); and (c) Mary's attorney informed Cher's attorney about the terminations and their effect in September of 2021 (Cher's UF 33). Cher appears to concede that it is legally irrelevant. *See generally* Cher Opp.

| | |
|---|---|
| | Respectfully submitted, |
| Dated: January 19, 2024 | DONAHUE FITZGERALD LLP |
| | By: */s/ Daniel J. Schacht* |
| | Daniel J. Schacht |
| | Mario M. Choi |
| | Hayley M. Lenahan |
| | *Attorneys for Defendant and Counterclaimant* |
| | MARY BONO |