Peter Anderson, Esq., Cal. Bar No. 88891
    peteranderson@dwt.com
Sean M. Sullivan, Esq., Cal. Bar No. 229104
    seansullivan@dwt.com
Eric H. Lamm, Esq., Cal. Bar No. 324153
    ericlamm@dwt.com
Samuel Turner, Esq., Cal. Bar No. 338089
    samturner@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

Attorneys for Plaintiff and Counterdefendant
CHER, Individually and as
Trustee of The Veritas Trust

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CHER, individually and as Trustee of The Veritas Trust,<br><br>Plaintiff,<br><br>v.<br><br>MARY BONO, individually and as Trustee of the Bono Collection Trust, and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. 2:21-CV-08157 JAK (RAOx)<br><br>PLAINTIFF AND COUNTER-DEFENDANT CHER'S TRIAL BRIEF<br><br>Pretrial Conference (if necessary):<br>    Date: April 21, 2025<br>    Time: 1:30 p.m.<br><br>Trial Date:   April 29, 2025<br><br>Courtroom of the Honorable<br>John A. Kronstadt<br>United States District Judge |

# **TABLE OF CONTENTS**

1. PLAINTIFF'S STATEMENT OF THE CASE ................................................... 1

   (a) The Court's Summary Judgment Ruling ................................................. 1

   (b) The Factual Issues Remaining for Trial at the Time of the Court's MSJ Order ........................................................................................................ 2

   (c) The Factual Issues Identified in the Court's MSJ Order Have Been Resolved ................................................................................................... 3

   (d) Following the Parties' Pretrial Filings, Wixen Advised That It Misstated by Half the Amount of Disputed Royalties It Had Distributed to the Bono Heirs ...................................................................................... 5

2. THE ISSUE TO BE TRIED ........................................................................... 6

3. DEFENDANT LIKELY WILL SEEK TO RELITIGATE ALREADY RESOLVED AND IRRELEVANT LEGAL ISSUES ....................................... 6

   (a) The Court Has Already Found That Plaintiff Has Standing to Obtain Prospective Declaratory Relief With Respect to the Post-July 1, 2022 Disputed Royalties Assigned to Iconic ..................................................... 7

   (b) The Court Has Already Found That Complete Relief Can Be Accorded Without Joining Sonny's Other Heirs Because Defendant Adequately Represents Their Interests ......................................................................... 8

   (c) The Court Need Not, and Should Not, Determine Defendant's "Post-Termination Share of Sonny's U.S. Royalties" ........................................ 9

   (d) It Is Undisputed That the Separate Accounts Include Wixen's Administration Fee .............................................................................. 10

4. ANTICIPATED EVIDENTIARY ISSUES ..................................................... 11

   (a) Defendant's Anticipated Objections to the Actual Amount of Disputed Royalties Distributed to Her Should Be Disregarded .......................... 11

   (b) Defendant's Evidentiary Objections to the Declaration of Daniel Brescoll Lack Merit .......................................................................... 12

      (1) Iconic Was Timely Disclosed ..................................................... 12

      (2) Mr. Brescoll Has Personal Knowledge of the Facts Described in His Declaration ...................................................................... 13

      (3) The Best Evidence Rule Does Not Apply ................................. 13

i

(4)    Mr. Brescoll Is Not Offering "Legal Conclusions" or "Expert Testimony" ................................................................................ 14

(5)    Mr. Brescoll Is Not Speculating or Mischaracterizing the Exhibits Attached to His Declaration .......................................... 15

(c)    Plaintiff's Objections to the Declaration of Jeremy Blietz Should Be Sustained .................................................................................... 15

5.    CONCLUSION ............................................................................................ 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Halicki Films, LLC v. Sanderson Sales & Marketing*,
    547 F.3d 1213 (9th Cir. 2008) ............................................................14

*U.S. v. Condry*,
    574 F. Supp. 3d 979 (N.D. Ok. 2021)................................................13

**Statutes**

17 U.S.C. § 304(c), (c)(6)(E) ...................................................................1

17 U.S.C. § 203(a)(2)(A) ....................................................................9, 10

**Rules**

Fed. R. Civ. Pro. 26(e)(1)(A) ................................................................12

Fed. R. Evid. 1002................................................................................13

Fed. R. Evid. 1003................................................................................13

C.D. Cal. Local Rule 16-10....................................................................1

Pursuant to Local Rule 16-10, plaintiff and counterdefendant Cher ("Plaintiff") respectfully submits the following Trial Brief.

1. **PLAINTIFF'S STATEMENT OF THE CASE**

   (a) **The Court's Summary Judgment Ruling**

Plaintiff filed this action for declaratory relief and breach of contract in October 2021 after learning that defendant and counterclaimant Mary Bono ("Defendant") secretly diverted music royalties that the late Sonny Bono granted in perpetuity to Plaintiff under his and Plaintiff's 1978 Marriage Settlement Agreement ("MSA").

The Copyright Act's Section 304(c) allows for the termination of certain pre-1978 grants of copyright rights and expressly does not affect grants of state law rights. *See* 17 U.S.C. § 304(c), (c)(6)(E). In 2016, Defendant issued a Section 304(c) notice (the "Notice of Termination") directed only to pre-1978 grants to various music publishers. The Notice of Termination was not served on Plaintiff and did not mention the MSA. Nor could it, since the MSA is not a pre-1978 agreement and did not grant copyright rights. Yet, Defendant secretly conspired with third party Wixen Music Publishing, Inc. ("Wixen")—who collects and disburses royalties to Plaintiff and Defendant—to redirect Plaintiff's royalties to Defendant and Sonny's other heirs on the specious basis that the Notice of Termination terminated Plaintiff's right to fifty percent of contingent receipts (the "Disputed Royalties") from U.S. exploitation of musical compositions owned or controlled, in whole or in part, by Sonny Bono.

In its May 29, 2024, Order, the Court granted summary judgment in favor of Plaintiff in full on her first claim for declaratory relief and as to liability on her second claim for breach of contract. The Court held that the Notice of Termination did not terminate and could not have terminated Plaintiff's right to the Disputed Royalties,

///
///
///
///

1

and that Defendant breached the MSA by diverting Plaintiff's Disputed Royalties. *See* Doc. 107 ("MSJ Order") at 10-12.[1]

The Court also ruled on Defendant's affirmative defenses as a matter of law. First, the Court held that Sonny's other heirs are not necessary parties, including because Defendant adequately represents their interests in this litigation. *See id.* at 8. Second, the Court held that Plaintiff's assignment to Iconic Cher, LLC ("Iconic") of certain assets, including her right to Disputed Royalties due and payable on or after July 1, 2022, did not deprive Plaintiff of standing or moot her claim for prospective declaratory relief. *See id.* at 5-6.

The Court also adjudicated Defendant's first counterclaim for declaratory relief and, in doing so, agreed with Plaintiff that Plaintiff retains her approval rights under the MSA. Finally, the Court granted summary judgment to Plaintiff on Defendant's second counterclaim. *See id.* at 13-15.

**(b)** **The Factual Issues Remaining for Trial at the Time of the Court's MSJ Order**

As background, Plaintiff's Motion for Summary Judgment sought two separate amounts as damages on her second claim for Defendant's breach of contract: (1) the Disputed Royalties that Wixen secretly paid to Defendant by February 2022, plus (2) the Disputed Royalties that Wixen thereafter deposited into separate bank accounts (the "Separate Accounts") pending the final resolution of this action.

As for the Disputed Royalties that Wixen secretly paid to Defendant, Wixen represented and warranted, in its 2022 agreement to deposit Disputed Royalties into

---

[1]    The MSJ Order uses the term "Composition Royalties" to refer to all royalties within paragraph 10(d) of the MSA. *See* MSJ Order at 2, 12. For clarity, Plaintiff's pretrial filings and this Trial Brief use the term "Disputed Royalties" specifically to refer to *Plaintiff's fifty percent* of the Composition Royalties, which fifty percent was granted to her in Paragraph 10(d) of the MSA. The MSJ Order also refers to "Record Royalties," *i.e.*, the royalties granted to Cher under Paragraphs 10(a)-(c) of the MSA. The parties agree that Plaintiff's right to the Record Royalties was not terminated.

the Separate Accounts, that up to that date, it had distributed $187,534.91 to Sonny's heirs. Because Defendant had directed Wixen to pay fifty percent of the Disputed Royalties to Defendant herself, Wixen's representation and warranty led to the conclusion that Defendant received half that amount, or $93,767.46. *See* Pltf's Stmt. of Uncontroverted Facts (Doc. 92-1) ¶¶ 57-59.

As for the Disputed Royalties that Wixen deposited into the Separate Accounts, the Court's MSJ Order identified two factual issues remaining for trial:

> (1) Whether the amounts held in the Separate Accounts "reflect[] Wixen's deduction of its 10% administration fee"; and

> (2) Whether "Plaintiff is entitled to the share of the Composition Royalties due under the MSA after July 1, 2022, *i.e.*, the royalty rights assigned to [Iconic]," which "turns on the provisions of the General Assignment…."

MSJ Order at 12.

## (c)   **The Factual Issues Identified in the Court's MSJ Order Have Been Resolved**

After the Court's MSJ Order, the following developments rendered the two factual issues identified above undisputed and/or moot.

*First*. Plaintiff advised that she no longer sought the amount of Disputed Royalties held in the Separate Accounts as part of her damages on her breach of contract claim. That is because the Court's grant of summary judgment in full as to Plaintiff's declaratory relief claim establishes that neither Defendant nor Sonny's other heirs have any right to the Disputed Royalties, and the Disputed Royalties in the Separate Accounts must therefore be released to Plaintiff. Thus, to also seek as damages those Disputed Royalties on her breach of contract claim would be a double recovery. Accordingly, Plaintiff seeks as an award of damages on her breach of contract claim only the amount of Disputed Royalties that Wixen paid to Defendant

///

3

1    rather than those deposited in the Separate Accounts.  *See* <u>Pltf's Memo. of Contentions</u>
2    <u>of Fact and Law (Doc. 147) at 9:19-10:3</u>.

3        *Second*.  The parties determined that the amounts held in the Separate Accounts
4    do include Wixen's ten percent administration fee.  *See* <u>Proposed Final Pretrial</u>
5    <u>Conference Order (Doc. 146) at 3:1-3</u>.

6        *Third*.  Plaintiff has produced the General Assignment and Asset Purchase
7    Agreement governing Plaintiff's assignment to Iconic, with redactions only as to
8    irrelevant and confidential material as expressly permitted by Magistrate Judge Oliver
9    (*see* Docs. <u>138</u>, <u>139</u>).  Those documents provide that although Iconic is the owner of
10   the post-July 1, 2022, Disputed Royalties, Iconic and Plaintiff agreed that Plaintiff
11   would continue to seek recovery of all Disputed Royalties, including the post-July 1,
12   2022, Disputed Royalties, in this action.  Under their agreement, Plaintiff will then
13   pay Iconic its share of Disputed Royalties that Wixen releases to Plaintiff after the
14   final resolution of this action, and the purchase price Plaintiff receives for her
15   assignment will be adjusted depending on the amount of Disputed Royalties that
16   Plaintiff recovers in this action.  *See* <u>Brescoll Decl. (Doc. 149) at 1-2 ¶¶ 5-8</u>; *id.* <u>Ex.</u>
17   <u>101 (Doc. 149-1)</u>.  Additionally, Iconic separately confirmed in writing to the parties
18   that Iconic consents to the release of the Disputed Royalties in the Separate Accounts
19   to Plaintiff after final judgment is entered, with Plaintiff to pay to Iconic its share of
20   those Disputed Royalties.  *See* <u>Brescoll Decl. (Doc. 149) at 2 ¶ 9</u>; *id.* <u>Ex. 103 (Doc.</u>
21   <u>149-3)</u>.

22       Together, these documents confirm that:

23   •    Plaintiff did not assign and continues to own all Disputed
24        Royalties due and payable before July 1, 2022, including (a)
25        those distributed to Defendant and (b) the portion of Disputed
26        Royalties in the Separate Accounts due and payable before that
27        date;

28   ///

4

- Plaintiff has Iconic's written consent to seek all Disputed Royalties in the Separate Accounts, including those due and payable on or after July 1, 2022, with Plaintiff then paying Iconic its share; and

- As the Court has already recognized (*see* <u>MSJ Order at 6</u>), Plaintiff maintains a sufficient interest in her prospective declaratory relief (*i.e.*, with respect to future Disputed Royalties assigned to Iconic and held in the Separate Accounts), including because the requested declaratory relief affects the value what Plaintiff assigned to Iconic and what Plaintiff receives in exchange.

Accordingly, at the time of the parties' initial pretrial filings on March 17, 2025, no factual issues remained for trial. *See* <u>Proposed Final Pretrial Conference Order (Doc. 146) at 7 § 8</u> ("the parties agree that there are no remaining triable issues of fact").

**(d)**    <u>**Following the Parties' Pretrial Filings, Wixen Advised That It Misstated by Half the Amount of Disputed Royalties It Had Distributed to the Bono Heirs**</u>

On March 20, 2025, Wixen's counsel advised the parties' counsel that, supposedly due to a misunderstanding, Wixen had understated by half the amount of Disputed Royalties it distributed to the Bono heirs before opening the Separate Accounts. Wixen's counsel revealed that Wixen distributed $375,068.91 in Disputed Royalties to the heirs, of which $187,534.91 was distributed to Defendant. *See* Anderson Decl. at 1-2 ¶¶ 3-4, Exs. 109, 110. Accordingly, ***the amount of damages to be awarded to Plaintiff on her breach of contract claim is not $93,767.46, but instead $187,534.91 (plus prejudgment interest)***. Notably, Defendant never disclosed that she had received more Disputed Royalties than Wixen initially represented.

5

Following receipt of this information, Plaintiff asked Defendant to submit an amended Proposed Final Pretrial Conference Order that did nothing more than identify the correct amount of Disputed Royalties distributed to Defendant by February 2022.  On April 14, 2025, Defendant provided a substantially revised draft of the amended Proposed Final Pretrial Conference Order in which Defendant backtracked on her prior positions, added pages of argument, claimed that Plaintiff is "estopped" from seeking to correct Wixen's admitted error, and advised that she intends to file yet another Motion *in Limine* on the issue.  Anderson Decl. 2-3 ¶¶ 5-10.  As discussed below, Defendant's arguments are nonsensical.  *See below* at 11-12.

## 2.  <u>THE ISSUE TO BE TRIED</u>

As discussed above, the two factual questions raised in the Court's MSJ Order are no longer at issue.  Instead, the sole remaining issue for trial is whether Plaintiff should be awarded $187,534.91 in Disputed Royalties (plus prejudgment interest), in accordance with Wixen's recent disclosure, rather than the $93,767.46 figure based on Wixen's now-recanted representation and warranty.

## 3.  <u>DEFENDANT LIKELY WILL SEEK TO RELITIGATE ALREADY RESOLVED AND IRRELEVANT LEGAL ISSUES</u>

Before Wixen's recent disclosure of the true amount of Disputed Royalties that it paid to Defendant, Defendant had conceded that there are no factual disputes remaining for trial.  *See* <u>Def's Memorandum of Contentions of Fact and Law (Doc. 142) at 2</u>.  However, setting that issue aside, Defendant claims that certain "legal issues" remain to be decided before the Disputed Royalties in the Separate Accounts can be released to Plaintiff.  <u>Proposed Final Pretrial Conference Order (Doc. 146) at 5</u>.  These "legal issues" were either already adjudicated in the Court's MSJ Order or are otherwise moot or irrelevant.

///

///

///

6

(a)    **The Court Has Already Found That Plaintiff Has Standing to Obtain Prospective Declaratory Relief With Respect to the Post-July 1, 2022 Disputed Royalties Assigned to Iconic**

Defendant argues that Plaintiff's requested declaratory relief cannot result in Iconic's portion of Disputed Royalties in the Separate Accounts—*i.e.*, those due and payable on or after July 1, 2022—being released to Plaintiff because the "issue should be decided between [Defendant and Iconic]." Proposed Final Pretrial Conference Order (Doc. 146) at 5-6.

First, Defendant is simply repeating the same "standing" argument that she made at the summary judgment stage. *See* Def's Memo. iso Opp. to Pltf's MSJ (Doc. 86) at 8 ("[W]hile Cher may have standing as it concerns the breach of the MSA for the pre-July 1, 2022 royalties, it cannot be readily disputed that Cher lost standing to pursue her declaratory judgment claim as well as any claim that concerns post-June 30, 2022 royalties."). And the Court properly rejected that argument, finding that Plaintiff has standing to pursue prospective declaratory relief, and her claim is not moot, including because:

Defendant has not proffered evidence showing that the requested declaration would not operate prospectively to affect the validity of Plaintiff's General Assignment of her rights under the MSA, just as it would have affected the validity of her rights before the sale.

MSJ Order at 6.

Second, Iconic authorized Plaintiff—both in the Asset Purchase Agreement and in Iconic's letter to counsel—to continue pursuing all Disputed Royalties, including Iconic's portion of the Disputed Royalties, and to pay Iconic its share upon the completion of this litigation. *See above* at 4-5; Brescoll Decl. (Doc. 149) at 2 ¶ 6 ("The Asset Purchase Agreement expressly contemplates that, even after her assignment, [Plaintiff] will continue to pursue in this action … all of the … Disputed Royalties, including the portion assigned to [Iconic]"); *id.* Ex. 101 (Doc. 149-1) (Asset

7

Purchase Agreement) § 2.5(c) (holdback provision); *id.* § 7.1 (permitting Plaintiff to settle the MSA Action); *id.* Ex. 103 (Doc. 149-3). Indeed, Plaintiff maintains a significant interest in obtaining Iconic's Disputed Royalties because if Defendant were to reduce Plaintiff's recovery, that would reduce the purchase price Plaintiff receives from Iconic. *See* Brescoll Decl. (Doc. 149) at 2 ¶ 6; *id.* Ex. 101 (Doc. 149-1) § 2.5(c). It would also result in *Defendant* receiving royalties that the Court has already found belong to Plaintiff and her successors and assigns, not Defendant.

Accordingly, the Court's grant of Plaintiff's requested declaratory relief entitles Plaintiff—as authorized by Iconic—to all Disputed Royalties in the Separate Accounts, with Plaintiff to pay Iconic the post-July 1, 2022, Disputed Royalties she receives pursuant to the parties' agreements.

**(b)** **The Court Has Already Found That Complete Relief Can Be Accorded Without Joining Sonny's Other Heirs Because Defendant Adequately Represents Their Interests**

Defendant argues that the Court's MSJ Order cannot result in the Disputed Royalties in the Separate Accounts being released to Plaintiff because, if Defendant were correct that the Notice of Termination terminated Plaintiff's MSA rights, some of the Disputed Royalties would instead be paid to Sonny's other heirs. Proposed Final Pretrial Conference Order (Doc. 146) at 6. Once again, Defendant made that argument at summary judgment and, once again, the Court properly rejected it. *Compare* Def's Memo. iso MSJ (Doc. 64-1) at 9-10 *with* MSJ Order at 6-8.

Indeed, the Court held that "complete relief can be accorded" without joining Sonny's other heirs because, even though the other heirs "have a legally protected interest in the matters at issue," the other heirs' interest is "adequately represented by Defendant in the litigation." MSJ Order at 7-8. And as the Court recognized, it is telling that Sonny's other heirs "are aware of this action" yet "have not sought to intervene … or bring a separate one against Plaintiff." *Id.* at 8. Instead, they agreed
///

to deposit the Disputed Royalties in the Escrow Accounts "to be disbursed to the appropriate party upon resolution of the litigation." *Id.* (quoting Doc. 64-33 at 2.).

The Court then went on to grant Plaintiff's first claim for declaratory relief *in full* on the grounds that the Notice of Termination, served by Defendant *and Sonny's other heirs*, did not affect Plaintiff's rights. *See id.* at 10-12. That ruling necessarily establishes that Plaintiff and Iconic—not Defendant or Sonny's other heirs—are entitled to the Disputed Royalties.

**(c)** **The Court Need Not, and Should Not, Determine Defendant's "Post-Termination Share of Sonny's U.S. Royalties"**

Defendant also requests that the Court determine what portion of *Sonny's* half of the total post-termination Composition Royalties belongs to Defendant. *See* Proposed Final Pretrial Conference Order (Doc. 146) at 6-7; Def's Memo. of Contentions of Fact and Law (Doc. 142) at 3. The Court cannot, and should not, decide this issue because Defendant never sought that relief in her counterclaims (which have already been adjudicated), and the issue is not presently before the Court. *See* Def's Answer (Doc. 47) at 27-28 (prayer for relief); MSJ Order at 13-15 (ruling on defendant's counterclaims); Proposed Final Pretrial Conference Order (Doc. 146) at 7:20-23.

Defendant instead attempts to shoehorn this issue into Plaintiff's claims by arguing that Plaintiff is seeking an "award [of] Defendant's share of the royalties." Def's Memo. of Contentions of Fact and Law (Doc. 142) at 3. Not so. Under the MSA, Plaintiff and Sonny Bono each received a right to fifty percent of the Composition Royalties, after certain administration fees and other deductions.[2] *See* Cher Decl. Ex. 1 (Doc. 150-1) at 5-8 ¶ 10(d). When Sonny Bono died, *Sonny's* fifty percent interest was split as a matter of probate law among Defendant and Sonny's

---

[2] During his lifetime, Sonny Bono himself served as the royalty administrator and accordingly kept the administration fee himself. *See* Def's Stmt. of Genuine Disputes (Doc 87) at 52 ¶ 122.

other heirs.  Under the California Probate Code, Defendant initially received a 1/3 interest in Sonny's fifty-percent share of the royalties.  *See* <u>Def's Statement of Genuine Disputes (Doc. 87) ¶ 129</u>.  Under Section 203(a)(2)(A) of the Copyright Act, however, Defendant receives a 1/2 interest in Sonny's fifty percent share of the royalties once the copyright terminations become effective, with Sonny's children receiving equal shares of the remaining fifty percent of Sonny's fifty percent.  *See* <u>17 U.S.C. § 203(a)(2)(A)</u> ("Where an author is dead, his or her termination interest is owned" by "[t]he widow … unless there are any surviving children or grandchildren of the author, in which case the widow … owns one-half of the author's interest."); <u>Def's Stmt. of Genuine Disputes (Doc. 87) ¶ 66</u>.

However, what portion Defendant owns of Sonny's fifty-percent interest is irrelevant to Plaintiff's claims because the Disputed Royalties at issue in this case are ***Plaintiff's fifty-percent of the Composition Royalties, not Sonny's fifty-percent of the Composition Royalties***.  Put differently, the Disputed Royalties in the Separate Accounts are only half (approximately) of the total Composition Royalties paid during that period; the other half of the Composition Royalties paid during that period have already been distributed to Defendant and Sonny's other heirs.  Nothing requires the Court to determine how the one-half of Composition Royalties already distributed to Defendant and Sonny's other heirs should be divided amongst them.

**(d)**    <u>**It Is Undisputed That the Separate Accounts Include Wixen's Administration Fee**</u>

Finally, Defendant argues that the Court must determine whether the Separate Accounts include Wixen's ten percent administration fee.  *See* <u>Proposed Final Pretrial Conference Order (Doc. 146) at 7</u>.  But Defendant has already admitted that the Separate Accounts *do* include that fee.  *See* <u>*id.*</u> <u>at 3</u>.

Therefore, there are no remaining "legal issues" preventing entry of judgment.

///

///

10

## 4.    **ANTICIPATED EVIDENTIARY ISSUES**

**(a)    Defendant's Anticipated Objections to the Actual Amount of Disputed Royalties Distributed to Her Should Be Disregarded**

Defendant has advised that she will seek to prevent Plaintiff from using at trial Wixen's representations in which it corrects the amount of Disputed Royalties it distributed to Defendant. *See* Anderson Decl. Exs. 109, 110. There is no legal basis to bar Plaintiff from relying on Wixen's corrections or recovering the correct amount of damages at trial.

Defendant has not identified any basis on which she could dispute Wixen's recent correction that, by February 2022, Defendant had received $187,534.91 in Disputed Royalties. Instead, Defendant apparently intends to argue that Plaintiff could have discovered the truth earlier. As explained above, Plaintiff previously believed that $187,534.91 in Disputed Royalties had been paid to *all of* Sonny's heirs (rather than Defendant herself) based on an earlier written representation by Wixen. *See above* at 2-3. While Plaintiff would be justified in relying on that representation alone, Plaintiff went further; she also sought confirmation of this figure in the depositions of both Randall Wixen and Defendant herself. *See* Anderson Decl. iso MSJ Ex. 35 (Doc. 65-42) at 144:2-5 ("Q. Do you have any reason to doubt that Wixen paid $187,535 of the Cher portion of the royalties to you and to the children? [Defendant:] I have no reason."); *id.* Ex. 37 (Doc. 65-44) at 167:22-168:2 ("Q. There was, however, a sum of money, approximately $187,000, that Wixen paid to Ms. Bono and others in reliance on the assumption, belief or instruction … not to pay Cher; is that correct? [Mr. Wixen:] Yes."). Furthermore, Plaintiff cannot reasonably have been required to additionally comb through complex royalty statements to double check the accuracy of Wixen's, Mr. Wixen's, and Defendant's representations.

Indeed, Defendant herself is in a much better position than Plaintiff to determine the amount of Disputed Royalties that *Defendant herself received* from ///

1  Wixen.  Her failure to disclose the actual amount she received strongly suggests
2  intentional or at least reckless disregard for the truth.

3      Defendant's failure is not a bar to Plaintiff introducing at trial evidence of the
4  true amount of Plaintiff's royalties that Defendant took.

5      **(b)   Defendant's Evidentiary Objections to the Declaration of Daniel**
6           **Brescoll Lack Merit**

7      Defendant has filed Objections (Doc. 154) to the Declaration of Daniel
8  Brescoll, who serves as Senior Vice President, Business & Legal Affairs of Iconic
9  Artist's Group ("IAG"), the owner and parent entity of Iconic.  *See* Brescoll Decl.
10 (Doc. 149) at 1 ¶ 2.  Defendant's objections should be overruled.

11          **(1)   Iconic Was Timely Disclosed**

12     Defendant first objects that Mr. Brescoll and IAG were not disclosed in
13 Plaintiff's Initial Disclosures and Plaintiff did not serve supplemental disclosures.  Mr.
14 Brescoll and IAG were not listed in Plaintiff's Initial Disclosures because when the
15 parties served their initial disclosures in August 2022, Plaintiff had not yet agreed to
16 assign any rights or interests to Iconic.  *See* Schacht Decl. iso Mot. *In Limine*, Ex. E
17 (Doc. 119-6) (Plaintiff's Initial Disclosures Dated August 26, 2022); Brescoll Decl.
18 Ex. 101 (Doc. 149-1) (Asset Purchase Agreement dated December 9, 2022).
19 However, after Plaintiff and Iconic entered their agreement, and during discovery in
20 this action, Plaintiff identified Iconic and the assignment of Plaintiff's royalties in her
21 discovery responses.  *See* Schacht Decl. iso Mot. *In Limine*, Ex. A (Doc. 119-2)
22 (Plaintiff's Interrogatory Responses); Ex. B (Doc. 119-3 at 6) (Plaintiff's Resp. to
23 Requests for Production).  Plaintiff also produced a redacted copy of the General
24 Assignment during discovery, which specifically identifies Iconic.  *Id.* Ex. C (Doc.
25 119-4) (General Assignment).

26     Rule 26(e) provides that disclosures must be supplemented only "if the
27 additional … information has not otherwise been made known to the other parties
28 during the discovery process or in writing."  Fed. R. Civ. Pro. 26(e)(1)(A).  As shown

above, Plaintiff timely provided substantial information regarding Plaintiff's assignment to Iconic and IAG during the discovery process and in writing. Plaintiff accordingly was not required to serve supplemental disclosures with this information.

Furthermore, Defendant failed to take any deposition of an Iconic witness during discovery, or even during the period after discovery in which the Court permitted Defendant to depose an Iconic witness. *See* Order (Doc. 122); *see also* Order Setting Second Amended Pretrial Deadlines (Doc. 129) (setting extended deadline "for completion of depositions related to Iconic Cher, LLC agreements"). Plaintiff should not be penalized for Defendant's failure to pursue that discovery.

### (2) Mr. Brescoll Has Personal Knowledge of the Facts Described in His Declaration

Defendant objects to Mr. Brescoll's description of certain provisions of the Asset Purchase Agreement and General Assignment on the purported grounds that Mr. Brescoll "lacks personal knowledge." *See* Def's Objections (Doc. 154) at 5-8. However, Mr. Brescoll expressly avers that he has "personal knowledge" of the facts stated in his Declaration, and moreover, he has explained the basis for his personal knowledge—he is a Senior Vice President of Business & Legal Affairs at IAG, Iconic's parent company. Brescoll Decl. (Doc. 149) at 2 ¶¶ 1-2; *see also* Brescoll Decl. iso Opp. to Mot. to Compel (Doc. 133-1) at 1 ¶¶ 1-5 (explaining IAG's relationship with Iconic and role in the sale with Plaintiff). Defendant's objection should accordingly be overruled.

### (3) The Best Evidence Rule Does Not Apply

Defendant further argues that Mr. Brescoll's descriptions of the Asset Purchase Agreement, General Assignment, and other documents attached to the Declaration violates the best evidence rule. *See* Def's Objections (Doc. 154) at 5-8. But the best evidence rule applies only where a party seeks to prove the contents of a document and the original or duplicate of the original of that document is *not* in evidence. *See* Fed. R. Evid. 1002; *U.S. v. Condry*, 574 F. Supp. 3d 979, 981 (N.D. Ok. 2021) ("Rule

1002's meaning is plain as day: it demands that courts exclude secondary evidence of an original's contents *unless the original is in evidence*.") (emphasis added); *see also* Fed. R. Evid. 1003 ("A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."). Here, the writings described in Mr. Brescoll's Declaration are *attached* to his Declaration, and originals or duplicates of those documents will also be offered at trial. The best evidence rule therefore does not apply.

### (4)    Mr. Brescoll Is Not Offering "Legal Conclusions" or "Expert Testimony"

Defendant also argues that Mr. Brescoll is offering "legal conclusion[s]" and "improper expert testimony" by offering an "interpretation of contractual provisions." *See* Def's Objections (Doc. 154) at 3, 5-8. But Mr. Brescoll is merely summarizing the provisions of the agreements attached to his Declaration, which are clear and unambiguous, and he is not offering any particular interpretation of them that Defendant disputes. *See* Brescoll Decl. at 1-2 ¶¶ 5-8. Furthermore, extrinsic evidence of the parties' interpretation of a contract, including testimony from a party, is admissible in interpreting contracts governed by California law. *See, e.g.*, *Halicki Films, LLC v. Sanderson Sales & Marketing*, 547 F.3d 1213, 1223 (9th Cir. 2008) ("Where parties dispute the meaning of contractual language, 'the first question to be decided is whether the disputed language is "reasonably susceptible" to the interpretation urged by the party'" and "[w]hen deciding this question, 'the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning....'"); *Id.* at 1217, 1223 (district court erred in refusing to consider party declarations in interpreting contract). Moreover, Mr. Brescoll is testifying based on personal knowledge and in no way offering an expert opinion regarding the terms of any contract.

14

**(5)**      **Mr. Brescoll Is Not Speculating or Mischaracterizing the Exhibits Attached to His Declaration**

Finally, Defendant vaguely argues that Mr. Brescoll's Declaration contains "[s]peculation and mischaracterization of evidence as it pertains to the purported connection between [the] 'MSA Action[,]' 'MSA Disputed Royalties[,]' and 'MSA Holdback[.]'" *See* Def's Objections (Doc. 154) at 6-8. But it is impossible to determine what in Mr. Brescoll's Declaration Defendant is objecting to: The objection is made against every statement in paragraphs five through nine of the Declaration, and the term "MSA Holdback" does not appear in Mr. Brescoll's Declaration. *See* Brescoll Decl. (Doc. 149).

In any event, the specific citations in Mr. Brescoll's Declaration confirm that he is not mischaracterizing the terms of Plaintiff's and Iconic's Agreements. For example, the term "MSA Action" is clearly defined as this lawsuit. *See* Brescoll Decl. Ex. 101 (Doc. 149-1) at 41 (definition of MSA Action"). The term "MSA Disputed Royalties" is clearly defined as the Disputed Royalties at issue in this lawsuit. *See id.* (definition of MSA Disputed Royalties). And to the extent Defendant is referring to the "MSA Holdback Amount," Section 2.5(c) of the Asset Purchase Agreement clearly shows that "if [Plaintiff] receives the MSA Disputed Royalties in full after this action, the MSA Holdback Amount will be paid to [Plaintiff] in full," and if Plaintiff "receives a different amount, the MSA Holdback Amount will be adjusted proportionately." Brescoll Decl. (Doc. 149) at 2 ¶ 6; *id.* Ex. 101 (Doc. 149-1) at 4 ¶ 2.5(c); *see above* at 4-5.

Defendant's Objections should accordingly be overruled.

**(c)**      **Plaintiff's Objections to the Declaration of Jeremy Blietz Should Be Sustained**

Defendant has filed a trial declaration of Jeremy Blietz, the purported custodian of records for Warner Chappel Music, Inc. f/k/a Warner/Chappel Music, Inc. and Cotillion Music, Inc. (together, "WCM"). *See* Blietz Decl. (Doc. 141). That

15

Declaration and accompanying exhibits should not be admitted into evidence because they are not relevant to the remaining issue left for trial in this action, and Defendant did not timely disclose Mr. Blietz's testimony. *See* Pltf's Objections (Doc. 153).

First, while none of Defendant's pretrial filings explain why she believes WCM or Mr. Blietz are relevant to the trial, it appears that Defendant is offering them to prove the amount of what Defendant calls the "Publisher Share"—*i.e.*, the amount of Composition Royalties that was paid to music publishers before being distributed to Plaintiff and Sonny Bono (during his life). *See* Blietz Decl. (Doc. 141) ¶ 4. Defendant apparently suggests that amount is relevant to her request that the Court determine the portion of *Sonny Bono's* Composition Royalties (*i.e.*, not the Disputed Royalties) that Defendant owns post-termination. *See* Proposed Pretrial Conference Order (Doc. 146) at 7:3-8. As discussed above, the Court need not, and should not, decide that issue. *See above* at 9-10. Indeed, Defendant even acknowledges that the "Publisher Share" is not relevant unless the Court reverses its own decision and finds that Sonny's other heirs are necessary parties. *See* Proposed Pretrial Conference Order (Doc. 146) at 7:9-12 ("If the Court agrees with Defendant that Plaintiff is not entitled to a judgment against Sonny's children (or their royalties), then whether Defendant has one-third, one-half, or a combination of the two, of the total royalties is relevant.").

Second, Defendant did not identify WCM as a witness likely to have discoverable information in her Initial Disclosures, nor did she serve any supplemental disclosures. And unlike in the case of Iconic discussed above, WCM is not a party that became relevant to this action due to facts that did not exist until after initial disclosures were served. *See above* at 12-13. Indeed, Defendant offers WCM to prove the amount of the Publisher Share that was paid years before this litigation even began.

For these reasons, Mr. Blietz's Declaration and the attached exhibits should be excluded from trial.

///

///

16

5. **CONCLUSION**

The only issue remaining for trial is the damages to be awarded on account of Plaintiff's breach of contract claim. That issue is simple and will be established through, among other things, testimony from Wixen that the appropriate amount to award is $187,534.91, plus prejudgment interest. Judgment should be entered thereafter so that Plaintiff can seek release of the remaining Disputed Royalties held in the Separate Accounts in accordance with Plaintiff's requested Declaratory Relief.

Dated: April 14, 2025                       /s/ Peter Anderson, Esq.
_____
Peter Anderson, Esq.
Sean M. Sullivan, Esq.
Eric H. Lamm, Esq.
Samuel Turner, Esq.
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiff
and Counterdefendant
CHER
Individually and as Trustee of
The Veritas Trust

1

## **CERTIFICATE OF COMPLIANCE**

2         The undersigned, counsel of record for the plaintiff and counterdefendant,

3  certifies that this Memorandum contains 5,021 words, which complies with the word

4  limit of L.R. 11-6.1.

5

6  Dated: April 14, 2025                       /s/ Peter Anderson, Esq.

7                                       Peter Anderson, Esq.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28